**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| KATERRA INC., *et al.*,[1] | ) |
| | ) Case No. 21-31861 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF**
**AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION**
**WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE**
**EXPENSES, AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

> **Emergency relief has been requested. A hearing will be conducted on this matter on June 7, 2021 at 3:30 pm (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**
>
> **You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than June 7, 2021.**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk/katerra.  The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto, authorizing the Debtors to:  (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      Katerra Inc., together with its Debtor and non-Debtor subsidiaries ("Katerra"), is a technology-driven construction company that develops, manufactures, and markets products and services in the commercial and residential construction spaces.  Katerra delivers a comprehensive suite of products and services for its clients through a distinct model that combines end-to-end integration with significant investment in technological and design innovation.  Katerra offers

services to its clients through three distinct offerings: (a) end-to-end new build; (b) construction services; and (c) renovations. Katerra has approximately 6,400 employees who are primarily located in nine countries. In the year ending 2020, Katerra's operations generated revenue of approximately $1.75 billion.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] and in the *Declaration of Matthew R. Niemann in Support of (A) DIP Financing and (B) All First Day Relief* filed contemporaneously with this Motion and incorporated by reference herein. As described in more detail in the First Day Declaration, the Debtors commenced these chapter 11 cases in the face of a liquidity crisis and with the goal of facilitating a marketing and sale process for their assets to maximize value and creditor recoveries.

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[2]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in this Motion or the First Day Declaration, as applicable.

## The Debtors' Workforce

8.      As of the Petition Date, the Debtors directly and indirectly employ a workforce of approximately 500 individuals (the "Employees") spread across 33 legal entities.  Of the approximately 500 Employees, 50 Employees are compensated on a weekly basis, while approximately 450 Employees are paid on a semi-monthly basis.  The Employees perform a wide variety of corporate and other job functions—including engineering, design, manufacturing, fabrication, health and safety oversight, construction, and project management—that are critical to the Debtors' business operations and the administration of these chapter 11 cases.  In many instances, the Employees are skilled personnel intimately familiar with the Debtors' processes, projects, and systems, many of which are highly technical and require unique training and experience.  Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maintain and administer their estates will be materially impaired.

9.      In addition to the Employees, the Debtors retain specialized individuals on a temporary or a project basis, including independent contractors and labor subcontractors (collectively, the "Independent Contractors") to complete discrete projects and fulfill duties similar to the job functions listed above.  During the first quarter of 2021, the Debtors retained approximately 400 Independent Contractors across all business segments.

10.      The Employees and Independent Contractors could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits.

## Employee Compensation and Benefits

11.      The Debtors seek authority to:  (a) pay and honor certain prepetition claims, if any, relating to, among other things, Wage Obligations, Unpaid Independent Contractor Obligations, Commission Plan, Incentive Plans, Withholding Obligations and Deductions,  Payroll Taxes,

Wage and Benefit Service Providers, Reimbursable Expenses, Health and Welfare Coverage and Benefits, Workers' Compensation Claims, Defined Contribution Plans, Paid Vacation Benefits, Paid Leave Benefits, Additional Benefit Programs and certain other benefits that the Debtors provide in the ordinary course (each as defined below, and collectively, the "Employee Compensation and Benefits"); and (b) pay all costs related to or on account of the Employee Compensation and Benefits.

12.    Subject to Court approval, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits, and to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

## I.    Compensation, Withholding, and Expense Reimbursement.

### A.    Wage Obligations.

13.    In the ordinary course, the Debtors incur obligations to their Employees for base salary and wages (the "Wage Obligations").  The Debtors process payroll for their Employees either weekly or semi-monthly.

14.    As of the Petition Date, the Debtors estimate that they owe approximately $2.1 million on account of accrued but unpaid Wage Obligations (the "Unpaid Compensation"). For the avoidance of doubt, as of the Petition Date, the Debtors do not believe that they owe Unpaid Compensation to any Employee in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  The Debtors request authority to pay all outstanding amounts of Unpaid Compensation.

**B.     Independent Contractors.**

15.     The Debtors retain Independent Contractors either directly, or indirectly through external staffing agencies and labor sub-contractors (the "Staffing Agencies"), and pay them either directly or through the Staffing Agencies.  The Employees and the Independent Contractors work side by side with respect to all of the Debtors' business operations, as described above.  As of the Petition Date, the Debtors estimate that Independent Contractors are owed approximately $1.8 million (the "Unpaid Independent Contactor Obligations") on account of services rendered and reimbursable expenses.

