## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION
## SEEKING ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTORS TO PAY PREPETITION CLAIMS OF
## CERTAIN CRITICAL VENDORS AND LIEN CLAIMANTS, (II) GRANTING
## ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED OBLIGATIONS ON
## ACCOUNT OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

**Emergency relief has been requested. A hearing will be conducted on this matter on June 7, 2021 at 3:30 pm (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

Relief is requested not later than June 7, 2021.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

**Relief Requested**

1.      The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms attached hereto:  (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of (i) Critical Vendor Claims (as defined herein) in an aggregate amount of up to $500,000 on an interim basis and $1.0 million on a final basis and (ii) Lien Claims (as defined herein) in an aggregate amount up to $1.0 million on an interim basis and $2.1 million on a final basis; (b) granting administrative expense priority to all undisputed obligations on account of goods ordered by the Debtors prior to the date hereof that will not be delivered until after the Petition Date and authorizing the Debtors to satisfy such obligations in the ordinary course of business; and (c) granting related relief.

2.      In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2

5.      The bases for the relief requested herein are sections 105(a), 363, 503(b), 507, 1107(a), 1108, and 1129 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

6.      Katerra Inc., together with its Debtor and non-Debtor subsidiaries ("Katerra"), is a technology-driven construction company that develops, manufactures, and markets products and services in the commercial and residential construction spaces.  Katerra delivers a comprehensive suite of products and services for its clients through a distinct model that combines end-to-end integration with significant investment in technological and design innovation.  Katerra offers services to its clients through three distinct offerings:  (a) end-to-end new build; (b) construction services; and (c) renovations.  Katerra has approximately 6,400 employees who are primarily located in nine countries.  In the year ending 2020, Katerra's operations generated revenue of approximately $1.75 billion.

7.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] and in the *Declaration of Matthew R. Niemann in Support of (A) DIP Financing and (B) All First Day Relief* filed contemporaneously with this Motion and incorporated by reference herein.  As described in more detail in the First Day Declaration, the Debtors commenced these chapter 11 cases in the

---

[2]   Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in this Motion or the First Day Declaration, as applicable.

face of a liquidity crisis and with the goal of facilitating a marketing and sale process for their assets to maximize value and creditor recoveries.

8.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Business Obligations

9.      The Debtors purchase goods and services from certain vendors and independent contractors and, in many instances, could not operate without access to the goods and services provided by these parties (collectively, the "Critical Vendors").

10.     The Debtors are not able to easily switch manufacturers, suppliers, or logistics providers on short notice and would face significant risks to their supply chain if prepetition amounts owed to their Critical Vendors (collectively, the "Critical Vendor Claims") cannot be paid.  The Debtors rely on the Critical Vendors to provide a wide-range of goods and services at competitive prices.  Not only do the Debtors rely heavily on the Critical Vendors to deliver current orders, but they also rely on their relationships with Critical Vendors for future supply.  More than merely the current orders would be at risk if these Critical Vendors are not paid—the Debtors risk losing entire projects.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' operations.  Any interruption in the provision of such Critical Vendor products and services could jeopardize the Debtors' ability to complete current projects.

4

11.     As a result of their plans to wind down operations, the Debtors believe they will have to make only very limited payments on account of Critical Vendor Claims in connection with completing certain ongoing projects.  To that end, the Debtors, to the extent they determine it is in the best interests of their estates to continue these projects until they are sold, may require the services of the Critical Vendors to maximize their value.

12.     Moreover, the Debtors believe that jeopardizing their relationships with the Critical Vendors at this critical juncture would impose a severe strain on the Debtors' ongoing projects and would likely result in significant revenue loss.

**I.      Critical Vendor Claims.**

13.     The Critical Vendors are so essential to the Debtors' business that the lack of any of their particular goods or services, even for a short duration, could significantly disrupt the Debtors' ongoing projects and cause irreparable harm to the Debtors' businesses, goodwill, and market share.  The Debtors' Critical Vendors provide products and services that generally fall into the following categories:  (a) goods and materials vendors; and (b) equipment vendors.

14.     In light of the above, the Debtors seek entry of the Interim Order and Final Order granting them authority to make payments, in their sole discretion and business judgment, on account of the Critical Vendor Claims in an amount not to exceed an aggregate amount of $500,000 on an interim basis and $1.0 million on a final basis, which amounts represent the Debtors' best estimate as to what amounts must be paid to the Critical Vendors to continue an uninterrupted supply of critical goods and services.  The Debtors further request that the Court grant the Debtors the authority to allocate the foregoing amounts at their discretion, without prejudice to seek additional relief, and subject to an agreement (within the Debtors' discretion) to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

15.     In an exercise of their business judgment, the Debtors have determined that continuing to receive goods and services from the Critical Vendors is necessary to operate and continue certain ongoing projects.  If granted discretion to satisfy Critical Vendor Claims as requested herein, the Debtors will assess, on a case by case basis, the benefits to their estates of paying the Critical Vendor Claims and pay any such claim only to the extent their estates will benefit.  Without this relief, the Debtors believe that the Critical Vendors may cease providing goods to the Debtors and/or stop providing certain critical services and thereby take action that could impede the Debtors' estate—a result that could be devastating for the Debtors and their stakeholders.

### A.     The Debtors' Process for Identifying Critical Vendors.

16.     The Debtors rely on goods and services provided by several thousand vendors. Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan would be extraordinary relief, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify only those vendors that are critical to the continued and uninterrupted operation of the Debtors' ongoing projects—the loss of which could materially harm their business, by, among other things, reducing their enterprise value to the detriment of the Debtors and their stakeholders.  Specifically, in identifying the Critical Vendors, the Debtors examined each of their vendor relationships with, among other things, the following criteria in mind:

- whether certain specifications or contract requirements directly or indirectly prevent the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or to refuse to ship inventory or to provide critical services on a postpetition basis;

- the location and nationality of the vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

17. In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

## II.    Lien Claims.

18. The Debtors' business depends on both the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the goods and other materials used for the Debtors' various construction projects.  The Debtors' supply chain depends on services provided by, among others, various freight forwarders, common carriers, and custom brokers (collectively, the "Shippers and Warehousemen").

7

19.     Certain manufacturers ship goods and materials to the Debtors either "free on board" ("FOB") or "delivery duty paid" ("DDP").  Under an FOB arrangement, the Debtors pay freight forwarders to transport goods and materials to warehouses, and title passes to the Debtors when such goods and materials are loaded for shipment.  Under the DDP arrangements, the vendor pays to ship goods and materials to warehouses, and title to such goods and materials does not pass to the Debtors until it arrives at the warehouse.  Under either arrangement, vendors may refuse (and have in the past refused) to release materials or other goods for shipment if they are not paid current.

20.     The Debtors routinely transact business with a number of third-party contractors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Third-Party Contractors").  These Third-Party Contractors perform various services for the Debtors' construction projects, including the installation and repair of certain equipment, maintenance, and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating equipment, and other repair, renovation, or construction of the facilities and property therein.

21.     Under certain non-bankruptcy laws, Lien Claimants (including, but not limited to, Shippers and Warehousemen and Third-Party Contractors) may be able to assert liens on the goods or materials in their possession or on the property they improved (as applicable) to secure payment of the charges or expenses incurred in connection with these prepetition obligations (collectively, "Lien Claims").  Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods or materials in their possession or otherwise impede the Debtors' use of property until their claims are satisfied

and their liens redeemed.  Lien Claimants' possession (and retention) of the Debtors' goods or enforcement of a mechanic's lien would disrupt the Debtors' ongoing projects and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

22.     As of the Petition Date, the Debtors owe Shippers and Warehousemen, Third-Party Contractors, and other Lien Claimants an aggregate amount of approximately $2.1 million on account of Lien Claims, approximately $1.0 million of which will come due within the first thirty days of these chapter 11 cases.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to (a) obtain release of critical or valuable goods and materials, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Shippers and Warehousemen, Third-Party Contractors, and other Lien Claimants to continue performing and otherwise supporting the Debtors' ongoing projects on a postpetition basis.  The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

III.    **Customary Trade Terms.**

23.     Subject to the Court's approval, the Debtors intend to pay the Critical Vendor and Lien Claims only to the extent necessary to preserve their business.  To that end, in return for paying such claims either in full or in part, the Debtors propose that they be authorized to require

the Critical Vendors and the Lien Claimants, as applicable, to provide favorable trade terms for the postpetition procurement of goods and services.

24.    Specifically, the Debtors seek authorization, but not direction, to condition payment of the Critical Vendor Claims and Lien Claims upon such claimant's agreement to continue—or recommencement of—supplying such products and services to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms").

25.    In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to re-characterize and apply any payment made pursuant to the relief requested by the motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## IV.    Outstanding Orders.

26.    The Debtors may have ordered goods prior to the Petition Date in the ordinary course of business that will not be delivered until after the Petition Date (the "Outstanding Orders").  In the mistaken belief that they would be general unsecured creditors

of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition, potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  As set forth in greater detail below, the Debtors are requesting that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders only in the ordinary course of business.

**Basis for Relief**

I.      **The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

27.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations, including payments to critical vendors, where necessary to protect and preserve the estate.  *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

28.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so.  *See Ionosphere*

*Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

29.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See Just for Feet*, 242 B.R. at 825.  Specifically, the Court may use its equitable power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *Ionosphere Clubs*, 98 B.R. at 176.  Indeed, courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *CoServe,* 273 B.R. at 497 ("Cases cited by Debtors that refer to necessity of payment to preserve value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also In re Scotia Dev., LLC,* No. 07-20027, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21. 2007) (outlining the factors for when a critical vendor payment is necessary).

30.     Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *CoServ*, 273 B.R. at 497.

Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . " *Id.*

31.    The Debtors have a sound business purpose for the relief requested herein. The authority to honor unpaid, prepetition Critical Vendor Claims and Lien Claims in the initial days of these chapter 11 cases, without disrupting the Debtors' ongoing projects, will maintain the integrity of the Debtors business and allow the Debtors to efficiently administer these chapter 11 cases and maximize the value of their estates.

32.    The resulting harm to the Debtors' estates far outweighs the costs associated with paying the Debtors' prepetition obligations to the Critical Vendors and Lien Claimants. Thus, the Debtors' other creditors will be no worse off, and likely fare better, if the Debtors are empowered to negotiate such payments to achieve a smooth transition into chapter 11 with minimal disruptions. As such, the Debtors believe the relief sought in this Motion will not burden the Debtors but will help maximize the value of their estates. Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims and Lien Claims.

## II.    The Court Should Authorize the Payment of the Critical Vendor Claims.

33.    Allowing the Debtors to pay the Critical Vendor Claims pursuant to all or some of the above-referenced Bankruptcy Code provisions is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code— preserving going concern value and maximizing the value of property available to satisfy creditors.

*See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve any value and maximize creditor recovery, courts in this district regularly grant relief consistent with that which the Debtors are seeking in this Motion.

34.     The Debtors depend on the goods and the provision of services by the Critical Vendors.  Ensuring these Critical Vendors continue to deliver goods and materials and provide services is therefore vital to the ability of the Debtors to maximize the value of their ongoing projects.  Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims.

### III.     The Court Should Authorize the Payment of Lien Claims.

35.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[3]  The Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment, or products, mere possession or retention could disrupt the Debtors' operations.

---

[3]     *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

36.     Paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully secured creditor of the Debtors' estates.  In such instances, payment now only provides such party with what they might be entitled to receive under a chapter 11 plan, without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate completion of the Debtors' ongoing projects.

## IV.     The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims is Authorized.

37.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

38.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority.  The attendant disruption and delay to the continuous and timely flow of critical materials and other goods to the Debtors would force the Debtors to potentially halt

15

operations, disrupt the Debtors' business, and lead to a loss of revenue, all to the detriment of the Debtors and their creditors.

## Emergency Consideration

39.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

40.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

41.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any

16

grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

<u>**Notice**</u>

42.    The Debtors will provide notice of this Motion to the following parties or their counsel:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) Weil, Gotshal & Manges LLP as counsel to the DIP Lender; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i)  any party that has requested notice pursuant to Bankruptcy Rule

2002; and (j) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

The Debtors request that the Court enter interim and final orders, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 7, 2021

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:       mcavenaugh@jw.com
             jwertz@jw.com
             mstull@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       joshua.sussberg@kirkland.com
             christine.okike@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Certificate of Service**

I certify that on June 7, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**Form Trade Agreement**

**THIS TRADE AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN.  ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN.  THE INFORMATION IN THIS TRADE AGREEMENT STATEMENT IS SUBJECT TO CHANGE.  THIS TRADE AGREEMENT STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## TRADE AGREEMENT

[Katerra Inc.] (the "Company"), on the one hand, and the supplier identified in the signature block below (the "Supplier"), on the other hand, hereby enter into the following trade agreement (this "Trade Agreement") dated as of the latest date in the signature blocks below.

### Recitals

WHEREAS on June 6, 2021 (the "Petition Date"), the Company and certain of its indirect and direct subsidiaries and related entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

WHEREAS on [●], 2021, the Court entered its [*Interim/Final*] *Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Critical Vendor Order") [Docket No. [●]] authorizing the Debtors on [an interim/a final] basis, under certain conditions, to pay the prepetition claims of certain suppliers, including the Supplier, subject to the terms and conditions set forth therein.[1]

WHEREAS prior to the Petition Date, the Supplier delivered goods to the Company and/or performed services for the Company, and the Company paid the Supplier for such goods and/or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Company and the Supplier (each a "Party," and collectively, the "Parties") agree to the following terms as a condition of payment on account of certain prepetition claims the Supplier may hold against the Company.

### Agreement

1.     **Recitals.  The foregoing recitals are incorporated herein by reference as if set forth at length herein.**

2.     **Supplier Payment.  The Supplier represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to the Supplier is $[__] (the "Agreed Supplier Claim").  Following execution of this Trade Agreement, the Company shall, in full and final satisfaction of the Agreed Supplier Claim,**

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Vendor Order.

pay the Supplier $[__] on account of its Agreed Supplier Claim (the "<u>Supplier Payment</u>") (without interest, penalties, or other charges), as such invoices become due and payable, which such Supplier Payments shall reduce the agreed amount of the Agreed Supplier Claim dollar-for-dollar.

3.      <u>Agreement to Supply</u>.

a.      The Supplier shall supply goods to and/or perform services for the Company, and the Company shall accept and pay for goods and/or services from the Supplier (to the extent the Company seeks such services), for the duration of the Debtors' chapter 11 cases based on the following terms (the "<u>Customary Trade Terms</u>"):  those trade terms at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, the number of days for timing of payments and payment terms, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs)  in place in the twelve months prior to the Petition Date, or are otherwise acceptable to the Company in light of customary industry practices, except for any partial payments or other payments (or assurances) the Company made with respect to any unfinished product.  "Duration of the Debtors' chapter 11 cases" means until the earlier of:  (i) the effective date of a chapter 11 plan in the Company's chapter 11 cases; (ii) the closing of a sale of all or a material portion of the Company's assets pursuant to Bankruptcy Code section 363 resulting in a cessation of the Company's business operations; (iii) the liquidation of the Company or conversion of the Debtor's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; or (iv) a default under any of the Company's debtor-in-possession financing facilities that results in the Company losing access to funds available under any such facility.

b.      The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed to in writing by the Parties.

c.      The Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

d.      The Supplier shall continue all shipments of goods in the ordinary course and shall fill orders for goods requested by the Company in the ordinary course of business pursuant to the Customary Trade Terms.

e.      The Supplier shall not be permitted to cancel on less than ninety days' notice any contract or agreement to which they provide services to the Debtors.

4.      <u>Other Matters</u>.

a.      The Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims the Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  The Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the

2

Customary Trade Terms then in effect.  The Supplier Payment will be made concurrently with payment of other outstanding administrative claims as provided in a confirmed plan.

        b.      The Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Trade Agreement or a plan confirmed in the Company's chapter 11 case.

        c.      The Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Supplier by the Company arising from prepetition agreements or transactions.  Furthermore, if the Supplier has taken steps to file or assert such a lien prior to entering into this Trade Agreement, the Supplier will promptly take all necessary actions to remove such liens and hereby authorizes the Company to take any such actions on its behalf.

**5.**       **Breach**.

        a.      In the event that the Supplier fails to satisfy its undisputed obligations arising under this Trade Agreement (a "Supplier Breach"), upon written notice to the Supplier, the Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Supplier Payment or any portion of the Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to the Supplier from the Company.

        b.      In the event that the Company recovers the Supplier Payment pursuant to Section 5(a) hereof or otherwise, the Agreed Supplier Claim shall be reinstated as if the Supplier Payment had not been made.

        c.      The Supplier agrees and acknowledges that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, the Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  The Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

3

6.      **Notice**.

If to the Supplier, then to the person and address identified in the signature block hereto.

If to the Company:

Katerra Inc.
9305 East Via de Ventura
Scottsdale, Arizona 85258
Attn:  Marc Liebman

-and-

If to Proposed Counsel and Co-Counsel to the Debtors:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue, New York, New York 10022
Facsimile: (212) 446-4900
Attn:    Joshua A. Sussberg
            Christine A. Okike
            E-mail:  joshua.sussberg@kirkland.com
                        christine.okike@kirkland.com

-and-

300 North LaSalle Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attn:  Dan Latona
E-mail:  dan.latona@kirkland.com

-and-

Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Facsimile: (713) 752-4221
Attn:     Matthew D. Cavenaugh
            Jennifer F. Wertz
            J. Machir Stull
E-mail:  mcavenaugh@jw.com
            jwertz@jw.com
            mstull@jw.com

7.    **Representations and Acknowledgements.  The Parties agree, acknowledge and represent that:**

a.    the Parties have reviewed the terms and provisions of the Critical Vendor Order and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Critical Vendor Order;

b.    any payments made on account of the Agreed Supplier Claim shall be subject to the terms and conditions of the Critical Vendor Order;

c.    if the Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Critical Vendor Order, the Bankruptcy Code, or applicable law; and

d.    in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from the Supplier to the Company, until a ruling of the Court is obtained.

8.    **Confidentiality.  In addition to any other obligations of confidentiality between the Supplier and Company, the Supplier agrees to hold in confidence and not disclose to any party:  (a) this Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade Agreement; (c) the terms of payment set forth herein;  and (d) the Customary Trade Terms (collectively, the "Confidential Information"); *provided* that if any party seeks to compel the Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or the Supplier intends to disclose any or all of the Confidential Information, the Supplier shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided*, *further, that,* if such remedy is not obtained, the Supplier shall furnish only such information as the Supplier is legally required to provide.**

9.    **Miscellaneous.**

a.    The Parties hereby represent and warrant that:  (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

b.    This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.  Moreover, Supplier agrees to vote all claims now or hereafter beneficially owned by Supplier in favor of, and not take any direct or indirect action to oppose or impede confirmation of, any chapter 11 plan on a timely basis in accordance with the applicable procedures set forth in any related disclosure statement and accompanying solicitation materials,

and timely return a duly-executed ballot to the Debtors in connection therewith, if such chapter 11 plan provides for a treatment of any Agreed Supplier Claim that is materially consistent with this Agreement.

        c.     Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

        d.     This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

        e.     The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

        f.     This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[Signature Page Follows]

AGREED AND ACCEPTED AS OF THE LATEST DATE SET FORTH BELOW:

**[DEBTOR ENTITY]**                                 **[SUPPLIER]**

_____        _____
By: [●]                                              By:
Title: [●]                                           Title:
                                                     Address:

                                                     Date: