# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (B) AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO DEFINITIVE PURCHASE AGREEMENTS

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the application should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the application and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> **Represented parties should act through their attorney.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258. Capitalized terms used but not defined herein shall have the meanings given to such terms in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and the *Declaration of Matt Niemann in Support of the Debtors' Emergency Motion for Entry of Interim and Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling the Final Hearing, and (E) Granting Related Relief* (the "Niemann Declaration"), as applicable, filed contemporaneously herewith and incorporated by reference herein.

## Introduction

1. As described in the First Day Declaration, the Debtors filed these chapter 11 cases to effectuate a marketing process for their assets aimed at maximizing the value of their estates. To that end, the Debtors and their advisors, with the support of the DIP Lender, determined in their business judgment, that exploring a marketing process for potential sales of some or all of the Debtors' assets was in the best interests of the Debtors' estates.

2. Prior to the Petition Date, the Debtors engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as their investment banker in connection with the Debtors' contingency planning efforts. Houlihan Lokey is spearheading a marketing process designed to identify potential bidders and purchasers for some or substantially all of the Debtors' assets or the Debtors' business. Specifically, prior to the date hereof, Houlihan Lokey contacted several potential bidders about certain of the Debtors' business and assets. The Debtors and their advisors are currently advancing discussions with these parties in an effort to identify the highest or otherwise best bidders amongst them and to improve their bids to the benefit of the Debtors' estates. As of the date of this Motion, that process remains ongoing.

3. The marketing process and the Bidding Procedures proposed herein will enable the Debtors and their advisors to move expeditiously to complete a fulsome marketing process, receive, evaluate, and improve upon bids, execute one or more Stalking Horse Agreements (as defined below) if doing so will maximize the value received for their assets, and hold an auction (if necessary) to determine the highest or otherwise best bid (or bids). The Debtors intend to use the proceeds of any asset sale to repay the proposed DIP Facility and fund distributions under a plan. The marketing process and the Bidding Procedures will result in the highest or otherwise best available offer for the assets. To the extent the Debtors move forward with a sale transaction

for the assets, the Debtors submit that such transaction will be in the best interest of the Debtors'

estates and their stakeholders.

4.      Maximizing the value of the Debtors' estates for the benefit of their stakeholders

depends, in large part, on the Debtors expeditiously proceeding through these chapter 11 cases and

minimizing cash burn.  Under the circumstances, the Debtors believe that the marketing process

will result in value-maximizing transactions for the benefit of their estates.  The Debtors request

that the Court grant the relief requested herein.

## Relief Requested

5.      The Debtors seek entry of an order, substantially in the form attached hereto

(the "Bidding Procedures Order"):

     a.     authorizing and approving bidding procedures, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (or sales) of some or all of the Debtors' assets (the "Assets"), potentially at an auction, if needed (the "Auction");

     b.     establishing the following dates and deadlines in connection with the Bidding Procedures:

- Bid Deadline:  July 29, 2021, at 5:00 p.m., prevailing Central Time, as the deadline by which all binding bids must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline");

- Auction:  August 2, 2021, at 10:00 a.m., prevailing Central Time, as the time and date on which the Debtors will conduct the Auction, if one is needed; and

- Sale Hearing:  August 5, 2021, or as soon thereafter as the Court's calendar permits, as the date for a hearing to approve one or more sales of the Assets (the "Sale Hearing").

     c.     authorizing the Debtors in their discretion, after consultation with the Consultation Parties (as defined in the Bidding Procedures), to (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and enter into a purchase agreement with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, (A) provide a breakup fee (the "Breakup Fee"), (B) provide other

appropriate and customary protections approved by the Court (together with the Breakup Fee, the "Bid Protections") to the extent the Debtors determine that provision of such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates, and/or (C) agree to reimburse reasonable and documented out-of-pocket fees and expenses of the Stalking Horse Bidder (the "Expense Reimbursement"); *provided* that, with respect to any particular Stalking Horse Agreement, the total Bid Protections shall not exceed 3% of the cash purchase price contemplated by such Stalking Horse Agreement and any Expense Reimbursement shall be subject to a cap to be agreed upon by the Debtors and the applicable Stalking Horse Bidder after consultation with the Consultation Parties;

d. approving the form and manner of notice of the Auction and Sale Hearing with respect to the sale or sales of some or all of the Assets free and clear of liens, claims, encumbrances, and other interests (any such sale, a "Sale"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice");

e. approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts") in connection with any Sale (the "Assumption and Assignment Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 3 to the Bidding Procedures Order (the "Cure Notice"); and

f. granting related relief.

6. The Debtors also seek entry of an order or orders (each such order, a "Sale Order"), in each case approving the Debtors' entry into a definitive purchase agreement substantially in the form attached to a given Sale Order (each such agreement with respect to particular assets, a "Definitive Purchase Agreement"). The Debtors will file a proposed form of Sale Order and related Definitive Purchase Agreement in advance of the Sale Hearing.

## Jurisdiction and Venue

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.       The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006(a), 9007, and 9014 and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Proposed Sale Process and Selection of Stalking Horse**

10.       The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a Sale (or Sales) of some or all of the Debtors' Assets that the Debtors believe is reasonable and will provide parties with sufficient time and information to submit a competitive bid.  In formulating the Bidding Procedures and time periods set forth therein, the Debtors balanced the need to provide adequate notice to parties in interest and potential bidders with the need to run a fulsome, expeditious, and efficient marketing process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids.  The Bidding Procedures are designed to allow the Debtors sufficient time to conduct a Sale (or Sales) and potentially an Auction while simultaneously ensuring that the Debtors maintain sufficient runway in these chapter 11 cases.

11.       Specifically, the Debtors propose the following timeline for the Sale:

| Event or Deadline | Date and Time |
| --- | --- |
| Deadline to Designate Stalking Horse Bidders (if any) | July 22, 2021 |
| Deadline to Object to Designation of any Stalking Horse Bidder or Grant of Bid Protections | Three (3) business days following service of the applicable Stalking Horse Notice |
| Qualified Bid Deadline | July 29, 2021, at 5:00 p.m. (prevailing Central Time) |

| Event or Deadline | Date and Time |
|---|---|
| Auction (if applicable) | The Auction will be held on August 2, 2021, at 10:00 a.m. (prevailing Central Time) via remote video[2] |
| Cure Objection Deadline | August 4, 2021, at 4:00 p.m. (prevailing Central Time) |
| Sale Objection Deadline | August 4, 2021, at 4:00 p.m. (prevailing Central Time) |
| Sale Hearing | August 5, 2021, at [____] [a./p.]m. (prevailing Central Time) or as soon thereafter as the Court's calendar permits |
| Outside Closing Date | August 15, 2021 |

12.    The Debtors believe that this timeline provides an opportunity to conduct a fulsome marketing process while proceeding expeditiously through these chapter 11 cases.  In addition to the Debtors' marketing efforts thus far, the Debtors will use the time period following entry of the Bidding Procedures Order to actively market the Assets in an attempt to solicit higher or otherwise better bids in advance of the Bid Deadline.

13.    The Debtors also request authority, as set forth in the Bidding Procedures and the Bidding Procedures Order, to (a) select one or more Stalking Horse Bidders and enter into Stalking Horse Agreements, and (b) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide Bid Protections to the extent the Debtors determine that provision of such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

14.    No later than one business day after selecting a Stalking Horse Bidder, the Debtors shall file with the Court and serve a notice (a "Stalking Horse Notice") (a) identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid (including the purchase price and Assets subject to such Stalking Horse Bid), and the amount and terms of any Bid Protections

---

[2]    If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

offered to the Stalking Horse Bidder, and (b) attaching a copy of the relevant Stalking Horse Agreement.   Any objection to the designation of the Stalking Horse Bidder or to the Bid Protections set forth in the Stalking Horse Notice and Stalking Horse Agreement (a "<u>Stalking Horse Objection</u>") shall be filed no later than three (3) business days after the date of service of the applicable Stalking Horse Notice.

15.    Having the flexibility to designate one or more Stalking Horse Bidders and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets. Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the ability to designate Stalking Horse Bidders and offer Bid Protections to each such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

## **<u>The Bidding Procedures</u>**

16.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.

17.    Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.   Generally speaking, however, the Bidding Procedures establish, among other things:[3]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale Notice, and the Cure Notice to interested parties as soon as practicable after entry of the Bidding Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders;

---

[3]    This summary is qualified in its entirety by the Bidding Procedures.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

- the availability of and access to due diligence by Potential Bidders;

- the deadlines and requirements for submitting bids and the method and criteria by which such bids are deemed to be Qualified Bids sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any bidder (other than a Stalking Horse Bidder) to be considered a Qualified Bidder, which shall be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid (or starting bids) for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors; and

- various other matters relating to the sale process generally, including the designation of the Backup Bid, return of any good faith deposits, and certain reservations of rights.

18.     Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and, as noted, they preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates. As such, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

19.     Following conclusion of the Auction, if any, and the selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek entry of the Sale Order (or Sale Orders).  Each Sale Order shall authorize the Debtors to enter into and perform under the applicable Definitive Purchase Agreement and deem the Debtors' selection of the applicable Successful Bid final.

**I.      Form and Manner of Sale Notice**.

20.      The Auction, if any, shall take place at 10:00 a.m. (prevailing Central Time) on August 2, 2021, via remote video,[4] or such later date and time as selected by the Debtors.

21.      Within three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "<u>Notice Parties</u>"):   (a) the United States Trustee for the Southern District of Texas; (b)  the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) Weil, Gotshal & Manges LLP as counsel to the DIP Lender; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i)  all known holders of liens, encumbrances, and other claims secured by the Assets; (j) all known creditors of the Debtors; (k) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

22.      In addition, within five (5) business days after entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (national edition) to provide notice to any other potential interested parties.

---

[4]      If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

23.    The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sales, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.  The Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Sales or the Auction (in each case, if any) be required.

## II.    Summary of the Assumption and Assignment Procedures.

24.    The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' Contracts in connection with any Sale(s). The proposed Assumption and Assignment Procedures are as follows:

a.    **Cure Notice**.  Within five (5) business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as <u>Exhibit 3</u> to the proposed Bidding Procedures Order, on certain non-Debtor contract counterparties (collectively, the "<u>Contract Counterparties</u>"), and post the Cure Notice to the case website (https://cases.primeclerk.com/katerra).

b.    **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information:  (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "<u>Assigned Contracts</u>," and each individually, an "<u>Assigned Contract</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "<u>Cure Objection</u>"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.    **Cure Objections**.  Cure Objections, if any, to a Cure Notice must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of

these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **August 4, 2021**, at **4:00 p.m. (prevailing Central Time)** (the "<u>Cure Objection Deadline</u>"); *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

d.    **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e.    **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.   To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.   If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "<u>Cure Dispute</u>"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.    **Supplemental Cure Notice**.   If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "<u>Supplemental Cure Notice</u>").

g.  **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any.   All Supplemental Cure Objections must:  (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.  **Dispute Resolution of Supplemental Cure Objection**.   If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice.   Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.  **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

**Basis for Relief**

**I.     The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment**.

25.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

26.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

27.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Integrated*

*Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

28.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for some or all of the Assets. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by the Debtors' estates from any eventual transactions.   In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

29.     It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  This is true here where any Sale or Sales of the Assets and related transactions have been subjected to a marketing process and intensively scrutinized by the Debtors and their retained advisors.  Having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Debtors retain flexibility to "lock in" a minimum purchase price for any Assets that will be subject to a further market test.  As a result, the Debtors and their creditors can

be assured that, taking into account current macroeconomic and industry conditions, the consideration obtained will be fair and reasonable and at or above market.

30.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  The Court should enter the Bidding Procedures Order.

## II.    The Bid Protections and Expense Reimbursement Have a Sound Business Purpose and Should Be Approved.

31.     The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer Bid Protections and Expense Reimbursement to each such Stalking Horse Bidder.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, 2011 WL 2671254 at *1 n. 1. As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (citation omitted).  The use of bidding protections has become an established practice in chapter 11 cases.

32.     Break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11:  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . .  In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis in original).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is

15

undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

33.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). The allowance of Bid Protections and Expense Reimbursement, in the event that the Debtors execute a Stalking Horse Agreement, is in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets that are the subject of such Stalking Horse Agreement, which will inure to the benefit of the Debtors' estates.

34.     Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established in this district that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

35.     The flexibility to offer Bid Protections and Expense Reimbursement is a critical component of the Debtors' ability to obtain the commitment of one or more Stalking Horse Bidders. To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will

continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.   Any Bid Protections and Expense Reimbursement offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length and with significant give-and-take with respect to such Bid Protections and Expense Reimbursement.   As a result, by preserving the flexibility to offer Bid Protections and Expense Reimbursement, the Debtors ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

36.   The Bid Protections and Expense Reimbursement provided to any Stalking Horse Bidder (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions (including any Sale transactions), the commitments that have been made, and the efforts that have been and will be expended by any Stalking Horse Bidder. The Bid Protections and Expense Reimbursement are necessary to induce a Stalking Horse Bidder to pursue a Sale and enter into a Stalking Horse Agreement.

37.   If the Court does not approve Bid Protections and Expense Reimbursement, the Debtors may not be able to induce any bidders to serve as Stalking Horse Bidders, to the detriment of the Debtors' estates.   Further, if the Debtors enter into a Stalking Horse Agreement with Bid Protections that were ultimately to be paid, it will necessarily be because the Debtors have received higher or otherwise superior offers for the applicable Assets.   In short, the proposed Bid Protections and Expense Reimbursement are fair and reasonable under the circumstances

because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

38.     The Bid Protections and Expense Reimbursement are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.  The Court should approve Bid Protections and Expense Reimbursement.

**III.    The Court Should Approve the Debtors' Entry into One or More Definitive Purchase Agreements As a Sound Exercise of Business Judgment**.

39.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."  *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

40.     As noted above, the business judgment rule shields a debtor's management's decisions from judicial second-guessing.  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain debtor

decisions—such as the Debtors' entry into one or more Definitive Purchase Agreements—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

41.    Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

### A.    A Sound Business Purpose Exists for the Sale.

42.    The Debtors have a sound business justification for selling the Assets. As is set forth more fully in the First Day Declaration, the Debtors entered into these chapter 11 cases in the wake of a severe liquidity crisis with the goal of pursuing a marketing process for and/or orderly wind-down of their assets. The Debtors and their advisors believe that exploring a more comprehensive marketing process for a potential sale (or sales) to unlock the highest possible value for the Debtors' assets is in the best interest of the Debtors' estates. In light of the Debtors' duty to maximize value for their estates, the Debtors have a sound business purpose for the Sale (or Sales).

43.    Additionally, any Stalking Horse Bidder and Stalking Horse Agreement will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimate successful bid, after being subject to a further "market check" in the form of the Auction (if any), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g.*, *In re Trans*

19

*World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

44.    The Definitive Purchase Agreements of any Successful Bidders will constitute the highest or otherwise best offer for the applicable Assets, which will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination to sell the Assets through an Auction process and to enter into Definitive Purchase Agreements with one or more Successful Bidders will be a valid and sound exercise of the Debtors' business judgment.  The Debtors request that the Court authorize the proposed Sale (or Sales) as a proper exercise of the Debtors' business judgment.

**B.      The Sale (or Sales) Should Be Approved "Free and Clear" Under Section 363(f) of the  Bankruptcy Code.**

45.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

46.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed Encumbrances under Definitive Purchase Agreement of the Successful Bidder.

*See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

47.     Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors request authority to convey the Assets to the Successful Bidder free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

## IV.     The Form And Manner of the Sale Notice Should Be Approved.

48.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors request that this Court approve the form and manner of the Sale Notice.

**V.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**.

   **A.     The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment**.

49.     To facilitate and effectuate the Sale (or Sales), the Debtors are seeking authority to assign or transfer the Assigned Contracts to a Successful Bidder to the extent required by such bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

50.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

51.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.  *First*, the Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets.  *Second*, it is unlikely

22

that any purchaser would want to acquire certain of the Assets unless certain of the contracts and leases needed to conduct business and manage day-to-day operations of those Assets were included in the transaction.  **Third,** the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

52.    The assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B.    Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.**

53.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

54.    The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**C.      Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

55.      Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."   *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).   Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

56.      The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.   As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts assigned to the Successful Bidder.   Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.

The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Definitive Purchase Agreement of the Successful Bidder.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

57.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

58.     The Debtors will provide notice of this Motion to the following parties or their counsel:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) Weil, Gotshal & Manges LLP as counsel to the DIP Lender; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) all known holders of liens, encumbrances, and other claims secured by the Assets; (j) all known creditors of the Debtors; (k) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

The Debtors request that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 7, 2021

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:        mcavenaugh@jw.com
              jwertz@jw.com
              mstull@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              christine.okike@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## <u>Certificate of Service</u>

I certify that on June 7, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh