## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| KATERRA INC., *et al.*,[1] | ) Case No. 21-31861 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF MATTHEW R. NIEMANN IN SUPPORT OF
## (A) DIP FINANCING AND (B) ALL FIRST DAY RELIEF

I, Matthew R. Niemann, declare under penalty of perjury:

1.      I am a Managing Director, Shareholder, and senior member of the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan Lokey") (NYSE:  HLI), a financial advisory services and investment banking firm, headquartered at 10250 Constellation Blvd., Los Angeles, California 90067.  Houlihan has been engaged as the investment banker to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2.      Houlihan Lokey was engaged to serve as investment banker for Katerra Inc. (Cayman) and its affiliates (together with its Debtor and non-Debtor affiliates, "Katerra" or the "Company") initially in September 2020, where it advised the Company in conjunction with a recapitalization transaction that closed in December 2020.  Houlihan Lokey was re-engaged by the Company in May 2021 to serve as the Debtors' financial advisor and investment banker in conjunction with the debtor-in-possession financing, restructuring, and asset monetization processes that are underway in these chapter 11 cases.  I am the senior-most officer at Houlihan

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra.  The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

Lokey with overall responsibility for Houlihan Lokey's provision of professional services to the Debtors.

3.      I submit this declaration (this "Declaration") to assist the Court and parties in interest and in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "DIP Motion").[2]

4.      Houlihan Lokey has worked closely with the Debtors' board, management, restructuring counsel, Kirkland & Ellis LLP ("Kirkland"), and restructuring advisor, Alvarez & Marsal North America LLP ("A&M"), in the lead up to these chapter 11 cases.  Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of my team at Houlihan Lokey, the Debtors' senior management and board members, other advisors to the Debtors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**Background and Qualifications**

5.      Houlihan Lokey is an internationally recognized investment banking and financial advisory firm with twenty-two offices worldwide.  It is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest in

---

[2]   Capitalized terms used but not defined herein have the meaning given to them in the DIP Motion or Interim DIP Order, as applicable.

complex financial restructurings, both in and out of bankruptcy. Houlihan Lokey provides corporate finance, financial advisory, and financial restructuring services and has the largest worldwide financial restructuring practice of any investment bank. I joined Houlihan Lokey 22 years ago. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit 1**.

6. I hold a finance and law degree from St. Louis University and St. Louis University School of Law, respectively. I have been involved in restructurings for over 32 years, having started my career as an attorney with Bryan Cave in St. Louis from 1989–1996, where I practiced in the banking, real estate, and corporate groups. I also worked at KPMG and PricewaterhouseCoopers prior to joining Houlihan Lokey in 1999. I left Houlihan Lokey in 2006 and joined Cerberus Capital as a Managing Director and portfolio manager and later GMAC ResCap (a Cerberus portfolio company) where I served as Senior Managing Director and Chief Strategic Officer in charge of strategy for its $5.0 billion portfolio of builder and developer real estate investments. I returned to Houlihan Lokey in September 2008, where I founded the Firm's Real Estate Strategic Advisory and Real Estate Restructuring Investment Banking groups.

7. From 2012–2019, I was a member of the Board of Directors of William Lyon Homes (NYSE: WLH), one of the largest homebuilders in the Western United States, where I chaired the Compensation Committee, and sat on the Governance, and Audit Committees. I also chaired the Pricing Committee for WLH's IPO in May 2013.

8. In addition to Houlihan Lokey's engagement for the Debtors, I have led Houlihan Lokey's engagements on several other debtor or sell-side restructurings in the bankruptcy courts of Texas, including, among others: *In re Bristow Group, Inc.*, No. 19-32713 (DRJ) (Bankr. S.D. Tex.); *In re SandRidge Energy, Inc.* No. 16-32488 (DRJ) (Bankr. S.D. Tex.); *In re PHI Inc.* No. 19-303932 (HDH) (Bankr. N.D. Tex.); *In re CHC Group Ltd.*, No. 16-31854

(BJH) (Bankr. N.D. Tex.); *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ) (Bankr. N.D. Tex.); *In re Linden Ponds, Inc.*, No. 11-33913 (SGJ) (Bankr. N.D. Tex.); *In re Erickson Retirement Communities, LLC*, No. 09-37010 (SGJ) (Bankr. N.D. Tex.); and *In re National Benevolent Association*, No. 04-50948 (RBK) (Bankr. W.D. Tex.).  I testified as an expert in most of the foregoing cases and have regularly testified as an expert in Chapter 11 cases over the last twenty-five years on issues ranging from debtor in possession financing, distressed M&A, asset monetization, and other issues core to these chapter 11 cases.

9.     The *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith, provides an overview of Katerra's businesses and the historical developments leading up to these chapter 11 cases.  A summary of the Company's recapitalization processes and current asset monetization program are set forth in this Declaration.

**I.     The Debtors' Prepetition Capital Structure**

10.     As of the Petition Date, the Debtors and certain of their non-debtor subsidiaries have an aggregate principal amount of approximately $1.29 billion to $1.55 billion in total obligations, consisting primarily of (i) prepetition funded debt of certain of the Debtors' foreign non-Debtor subsidiaries, (ii) surety bond obligations, (iii) letters of credit, and (iv) corporate guarantees.  The estimated aggregate outstanding amount of each debt obligation is as follows:

| Funded Debt | Principal Amount (in USD millions) |
|---|---:|
| Prepetition Samba Credit Facility | $ 17 |
| Prepetition SIDF Term Loan | 16 |
| Prepetition YES Bank Facility | 40 |
| **Subtotal: Prepetition Foreign Debt** | **$ 73** |
| Surety Bond Obligations | $ 677 |
| Letters of Credit | 22 |
| **Subtotal: Bonding and LoC** | **$ 699** |
| Corporate Guarantees | $ 515 - 779 |
| **Total Debt Obligations** | **$ 1,287 - 1,551** |

### A.      Prepetition Foreign Funded Debt of Non-Debtor Subsidiaries

#### i.      Samba Credit Facility

11.     On July 19, 2019, Katerra Inc. (Delaware, US) ("Katerra Delaware") and Katerra Inc. (Cayman) ("Katerra Cayman") as guarantors, entered into that certain credit facility (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Samba Credit Agreement"), with non-Debtor subsidiary Katerra Saudi Arabia, LLC ("Katerra Saudi Arabia"), as borrower, and Samba Financial Group, as lender, to fund certain projects in the Middle East region.   The Samba Credit Agreement provides an aggregate availability of approximately $133 million (the "Samba Credit Facility").   As of the Petition Date, the Debtors estimate that approximately $16.7 million is outstanding on account of the Samba Credit Facility.

#### ii.      SIDF Term Loan

12.     On October 23, 2019, Katerra Cayman, as guarantor, entered into that certain term loan agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SIDF Term Loan Agreement"), with Katerra Saudi Arabia, as

borrower, and Saudi Industrial Development Fund, as lender, for an aggregate principal amount of approximately USD $81.5 million (the "SIDF Term Loan") to fund certain projects in the Middle East region.  The SIDF Term Loan is secured by a lien on all the fixed assets of non-Debtor subsidiary Katerra Saudi Arabia LLC – Branch Jeddah (Saudi Arabia).  As of the Petition Date, the Debtors estimate that approximately $16.3 million is outstanding on account of the SIDF Term Loan.

### iii.      YES Bank Facility

13.      Katerra Delaware is party to that certain agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "YES Bank Agreement") by and among non-Debtor subsidiary KEF Infrastructure India Pvt. Ltd., as borrower, Katerra Delaware and non-Debtor Katerra Operating Company Inc., as guarantors, and YES Bank Limited, as lender.   The YES Bank Agreement consists of (a) term loans maturing on February 18, 2029 (the "YES Bank Term Loans") in the aggregate principal amount of approximately $34.7 million, and (b) a credit facility (the "YES Bank Credit Facility," and, together with the YES Bank Term Loans, the "YES Bank Facility") with approximately $11 million of availability, approximately $4.8 million of which is drawn.  The YES Bank Term Loans accrue interest at a rate of 11.15% and the YES Bank Credit Facility accrues interest at a rate of 10.2%.  The YES Bank Facility is secured by a standby letter of credit in the amount of $10 million.   As of the Petition Date, the Debtors estimate that approximately $39.5 million is outstanding on account of the YES Bank Facility.

### B.      Bonding and Letters of Credit

14.      A description of the Debtors' surety bond obligations and outstanding letters of credit is set forth in the First Day Declaration.  *See* First Day Declaration ¶¶ 46–48.

### C.      Corporate Guarantees

15.      Katerra Cayman and Katerra Delaware have guaranteed certain projects of Katerra Saudi Arabia.   Under these guarantees, Katerra Cayman and Katerra Delaware are liable for unfunded obligations of Katerra Saudi Arabia under performance bonds, bid bonds, advance payment guarantees, and letters of credit provided in favor of project owners.  As of the Petition Date, the Debtors estimate that they have guaranteed approximately $514.8 million to $779.2 million in project obligations of Katerra Saudi Arabia.

## II.   Katerra's Common and Preferred Stock

### A.      Historical Capital Raises

16.      Historically, Katerra raised the majority of its financing through multiple rounds of equity investments.  As a start-up, in 2015, Katerra raised approximately $14.5 million in capital through two separate rounds of "angel" investing.  The majority of the capital was provided by Katerra's three co-founders (Michael Marks, Jim Davidson, and Fritz Wolff) and certain of their companies.

| Investor | Angel (Individual) Feb-2015 Contributed Capital | Angel (Individual) Jun-2015 Contributed Capital |
|---|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $            0.00 | $      2,000,000.00 |
| Paxion Capital | 0.00 | 4,000,000.00 |
| Wolff-related entities | 20,000.00 | 4,000,000.00 |
| Michael Marks (Outside Paxion) | 475,900.00 | 0.00 |
| Jim Davidson (Outside Paxion) | 98,000.00 | 0.00 |
| Fritz Wolff (Outside Paxion) | 49,752.00 | 0.00 |
| Others | 276,348.00 | 3,559,520.00 |
| **Total** | **$        920,000.00** | **$    13,559,520.00** |
| **Total Invested to Date** | **920,000.00** | **14,479,520.00** |
| **$ / share** | **0.005** | **0.50** |

17.   In 2016, Katerra commenced a second round of venture capital funding, which raised approximately $77.35 million in capital.

| Investor | Early Stage VC Mar-2016 Contributed Capital |
|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $      49,974,400.00 |
| Paxion Capital | 4,997,440.00 |
| Wolff-related entities | 2,989,540.00 |
| Jim Davidson (Outside Paxion) | 490,820.00 |
| Others | 18,895,824.00 |
| **Round Total** | **$      77,348,024.00** |
| **Total Invested to Date** | **91,827,544.00** |
| **Post $ Valuation** | **577,321,170.00** |
| **$ / share** | **2.231** |

18.   The following year, in 2017, Katerra commenced a Series C financing, which raised another $141 million in capital.

| Investor | Series C Mar-2017 Contributed Capital | |
|---|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $ | 29,970,000.00 |
| Paxion Capital | | 9,990,000.00 |
| Others | | 101,009,112.00 |
| **Round Total** | **$** | **140,969,112.00** |
| **Total Invested to Date** | | **232,796,656.00** |
| **Post $ Valuation** | | **1,168,996,574.00** |
| **$ / share** | | **3.70** |

19.     In 2018 and 2019, Katerra initiated four different rounds of financing and raised a total of approximately $2.4 billion.  During Katerra's Series D-1 & D-2 financing and Series E financing, SoftBank Vision Fund I ("SVF") contributed approximately $1.4 billion of financing and subsequently became Katerra's largest capital investor (though SVF did not hold a controlling stake in Katerra).  As of the petition date, SVF and its affiliates have invested approximately $2.15 billion in Katerra.

| Investor | Series D-1 & D-2 Jan-2018 Contributed Capital | | Series E (Incl. Extension) Dec-2018 / Jul-2019 Contributed Capital | | Conv. Promissory Note Jul-2019 Contributed Capital | | Middle East JV Q4 2018 & Jul-2019 Contributed Capital | |
|---|---|---|---|---|---|---|---|---|
| Softbank | $ | 649,999,950.00 | $ | 749,999,988.00 | $ | 200,000,000.00 | $ | 150,000,000.00 |
| Foxconn (iCreate & Foxconn Ventures) | | 29,999,997.00 | | 0.00 | | 0.00 | | 0.00 |
| Michael Marks (Outside Paxion) | | 0.00 | | 4,999,992.00 | | 0.00 | | 0.00 |
| Katerra | | 0.00 | | (52,000,000.00) | | 0.00 | | 52,000,000.00 |
| Others | | 390,775,676.00 | | 242,001,091.00 | | 0.00 | | 0.00 |
| **Round Total** | **$** | **1,070,775,623.00** | **$** | **945,001,071.00** | **$** | **200,000,000.00** | **$** | **202,000,000.00** |
| **Total Invested to Date** | | **1,303,572,279.00** | | **2,248,573,350.00** | | **2,448,573,350.00** | | **2,650,573,350.00** |
| **Post $ Valuation** | | **3,485,000,000.00** | | **5,999,762,400.00** | | **0.00** | | **0.00** |
| **$ / share** | | **79.50** | | **0.00** | | **0.00** | | **0.00** |

20.     On December 9, 2019, Katerra Delaware entered into the Greensill Receivables Facility by and among Katerra Delaware, a Delaware limited liability company, as a seller, the other sellers party thereto and Greensill Limited ("Greensill"), together with the Transaction Documents (as defined therein) (the "Greensill Receivables Facility").  It is my understanding that SVF and/or its affiliates owned approximately 40% of Greensill at the time of the 2020 recapitalization transaction described herein.

9

21.     Pursuant to the terms of the Greensill Receivables Facility, Greensill paid Katerra's suppliers in exchange for a security interest in Katerra's account receivables.  Katerra would then pay Greensill directly on the terms set forth in the Greensill Receivables Facility agreement instead of its suppliers.  Katerra relied on the Greensill Receivables Facility to fund operations instead of raising capital through rounds of equity financing from December 2019 to May 2020.  By December 2020, Katerra owed approximately $440 million under the Greensill Receivables Facility.

22.     In May 2020, Katerra commenced another round of financing (Series F) with one of its previous investors, SVF, to raise additional capital to fund operations.  As described above, in 2018 and 2019, SVF contributed capital of approximately $1.4 billion as a part of Katerra's Series D-1 & D-2 financing and Series E financing.  In 2019, SVF provided Katerra with an additional $200 million in exchange for a promissory note and another $150 million in exchange for an ownership stake in non-Debtor Katerra Middle East.  Pursuant to the terms of the Series F financing, SVF provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately 45 days later.  In addition, SVF exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

III.    **The Debtors' 2020 Recapitalization Transaction**

23.     In September 2020, Houlihan Lokey was engaged to render investment banking services to Katerra in connection with Katerra's liability management initiatives and exploration of strategic alternatives.  During this initial engagement, Houlihan Lokey explored several strategic alternatives, including the investment of third-party capital, the bifurcation of Katerra's businesses into a "NewCo / OldCo" and other alternatives.  Katerra, with the assistance of Houlihan Lokey, approached several parties, including existing counterparties of Katerra and other

interested parties to explore financing and other strategic transactions. Houlihan Lokey actively pursued negotiations with SVF and a consortium of new investors and existing stakeholders (the "Consortium") who expressed a desire to support Katerra's business. The proposed transaction contemplated a new-money investment by the Consortium and SVF of approximately $380 million in exchange for a 90% equity ownership stake in Katerra, with the remaining 10% of Katerra's equity reserved for management. In addition, the transaction contemplated the retirement of Katerra's outstanding Greensill Receivables Facility and the sale of Katerra's ownership interests in certain foreign ventures. Katerra, SVF, and the Consortium executed a non-binding letter of intent reflecting this transaction. The transaction, however, did not materialize.

24.     In late November 2020, following the breakdown of negotiations with SVF and the Consortium, SVF Abode (Cayman) Limited ("SVF Abode"), an affiliate of SVF, indicated an interest in investing an additional $200 million to ensure Katerra would be able to meet its ongoing obligations. Katerra issued a promissory note to SVF Abode in exchange for a $25 million bridge loan while Katerra engaged with SVF Abode and other stakeholders to negotiate the terms of an out-of-court financial restructuring and recapitalization of Katerra.

25.     Ultimately, Katerra consummated a comprehensive recapitalization transaction at the end of December 2020 on the following terms:

- SVF Abode exercised its warrant to purchase ordinary shares of the Company and converted $300 million of promissory notes of the Company held by SVF Abode to equity;

- the Company (i) converted all existing preferred share into ordinary shares of the Company, and (ii) issued a new class of preferred shares (the Series A preferred shares) to SVF Abode in exchange for $175 million in cash and extinguishment of a $25 million bridge loan owed to SVF Abode;

- Greensill extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-equity closing in Katerra, which equity was immediately transferred by Greensill to an affiliate of SoftBank Vision Fund II ("SVF II") in connection

with a transaction in which SVF II invested $440 million in the parent company of Greensill;

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved in a share pool for an equity incentive plan and related grants; and

- Katerra and Wolff Principal Holdings, L.P. ("Wolff") settled and waived certain claims against Katerra, including the amendment of the "Substantial Completion Dates" of a number of active projects with Wolff and certain of its related parties, and in exchange, Katerra granted Wolff a lien on its CLT facility in Spokane, Washington.

As a part of this transaction, SVF was diluted to the same extent as all other investors (100,000.0:1.0), which resulted in the previous $1.95 billion invested by SVF equating to less than 0.1% of the post-recapitalization transaction equity.   A general summary of the Company's capitalization prior and subsequent to the 2020 recapitalization transaction is attached hereto as **Exhibit 2**.

26.    When Houlihan Lokey was retained in September 2020, Katerra had $740 million in funded debt obligations, including the $440 million owing to Greensill under the Greensill Receivables Facility and excluding the Debtors' foreign affiliate debt, and approximately $2.3 billion in preferred and common equity capitalization.  Through the 2020 recapitalization, all of the Company's funded debt obligations and existing preferred equity were extinguished.  *See* **Exhibit 2**.

27.    As of the Petition Date, Katerra Cayman's equity was primarily held by the following entities:

| Stakeholder | Series A Preferred | Ownership Percentage |
|---|---|---|
| SVF Abode (Cayman) Limited | 11,420,798 | 93.65% |
| SVF II Abode (Cayman) Limited | 762,144 | 6.25% |
| SVF Habitat (Cayman) Limited | 7,775 | 0.06% |

## IV.    The Debtors' Need for Debtor-in-Possession Financing

28.     Upon re-engaging Houlihan Lokey in May 2021, it was determined that the Debtors were operating at a perilous level of liquidity.  The impact of the Greensill insolvency and the press coverage in conjunction therewith, along with other rumors and concerns throughout the marketplace, caused a run on Katerra's liquidity, all as more fully set forth in the First Day Declaration.  Moreover, given the capital-intensive nature of the Debtors' businesses and the position of the Debtors as general contractors on a multitude of projects, the Debtors had to ensure that projects were appropriately funded and that subcontractors on these projects were paid.  Consequently, the Company's available liquidity was strained to an unsustainable level leading up to the filing of these chapter 11 cases.

29.     Houlihan Lokey embarked on a process to raise liquidity on an exigent basis, approaching several parties, including SVF and other parties familiar with the Debtors' businesses.  Given the very short time frame (approximately two weeks) along with the complexities of the Debtors' businesses and underlying assets, it was impractical to approach a broad range of traditional financing sources.  As a result, Houlihan Lokey embarked on a very targeted approach to solicit financing.  Given its initial engagement on behalf of the Company in September 2020, Houlihan Lokey was able to immediately engage in discussions with parties who had a familiarity with the business and could potentially provide capital in a matter of weeks.  Houlihan Lokey solicited both out-of-court and in-court financing proposals from SVF, third party lenders, and parties who had expressed an interest in acquiring certain assets of Katerra.  Ultimately, the only party willing to provide the liquidity the Company required on an expedited basis was SVF.

30.     Accordingly, the $35.0 million DIP Promissory Note is not only the best financing available, but also the only financing that was available as of the Petition Date.  Attached hereto as **Exhibit 3** is a summary of the key terms of the DIP Promissory Note.  The Debtors' best path

forward is to obtain credit under the DIP Promissory Note and work to refinance the DIP Promissory Note or to consummate one or more asset sales to provide additional liquidity to achieve an orderly value maximizing asset monetization and overall resolution of these chapter 11 cases.

31.     Without immediate access to the DIP Promissory Note as structured, the Debtors and their constituents risk massive value degradation.  Thus, to preserve value and avoid irreparable harm pending the Final Hearing on the DIP Promissory Note, it is essential that the Debtors have access to credit under the DIP Promissory Note on an interim basis as requested.

32.     Based on my experience in soliciting and negotiating debtor in possession financings, it is my opinion that the terms of the DIP Promissory Note are reasonable under the circumstances.  While the Debtors and Houlihan Lokey attempted multiple times to negotiate more favorable terms for the Debtors, the terms of the DIP Promissory Note are within market based on my experience.  Further, the DIP Promissory Note is the product of good-faith, robust arm's-length negotiations and is necessary for the Debtors to maximize value on behalf of its constituents in these cases.

**V.     The Asset Monetization Process**

33.     Before the Petition Date, during Houlihan Lokey's initial and re-engagement on behalf of the Debtors, I and other members of the Houlihan Lokey team contacted several potential parties, including existing counterparties and third-party bidders, who may have an interest in acquiring portions of Katerra's business and assets.  The Debtors and Houlihan Lokey are currently advancing discussions with these parties in an effort to identify the highest or otherwise best bidders amongst them and to submit formal bids to the benefit of the Debtors' estates.  As of the date hereof, that process remains very active and comprehensive.

## Conclusion

34.     Based on the foregoing, I believe the DIP Lender's financing proposal represents the best postpetition financing alternative available to the Debtors.  The DIP Promissory Note will provide the Debtors and their creditor constituencies with postpetition financing on terms that represent their best and only viable alternative.

35.     Further, the DIP Promissory Note is the product of good-faith, arm's-length negotiations and is necessary for the Debtors to pursue a marketing process for some or all of the Debtors' assets.  Given the timing and circumstances, I do not believe alternative sources of DIP financing with better, or even as favorable, terms as those of the DIP Promissory Note would be available.  Given the Debtors' financing history and SVF's willingness to provide DIP financing on terms and on the timeline dictated by the Debtors' liquidity needs, I do not believe soliciting alternate financing proposals would be a productive or fruitful endeavor.  Having the financing requested under the DIP Motion in place on an exigent basis will allow the Debtors and Houlihan Lokey to focus solely on the process of maximizing recoveries through asset monetization and claims mitigation on a vigilant and efficient basis so as to avoid unnecessary process liquidity burn during these chapter 11 cases.  Accordingly, approval of the DIP Promissory Note is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment.


[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated:  June 7, 2021                    /s/*Matthew R. Niemann*
                                        Matthew R. Niemann
                                        Managing Director
                                        Houlihan Lokey Capital, Inc.

## __Exhibit 1__

**Matthew R. Niemann Curriculum Vitae**



## Matthew R. Niemann
Managing Director

Mr. Niemann is a Managing Director and senior member of Houlihan Lokey's Financial Restructuring Investment Banking Group.  Since joining Houlihan Lokey over twenty-two years ago, Mr. Niemann has served on the Firm's management committee, among other leadership roles, including running Houlihan Lokey's Global Real Estate and Real Estate Restructuring Investment Banking Groups, and West Coast and Midwest Financial Restructuring Groups.

From 2012-2019, Mr. Niemann was a member of the Board of Directors of William Lyon Homes (NYSE: WLH), one of the largest homebuilders in the Western United States, where he sat on the Compensation (Chair), Governance, and Audit Committees and chaired the Pricing Committee for WLH's IPO in May 2013.  Over his thirty-two year career, Mr. Niemann has served as a principal or advisor in a wide range of M&A, restructuring, and financing transactions for Fortune 500 and middle-market companies. He also regularly testifies as an expert in federal court on valuation, capital market, fiduciary duty, and transaction process issues. Prior to joining Houlihan Lokey, Mr. Niemann ran PricewaterhouseCoopers' Financial Advisory Services Group and practiced law in Bryan Cave's Corporate, Banking & Real Estate practice in St. Louis. He also spent three years with Cerberus Capital where he was a Managing Director and investment professional and served as Senior Managing Director and Chief Strategic Officer of GMAC ResCap (a Cerberus portfolio company) in charge of strategy for its $5.0 billion portfolio of builder and developer real estate investments.

Mr. Niemann holds Finance and Law degrees from St. Louis University, where he served on the *Law Review*. He was a guest lecturer from 2006-2011 at the Kellogg Graduate School of Management at Northwestern University in Chicago, was a member of the Ph.D. Dissertation Committee at Webster University in St. Louis, and has been recognized by the K&A Registry as one of the leading restructuring investment bankers in the United States.  Mr. Niemann founded the American Bankruptcy Institute Corporate Bankruptcy Restructuring Competition and authored the inaugural case study *Delicious Delights* in 2003. He was the chairman of the Turnaround Management Association ("TMA") Distressed Investing Conference in 2008 and regularly participates in industry conferences.  He holds a Series 7 and 63 issued by the National Securities Association Dealers and has been accredited as a Certified Turnaround Professional by the TMA.  Mr. Niemann has served on the executive committee of the board (Treasurer) of The Ronald McDonald Houses of Greater St. Louis, Our Holy Redeemer Parish Council (Treasurer) and School Board and the Webster Groves Economic Advisory Council.

**<u>Exhibit 2</u>**

**Pre- and Post-2020 Capitalization Structure**

| | Pre-Recapitalization Transaction | Post-Recapitalization Transaction *(additional changes have occurred since the closing of the 2020 Recapitalization)* |
|---|---|---|
| **Indebtedness** | | |
| SVF Secured Bridge | $            25,000,000.00 | $            0.00 |
| Greensill Secured Facility | 440,000,000.00 | 0.00 |
| SVF Convertible Notes | 300,000,000.00 | 0.00 |
| **Total Indebtedness** | **$          765,000,000.00** | **$            0.00** |
| | | |
| **Equity** | | |
| Preferred Equity (All Series)[1] | $        2,119,716,595.00 | $        199,922,250.00 |
| Common Equity (All Series) | 168,182,089.28 | 77,750.00 |
| **Total Indebtedness + Equity** | **$      3,052,898,684.28** | **$        200,000,000.00** |
| | | |
| **Fully Diluted Equity Ownership**[2] | | |
| SVF and Affiliates | 40.2% | 74.9% |
| Non-SVF Existing Investors[3] | 59.8% | 0.1% |
| Greensill Limited[4] | 0.0% | 5.0% |
| Wolff Principal Holdings, LP and Affiliates[3] | UNK | 5.0% |
| Management Incentive Plan | 0.0% | 15.0% |
| **Total Ownership** | **100.0%** | **100.0%** |

(1) *SVF invested $200mm, which included $25mm of SVF Secured Bridge that was converted into Series A Preferred Shares*

(2) *Pre-Recapitalization Transaction Fully Diluted Equity Ownership shown prior to the conversion of the SVF Convertible Notes*

(3) *Wolff and Affiliates owned an unknown percentage of the fully diluted equity pre-transaction*

(4) *Following the close of the SVF Recapitalization Transaction, the Greensill shares were sold to SVF*

## <u>Exhibit 3</u>

## Summary of DIP Financing

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Parties to the DIP Promissory Note**<br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Katerra Inc., a Delaware corporation (the "Company").<br><br>**DIP Guarantors**: Katerra Inc., a Cayman company (the "Parent") and each Subsidiary of the Parent from time to time party to the Security Agreement (as defined in the DIP Promissory Note) (each, a "DIP Guarantor," and, together with the Company, the "DIP Note Parties").<br><br>**DIP Lender**: SB Investment Advisers (UK) Limited, a UK private limited company (in its capacity under the DIP Promissory Note, including its registered assigns, the "Holder").<br><br>*See* DIP Promissory Note, Preamble, ¶ 1, "Guarantors" |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Promissory Note (the "Maturity Date") shall be the earlier of:<br><br>(a)  the consummation of a sale of all or substantially all of the assets of the DIP Note Parties;<br><br>(b)  acceleration of the Balance of the DIP Promissory Note pursuant to the DIP Promissory Note;<br><br>(c)  35 days after entry of the Interim DIP Order (or such later date as the Holder in its sole discretion may agree in writing with the Company) if the Final DIP Order has not been entered on or prior to the expiration of such 35-day period;<br><br>(d)  the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a Chapter 11 Plan (as defined in the DIP Promissory Note) that is confirmed pursuant to a Final DIP Order entered by the Court; and<br><br>(e)  the Scheduled Maturity Date (to be seventy-five (75) days post-closing).<br><br>*See* DIP Promissory Note, ¶ 1, "Maturity Date" and "Scheduled Maturity Date" |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Promissory Note commitments total $35 million (and, all amounts extended under the DIP Promissory Note, the "DIP Loans"), up to $25 million of which are available on an interim basis (the "Initial Funding Amount").<br><br>*See* DIP Promissory Note, Preamble, ¶ 2.1(a); Interim DIP Order ¶ (i)–(iii). |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Promissory Note, ¶ 9. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at a rate equal to the lower of (a) the Highest Lawful Rate; and (b) 10% per annum; *provided*, that, in the event the entire Balance of the DIP Promissory Note except for any capitalized interest as of the date thereof is indefeasibly paid in full in cash on or prior to the date that is 60 days following the Petition Date, no such capitalized interest shall be payable in connection with such repayment.<br><br>*See* DIP Promissory Note, ¶ 1, "Applicable Rate" and "Highest Lawful Rate." |
| **Use of DIP Promissory Note** | The Company shall use the proceeds of the Loans to finance, in each case consistent in all material respects with the Approved Budget (as defined below), subject to Permitted Variances:  (i) working capital, letters of credit, surety and performance bonds, and |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Bankruptcy Rule** 4001(c)(l)(B)(ii) | general corporate purposes of the DIP Note Parties, including capital expenditures and Permitted Investments, (ii) the negotiation, documentation, pursuit and/or consummation of an Acceptable Sale, (iii) costs, fees, expenses and charges, in each case, related to, arising out of or in connection with the chapter 11 cases, subject to the Carve-Out, and (iv) certain other prepetition and pre-filing expenses that are approved by the Court and permitted by the Approved Budget. <br><br> *See* DIP Promissory Note, Ex. A ¶ 9. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) | Upon the Maturity Date, the Company shall pay all reasonable out-of-pocket expenses incurred by Holder, including the fees, charges and disbursements of one primary counsel to the Holder (including Weil, Gotshal & Manges LLP), one local counsel to the Holder in each relevant jurisdiction and any other third party advisor consented to by the Company (such consent not to be unreasonably denied, withheld or delayed), in connection with the chapter 11 cases, the DIP Promissory Note (and any amendments, modifications or waivers thereof), the enforcement of rights in connection with the DIP Promissory Note and the administration of the DIP Promissory Note. <br><br> No other fees and expenses are due and payable under the terms of the DIP Promissory Note. <br><br> *See* DIP Promissory Note, ¶ 8.2. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) | The proceeds from the DIP Promissory Note is subject to the Approved Budget (as defined herein), and the initial Approved Budget is attached as <u>Schedule 2</u> to the Interim DIP Order. <br><br> *See* DIP Promissory Note, Ex. D; Interim DIP Order, <u>Schedule 2</u>. |
| **Case Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Note Parties shall pursue and achieve the following milestones, in form and substance acceptable to the DIP Lender: <br><br>     (a)     on or before the date that is two (2) Business Days after the Petition Date, the Court shall have entered the Interim DIP Order; <br>     (b)     on or before the date that is five (5) days after the Petition Date, the DIP Note Parties shall file with the Court a sale motion and bid procedures motion in form and substance reasonably acceptable to the Holder; <br>     (c)     on or before the date that is thirty five (35) days after the Petition Date, the Court shall have entered the Final DIP Order; <br>     (d)     on or before the date that is forty-five (45) days after the Petition Date (i) the Court shall have entered an order establishing bid procedures in form and substance reasonably acceptable to the Holder (the "<u>Bid Procedures Order</u>") which shall, among other things, provide that the deadline for bidding be a date not later than fifty-five (55) days from the Petition Date and the Bid Procedures Order shall approve entry into one or more agreements that provide for one or more Acceptable Sale(s), or (ii) the Company shall have obtained a binding commitment for a Replacement DIP and filed a motion with the Court seeking entry of an order approving such Replacement DIP and the indefeasible repayment in full in cash of the Balance; <br>     (e)     on or before the date that is sixty (60) days after the Petition Date, either (i) one or more sale orders in form and substance acceptable to the Holder with respect to one or more Acceptable Sales shall have been entered by the Court, or (ii) the Court shall have entered one or more orders approving the Debtors' entry into a Replacement DIP and the indefeasible repayment in full in cash of the Balance (the "<u>DIP Refinancing Order</u>"); |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (f)      if the DIP Refinancing Order is entered, on or before the date that is three (3) days after entry of the DIP Refinancing Order, the Balance shall be repaid in full in cash with the net cash proceeds of the Replacement DIP; <br><br> (g)      on or before the date that is sixty (60) days after the Petition Date, the DIP Note Parties shall file with the Court an Acceptable Plan and a disclosure statement with respect to such Acceptable Plan (the "Disclosure Statement"); provided, that the DIP Note Parties' compliance with this milestone shall not be affected by technical and immaterial changes and other changes, modifications and supplements to such Acceptable Plan and Disclosure Statement that are reasonably acceptable to the Holder filed with the Court subsequent to the original filing of such Acceptable Plan and Disclosure Statement; <br><br> (h)      on or before the date that is seventy (70) days after the Petition Date, one or more Acceptable Sales shall be consummated; <br><br> (i)      on or before the date that is ninety (90) days after the Petition Date, the Court shall have entered an order approving the Disclosure Statement; <br><br> (j)      on or before the date that is one hundred twenty (120) days after the Petition Date, the Court shall have entered the Confirmation Order; and <br><br> (k)      on or before the date that is one hundred thirty five (135) days after the Petition Date, the Acceptable Plan shall be effective. <br><br> *See* DIP Promissory Note, Ex. D; Interim DIP Order ¶ 23. |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) | DIP Liens.  Subject and subordinate solely to any Prior Perfected Liens and the Carve-Out as set forth in the Interim DIP Order, and effective immediately upon entry of this Interim DIP Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property, whether now existing or hereafter arising and wherever located, tangible, or intangible, of each of the Debtors (the "DIP Collateral"). <br><br> Superpriority Claims.  Subject to the Carve-Out, upon entry of the Interim DIP Order, the DIP Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the chapter 11 cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the chapter 11 cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof. <br><br> *See* Interim DIP Order, ¶ 6–8. |
| **Carve-Out** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code. <br><br> *See* Interim DIP Order, ¶ 30. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge period no later than the date that is sixty (60) days from the formation of the Committee (the "<u>Challenge Deadline</u>"), as such deadline may be extended in writing from time to time in the sole discretion of the DIP Lender or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline.<br><br>*See* Interim DIP Order, ¶ 32(a). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Promissory Note contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, the failure to timely comply with any of the Case Milestones.<br><br>*See* DIP Promissory Note, Section ¶ 6; Interim DIP Order ¶ 22. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 13. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Promissory Note contains indemnification provisions ordinary and customary for financings of this type, including that the Holder (and its officers, directors, employees, advisors and agents) (each such person, an "<u>Indemnitee</u>") will have no liability for, and will be indemnified and held harmless against, any actual losses, claims, damages, liabilities or expenses (in the case of (i) legal fees and expenses, limited to reasonable and documented fees and out-of-pocket expenses of one primary counsel for all such Indemnitees taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Company has consented to the retention of such person) incurred or arising out of, in connection with, or as a result of, the DIP Promissory Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by the DIP Promissory Note and the other Financing Documents, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, material breach by the Holder of its funding obligations under the DIP Promissory Note or willful misconduct of the relevant Indemnitee.<br><br>*See* DIP Promissory Note, ¶ 8.3. |