**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY**
**MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO**
**OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS**
**AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (C) MODIFYING THE AUTOMATIC STAY,**
**(D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. A hearing will be conducted on this matter on June 7, 2021 at 3:30 pm (prevailing Central time) in Courtroom 400, 4th floor, 515 Rusk, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**
>
> **You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the**

---

[1]   1   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

> **hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than June 7, 2021.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (this "<u>Motion</u>"):[2]

### Preliminary Statement

1.    The Debtors filed these chapter 11 cases in the wake of a severe liquidity crisis with the goal of pursuing a value-maximizing marketing and sale process and orderly wind down of their business.  Close to negative liquidity, the Debtors will suffer immediate and irreparable harm absent immediate access to capital.  The postpetition financing sought herein is essential to the Debtors' continued operations during these chapter 11 cases.

2.    As discussed more fully in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>") and the *Declaration of Matthew R. Niemann in Support of (A) DIP Financing and (B) All First Day Relief* (the "*Niemann Declaration*") attached hereto as **<u>Exhibit A</u>**, by the end of May 2021, the Debtors found themselves with a negative cash position and in need of an immediate capital infusion.

3.    Houlihan Lokey Capital, Inc. ("<u>Houlihan Lokey</u>"), the Debtors' investment banker, embarked on a process to raise liquidity on an exigent basis, approaching several parties, including SB Investment Advisers (UK) Limited—an affiliate of SoftBank Vision Fund I ("<u>SVF</u>") and other parties familiar with the Debtors' businesses.  *See* Niemann Decl. ¶ 29.  Houlihan Lokey solicited both in-court and out-of-court financing proposals from SVF, third party lenders, and parties who

---

[2]    Capitalized terms used but not immediately defined in their respective sections have the meanings given to them in the First Day Declaration, Niemann Declaration, the DIP Documents, or the Interim DIP Order (each as defined herein), as applicable.

had expressed an interest in acquiring certain assets of the Debtors.  *See id*.  Ultimately, the ***only*** party both willing and able to provide the liquidity the Debtors required on an expedited basis was SB Investment Advisors (UK) Limited, an affiliate of SVF.

4.      To help aid the Debtors' orderly and smooth transition into chapter 11 and help maximize recoveries for all creditors, SVF committed to provide $35 million of postpetition financing in the form of a senior secured superpriority debtor in possession promissory note (the "DIP Promissory Note" and the holder of such promissory note, the "DIP Lender").

5.      The DIP Promissory Note provides the Debtors with immediate access to liquidity on favorable economic terms under the circumstances, including no up-front fees, no exit fees, no ticking fees, no premiums, no repayment or prepayment fees, no cash interest is required and, if the loan is repaid within the first sixty (60) days, all accrued interest is waived, and payment of all DIP Lenders' advisors fees and expenses are deferred until the maturity of the DIP Promissory Note.  These concessions from SVF are designed to provide the Debtors as much near-term liquidity as possible under the circumstances to avoid a chapter 7 filing and bridge the Debtors to an orderly and expeditious sale process and wind-down intended to maximize value available for creditors.

### Relief Requested

6.      The Debtors seek entry of an interim order, substantially in the form attached hereto  (the "Interim DIP Order") and a final order (the "Final DIP Order," and, together with the Interim DIP Order, the "DIP Orders"):[3]

---

3    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

- ***DIP Promissory Note***:  authorizing the Debtors to obtain credit under the DIP Promissory Note in the aggregate principal amount of $35 million, pursuant to the terms and conditions set forth in the DIP Promissory Note;

- ***DIP Documents***:  authorizing the Debtors to enter into the DIP Promissory Note, substantially in the form annexed as <u>Schedule 1</u> to the Interim DIP Order attached hereto, the Security Agreement (as defined in the DIP Promissory Note) and certain ancillary documentation (together with the DIP Promissory Note, the "<u>DIP Documents</u>") and all of the Debtors' secured obligations arising thereunder (the "<u>DIP Obligations</u>");

- ***Security and Priority***:  authorizing the Debtors to grant, subject and subordinate solely to any Prior Perfected Liens (as defined in the Interim DIP Order) and the Carve Out, senior liens and superpriority administrative expense status to the DIP Lender to secure the DIP Obligations, including continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim DIP Order);

- ***Automatic Stay***:  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders; and

- ***Final Hearing***:  scheduling a final hearing to consider entry of the Final DIP Order.

<u>**Concise Statement Pursuant to**</u>
<u>**Bankruptcy Rule 4001 and the United States Bankruptcy**</u>
<u>**Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**</u>

7.     The following chart contains a summary of the material terms of the proposed DIP Promissory Note (the "<u>Summary of Material Terms</u>"), together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "<u>Complex Case Procedures</u>").[4]

---

4    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Parties to the DIP Promissory Note** Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Katerra Inc., a Delaware corporation (the "Company"). **DIP Guarantors**: Katerra Inc., a Cayman company (the "Parent") and each Subsidiary of the Parent from time to time party to the Security Agreement (as defined in the DIP Promissory Note) (each, a "DIP Guarantor," and, together with the Company, the "DIP Note Parties"). **DIP Lender**: SB Investment Advisers (UK) Limited, a UK private limited company (in its capacity under the DIP Promissory Note, including its registered assigns, the "Holder"). *See* DIP Promissory Note, Preamble, ¶ 1, "Guarantors" |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Promissory Note (the "Maturity Date") shall be the earlier of: (a) the consummation of a sale of all or substantially all of the assets of the DIP Note Parties; (b) acceleration of the Balance of the DIP Promissory Note pursuant to the DIP Promissory Note; (c) 35 days after entry of the Interim DIP Order (or such later date as the Holder in its sole discretion may agree in writing with the Company) if the Final DIP Order has not been entered on or prior to the expiration of such 35-day period; (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a Chapter 11 Plan (as defined in the DIP Promissory Note) that is confirmed pursuant to a Final DIP Order entered by the Court; and (e) the Scheduled Maturity Date (to be seventy-five (75) days post-closing). *See* DIP Promissory Note, ¶ 1, "Maturity Date" and "Scheduled Maturity Date" |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | The DIP Promissory Note commitments total $35 million (and, all amounts extended under the DIP Promissory Note, the "DIP Loans"), up to $25 million of which are available on an interim basis (the "Initial Funding Amount"). *See* DIP Promissory Note, Preamble, ¶ 2.1(a); Interim DIP Order ¶ (i)–(iii). |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type. *See* DIP Promissory Note, ¶ 9. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at a rate equal to the lower of (a) the Highest Lawful Rate; and (b) 10% per annum; *provided*, that, in the event the entire Balance of the DIP Promissory Note except for any capitalized interest as of the date thereof is indefeasibly paid in full in cash on or prior to the date that is 60 days following the Petition Date, no such capitalized interest shall be payable in connection with such repayment. *See* DIP Promissory Note, ¶ 1, "Applicable Rate" and "Highest Lawful Rate." |
| **Use of DIP Promissory Note** | The Company shall use the proceeds of the Loans to finance, in each case consistent in all material respects with the Approved Budget (as defined below), subject to Permitted Variances:  (i) working capital, letters of credit, surety and performance bonds, and |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Bankruptcy Rule** 4001(c)(l)(B)(ii) | general corporate purposes of the DIP Note Parties, including capital expenditures and Permitted Investments, (ii) the negotiation, documentation, pursuit and/or consummation of an Acceptable Sale, (iii) costs, fees, expenses and charges, in each case, related to, arising out of or in connection with the chapter 11 cases, subject to the Carve-Out, and (iv) certain other prepetition and pre-filing expenses that are approved by the Court and permitted by the Approved Budget.<br><br>*See* DIP Promissory Note, Ex. A ¶ 9. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Upon the Maturity Date, the Company shall pay all reasonable out-of-pocket expenses incurred by Holder, including the fees, charges and disbursements of one primary counsel to the Holder (including Weil, Gotshal & Manges LLP), one local counsel to the Holder in each relevant jurisdiction and any other third party advisor consented to by the Company (such consent not to be unreasonably denied, withheld or delayed), in connection with the chapter 11 cases, the DIP Promissory Note (and any amendments, modifications or waivers thereof), the enforcement of rights in connection with the DIP Promissory Note and the administration of the DIP Promissory Note.<br><br>No other fees and expenses are due and payable under the terms of the DIP Promissory Note.<br><br>*See* DIP Promissory Note, ¶ 8.2. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The proceeds from the DIP Promissory Note is subject to the Approved Budget (as defined herein), and the initial Approved Budget is attached as <u>Schedule 2</u> to the Interim DIP Order.<br><br>*See* DIP Promissory Note, Ex. D; Interim DIP Order, <u>Schedule 2</u>. |
| **Case Milestones** Bankruptcy Rule 4001(c)(1)(B) | The DIP Note Parties shall pursue and achieve the following milestones, in form and substance acceptable to the DIP Lender:<br><br>    (a)    on or before the date that is two (2) Business Days after the Petition Date, the Court shall have entered the Interim DIP Order;<br>    (b)    on or before the date that is five (5) days after the Petition Date, the DIP Note Parties shall file with the Court a sale motion and bid procedures motion in form and substance reasonably acceptable to the Holder;<br>    (c)    on or before the date that is thirty five (35) days after the Petition Date, the Court shall have entered the Final DIP Order;<br>    (d)    on or before the date that is forty-five (45) days after the Petition Date (i) the Court shall have entered an order establishing bid procedures in form and substance reasonably acceptable to the Holder (the "<u>Bid Procedures Order</u>") which shall, among other things, provide that the deadline for bidding be a date not later than fifty-five (55) days from the Petition Date and the Bid Procedures Order shall approve entry into one or more agreements that provide for one or more Acceptable Sale(s), or (ii) the Company shall have obtained a binding commitment for a Replacement DIP and filed a motion with the Court seeking entry of an order approving such Replacement DIP and the indefeasible repayment in full in cash of the Balance;<br>    (e)    on or before the date that is sixty (60) days after the Petition Date, either (i) one or more sale orders in form and substance acceptable to the Holder with respect to one or more Acceptable Sales shall have been entered by the Court, or (ii) the Court shall have entered one or more orders approving the Debtors' entry into a Replacement DIP and the indefeasible repayment in full in cash of the Balance (the "<u>DIP Refinancing Order</u>"); |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (f)      if the DIP Refinancing Order is entered, on or before the date that is three (3) days after entry of the DIP Refinancing Order, the Balance shall be repaid in full in cash with the net cash proceeds of the Replacement DIP; <br><br>(g)      on or before the date that is sixty (60) days after the Petition Date, the DIP Note Parties shall file with the Court an Acceptable Plan and a disclosure statement with respect to such Acceptable Plan (the "Disclosure Statement"); provided, that the DIP Note Parties' compliance with this milestone shall not be affected by technical and immaterial changes and other changes, modifications and supplements to such Acceptable Plan and Disclosure Statement that are reasonably acceptable to the Holder filed with the Court subsequent to the original filing of such Acceptable Plan and Disclosure Statement; <br><br>(h)      on or before the date that is seventy (70) days after the Petition Date, one or more Acceptable Sales shall be consummated; <br><br>(i)      on or before the date that is ninety (90) days after the Petition Date, the Court shall have entered an order approving the Disclosure Statement; <br><br>(j)      on or before the date that is one hundred twenty (120) days after the Petition Date, the Court shall have entered the Confirmation Order; and <br><br>(k)      on or before the date that is one hundred thirty five (135) days after the Petition Date, the Acceptable Plan shall be effective. <br><br>*See* DIP Promissory Note, Ex. D; Interim DIP Order ¶ 23. |
| **Liens and Priorities** <br>Bankruptcy Rule 4001(c)(l)(B)(i) | <u>DIP Liens</u>.  Subject and subordinate solely to any Prior Perfected Liens and the Carve-Out as set forth in the Interim DIP Order, and effective immediately upon entry of this Interim DIP Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property, whether now existing or hereafter arising and wherever located, tangible, or intangible, of each of the Debtors (the "DIP Collateral"). <br><br><u>Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of the Interim DIP Order, the DIP Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the chapter 11 cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the chapter 11 cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof. <br><br>*See* Interim DIP Order, ¶ 6–8. |
| **Carve-Out** <br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code. <br><br>*See* Interim DIP Order, ¶ 30. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge period no later than the date that is sixty (60) days from the formation of the Committee (the "Challenge Deadline"), as such deadline may be extended in writing from time to time in the sole discretion of the DIP Lender or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. *See* Interim DIP Order, ¶ 32(a). |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | The DIP Promissory Note contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, the failure to timely comply with any of the Case Milestones. *See* DIP Promissory Note, Section ¶ 6; Interim DIP Order ¶ 22. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order. *See* Interim DIP Order, ¶ 13. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Promissory Note contains indemnification provisions ordinary and customary for financings of this type, including that the Holder (and its officers, directors, employees, advisors and agents) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless against, any actual losses, claims, damages, liabilities or expenses (in the case of (i) legal fees and expenses, limited to reasonable and documented fees and out-of-pocket expenses of one primary counsel for all such Indemnitees taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Company has consented to the retention of such person) incurred or arising out of, in connection with, or as a result of, the DIP Promissory Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by the DIP Promissory Note and the other Financing Documents, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, material breach by the Holder of its funding obligations under the DIP Promissory Note or willful misconduct of the relevant Indemnitee. *See* DIP Promissory Note, ¶ 8.3. |

### **Statement Regarding Significant Provisions**

8.     The   Interim   DIP   Order   contains   certain   of   the   provisions (the "Significant Provisions") identified in paragraph 27 of the Complex Case Procedures as set forth below:

9.     The  Interim  DIP  Order  and  the  Final  DIP  Order,  as  applicable,  include  the following Significant Provisions:

(a) ***Case Milestones*.**  As detailed in the Summary of Material Terms herein, the Interim DIP Order contains Case Milestones the Debtors shall achieve with respect to the marketing and sale of their assets.  *See* Interim DIP Order ¶ 22.

(b) ***No Cross-Collateralization*.**  The DIP Orders do not provide for cross-collateralization.

(c) ***No Roll ups*.**  The DIP Orders do not provide for (i) provisions deeming pre-petition debt to be post-petition debt; and (ii) provisions requiring the proceeds of post-petition loans to be used to repay pre-petition debt.

(d) ***Liens on Avoidance Actions*.**  As detailed in the Summary of Material Terms herein, subject to and upon entry of the Final DIP Order, the DIP Liens shall attach to the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "Avoidance Action Proceeds").  *See* Interim DIP Order ¶ 6.

(e) ***Default Provisions and Remedies*.**  As detailed in the Summary of Material Terms herein, the DIP Promissory Note contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, the failure to timely comply with any of the Case Milestones. Upon the occurrence of an event of default, (a) the DIP Lender may declare (i) all outstanding DIP Obligations to be immediately due and payable, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lender, without affecting any of the DIP Liens or the DIP Obligations, or the post-petition administrative superpriority claim status of the DIP Obligations, and (iv) that the application of the Carve-Out has occurred through the delivery of the Carve-Out Trigger Notice (as defined below) to the Debtors; and (b) the DIP Lender may declare a termination, reduction or restriction of the Debtors' ability to use any cash collateral (any such declaration shall be referred to as a "Termination Declaration" and the date on which a Termination Declaration is delivered shall be referred to as the "DIP Termination Date").  *See* Interim DIP Order ¶ 22, 24.

(f) ***Releases*.**  Subject to entry of the Final DIP Order and the Conflicts Committee (as defined below) conducting a Board Investigation (as defined below) and the Board Investigation concluding that granting the releases contemplated in the Interim DIP Order is a reasonable exercise of business judgement, and is in the best interest of the Debtors' estates, the DIP Lender and certain related parties shall be released by the Debtors and their estates.  *See* Interim DIP Order ¶ 37.

(g) ***Limits on Use of Cash Collateral other than "Carve-Outs."*** Proceeds of the DIP Facility shall be used in a manner consistent in all material respects with the terms and conditions of this Interim DIP Order and the DIP Documents and in accordance in all material respects with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to Permitted Variance, the "Budget") (subject to Permitted Variances), solely for the purposes set forth in the DIP Agreement and this Interim DIP Order, including:  (a) ongoing working capital and other general corporate purposes of the Debtors; (b) permitted payment of costs of administration of the chapter 11 cases, including restructuring charges arising on account of the chapter 11 cases, including statutory fees of the U.S. Trustee and allowed professional fees and expenses of the Debtors' professionals and professionals retained by a Committee (if any); (c) payment of prepetition expenses to the extent permitted by the DIP Facility; (d) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, legal and other professionals' fees and expenses of the DIP Lender) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation, documentation, and the Court's approval of the DIP Facility; and (e) payment of obligations arising from or related to the Carve-Out, and making disbursements therefrom, including by funding the Carve-Out Reserve Account. *See* Interim DIP Order ¶ G(iv).

(h) ***No Priming Liens.*** The DIP Orders do not seek any priming liens.

(i) ***No Provisions that Limit the Ability of Estate Fiduciaries to Fulfill their Duties under the Bankruptcy Code and Applicable Law.*** The DIP Orders do not limit the ability of the estate fiduciaries to fulfil their duties under the Bankruptcy Code and applicable law.

(j) ***Validity, Perfection, and Amount of Prepetition Liens.*** As detailed in the Summary of Material Terms herein, the Debtors have agreed to the various stipulations and made various admissions contained in the Interim DIP Order. *See* Interim DIP Order ¶ 6.

(k) ***Provisions Granting Superpriority Claims.*** As detailed in the Summary of Material Terms herein, the DIP Orders provide for joint and several superpriority administrative claims against the Debtors as provided by section 364(c)(1) of the Bankruptcy Code, (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the chapter 11 cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor

10

trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof.  *See* Interim DIP Order ¶ 8.

(l) **506(c) Waiver.**  As detailed in the Summary of Material Terms herein, subject to and upon entry of the Final DIP Order, except with respect to the Carve-Out, no costs or expenses of administration of the chapter 11 cases or any future proceeding that may result therefrom shall be charged against or recovered from the DIP Collateral or DIP Lender pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party and no such consent shall be implied from any other action, inaction, or acquiescence by any party.  *See* Interim DIP Order ¶ 34.

10.     The DIP Promissory Note is critical to the Debtors' continuing operations and essential to facilitating a successful marketing and sale process.  In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the DIP Orders should be approved.

### Jurisdiction and Venue

11.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and rules 4002-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas.

14.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  In support of this Motion, the Debtors submit the Niemann Declaration and the First Day Declaration.

## The Debtors' Prepetition Capital Structure

15.     As of the Petition Date, the Debtors and certain of their non-debtor subsidiaries have an aggregate principal amount of approximately $1.29 billion to $1.55 billion in total obligations, consisting primarily of (i) prepetition funded debt of certain of the Debtors' foreign non-Debtor subsidiaries, (ii) surety bond obligations, (iii) letters of credit, and (iv) corporate guarantees.  The estimated aggregate outstanding amount of each debt obligation is as follows:

| Funded Debt | Principal Amount (in USD) |
|---|---|
| **Prepetition Foreign Funded Debt** | **$72.4 million** |
| *Prepetition Samba Credit Facility* | $16.7 million |
| *Prepetition SIDF Term Loan* | $16.3 million |
| *Prepetition YES Bank Facility* | $39.5 million |
| **Bonding and Letters of Credit** | **$699.1 million** |
| *Surety Bond Obligations* | $676.7 million |
| *Letters of Credit* | $22.3 million |
| **Corporate Guarantees** | **$514.8 million–$779.2 million** |
| **Total Debt Obligations** | **$1.29 billion–$1.55 billion** |

16.     In addition to the debt obligations, Debtor Katerra Inc. (Cayman) ("Katerra Cayman") has a total number of 12,195,150 shares on a fully diluted basis as of the Petition Date.

### (a)     Prepetition Foreign Funded Debt of Non-Debtor Subsidiaries.

#### (i)     Samba Credit Facility.

17.     On July 19, 2019, Katerra Delaware and Katerra Cayman, as guarantors, entered into that certain credit facility (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Samba Credit Agreement"), with non-Debtor subsidiary Katerra Saudi Arabia, LLC ("Katerra Saudi Arabia"), as borrower, and Samba Financial

Group, as lender, to fund certain projects in the Middle East region.  The Samba Credit Agreement provides an aggregate availability of approximately $133 million (the "Samba Credit Facility"). As of the Petition Date, the Debtors estimate that approximately $16.7 million is outstanding on account of the Samba Credit Facility.

(ii)    <strong>SIDF Term Loan.</strong>

18.    On October 23, 2019, Katerra Cayman, as guarantor, entered into that certain term loan agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SIDF Term Loan Agreement"), with Katerra Saudi Arabia, as borrower, and Saudi Industrial Development Fund, as lender, for an aggregate principal amount of approximately USD $81.5 million (the "SIDF Term Loan") to fund certain projects in the Middle East region.  The SIDF Term Loan is secured by a lien on all of the fixed assets of non-Debtor subsidiary Katerra Saudi Arabia LLC – Branch Jeddah (Saudi Arabia).  As of the Petition Date, the Debtors estimate that approximately $16.3 million is outstanding on account of the SIDF Term Loan.

(iii)    <strong>YES Bank Facility.</strong>

19.    Katerra Delaware is party to that certain agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "YES Bank Agreement") by and among non-Debtor subsidiary KEF Infrastructure India Pvt. Ltd., as borrower, Katerra Delaware and non-Debtor Katerra Operating Company Inc., as guarantors, and YES Bank Limited, as lender.   The YES Bank Agreement consists of (a) term loans maturing on February 18, 2029 (the "YES Bank Term Loans") in the aggregate principal amount of approximately $34.7 million, and (b) a credit facility (the "YES Bank Credit Facility," and, together with the YES Bank Term Loans, the "YES Bank Facility") with approximately $11 million of availability, approximately $4.8 million of which is drawn.  The YES Bank Term Loans

13

accrue interest at a rate of 11.15% and the YES Bank Credit Facility accrues interest at a rate of 10.2%. The YES Bank Facility is secured by a standby letter of credit in the amount of $10 million. As of the Petition Date, the Debtors estimate that approximately $39.5 million is outstanding on account of the YES Bank Facility.

      **(b)**       **Bonding and Letters of Credit.**

            **(i)**       **Surety Bond Obligations.**

20.     In the ordinary course of business, the Debtors are required to provide surety bonds or other forms of similar credit support (collectively, the "Surety Bonds") to certain third parties to secure the payment or performance of obligations related to their construction projects (the "Surety Bond Program"). Failure to provide, maintain, or timely renew the Surety Bonds may jeopardize the Debtors' ability to continue operations. As of the Petition Date, the Debtors estimate that they have an aggregate liability of approximately $676.7 million on account of the Surety Bond Program.

21.     The Debtors are also parties to, or may become parties to, certain indemnity agreements that set forth the sureties' (each a "Surety" and collectively, the "Sureties") rights to recover from the Debtors (collectively, the "Surety Indemnity Agreements") pursuant to which the Debtors agree to indemnify such Surety from any loss, cost, or expense that such Surety may incur on account of the issuance of any bonds on behalf of the Debtors. In addition, certain Surety Indemnity Agreements allow the Sureties to request collateral security, including cash collateral (collectively, the "Surety Collateral"), from the Debtors from time to time. As of the Petition Date, the Sureties have a total of approximately $9.6 million held in certain bank accounts as Surety Collateral pursuant to the Surety Indemnity Agreements.

(ii)     **Letters of Credit.**

22.     The Debtors have issued certain letters of credit to various other parties (such letters of credit, the "Letters of Credit").  As of the Petition Date, the Debtors estimate that approximately $22.3 million in Letters of Credit remain outstanding.

(c)     **Corporate Guarantees.**

23.     Katerra Cayman and Katerra Delaware have guaranteed certain projects of Katerra Saudi Arabia.  Under these guarantees, Katerra Cayman and Katerra Delaware may be liable for unfunded obligations of Katerra Saudi Arabia under performance bonds, bid bonds, advance payment guarantees, and letters of credit provided in favor of project owners.  As of the Petition Date, the Debtors estimate that they have guaranteed approximately $514.8 million to $779.2 million in project obligations of Katerra Saudi Arabia.

(d)     **Current Equity Holdings.**

24.     As of the Petition Date, Katerra Cayman has approximately 12,194,322 shares issued and outstanding consisting of approximately: 15,005 in common stock issued and outstanding; and 12,179,065 in preferred stock issued and outstanding.  Additionally Katerra Cayman had approximately 252 options and restricted stock units issued and outstanding; and approximately 828 shares available for issuance under Katerra Cayman's equity incentive plan. As a result, the total number of shares of Katerra Cayman on a fully diluted basis is 12,195,150. As of April 30, 2021, the total book value of the equity in Katerra Cayman was approximately $203,187,107.

25.     Prior to the Petition Date, Katerra Cayman's equity was primarily held by the following entities:

| Stakeholder | Series A Preferred | Ownership Percentage |
|---|---|---|
| SVF Abode (Cayman) Limited | 11,420,798 | 93.65% |
| SVF II Abode (Cayman) Limited | 762,144 | 6.25% |

| SVF Habitat (Cayman) Limited | 7,775 | 0.06% |

### The Debtors Have a Need for
### Debtor-in-Possession Financing

26.     The Debtors require immediate access to capital.  As of the Petition Date, the Debtors' total unrestricted cash balance is insufficient to operate their business and continue paying their obligations as they come due.  Given the capital-intensive nature of the Debtors' businesses and the position of the Debtors as general contractors on a multitude of projects, the Debtors had to ensure that projects were appropriately funded and that subcontractors on these projects were paid.  *See* Niemann Decl. ¶ 28.  Consequently, the Debtors' available liquidity was strained to an unsustainable level leading up to the filing of these chapter 11 cases.  *See id*.  As such, the Debtors will need immediate access to the liquidity provided by the DIP Promissory Note to fund these chapter 11 cases, market and sell their assets and pursue the orderly wind down of their businesses.

27.     Absent expedient and fully funded chapter 11 cases, a combination of insufficient funding and heightened business disruption would make it nearly impossible for the Debtors to pursue, much less consummate, a marketing and sale process, cause significant and permanent value destruction, and would otherwise be detrimental to potential creditor recoveries.  *See* Niemann Decl. ¶ 31.

### Alternative Sources of Financing
### Are Not Available Given the Circumstances

28.     Before commencing the DIP financing process, the Debtors recognized that it would be particularly difficult to secure financing given the severity of their liquidity position and the immediacy with which they required financing to avoid value destruction.  Houlihan Lokey immediately embarked on a process to raise liquidity on an exigent basis, approaching several parties, including SVF and other parties familiar with the Debtors' businesses.  *See* Niemann

Decl. ¶ 29.   Given the very short time frame (approximately two weeks) along with the complexities of the Debtors' businesses and underlying assets, it was impractical to approach a broad range of traditional financing sources.  *See id*.  As a result, Houlihan Lokey embarked on a very targeted approach to solicit financing.  Given its initial engagement on behalf of the Debtors in September 2020, Houlihan Lokey was able to immediately engage in discussions with parties who had a familiarity with the business and could potentially provide capital in a matter of weeks.  *See id*.  Houlihan Lokey solicited both in-court and out-of-court financing proposals from SVF, third party lenders, and parties who had expressed an interest in acquiring certain assets of the Debtors.  *See id*.  Ultimately, the only party that was willing and able to provide the liquidity the Debtors required on an expedited basis was SVF.  *See id*.

29.     Although the Debtors' long-term liquidity needs to fully fund these chapter 11 cases through a confirmed plan of liquidation are projected to exceed the liquidity provided by the DIP Promissory Note, the DIP Promissory Note provides sufficient liquidity in the near-term to bridge the Debtors through their transition into chapter 11 and to undertake an orderly and expeditious asset monetization process.  The Debtors have explored and considered other possible alternatives for financing, and none are viable.  Accordingly, the Debtors' best path forward is to obtain credit under the DIP Promissory Note and work to refinance the DIP Promissory Note or to consummate one or more asset sales to provide additional liquidity to achieve an orderly, value maximizing asset monetization and overall resolution of these chapter 11 cases.  *See* Niemann Decl. ¶ 30.

30.     The terms of the DIP Promissory Note are reasonable under the circumstances.  *See* Niemann Decl. ¶ 31.  Although the Debtors and Houlihan attempted to negotiate more favorable terms for the Debtors, the terms of the DIP Promissory Note are within market, and, indeed, many economic terms are off-market because they are far better than the terms any

borrower—let alone a debtor in chapter 11—could ever expect:  there are no up-front fees, no exit fees, no ticking fees, no premiums, no repayment or prepayment fees, no cash interest is required and, if the loan is repaid within the first sixty (60) days, accrued interest is waived altogether, and payment of all DIP Lenders' advisors fees and expenses are deferred until maturity.  The DIP Promissory Note is the product of good-faith, robust arm's-length negotiations and is necessary for the Debtors to maximize value on behalf of their constituents in these cases.  *See* Niemann Decl. ¶ 32.  Accordingly, approval of the DIP Promissory Note is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment. *See* Niemann Decl. ¶ 36.

## **Basis for Relief**

I.      **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

      A.   **Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.**

31.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Promissory Note.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

32.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

33.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

34.     The Debtors' determination to move forward with the DIP Promissory Note is a sound exercise of their business judgment following a thorough process and careful evaluation of the availability and viability of alternatives likely to result in a favorable outcome given their needs.  Specifically, the Debtors and their advisors determined that the Debtors would require postpetition financing to support the administration of their chapter 11 cases, pursue a marketing and sale process, and otherwise wind down their businesses in an orderly manner.  *See* Niemann Decl. ¶ 28.  The Debtors negotiated the DIP Documents with the DIP Lender in good faith, at

arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best and only financing result given the circumstances. *See* Niemann Decl. ¶ 36.

35.     The releases to be provided to the DIP Lender (and its affiliates) are reasonable and appropriate and represent a sound exercise of the Debtors' business judgment given the unique circumstances of these chapter 11 cases.  Unlike most chapter 11 cases, the Debtors do not seek a release of their prepetition lenders.  SVF (together with its affiliates) stand in the unique position of a majority equity holder who has invested over $2.1 billion into the Debtors and who is unlikely to receive a distribution in these cases on account of such contributions.  It is the rare case where a majority equity holder steps into the shoes of DIP lender.  Moreover, the DIP Promissory Note provides the Debtors with immediate access to liquidity on favorable economic terms under the circumstances, including no up-front fees, no exit fees, no ticking fees, no premiums, no repayment or prepayment fees, no cash interest is required and, if the loan is repaid within the first sixty (60) days, all accrued interest is waived, and payment of all DIP Lenders' advisors fees and expenses are deferred until the maturity of the DIP Promissory Note. These concessions from SVF are designed to provide the Debtors as much liquidity as possible in the near term to avoid a chapter 7 filing and bridge the Debtors through an orderly and expeditious sale process and wind-down intended to maximize value available for creditors.

36.     Further, SVF is the ***only*** source of financing available to the Debtors to fund these chapter 11 cases.  The proposed DIP Promissory Note is critical to preserving the value of the Debtors' estates and providing the liquidity necessary for the Debtors to pursue a value-maximizing marketing and sale process and orderly wind down of their business, which will inure to the benefit of all stakeholders.  The DIP Lender is not willing to provide the financing necessary to prevent a catastrophic collapse of the Debtors in the absence of receiving a release.

The Debtors do not believe there are any colorable claims or causes of action against the DIP Lender, but out of an abundance of caution, the special committee of the Debtors' Board of Directors ("Conflicts Committee") will conduct an independent investigation (the "Board Investigation") to determine whether the releases contemplated upon entry of the Final DIP Order are warranted, in the best interest of the Debtors' estates, and otherwise represent a sound exercise of the Debtors' business judgment.   The releases are subject to the outcome of the Board Investigation and the entry of the Final DIP Order, and thus they can only be effectuated if the Special Committee determines that they are supported by the Debtors' business judgment.

### B.   The Debtors Should be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.

37.     The Debtors propose to obtain financing under the DIP Promissory Note, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. The Debtors propose to provide first priority liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible, or intangible, of each of the Debtors.

38.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b) the credit transaction is necessary to preserve the assets of the estate; and

(c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

39.     Based on the immediacy with which the Debtors require financing to avoid value destruction, the Debtors and their advisors believe that the DIP Promissory Note represents the only alternative available to the Debtors under the circumstances. *See* Niemann Decl. ¶ 30. The DIP Lender was not willing to provide the DIP Promissory Note on any other terms and there are no alternative sources of financing available to the Debtors. *See* Niemann Decl. ¶ 36. The DIP Promissory Note will provide the Debtors with postpetition financing on terms that the Debtors believe represent their best and only viable alternative. *See* Niemann Decl. ¶ 35. Accordingly, the superpriority claims and liens granted to the DIP Lender are appropriate and should be approved.

**C.    No Comparable Alternative to the DIP Promissory Note is Reasonably Available.**

40.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)

(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

41.     Simply put, alternative sources of financing with better, or even as favorable, terms as those of the DIP Promissory Note are not available to the Debtors.  *See* Niemann Decl. ¶ 36. Further, the DIP Promissory Note is the product of good-faith, arm's-length negotiations and is necessary for the Debtors to pursue a value-maximizing marketing and sale process.  *See id*. Accordingly, approval of the DIP Promissory Note is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment.  *See id*.

**II.     The Debtors Should be Authorized to Pay the Interest Required by the DIP Lender under the DIP Documents.**

42.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay interest to the DIP Lender.  In particular, the Debtors have agreed to pay interest at the "Applicable Rate" as defined in the DIP Promissory Note meaning a rate equal to the lower of: (a) the Highest Lawful Rate; and (b) 10.00% per annum.  Notably, this interest is only due and payable upon maturity of the DIP Promissory Note, and only if the DIP Promissory Note is not repaid within the first sixty (60) days of the chapter 11 cases.  If the DIP Loan is repaid in full in cash on or prior to the date that is sixty (60) days following the Petition Date, all accrued interest is waived.

43.     The Debtors believe that the interest to be paid under the DIP Promissory Note is consistent with the market given the financial and operating condition of the Debtors, the timing,

cost, and risk of administering these chapter 11 cases, and the Debtors' liability profile. The Debtors considered the rate described above when determining in their sound business judgment that the DIP Promissory Note constituted the best and only actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest provided under the DIP Documents in connection with the DIP Promissory Note.

**III.    The DIP Lender Should be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.**

44.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

45.    The DIP Promissory Note is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the only terms on which to obtain critical postpetition financing given the circumstances and (ii) extensive good-faith, arm's-length negotiations between the Debtors and the DIP Lender. The terms and conditions of the DIP Promissory Note are reasonable and appropriate under the circumstances, and the proceeds of the DIP Promissory Note will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the obligations arising under the DIP Promissory Note and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of

section 364(e) of the Bankruptcy Code and, therefore, the DIP Lender is entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should be Modified on a Limited Basis.**

46.     The Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  The proposed Interim DIP Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.

47.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.

**V.     Failure to Obtain Immediate Interim Access to the DIP Promissory Note Would Cause Immediate and Irreparable Harm.**

48.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n motion by

the debtor(s), a hearing . . . will routinely be conducted within three business days to consider . . . interim debtor-in-possession financing[.]"  Complex Case Procedures, § J, ¶ 23.

49.     The Debtors require immediate access to the financing under the DIP Promissory Note.  The Debtors available liquidity was strained to an unsustainable level leading up to the filing of these chapter 11 case and the Debtors and their advisors determined that their best path forward is to obtain credit under the DIP Promissory Note and work to refinance the DIP Promissory Note or to consummate one or more asset sales to provide additional liquidity to achieve an orderly value maximizing asset monetization and overall resolution of these chapter 11 cases.  *See* Niemann Decl. ¶ 28.  Without immediate access to the DIP Promissory Note as structured, the Debtors and their constituents risk massive value degradation.  *See* Niemann Decl. ¶ 31.  Thus, to preserve value and avoid irreparable harm pending the Final Hearing on the DIP Promissory Note, it is essential that the Debtors have access to credit under the DIP Promissory Note on an interim basis as requested.  *See id*.

50.     Prior to the Petition Date, the Debtors, in consultation with their advisors, including Alvarez & Marsal North America, LLC, reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Promissory Note, the "Approved Budget")[5] of postpetition cash needs for the Debtors' businesses in the initial twelve weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.  The Approved Budget and projections provide an

---

[5]     A copy of the initial Approved Budget is attached to the Interim DIP Order as Schedule 2.

accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are reasonable and appropriate under the circumstances.

51.    Failure to obtain access to the DIP Promissory Note will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.  Absent approval of the DIP Promissory Note, to enable expedient chapter 11 cases, a combination of insufficient funding and heightened business disruption would make it nearly impossible for the Debtors to pursue, much less consummate, a marketing and sale process and cause significant and permanent value destruction.

52.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the Interim DIP Order authorizing the Debtors to enter into the DIP Promissory Note.

## **Request for Final Hearing**

53.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Emergency Consideration**

54.    Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical

juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

55.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### **Notice**

56.     The Debtors will provide notice of this motion to the following parties or their counsel:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) Weil, Gotshal & Manges LLP, Attn: Gary Holtzer, Jessica Liou, Scott Bowling, David J. Cohen; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

The Debtors request that the Court enter the DIP Orders, granting the relief requested in this Motion and such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 7, 2021

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:         mcavenaugh@jw.com
                jwertz@jw.com
                mstull@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         joshua.sussberg@kirkland.com
                christine.okike@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on June 7, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

### Exhibit A

**Niemann Declaration**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### DECLARATION OF MATTHEW R. NIEMANN IN SUPPORT OF
### (A) DIP FINANCING AND (B) ALL FIRST DAY RELIEF

I, Matthew R. Niemann, declare under penalty of perjury:

1.      I am a Managing Director, Shareholder, and senior member of the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan Lokey") (NYSE:  HLI), a financial advisory services and investment banking firm, headquartered at 10250 Constellation Blvd., Los Angeles, California 90067.  Houlihan has been engaged as the investment banker to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2.      Houlihan Lokey was engaged to serve as investment banker for Katerra Inc. (Cayman) and its affiliates (together with its Debtor and non-Debtor affiliates, "Katerra" or the "Company") initially in September 2020, where it advised the Company in conjunction with a recapitalization transaction that closed in December 2020.  Houlihan Lokey was re-engaged by the Company in May 2021 to serve as the Debtors' financial advisor and investment banker in conjunction with the debtor-in-possession financing, restructuring, and asset monetization processes that are underway in these chapter 11 cases.  I am the senior-most officer at Houlihan

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra.  The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

Lokey with overall responsibility for Houlihan Lokey's provision of professional services to the Debtors.

3.      I submit this declaration (this "Declaration") to assist the Court and parties in interest and in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "DIP Motion").[2]

4.      Houlihan Lokey has worked closely with the Debtors' board, management, restructuring counsel, Kirkland & Ellis LLP ("Kirkland"), and restructuring advisor, Alvarez & Marsal North America LLP ("A&M"), in the lead up to these chapter 11 cases.  Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of my team at Houlihan Lokey, the Debtors' senior management and board members, other advisors to the Debtors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**Background and Qualifications**

5.      Houlihan Lokey is an internationally recognized investment banking and financial advisory firm with twenty-two offices worldwide.  It is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest in

---

[2]   Capitalized terms used but not defined herein have the meaning given to them in the DIP Motion or Interim DIP Order, as applicable.

2

complex financial restructurings, both in and out of bankruptcy. Houlihan Lokey provides corporate finance, financial advisory, and financial restructuring services and has the largest worldwide financial restructuring practice of any investment bank. I joined Houlihan Lokey 22 years ago. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit 1**.

6.      I hold a finance and law degree from St. Louis University and St. Louis University School of Law, respectively. I have been involved in restructurings for over 32 years, having started my career as an attorney with Bryan Cave in St. Louis from 1989–1996, where I practiced in the banking, real estate, and corporate groups. I also worked at KPMG and PricewaterhouseCoopers prior to joining Houlihan Lokey in 1999. I left Houlihan Lokey in 2006 and joined Cerberus Capital as a Managing Director and portfolio manager and later GMAC ResCap (a Cerberus portfolio company) where I served as Senior Managing Director and Chief Strategic Officer in charge of strategy for its $5.0 billion portfolio of builder and developer real estate investments. I returned to Houlihan Lokey in September 2008, where I founded the Firm's Real Estate Strategic Advisory and Real Estate Restructuring Investment Banking groups.

7.      From 2012–2019, I was a member of the Board of Directors of William Lyon Homes (NYSE: WLH), one of the largest homebuilders in the Western United States, where I chaired the Compensation Committee, and sat on the Governance, and Audit Committees. I also chaired the Pricing Committee for WLH's IPO in May 2013.

8.      In addition to Houlihan Lokey's engagement for the Debtors, I have led Houlihan Lokey's engagements on several other debtor or sell-side restructurings in the bankruptcy courts of Texas, including, among others: *In re Bristow Group, Inc.*, No. 19-32713 (DRJ) (Bankr. S.D. Tex.); *In re SandRidge Energy, Inc.* No. 16-32488 (DRJ) (Bankr. S.D. Tex.); *In re PHI Inc.* No. 19-303932 (HDH) (Bankr. N.D. Tex.); *In re CHC Group Ltd.*, No. 16-31854

(BJH) (Bankr. N.D. Tex.); *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ) (Bankr. N.D. Tex.); *In re Linden Ponds, Inc.*, No. 11-33913 (SGJ) (Bankr. N.D. Tex.); *In re Erickson Retirement Communities, LLC*, No. 09-37010 (SGJ) (Bankr. N.D. Tex.); and *In re National Benevolent Association*, No. 04-50948 (RBK) (Bankr. W.D. Tex.).  I testified as an expert in most of the foregoing cases and have regularly testified as an expert in Chapter 11 cases over the last twenty-five years on issues ranging from debtor in possession financing, distressed M&A, asset monetization, and other issues core to these chapter 11 cases.

9.      The *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith, provides an overview of Katerra's businesses and the historical developments leading up to these chapter 11 cases.  A summary of the Company's recapitalization processes and current asset monetization program are set forth in this Declaration.

**I.      The Debtors' Prepetition Capital Structure**

10.      As of the Petition Date, the Debtors and certain of their non-debtor subsidiaries have an aggregate principal amount of approximately $1.29 billion to $1.55 billion in total obligations, consisting primarily of (i) prepetition funded debt of certain of the Debtors' foreign non-Debtor subsidiaries, (ii) surety bond obligations, (iii) letters of credit, and (iv) corporate guarantees.  The estimated aggregate outstanding amount of each debt obligation is as follows:

4

| Funded Debt | Principal Amount *(in USD millions)* |
|---|---|
| Prepetition Samba Credit Facility | $ 17 |
| Prepetition SIDF Term Loan | 16 |
| Prepetition YES Bank Facility | 40 |
| **Subtotal: Prepetition Foreign Debt** | **$ 73** |
| Surety Bond Obligations | $ 677 |
| Letters of Credit | 22 |
| **Subtotal: Bonding and LoC** | **$ 699** |
| **Corporate Guarantees** | **$ 515 - 779** |
| **Total Debt Obligations** | **$ 1,287 - 1,551** |

**A.    Prepetition Foreign Funded Debt of Non-Debtor Subsidiaries**

**i.    Samba Credit Facility**

11.    On July 19, 2019, Katerra Inc. (Delaware, US) ("Katerra Delaware") and Katerra Inc. (Cayman) ("Katerra Cayman") as guarantors, entered into that certain credit facility (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Samba Credit Agreement"), with non-Debtor subsidiary Katerra Saudi Arabia, LLC ("Katerra Saudi Arabia"), as borrower, and Samba Financial Group, as lender, to fund certain projects in the Middle East region.   The Samba Credit Agreement provides an aggregate availability of approximately $133 million (the "Samba Credit Facility").   As of the Petition Date, the Debtors estimate that approximately $16.7 million is outstanding on account of the Samba Credit Facility.

**ii.    SIDF Term Loan**

12.    On October 23, 2019, Katerra Cayman, as guarantor, entered into that certain term loan agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SIDF Term Loan Agreement"), with Katerra Saudi Arabia, as

5

borrower, and Saudi Industrial Development Fund, as lender, for an aggregate principal amount of approximately USD $81.5 million (the "SIDF Term Loan") to fund certain projects in the Middle East region.  The SIDF Term Loan is secured by a lien on all the fixed assets of non-Debtor subsidiary Katerra Saudi Arabia LLC – Branch Jeddah (Saudi Arabia).  As of the Petition Date, the Debtors estimate that approximately $16.3 million is outstanding on account of the SIDF Term Loan.

### iii.      YES Bank Facility

13.      Katerra Delaware is party to that certain agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "YES Bank Agreement") by and among non-Debtor subsidiary KEF Infrastructure India Pvt. Ltd., as borrower, Katerra Delaware and non-Debtor Katerra Operating Company Inc., as guarantors, and YES Bank Limited, as lender.  The YES Bank Agreement consists of (a) term loans maturing on February 18, 2029 (the "YES Bank Term Loans") in the aggregate principal amount of approximately $34.7 million, and (b) a credit facility (the "YES Bank Credit Facility," and, together with the YES Bank Term Loans, the "YES Bank Facility") with approximately $11 million of availability, approximately $4.8 million of which is drawn.  The YES Bank Term Loans accrue interest at a rate of 11.15% and the YES Bank Credit Facility accrues interest at a rate of 10.2%.  The YES Bank Facility is secured by a standby letter of credit in the amount of $10 million.  As of the Petition Date, the Debtors estimate that approximately $39.5 million is outstanding on account of the YES Bank Facility.

### B.       Bonding and Letters of Credit

14.       A description of the Debtors' surety bond obligations and outstanding letters of credit is set forth in the First Day Declaration.  *See* First Day Declaration ¶¶ 46–48.

### C.       Corporate Guarantees

15.       Katerra Cayman and Katerra Delaware have guaranteed certain projects of Katerra Saudi Arabia.   Under these guarantees, Katerra Cayman and Katerra Delaware are liable for unfunded obligations of Katerra Saudi Arabia under performance bonds, bid bonds, advance payment guarantees, and letters of credit provided in favor of project owners.  As of the Petition Date, the Debtors estimate that they have guaranteed approximately $514.8 million to $779.2 million in project obligations of Katerra Saudi Arabia.

## II.     Katerra's Common and Preferred Stock

### A.       Historical Capital Raises

16.       Historically, Katerra raised the majority of its financing through multiple rounds of equity investments.  As a start-up, in 2015, Katerra raised approximately $14.5 million in capital through two separate rounds of "angel" investing.  The majority of the capital was provided by Katerra's three co-founders (Michael Marks, Jim Davidson, and Fritz Wolff) and certain of their companies.

| Investor | Angel (Individual) Feb-2015 Contributed Capital | Angel (Individual) Jun-2015 Contributed Capital |
|---|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $                0.00 | $        2,000,000.00 |
| Paxion Capital | 0.00 | 4,000,000.00 |
| Wolff-related entities | 20,000.00 | 4,000,000.00 |
| Michael Marks (Outside Paxion) | 475,900.00 | 0.00 |
| Jim Davidson (Outside Paxion) | 98,000.00 | 0.00 |
| Fritz Wolff (Outside Paxion) | 49,752.00 | 0.00 |
| Others | 276,348.00 | 3,559,520.00 |
| **Total** | **$           920,000.00** | **$      13,559,520.00** |
| **Total Invested to Date** | **920,000.00** | **14,479,520.00** |
| **$ / share** | **0.005** | **0.50** |

17.    In 2016, Katerra commenced a second round of venture capital funding, which raised approximately $77.35 million in capital.

| Investor | Early Stage VC Mar-2016 Contributed Capital |
|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $        49,974,400.00 |
| Paxion Capital | 4,997,440.00 |
| Wolff-related entities | 2,989,540.00 |
| Jim Davidson (Outside Paxion) | 490,820.00 |
| Others | 18,895,824.00 |
| **Round Total** | **$      77,348,024.00** |
| **Total Invested to Date** | **91,827,544.00** |
| **Post $ Valuation** | **577,321,170.00** |
| **$ / share** | **2.231** |

18.    The following year, in 2017, Katerra commenced a Series C financing, which raised another $141 million in capital.

| Investor | Series C Mar-2017 Contributed Capital | |
|---|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $ | 29,970,000.00 |
| Paxion Capital | | 9,990,000.00 |
| Others | | 101,009,112.00 |
| **Round Total** | **$** | **140,969,112.00** |
| **Total Invested to Date** | | **232,796,656.00** |
| **Post $ Valuation** | | **1,168,996,574.00** |
| **$ / share** | | **3.70** |

19.     In 2018 and 2019, Katerra initiated four different rounds of financing and raised a total of approximately $2.4 billion.  During Katerra's Series D-1 & D-2 financing and Series E financing, SoftBank Vision Fund I ("SVF") contributed approximately $1.4 billion of financing and subsequently became Katerra's largest capital investor (though SVF did not hold a controlling stake in Katerra).

| Investor | Series D-1 & D-2 Jan-2018 Contributed Capital | | Series E (Incl. Extension) Dec-2018 / Jul-2019 Contributed Capital | | Conv. Promissory Note Jul-2019 Contributed Capital | | Middle East JV Q4 2018 & Jul-2019 Contributed Capital | |
|---|---|---|---|---|---|---|---|---|
| Softbank | $ | 649,999,950.00 | $ | 749,999,988.00 | $ | 200,000,000.00 | $ | 150,000,000.00 |
| Foxconn (iCreate & Foxconn Ventures) | | 29,999,997.00 | | 0.00 | | 0.00 | | 0.00 |
| Michael Marks (Outside Paxion) | | 0.00 | | 4,999,992.00 | | 0.00 | | 0.00 |
| Katerra | | 0.00 | | (52,000,000.00) | | 0.00 | | 52,000,000.00 |
| Others | | 390,775,676.00 | | 242,001,091.00 | | 0.00 | | 0.00 |
| **Round Total** | **$** | **1,070,775,623.00** | **$** | **945,001,071.00** | **$** | **200,000,000.00** | **$** | **202,000,000.00** |
| **Total Invested to Date** | | **1,303,572,279.00** | | **2,248,573,350.00** | | **2,448,573,350.00** | | **2,650,573,350.00** |
| **Post $ Valuation** | | **3,485,000,000.00** | | **5,999,762,400.00** | | **0.00** | | **0.00** |
| **$ / share** | | **79.50** | | **0.00** | | **0.00** | | **0.00** |

20.     On December 9, 2019, Katerra Delaware entered into the Greensill Receivables Facility by and among Katerra Delaware, a Delaware limited liability company, as a seller, the other sellers party thereto and Greensill Limited ("Greensill"), together with the Transaction Documents (as defined therein) (the "Greensill Receivables Facility").  It is my understanding that SVF and/or its affiliates owned approximately 40% of Greensill at the time of the 2020 recapitalization transaction described herein.

21.     Pursuant to the terms of the Greensill Receivables Facility, Greensill paid Katerra's suppliers in exchange for a security interest in Katerra's account receivables.  Katerra would then pay Greensill directly on the terms set forth in the Greensill Receivables Facility agreement instead of its suppliers.  Katerra relied on the Greensill Receivables Facility to fund operations instead of raising capital through rounds of equity financing from December 2019 to May 2020.  By December 2020, Katerra owed approximately $440 million under the Greensill Receivables Facility.

22.     In May 2020, Katerra commenced another round of financing (Series F) with one of its previous investors, SVF, to raise additional capital to fund operations.  As described above, in 2018 and 2019, SVF contributed capital of approximately $1.4 billion as a part of Katerra's Series D-1 & D-2 financing and Series E financing.  In 2019, SVF provided Katerra with an additional $200 million in exchange for a promissory note and another $150 million in exchange for an ownership stake in non-Debtor Katerra Middle East.  Pursuant to the terms of the Series F financing, SVF provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately 45 days later.  In addition, SVF exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

III.    **The Debtors' 2020 Recapitalization Transaction**

23.     In September 2020, Houlihan Lokey was engaged to render investment banking services to Katerra in connection with Katerra's liability management initiatives and exploration of strategic alternatives.  During this initial engagement, Houlihan Lokey explored several strategic alternatives, including the investment of third-party capital, the bifurcation of Katerra's businesses into a "NewCo / OldCo" and other alternatives.  Katerra, with the assistance of Houlihan Lokey, approached several parties, including existing counterparties of Katerra and other

interested parties to explore financing and other strategic transactions. Houlihan Lokey actively pursued negotiations with SVF and a consortium of new investors and existing stakeholders (the "Consortium") who expressed a desire to support Katerra's business. The proposed transaction contemplated a new-money investment by the Consortium and SVF of approximately $380 million in exchange for a 90% equity ownership stake in Katerra, with the remaining 10% of Katerra's equity reserved for management. In addition, the transaction contemplated the retirement of Katerra's outstanding Greensill Receivables Facility and the sale of Katerra's ownership interests in certain foreign ventures. Katerra, SVF, and the Consortium executed a non-binding letter of intent reflecting this transaction. The transaction, however, did not materialize.

24.     In late November 2020, following the breakdown of negotiations with SVF and the Consortium, SVF Abode (Cayman) Limited ("SVF Abode"), an affiliate of SVF, indicated an interest in investing an additional $200 million to ensure Katerra would be able to meet its ongoing obligations. Katerra issued a promissory note to SVF Abode in exchange for a $25 million bridge loan while Katerra engaged with SVF Abode and other stakeholders to negotiate the terms of an out-of-court financial restructuring and recapitalization of Katerra.

25.     Ultimately, Katerra consummated a comprehensive recapitalization transaction at the end of December 2020 on the following terms:

- SVF Abode exercised its warrant to purchase ordinary shares of the Company and converted $300 million of promissory notes of the Company held by SVF Abode to equity;

- the Company (i) converted all existing preferred share into ordinary shares of the Company, and (ii) issued a new class of preferred shares (the Series A preferred shares) to SVF Abode in exchange for $175 million in cash and extinguishment of a $25 million bridge loan owed to SVF Abode;

- Greensill extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-equity closing in Katerra, which equity was immediately transferred by Greensill to an affiliate of SoftBank Vision Fund II ("SVF II") in connection

11

with a transaction in which SVF II invested $440 million in the parent company of Greensill;

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved in a share pool for an equity incentive plan and related grants; and

- Katerra and Wolff Principal Holdings, L.P. ("Wolff") settled and waived certain claims against Katerra, including the amendment of the "Substantial Completion Dates" of a number of active projects with Wolff and certain of its related parties, and in exchange, Katerra granted Wolff a lien on its CLT facility in Spokane, Washington.

As a part of this transaction, SVF was diluted to the same extent as all other investors (100,000.0:1.0), which resulted in the previous $1.95 billion invested by SVF equating to less than 0.1% of the post-recapitalization transaction equity.  A general summary of the Company's capitalization prior and subsequent to the 2020 recapitalization transaction is attached hereto as **Exhibit 2**.

26.     When Houlihan Lokey was retained in September 2020, Katerra had $740 million in funded debt obligations, including the $440 million owing to Greensill under the Greensill Receivables Facility and excluding the Debtors' foreign affiliate debt, and approximately $2.3 billion in preferred and common equity capitalization.  Through the 2020 recapitalization, all of the Company's funded debt obligations and existing preferred equity were extinguished.  *See* **Exhibit 2**.

27.     As of the Petition Date, Katerra Cayman's equity was primarily held by the following entities:

| Stakeholder | Series A Preferred | Ownership Percentage |
|---|---|---|
| SVF Abode (Cayman) Limited | 11,420,798 | 93.65% |
| SVF II Abode (Cayman) Limited | 762,144 | 6.25% |
| SVF Habitat (Cayman) Limited | 7,775 | 0.06% |

## IV.    The Debtors' Need for Debtor-in-Possession Financing

28.     Upon re-engaging Houlihan Lokey in May 2021, it was determined that the Debtors were operating at a perilous level of liquidity.  The impact of the Greensill insolvency and the press coverage in conjunction therewith, along with other rumors and concerns throughout the marketplace, caused a run on Katerra's liquidity, all as more fully set forth in the First Day Declaration.  Moreover, given the capital-intensive nature of the Debtors' businesses and the position of the Debtors as general contractors on a multitude of projects, the Debtors had to ensure that projects were appropriately funded and that subcontractors on these projects were paid.  Consequently, the Company's available liquidity was strained to an unsustainable level leading up to the filing of these chapter 11 cases.

29.     Houlihan Lokey embarked on a process to raise liquidity on an exigent basis, approaching several parties, including SVF and other parties familiar with the Debtors' businesses.  Given the very short time frame (approximately two weeks) along with the complexities of the Debtors' businesses and underlying assets, it was impractical to approach a broad range of traditional financing sources.  As a result, Houlihan Lokey embarked on a very targeted approach to solicit financing.  Given its initial engagement on behalf of the Company in September 2020, Houlihan Lokey was able to immediately engage in discussions with parties who had a familiarity with the business and could potentially provide capital in a matter of weeks.  Houlihan Lokey solicited both out-of-court and in-court financing proposals from SVF, third party lenders, and parties who had expressed an interest in acquiring certain assets of Katerra.  Ultimately, the only party willing to provide the liquidity the Company required on an expedited basis was SVF.

30.     Accordingly, the $35.0 million DIP Promissory Note is not only the best financing available, but also the only financing that was available as of the Petition Date.  Attached hereto as **Exhibit 3** is a summary of the key terms of the DIP Promissory Note.  The Debtors' best path

13

forward is to obtain credit under the DIP Promissory Note and work to refinance the DIP Promissory Note or to consummate one or more asset sales to provide additional liquidity to achieve an orderly value maximizing asset monetization and overall resolution of these chapter 11 cases.

31.     Without immediate access to the DIP Promissory Note as structured, the Debtors and their constituents risk massive value degradation.  Thus, to preserve value and avoid irreparable harm pending the Final Hearing on the DIP Promissory Note, it is essential that the Debtors have access to credit under the DIP Promissory Note on an interim basis as requested.

32.     Based on my experience in soliciting and negotiating debtor in possession financings, it is my opinion that the terms of the DIP Promissory Note are reasonable under the circumstances.  While the Debtors and Houlihan Lokey attempted multiple times to negotiate more favorable terms for the Debtors, the terms of the DIP Promissory Note are within market based on my experience.  Further, the DIP Promissory Note is the product of good-faith, robust arm's-length negotiations and is necessary for the Debtors to maximize value on behalf of its constituents in these cases.

**V.     The Asset Monetization Process**

33.     Before the Petition Date, during Houlihan Lokey's initial and re-engagement on behalf of the Debtors, I and other members of the Houlihan Lokey team contacted several potential parties, including existing counterparties and third-party bidders, who may have an interest in acquiring portions of Katerra's business and assets.  The Debtors and Houlihan Lokey are currently advancing discussions with these parties in an effort to identify the highest or otherwise best bidders amongst them and to submit formal bids to the benefit of the Debtors' estates.  As of the date hereof, that process remains very active and comprehensive.

### Conclusion

34.     Based on the foregoing, I believe the DIP Lender's financing proposal represents the best postpetition financing alternative available to the Debtors.  The DIP Promissory Note will provide the Debtors and their creditor constituencies with postpetition financing on terms that represent their best and only viable alternative.

35.     Further, the DIP Promissory Note is the product of good-faith, arm's-length negotiations and is necessary for the Debtors to pursue a marketing process for some or all of the Debtors' assets.  Given the timing and circumstances, I do not believe alternative sources of DIP financing with better, or even as favorable, terms as those of the DIP Promissory Note would be available.  Given the Debtors' financing history and SVF's willingness to provide DIP financing on terms and on the timeline dictated by the Debtors' liquidity needs, I do not believe soliciting alternate financing proposals would be a productive or fruitful endeavor.  Having the financing requested under the DIP Motion in place on an exigent basis will allow the Debtors and Houlihan Lokey to focus solely on the process of maximizing recoveries through asset monetization and claims mitigation on a vigilant and efficient basis so as to avoid unnecessary process liquidity burn during these chapter 11 cases.  Accordingly, approval of the DIP Promissory Note is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated:  June 7, 2021                                                   /s/ *Matthew R. Niemann*
                                                      Matthew R. Niemann
                                                      Managing Director
                                                      Houlihan Lokey Capital, Inc.

## **Exhibit 1**

**Matthew R. Niemann Curriculum Vitae**



## Matthew R. Niemann
Managing Director

Mr. Niemann is a Managing Director and senior member of Houlihan Lokey's Financial Restructuring Investment Banking Group.  Since joining Houlihan Lokey over twenty-two years ago, Mr. Niemann has served on the Firm's management committee, among other leadership roles, including running Houlihan Lokey's Global Real Estate and Real Estate Restructuring Investment Banking Groups, and West Coast and Midwest Financial Restructuring Groups.

From 2012-2019, Mr. Niemann was a member of the Board of Directors of William Lyon Homes (NYSE: WLH), one of the largest homebuilders in the Western United States, where he sat on the Compensation (Chair), Governance, and Audit Committees and chaired the Pricing Committee for WLH's IPO in May 2013.  Over his thirty-two year career, Mr. Niemann has served as a principal or advisor in a wide range of M&A, restructuring, and financing transactions for Fortune 500 and middle-market companies. He also regularly testifies as an expert in federal court on valuation, capital market, fiduciary duty, and transaction process issues. Prior to joining Houlihan Lokey, Mr. Niemann ran PricewaterhouseCoopers' Financial Advisory Services Group and practiced law in Bryan Cave's Corporate, Banking & Real Estate practice in St. Louis. He also spent three years with Cerberus Capital where he was a Managing Director and investment professional and served as Senior Managing Director and Chief Strategic Officer of GMAC ResCap (a Cerberus portfolio company) in charge of strategy for its $5.0 billion portfolio of builder and developer real estate investments.

Mr. Niemann holds Finance and Law degrees from St. Louis University, where he served on the *Law Review*. He was a guest lecturer from 2006-2011 at the Kellogg Graduate School of Management at Northwestern University in Chicago, was a member of the Ph.D. Dissertation Committee at Webster University in St. Louis, and has been recognized by the K&A Registry as one of the leading restructuring investment bankers in the United States.  Mr. Niemann founded the American Bankruptcy Institute Corporate Bankruptcy Restructuring Competition and authored the inaugural case study *Delicious Delights* in 2003. He was the chairman of the Turnaround Management Association ("TMA") Distressed Investing Conference in 2008 and regularly participates in industry conferences.  He holds a Series 7 and 63 issued by the National Securities Association Dealers and has been accredited as a Certified Turnaround Professional by the TMA.  Mr. Niemann has served on the executive committee of the board (Treasurer) of The Ronald McDonald Houses of Greater St. Louis, Our Holy Redeemer Parish Council (Treasurer) and School Board and the Webster Groves Economic Advisory Council.

## **Exhibit 2**

**Pre- and Post-2020 Capitalization Structure**

| | Pre-Recapitalization Transaction | Post-Recapitalization Transaction *(additional changes have occurred since the closing of the 2020 Recapitalization)* |
|---|---|---|
| **Indebtedness** | | |
| SVF Secured Bridge | $        25,000,000.00 | $                    0.00 |
| Greensill Secured Facility | 440,000,000.00 | 0.00 |
| SVF Convertible Notes | 300,000,000.00 | 0.00 |
| **Total Indebtedness** | **$      765,000,000.00** | **$                    0.00** |
| | | |
| **Equity** | | |
| Preferred Equity (All Series)[1] | $    2,119,716,595.00 | $      199,922,250.00 |
| Common Equity (All Series) | 168,182,089.28 | 77,750.00 |
| **Total Indebtedness + Equity** | **$    3,052,898,684.28** | **$      200,000,000.00** |
| | | |
| **Fully Diluted Equity Ownership**[2] | | |
| SVF and Affiliates | 40.2% | 74.9% |
| Non-SVF Existing Investors[3] | 59.8% | 0.1% |
| Greensill Limited[4] | 0.0% | 5.0% |
| Wolff Principal Holdings, LP and Affiliates[3] | UNK | 5.0% |
| Management Incentive Plan | 0.0% | 15.0% |
| **Total Ownership** | **100.0%** | **100.0%** |

(1) *SVF invested $200mm, which included $25mm of SVF Secured Bridge that was converted into Series A Preferred Shares*
(2) *Pre-Recapitalization Transaction Fully Diluted Equity Ownership shown prior to the conversion of the SVF Convertible Notes*
(3) *Wolff and Affiliates owned an unknown percentage of the fully diluted equity pre-transaction*
(4) *Following the close of the SVF Recapitalization Transaction, the Greensill shares were sold to SVF*

## <u>Exhibit 3</u>

## Summary of DIP Financing

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Parties to the DIP Promissory Note** Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Katerra Inc., a Delaware corporation (the "Company"). **DIP Guarantors**: Katerra Inc., a Cayman company (the "Parent") and each Subsidiary of the Parent from time to time party to the Security Agreement (as defined in the DIP Promissory Note) (each, a "DIP Guarantor," and, together with the Company, the "DIP Note Parties"). **DIP Lender**: SB Investment Advisers (UK) Limited, a UK private limited company (in its capacity under the DIP Promissory Note, including its registered assigns, the "Holder"). *See* DIP Promissory Note, Preamble, ¶ 1, "Guarantors" |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Promissory Note (the "Maturity Date") shall be the earlier of: (a)  the consummation of a sale of all or substantially all of the assets of the DIP Note Parties; (b)  acceleration of the Balance of the DIP Promissory Note pursuant to the DIP Promissory Note; (c)  35 days after entry of the Interim DIP Order (or such later date as the Holder in its sole discretion may agree in writing with the Company) if the Final DIP Order has not been entered on or prior to the expiration of such 35-day period; (d)  the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a Chapter 11 Plan (as defined in the DIP Promissory Note) that is confirmed pursuant to a Final DIP Order entered by the Court; and (e)  the Scheduled Maturity Date (to be seventy-five (75) days post-closing). *See* DIP Promissory Note, ¶ 1, "Maturity Date" and "Scheduled Maturity Date" |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | The DIP Promissory Note commitments total $35 million (and, all amounts extended under the DIP Promissory Note, the "DIP Loans"), up to $25 million of which are available on an interim basis (the "Initial Funding Amount"). *See* DIP Promissory Note, Preamble, ¶ 2.1(a); Interim DIP Order ¶ (i)–(iii). |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type. *See* DIP Promissory Note, ¶ 9. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at a rate equal to the lower of (a) the Highest Lawful Rate; and (b) 10% per annum; *provided*, that, in the event the entire Balance of the DIP Promissory Note except for any capitalized interest as of the date thereof is indefeasibly paid in full in cash on or prior to the date that is 60 days following the Petition Date, no such capitalized interest shall be payable in connection with such repayment. *See* DIP Promissory Note, ¶ 1, "Applicable Rate" and "Highest Lawful Rate." |
| **Use of DIP Promissory Note** | The Company shall use the proceeds of the Loans to finance, in each case consistent in all material respects with the Approved Budget (as defined below), subject to Permitted Variances:  (i) working capital, letters of credit, surety and performance bonds, and |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Bankruptcy Rule** 4001(c)(l)(B)(ii) | general corporate purposes of the DIP Note Parties, including capital expenditures and Permitted Investments, (ii) the negotiation, documentation, pursuit and/or consummation of an Acceptable Sale, (iii) costs, fees, expenses and charges, in each case, related to, arising out of or in connection with the chapter 11 cases, subject to the Carve-Out, and (iv) certain other prepetition and pre-filing expenses that are approved by the Court and permitted by the Approved Budget. <br><br> *See* DIP Promissory Note, Ex. A ¶ 9. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) | Upon the Maturity Date, the Company shall pay all reasonable out-of-pocket expenses incurred by Holder, including the fees, charges and disbursements of one primary counsel to the Holder (including Weil, Gotshal & Manges LLP), one local counsel to the Holder in each relevant jurisdiction and any other third party advisor consented to by the Company (such consent not to be unreasonably denied, withheld or delayed), in connection with the chapter 11 cases, the DIP Promissory Note (and any amendments, modifications or waivers thereof), the enforcement of rights in connection with the DIP Promissory Note and the administration of the DIP Promissory Note. <br><br> No other fees and expenses are due and payable under the terms of the DIP Promissory Note. <br><br> *See* DIP Promissory Note, ¶ 8.2. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) | The proceeds from the DIP Promissory Note is subject to the Approved Budget (as defined herein), and the initial Approved Budget is attached as <u>Schedule 2</u> to the Interim DIP Order. <br><br> *See* DIP Promissory Note, Ex. D; Interim DIP Order, <u>Schedule 2</u>. |
| **Case Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Note Parties shall pursue and achieve the following milestones, in form and substance acceptable to the DIP Lender: <br><br> (a)      on or before the date that is two (2) Business Days after the Petition Date, the Court shall have entered the Interim DIP Order; <br> (b)      on or before the date that is five (5) days after the Petition Date, the DIP Note Parties shall file with the Court a sale motion and bid procedures motion in form and substance reasonably acceptable to the Holder; <br> (c)      on or before the date that is thirty five (35) days after the Petition Date, the Court shall have entered the Final DIP Order; <br> (d)      on or before the date that is forty-five (45) days after the Petition Date (i) the Court shall have entered an order establishing bid procedures in form and substance reasonably acceptable to the Holder (the "<u>Bid Procedures Order</u>") which shall, among other things, provide that the deadline for bidding be a date not later than fifty-five (55) days from the Petition Date and the Bid Procedures Order shall approve entry into one or more agreements that provide for one or more Acceptable Sale(s), or (ii) the Company shall have obtained a binding commitment for a Replacement DIP and filed a motion with the Court seeking entry of an order approving such Replacement DIP and the indefeasible repayment in full in cash of the Balance; <br> (e)      on or before the date that is sixty (60) days after the Petition Date, either (i) one or more sale orders in form and substance acceptable to the Holder with respect to one or more Acceptable Sales shall have been entered by the Court, or (ii) the Court shall have entered one or more orders approving the Debtors' entry into a Replacement DIP and the indefeasible repayment in full in cash of the Balance (the "<u>DIP Refinancing Order</u>"); |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (f)    if the DIP Refinancing Order is entered, on or before the date that is three (3) days after entry of the DIP Refinancing Order, the Balance shall be repaid in full in cash with the net cash proceeds of the Replacement DIP;<br><br>(g)    on or before the date that is sixty (60) days after the Petition Date, the DIP Note Parties shall file with the Court an Acceptable Plan and a disclosure statement with respect to such Acceptable Plan (the "Disclosure Statement"); provided, that the DIP Note Parties' compliance with this milestone shall not be affected by technical and immaterial changes and other changes, modifications and supplements to such Acceptable Plan and Disclosure Statement that are reasonably acceptable to the Holder filed with the Court subsequent to the original filing of such Acceptable Plan and Disclosure Statement;<br><br>(h)    on or before the date that is seventy (70) days after the Petition Date, one or more Acceptable Sales shall be consummated;<br><br>(i)    on or before the date that is ninety (90) days after the Petition Date, the Court shall have entered an order approving the Disclosure Statement;<br><br>(j)    on or before the date that is one hundred twenty (120) days after the Petition Date, the Court shall have entered the Confirmation Order; and<br><br>(k)    on or before the date that is one hundred thirty five (135) days after the Petition Date, the Acceptable Plan shall be effective.<br><br>*See* DIP Promissory Note, Ex. D; Interim DIP Order ¶ 23. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | <u>DIP Liens</u>.  Subject and subordinate solely to any Prior Perfected Liens and the Carve-Out as set forth in the Interim DIP Order, and effective immediately upon entry of this Interim DIP Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property, whether now existing or hereafter arising and wherever located, tangible, or intangible, of each of the Debtors (the "<u>DIP Collateral</u>").<br><br><u>Superpriority Claims</u>. Subject to the Carve-Out, upon entry of the Interim DIP Order, the DIP Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the chapter 11 cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the chapter 11 cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof.<br><br>*See* Interim DIP Order, ¶ 6–8. |
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Orders provide a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim DIP Order, ¶ 30. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge period no later than the date that is sixty (60) days from the formation of the Committee (the "<u>Challenge Deadline</u>"), as such deadline may be extended in writing from time to time in the sole discretion of the DIP Lender or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline.<br><br>*See* Interim DIP Order, ¶ 32(a). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Promissory Note contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, the failure to timely comply with any of the Case Milestones.<br><br>*See* DIP Promissory Note, Section ¶ 6; Interim DIP Order ¶ 22. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 13. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Promissory Note contains indemnification provisions ordinary and customary for financings of this type, including that the Holder (and its officers, directors, employees, advisors and agents) (each such person, an "<u>Indemnitee</u>") will have no liability for, and will be indemnified and held harmless against, any actual losses, claims, damages, liabilities or expenses (in the case of (i) legal fees and expenses, limited to reasonable and documented fees and out-of-pocket expenses of one primary counsel for all such Indemnitees taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Company has consented to the retention of such person) incurred or arising out of, in connection with, or as a result of, the DIP Promissory Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by the DIP Promissory Note and the other Financing Documents, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, material breach by the Holder of its funding obligations under the DIP Promissory Note or willful misconduct of the relevant Indemnitee.<br><br>*See* DIP Promissory Note, ¶ 8.3. |