16.     The Debtors believe the authority to pay Unpaid Independent Contractor Obligations and continue paying their Independent Contractors is critical to maintaining and administering their estates.  The Debtors seek authority to continue to pay Unpaid Independent Contractor Obligations incurred on account of the Independent Contractors and to continue to make payments on these obligations in the ordinary course of business on a postpetition basis.

**C.     Commission Plan.**

17.     The Debtors maintain a commission-based sales incentive program (the "Commission Plan").  The commissions are paid out on a monthly or quarterly basis and are based on a percentage of revenue generated on home renovation sales.  Approximately $250,000 in commission bonuses were paid to 10 non-insider Employees during the first quarter of 2021.  As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the Commission Plan.  Out of an abundance of caution, the Debtors seek authority to honor all fully earned obligations under the Commission Plan in the ordinary course of business and on a postpetition basis.

### D.      Incentive Plans.[3]

18.      The Debtors maintain several incentive plans to motivate, reward, and retain certain of their non-insider Employees and Independent Contractors as an additional component of overall compensation (each as defined herein and collectively, the "Incentive Plans").   The Debtors believe the Incentive Plans drive employee performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

19.      In addition, the Debtors' maintain a short term incentive plan, a spot bonus program on an ad hoc basis, and project specific incentive programs (the "Short Term Incentive Plans"). The amounts payable on account of the Short Term Incentive Plans are initially based on team or group performance and then distributed to Employees based on individual performance.   Spot bonuses generally require senior management approval and are given only to non-insider Employees in amounts less than $3,000.   The Debtors also maintain a project specific Short Term Incentive Plan, under which Employees are compensated by either participation or project completion.   Employees must be actively employed by the Debtors at the time of project completion in order to be eligible to be paid under the Short Term Incentive Plans.   Approximately 30 non-insider Employees were paid approximately $150,000 in the aggregate under the Short Term Incentive Plans during the first quarter of 2021.   The next payments under the Short Term Incentive Plans are scheduled to be paid during the second quarter of 2021, for which the Debtors estimate approximately $100,000 in payments could be earned by Employees.   The Debtors seek

---

[3]      The relief sought under this Motion with respect to the Incentive Plans (as defined herein) does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders").   The Debtors shall not make any bonus, incentive, or severance payments to any Insiders without further order of this Court.

authority to pay prepetition amounts on account of the Short Term Incentive Plans and to continue the Short Term Incentive Plans on a postpetition basis in the ordinary course of business.

20.     The Debtors also maintain retention bonus programs for non-insider Employees (the "Non-Insider Retention Bonus Programs").  The Non-Insider Retention Bonus Programs have been implemented to retain specific key personnel.  These Employees work in the technology, marketing, human resources, legal, finance, and project management departments and are crucial to the Debtors' operations.  As of the Petition Date, the Debtors estimate approximately $120,000 is owed to employees on account of the Non-Insider Retention Bonus Programs.  The Debtors estimate that the total amount that will come due under the Non-Insider Retention Bonus Programs after the Petition Date and during the pendency of these chapter 11 cases is approximately $54,000. Out of an abundance of caution, the Debtors seek authority to pay prepetition amounts on account of the Non-Insider Retention Bonus Programs and to continue the Non-Insider Retention Bonus Programs on a postpetition basis in the ordinary course of business.

21.     The Debtors have made approximately $200,000 in total payments under the Incentive Plans during the first quarter of 2021.  As of the Petition Date, the Debtors estimate that they owe $120,000 in prepetition amounts on account of the Incentive Plans.  To safeguard employee morale and optimize performance during these chapter 11 cases, the Debtors seek authority to honor all fully earned prepetition obligations under the Incentive Plans and to continue the Incentive Plans in the ordinary course of business on a postpetition basis.

### E.     Withholding Obligations and Deductions.

22.     Certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes for remittance to the appropriate federal, state, or local taxing authorities.  Other amounts are withheld from Employees as required by statute including garnishments, child support, and Social Security and Medicare

taxes (the "Withholding Obligations").  As of the Petition Date, the Debtors withhold and subsequently remit approximately $1.1 million per month on account of Withholding Obligations for their Employees.

23.     The Debtors also routinely deduct certain amounts from Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, and miscellaneous deductions (collectively, the "Deductions") and forward such amounts to various third-party recipients or retain such amounts for any self-insured benefit programs.  As of the Petition Date, the Debtors withhold and remit approximately $600,000 per month on account of Deductions.

24.     As of the Petition Date, the Debtors estimate that they owe approximately $900,000 on account of the Withholding Obligations and Deductions.  The Debtors seek authority to continue to pay amounts incurred in the ordinary course on account of the Withholding Obligations and Deductions and to continue these programs in the ordinary course of business and consistent with past practices on a postpetition basis.

**F.     Employer Payroll Taxes.**

25.     In addition to the Withholding Obligations and Deductions described above, the Debtors are required by applicable statutory authority to match from their own funds Social Security, Medicare taxes, and other similar statutory obligations (the "Payroll Taxes").  As of the Petition Date, the Debtors pay and remit approximately $200,000 per month on account of the Payroll Taxes.

26.     The Debtors estimate that as of the Petition Date approximately $10.1 million of accrued but unpaid Payroll Taxes have not been remitted to the appropriate taxing authorities (the "Unpaid Employer Taxes").  The majority of the Unpaid Employer Taxes are attributable to

2020 Payroll Taxes that were deferred pursuant to the federal payroll tax relief and deferral program enacted in 2020 as part of the Coronavirus, Aid, Relief and Economic Security (CARES) Act.[4]  The Debtors seek authority to remit the Unpaid Employer Taxes and to continue to honor and process the Payroll Taxes on a postpetition basis in the ordinary course of business and consistent with past practices.

       **G.**    **Wage and Benefit Service Providers.**

27.    The Debtors have relationships with several firms that handle human resources-related administrative functions, including, but not limited to, payroll, processing, withholding, remittance, and reporting of payroll taxes (including the Payroll Taxes) for the Employees (collectively, the "Wage and Benefit Service Providers").  These relationships with the Wage and Benefit Service Providers allow the Debtors to realize substantial cost savings with respect to the administration of their employee payroll and benefits by not having to employ additional human resources professionals and administer payroll and benefit programs internationally, and allow the Debtors to offer better and broader benefits to their Employees at significantly reduced rates relative to the costs of participating in those programs without third-party intermediaries like the Wage and Benefit Service Providers.

28.    The Debtors pay the Wage and Benefit Service Providers for the cost of administering employee Wage Obligations and benefits, as well as fees for these services.  As of the Petition Date, the Debtors estimate that they owe $300,000 to the Wage and Benefit Service Providers.  The Debtors intend to continue to utilize the Wage and Benefit Service Providers during

---

[4]   Fifty percent of the $9.7 million in deferred Unpaid Employer Taxes is required to be paid on or prior to December 31, 2021—with the remaining fifty percent to be paid on or prior to December 31, 2022—the Debtors seek authority to pay these amounts as and when they come due during the pendency of these chapter 11 cases out of an abundance of caution.

these chapter 11 cases and seek authority to pay all outstanding prepetition amounts incurred on account of the Wage and Benefit Service Providers and to continue to make all payments in the ordinary course of business on a postpetition basis.

  **H.** **Reimbursable Expenses.**

  29. The Debtors have policies whereby Employees seek reimbursement or file expense reports for the Debtors' payment of business related expenses.  The expenses are ordinary course expenses that the Employees incur in performing their job functions (the "Reimbursable Expenses") and are processed through SAP Concur.  The Debtors utilize Carlson Wagonlit Travel through SAP Concur for airline and rail ticketing, auto rental and hotel bookings and services. Once the Debtors determine that the charges are for Reimbursable Expenses and comply with the Debtors' policies and procedures, the Debtors typically reimburse the Employees.  It is essential to the continued operation of the Debtors' business that the Debtors continue reimbursing, or making direct payments on behalf of, the Employees for such expenses.

  30. The Debtors' inability to reimburse Reimbursable Expenses could impose a hardship on Employees where such individuals incurred Reimbursable Expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies and to pay any prepetition or postpetition claims and fees with respect thereto, in each case, in the ordinary course of business on a postpetition basis.  Prior to the Petition Date, the Debtors incurred a monthly average of approximately $150,000 on account of Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of Reimbursable Expenses.  The Debtors seek authority to continue to pay amounts incurred on account of the Reimbursable Expenses and to continue these programs in the ordinary course of business on a postpetition basis.  For the avoidance of doubt, the Debtors will not seek

to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.

## II.    Health and Welfare Coverage and Benefits.

31.    The Debtors offer health and welfare benefits to eligible Employees for medical, prescription, dental, and vision care coverage and certain other welfare benefits, including life, accidental death & dismemberment insurance, and other insurance benefits (collectively, the "Health and Welfare Coverage and Benefits").  As of the first quarter of 2021, the Debtors have incurred a monthly average of approximately $1.7 million on account of the Health and Welfare Coverage and Benefits.  Failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the workforce.

32.    The Debtors believe they are authorized to continue the Health and Welfare Coverage and Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

### A.    Medical and Prescription Coverage.

33.    The Debtors offer self-insured medical coverage and prescription drug coverage to Employees administered by Collective Health (the "Medical Plan").  Approximately 400 Employees are enrolled in the Medical Plan, under which participants and their eligible dependents (usually spouses; and children, if both parents are Employees) receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness.  During the first quarter of 2021, Medical Plan costs averaged approximately $1,000 per Employee, with approximately seventy percent funded by employer contributions and approximately thirty percent funded by Deductions from participating eligible Employees as applicable.

### B.    Dental and Vision Insurance Coverage.

34.    The Debtors provide a self-insured dental plan administered by Collective Health (the "Dental Plan"), and fully-insured vision plan by Collective Health (the "Vision Plan") for eligible Employees.  As of the first quarter of 2021, costs under the Dental Plan ranged from $20 per month per Employee up to $63 per month per family and $5 per month per Employee up to $10 per month per family under the Vision Plan.  The Vision Plan is entirely funded through Employee Deductions.

### C.    FSA and HSA.

35.    The Debtors provide Employees with the opportunity to contribute to a flexible spending account (the "FSA") administered by Navia Benefits Solutions, or to a health savings account (the "HSA") administered by HealthEquity, to make pre-tax contributions through payroll deductions to pay for certain health and welfare needs.

36.    The Debtors deduct an average of $160 from each participating Employee's Wage Obligations on account of the Employee contributions to the FSA and the HSA on a monthly basis. Currently, approximately 20 Employees contribute to the FSA and approximately 110 Employees contribute to the HSA.

### D.    Life and AD&D Insurance Coverage.

37.    The Debtors provide basic fully-insured life insurance, AD&D insurance, long- and short-term disability insurance, administered by Sun Life, to all active eligible Employees as well as supplemental, spouse, and child life products offered on a voluntary, Employee-paid basis (the "Life Insurance Coverage").

### E.    Other Coverage.

38.    Other voluntary, Employee-paid benefits are offered such as critical illness, medical clinics, hospitalization, identity theft, disability, legal insurance and others.

### III.   Workers' Compensation.

39.     The Debtors maintain workers' compensation insurance for their Employees (the "Workers' Compensation Program") supported with a stop-loss insurance policy (the "Workers' Compensation Insurance Policy") with Liberty Mutual Insurance Company that carries an annual premium of approximately $2.65 million paid in monthly installments. Separately, employees in Washington state are provided coverage through the state sponsored program that carries a quarterly premium cost of approximately $110,000.  The Debtors must continue the claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  There are approximately 27 open claims (the "Workers' Compensation Claims") under the Workers' Compensation Program.  As of the Petition Date, the Debtors reserved $900,000 on account of the Workers' Compensation Claims, all of which are covered on a first dollar basis with no deductible or payment due from the Debtors.  The Debtors estimate that they owe approximately $228,000 on account of accrued annual premium payments and approximately $1.0 million in fees related to the annual audit of the Workers Compensation Program.  The Debtors seek authority to continue to pay amounts incurred on account of the Workers' Compensation Program and to continue this program in the ordinary course of business on a postpetition basis.[5]

---

[5]  The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policies and practices that become necessary.

**IV.      Retirement Programs.**

      **A.      Defined Contribution Plans.**

      40.      As of the Petition Date, the Debtors maintain both a traditional pre-tax 401(k) and an after-tax Roth 401(k) retirement savings plan for the benefit of their Employees that satisfy the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plans").   The 401(k) Plans are administered by Fidelity and allow for automatic salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.   There is an annual audit fee associated with the 401(k) Plans, but as of the Petition Date the Debtors believe that they do not owe any amounts on account of the annual audit fees associated with the 401(k) Plans. Accordingly, out of an abundance of caution, the Debtors seek authority to pay any fees associated with the 401(k) Plans in the ordinary course of business on a postpetition basis.

**V.      Paid Time Off Benefits.**

      41.      The Debtors provide paid time off to certain Employees for vacation days (the "Paid Vacation Benefits").   Hourly Employees accrue Paid Vacation Benefits at a rate of one hour for every thirty hours worked (approximately 69 hours of Paid Vacation Benefits in one year of full time employment, not including any overtime hours worked).   In addition, hourly employees accrue Paid Vacation Benefits based on actual hours worked and length of service.   Salaried employees are offered Paid Vacation Benefits according to a tiered model based on years of service and hours worked.   Most Employees are paid their regular hourly or salaried rate when they elect to use Paid Vacation Benefits.   Terminated Employees, either voluntary or involuntary, are paid for earned but unused Paid Vacation Benefits where required by state law.   The Debtors seek authority to pay any amounts due with respect to earned but unused Paid Vacation Benefits for terminated Employees and to continue the Paid Vacation Benefits policies in the ordinary course of business on a postpetition basis.

42.     The Debtors also provide paid leave benefit programs (the "Paid Leave Benefits") for eligible Employees.  Employees are paid only for specific types of leaves, including medical leave, parental leave, unusual and extreme personal circumstances, and other leaves authorized or required by law.  Generally, Employees have the option to use accrued Paid Vacation Benefits concurrently with Paid Leaves Benefits and will not receive a payment for any unused leave days at the end of the year or at termination unless required by law.  The Debtors seek authority to honor all fully earned obligations under the Paid Leave Benefits and to continue the Paid Leave Benefits in the ordinary course of business on a postpetition basis.

**VI.    Additional Benefit Programs.**

43.     In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of ancillary benefits, including, company gas cards, transportation savings accounts, phone and internet stipends, and other employee programs (the "Additional Benefit Programs").  The aggregate cost of the Additional Benefit Programs is $50,000 per month as of the Petition Date.  The Debtors seek authority to pay any amounts due with respect to these programs and policies and to continue them in the ordinary course of business on a postpetition basis.

**VII.   WARN Obligations.**

44.     Prior to filing the chapter 11 petitions, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") to employees that are expected to be impacted by a qualified "mass layoff" or "plant closing" and certain governmental entities (collectively, the "WARN Act Notices").  Some of the WARN Act Notices were conditional, providing that, in the event that a sale of certain business lines does not occur, or occurs in a manner different than anticipated, and the Debtors are not able to secure additional

financing, employees at those locations may experience an employment loss under the WARN Act.

45.     Unless an exception applies, the WARN Act generally requires 60 days' advance notice to affected employees and governmental entities prior to the implementation of a "mass layoff" or "plant closing."  The WARN Notices were not issued 60 days before the anticipated terminations due to the applicability of the "faltering company," "unforeseeable business circumstances," and "natural disaster" exceptions under the WARN Act, which relieve Debtors from any obligation to provide additional pay or benefits in the event that employees do not receive pay and benefits for a full 60 days after receiving the notice.[6]

**Basis for Relief**

**I.      Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Obligations.**

**A.      Certain of the Employee Compensation and Benefits Are Entitled To Priority Treatment.**

46.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or [c]ommissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than the statutory

---

[6]     In the event these exceptions are challenged and are found not to apply, Katerra's position is that any claim under the WARN Act should be considered pre-petition.  *See In re Powermate Holding Corp.*, 394 B.R. 765 (Bankr. D. Del. 2008) (finding that WARN Act claims vested pre-petition where employees were terminated without prior notice under the WARN Act prior to bankruptcy filing); *In re Kitty Hawk, Inc.*, Case No. 00-42141-BJH (Bankr. N.D. Tex. May 4, 2000) (same).

prescribed limit of $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors.  The Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.  Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B.      Payment of Certain Employee Compensation and Benefits Is Required by Law.**

47.      The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

48.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II.    Payment of the Employee Compensation and Benefits and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.

49.     Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants).  In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

50.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value."  *Id.*  Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *Id.*  The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of

the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

51.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

52.     Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Courts apply section 105(a) of the Bankruptcy Code pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation).

53.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

54.     The Debtors submit that the payment of the Employee Compensation and Benefits represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.   Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.   The Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.   Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and consummate value-maximizing transactions for the benefit of their stakeholders.   The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.   Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

55.     The majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses.  Many of the Debtors' Employees expect and require their wages to arrive on a timely basis.  Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto expeditiously. Failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the Health and Welfare Coverage and Benefits described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Employee attrition would also cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

56.     The Debtors request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**III.   The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.**

57.     Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

58.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, solely to permit Employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on the financial well-being of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

## Emergency Consideration

59.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

60.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

61.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**<u>Notice</u>**

62.     The Debtors will provide notice of this Motion to the following parties or their counsel:  (a) the United States Trustee for the Southern District of Texas; (b)  the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) Weil, Gotshal & Manges LLP as counsel to the DIP Lender; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

The Debtors request that the Court enter an order, granting the relief requested in this Motion and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 7, 2021

/s/  *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:        mcavenaugh@jw.com
              jwertz@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              christine.okike@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>Certificate of Service</u>**

I certify that on June 7, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh
