# **Exhibit 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF MARC LIEBMAN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Marc Liebman, Chief Transformation Officer of Katerra Inc. (Cayman) (together with its Debtor and non-Debtor affiliates, "Katerra" or the "Company"), hereby declare under penalty of perjury:

## Introduction

1. Katerra was co-founded in 2015 by Michael Marks, Jim Davidson, and Fritz Wolff and is an innovative and eco-conscious construction company that develops, manufactures, and markets products and services in the commercial and residential construction spaces. With the mission of revolutionizing a stagnant construction industry that has failed to keep pace with technological advancements, Katerra focuses on end-to-end integration of all products and services to drive innovation, efficiency, and sustainability. Over its six years in operation, Katerra has raised close to $3 billion in equity investments but was unable to generate a profit.

2. Katerra's manufacturing network specializes in "productized design," whereby Katerra manufactures building components as repeatable modules. In furtherance of productized

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 2700 Post Oak Boulevard, Suite 2450, Houston, Texas 77056.

design, in 2019, Katerra launched "K3," a building platform focused on the construction and assembly of high-quality apartment buildings through the use of modular building components that are assembled onsite. Under the K3 platform, building components are manufactured in a factory similar to "building blocks," enabling a higher level of quality control and standardization than if those components had been built onsite. Those "building blocks" are then assembled at the construction site. As a result, contractors can utilize the K3 platform to develop and build a predesigned, componentized, and manufacturable 24-unit walk-up apartment building on an expedited timetable with a smaller budget and less waste.



3. Katerra also has pioneered the use of new building technologies, such as cross-laminated timber ("CLT"). CLT, as shown in the picture below, is an engineered solid-wood building material composed of lumber stacked crosswise at 90-degree angles in multiple layers and bonded together under high pressure using structural adhesives. The large format size, cross-layer makeup, and high strength-to-weight ratio of CLT products make them sustainable high-performance substitutes for conventional building materials, such as steel or masonry.




4. In pursuit of a fully integrated business model, Katerra acquired several general contractor businesses specializing in commercial, residential and multi-family projects in the West, Northeast, Mid-Atlantic and South East regions.

5. Although Katerra won numerous projects, rapidly expanded its national footprint, and completed a series of successful capital raises, it was unable to generate a profit. Over time, Katerra experienced losses on contracted projects that experienced significant cost overruns, resulting in massive, ongoing losses, especially when Katerra had to honor the maximum price

guarantees and discounts it had provided to certain legacy customers. In hindsight, those discounts were value destructive.

6. In May 2020, Katerra commenced a sixth round of financing, Series F, with one of its existing investors, SVF Abode (Cayman) Limited ("SVF Abode"), to raise additional capital (on top of close to $3 billion previously raised) to fund its operations. Pursuant to the terms of the Series F financing, SVF Abode provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately 45 days later. In addition, SVF Abode exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

7. At the end of May 2020, Katerra identified potential improper revenue recognition practices related to its Katerra Renovations, LLC ("Renovations") business. Within days, an independent committee (the "Independent Committee") of the Board of Directors of Katerra Cayman ("Katerra Cayman") was formed to oversee an investigation into these potential accounting irregularities, and Katerra elected to freeze its equity raises while that investigation was ongoing. As a result of this investigation, SVF Abode elected to exercise its contractual right to withhold the additional $100 million of financing on the 45-day timeline.

8. During the investigation, and in part due to the freeze on raising capital, Katerra continued to face worsening liquidity that threatened its operations. Katerra experienced financial and technical setbacks on some of its legacy construction projects due to re-work issues related to earlier-completed work. The Company's exposure to expensive long-term, third-party commitments in real estate, IT, and software further restrained cash flow. Finally, the Greensill Receivables Facility was already fully drawn, and the debt level thereunder, combined with

Katerra's inability to comply with the covenant criteria since early 2020, made it difficult to obtain bonding for new project starts, impeding Katerra's ability to secure new business

9. In July 2020, Katerra appointed new management to address its constrained liquidity, which was preventing investment in new growth areas and timely vendor payments, straining those relationships and placing projects at risk. Further, due to COVID-19, Katerra, along with the rest of the global construction industry, experienced unprecedented economic disruption, including project delays, shutdowns, and cancellations. Despite its best efforts, Katerra was unable to reduce its heavy operating-cost structure and high cash burn to optimize its business.

10. Given these difficulties, Katerra engaged restructuring advisors and investment bankers in August and September 2020 to evaluate its restructuring alternatives, including raising additional capital. Also in September 2020, Katerra appointed two independent directors with extensive restructuring experience to the Board of Directors of Katerra Cayman. Around this time, Katerra also voluntarily contacted the SEC to inform the SEC of the findings of the Independent Committee investigation.

11. After several months of exploring options to restructure its business and balance sheet (including negotiating a prospective transaction with a consortium of new and existing investors that ultimately did not materialize), in late November 2020, Katerra reached a non-binding term sheet with the only investor willing to engage in an out-of-court restructuring, SVF Abode, and other key stakeholders, agreeing to a series of transactions that resulted in the financial recapitalization and restructuring of Katerra's material obligations, whereby, among other things:

- SVF Abode agreed to invest $200 million in new money in exchange for approximately 75% of Katerra's post-closing equity;

Case 21-31861 Document 63 Filed in TXSB on 06/07/21 Page 6 of 42

- Certain of Katerra's contract counterparties agreed to global amendments to their project contracts to amend and extend project timelines and completion dates in exchange for granting releases of certain claims regarding active projects;

- Greensill Limited (together with its affiliates, "Greensill") extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-equity closing in Katerra, which equity was immediately transferred by Greensill to an affiliate of SoftBank Vision Fund II ("SVF II") in connection with a transaction in which SVF II invested $440 million in the parent company of Greensill; and

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved in a share pool for an equity incentive plan and related grants.

The transaction was implemented, allowing Katerra to avoid a near-term chapter 11 filing and it was expected to provide Katerra with sufficient liquidity to address its immediate ongoing obligations and continue operating in the ordinary course of business pursuant to a new business plan.

12. While negotiating the December 2020 transaction, Katerra was also negotiating the final terms of the PIF Sale, as further explained herein, which was expected to generate approximately $147 million of additional capital, $47 million of which was expected to go directly to Katerra Cayman. The PIF Sale was not expected to close until early 2021.

13. In March 2021, Greensill filed multiple insolvency proceedings in the United Kingdom, Australia, and in the United States.[2] Certain of Katerra's important bond providers demanded exorbitant cash collateral to facilitate construction and certain of Katerra's contract counterparties stopped doing business with Katerra, speculating that Katerra was still burdened with the Greensill Receivables Facility and would be implicated in the Greensill proceedings. In addition, the PIF Sale did not close and Katerra Cayman needed to use $23 million of its own

---

[2] *See Greensill Cap. Inc.*, No. 21-10561 (MEW) (Bankr. S.D.N.Y. Mar. 25, 2021).

liquidity to address covenant compliance concerns under the Samba Credit Facility. Katerra was thus unable to bond certain contract projects, exacerbating its existing operational issues because, without appropriate bonding, it was unable to provide the security of payment and performance of its obligations under certain projects. All of which created massive liquidity constraints and, in some instances, a halt to existing construction projects.

14. After providing Katerra with over $2 billion in equity funding to support ongoing operations and the direct repayment to Greensill of $440 million to facilitate the 2020 recapitalization, SoftBank Vision Fund I ("SVF") explained to Katerra that it could not responsibly continue to support Katerra with go-forward equity in May 2021. Immediately thereafter, on May 17, 2021, three members of Katerra's senior management team resigned, further straining Katerra's already tenuous position.

15. In response, Katerra's board of directors formed a special committee comprised of its two independent directors (the "Special Committee"). The Special Committee called upon the same legal and financial advisors to once again start exploring strategic alternatives. Unfortunately, Katerra's liquidity continued to rapidly deteriorate and, by the end of May 2021, the Company found itself facing an overdrawn cash position unless it received an immediate capital infusion. Katerra immediately shut down several unprofitable and unmarketable active projects to preserve liquidity and implemented a substantial reduction in force (approximately 730 employees). Katerra continues to work on certain projects to preserve value so that certain business lines may be sold.

16. Notwithstanding that SVF (together with its affiliates) has invested over $2 billion into Katerra and is unlikely to receive a distribution in these chapter 11 cases, SB Investment Advisers (UK) Limited, an affiliate of SVF, has agreed to provide $35 million of postpetition

financing as a sign of continuing support to facilitate a marketing process for the Debtors' remaining assets and an orderly wind-down of the Debtors' business for the benefit of the Debtors' estates. Time is clearly of the essence, and Katerra intends to move expeditiously to maximize value for the benefit of all stakeholders.

**Background**

17. I am the Chief Transformation Officer of Katerra Inc. (Cayman) and an authorized representative of each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors"), and have held that position since May 2021. I am generally familiar with the Debtors' capital structure, day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' corporate structure and the status of the Debtors' relationships with various tenants, joint venture partners, vendors, and service providers. I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

18. I am also a Managing Director at Alvarez & Marsal North America LLP ("A&M"). A&M has served as the Debtors' restructuring advisor since May 2021. Specifically, in my role as Chief Transformation Officer to the Debtors, I, along with other members of the A&M team have, among other advisory services, assisted the Debtors with: (a) their cash management and cash forecasting efforts; (b) their contingency planning efforts in preparing for a potential chapter 11 filing; (c) preparing a 13-week budget for the DIP Promissory Note; (d) preparing financial forecasts to size the DIP needs; and (e) developing an operational consolidation plan.

19. I have been a financial advisor to stressed and distressed companies for over 20 years. I have a bachelor's degree in business administration with a concentration in accounting from the University of Notre Dame and an MBA in finance from the University of Chicago. I

have been employed by A&M for over 18 years. A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans and related assessments of strategic position; (b) monitoring and managing cash, cash flow and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization. Some notable, publicly-disclosed restructuring assignments that I have personally advised on include AMERCO/U-Haul, Clover Technologies, Conexant Semiconductor, Euro Fresh Farms, Forbes Energy, Fresh & Easy Markets, Grubb & Ellis, Isola, LBI Media, Nellson Nutraceutical, Relativity Media, Shea Homes, Washington Group, Whiting Petroleum, William Lyon Homes, and World Kitchen.

20. On June 6, 2021 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). To minimize any disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their business, the Debtors have filed various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions"). I submit this Declaration to assist the Court and parties in interest in understanding the circumstances surrounding the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions.

21. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, my conversations with the Debtors' counsel or other advisors, information supplied to me by other members of the Debtors' management and third-party advisors, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on documents and other information prepared or collected by the Debtors' employees or my conversations with the Debtors' counsel or other advisors, I have relied upon the accuracy of such documentation and other information.

22. To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;
- **Part II** provides an overview of the Debtors' prepetition capital structure;
- **Part III** describes the circumstances leading to the filing of these chapter 11 cases; and
- **Part IV** summarizes the relief requested in and the legal and factual bases supporting the First Day Motions.

## Discussion

## I. Katerra's Corporate History, Structure, and Business Overview

### A. Katerra's Corporate History

23. Katerra was co-founded in 2015 by Michael Marks, Jim Davidson, and Fritz Wolff as a construction services provider focused on architecture, interior design, and construction management services. Katerra specializes in "productized design," which enables it to

manufacture building components as repeatable products in a factory and then assemble those components on-site. This approach allows Katerra to offer improved efficiency to customers at scale without compromising design. In addition, Katerra manufactures and supplies a wide range of building components and materials including lighting, cabinetry, truss assemblies, and wall panels. Since its founding, Katerra has sought to disrupt a construction industry that has typically not kept pace with technological innovations adopted in other industries.

24. Katerra has historically evaluated and, where appropriate, executed opportunities to expand through the acquisition of products and companies in areas it believes offer attractive opportunities for growth and fit within its vision of providing end-to-end integration of products and services. In pursuit of a fully integrated business model, Katerra has acquired more than twenty companies that are leaders in their sector of the construction industry, including in general contractor business specializing in commercial, residential, and multi-family projects. These acquisitions include seven key companies acquired over a two-year time period:

- ***Michael Green Architecture***. Founded in 2012, Michael Green Architecture Inc. ("MGA") is a Canada-based multi-disciplinary architecture and design firm known for its use of advanced wood products and technologies to achieve innovative designs. Katerra acquired MGA in May 2018.

- ***Fields Construction***. Founded in 1999, Fields Construction is a vertically integrated full-service construction management firm focused on serving the Northeast. Katerra acquired Fields Construction in May 2018.

- ***Lord, Aeck & Sargent***. Founded in 1942, Lord, Aeck & Sargent, Inc. ("LAS") is an architecture and design firm that has been in operation for over 70 years. LAS provides master planning and programming services as well as design, construction administration, and facility management support. Katerra acquired LAS in June 2018.

- ***Equilibrium***. Founded in 1998, Equilibrium Consulting Inc. ("Equilibrium") is a structural consulting firm that specializes in innovative structural designs, architecturally integrated approach, and state-of-the-art timber engineering expertise. Katerra acquired Equilibrium in August 2018.

- ***KGD***. Founded in 2003, KGD is an international, integrated practice firm with a diversified portfolio in design and engineering. It is headquartered in India. Katerra partnered with KGD in 2019.

- ***UEB Builders***. Founded in 2005, UEB Builders is a general contractor specializing in the multifamily, student housing, mixed-use, and institutional markets. Katerra acquired UEB Builders in June 2019.

- ***Fortune-Johnson***. Founded in 1991, Fortune-Johnson offers general contracting and construction management services for a variety of residential building types, including high-density mixed-use communities, garden-style apartments, senior living facilities, and student housing projects. Katerra acquired Fortune-Johnson in September 2019 and transferred the business back to its prior owners in 2021.

25. These acquisitions and partnerships, among others, have allowed Katerra to grow the number of products it offers and provide end-to-end services for ground-up new build projects.

## B. Katerra's Business Operations

### 1. Katerra's Manufacturing Facilities

26. Katerra operates two factories in the United States, three factories in India, and five factories in Saudi Arabia.

***CLT Facility***

27. Katerra's innovative CLT facility in Spokane, Washington (the "CLT Facility") is used to engineer CLT: solid-wood building material composed of lumber stacked crosswise at 90-degree angles in multiple layers and bonded together under high pressure using structural adhesives. CLT is lightweight, easy to install, and generates almost no waste onsite. The CLT Facility is central to Katerra's drive to reimagine commercial and residential building materials and is the largest single-use CLT facility in North America, producing 30% of the current North American mass timber manufacturing capacity.




28. Using CLT as a building material provides a variety of design, assembly, and cost benefits. CLT allows for increased floor-to-ceiling height, thinner overall floor assembly, and reduced weight on footings, gravity load, and bracing requirements. Panelized CLT speeds up the assembly process by using prefabricated CLT panels and simplified designs to facilitate easy installation, among other things. Further, building with CLT provides environmental and sustainability advantages due to the carbon-capture qualities of wood, the CLT production process, and the efficiency of installation.

29. Recently, CLT technology was used in the first zero carbon building—the Catalyst building, located in Spokane, Washington. Through the incorporation of CLT and other mass timber technologies, Katerra was able to achieve near "Passive House levels" of thermal performance reducing the need for traditional carbon-based heating and cooling.[3] MGA designed the Catalyst building, as pictured below.

[3] "Passive House levels" is one of the building standards ratings for energy efficiency. Passive house buildings are environmentally friendly structures that require little energy for heating or cooling, making conventional heating and air conditioning systems obsolete.





30. Wolff Principal Holdings, L.P. ("Wolff") has a first lien security interest in this facility, which was issued by Katerra as security as a part of the December 2020 recapitalization to maintain Katerra's relationship with Wolff and ensure completion of other active construction projects that were necessary to Katerra's ongoing business operations.

***Tracy Factory***

31. In June 2019, Katerra opened a 577,000 square foot technologically advanced manufacturing factory in Tracy, California (the "Tracy Factory") and moved all manufacturing operations out of, and subsequently shut down, its Phoenix, Arizona factory. The Tracy Factory features highly automated production lines for wood-framed walls, floor trusses, roof trusses, as well as cold-formed steel production, automated cabinet and finish areas, and a highly sophisticated window line. On an annual basis, it can produce the equivalent of 12,500 multifamily units. The Tracy Factory uses solar energy to offset the majority of the facility's energy consumption with renewable energy, making it a high-tech operation with a low carbon footprint.

32. Katerra owns and operates certain equipment used at the Tracy Factory, including 30 fixed robots, 12 mobile robots, and a digital manufacturing process using Self-Guided Vehicle technology.



***India Facilities (non-Debtor entity)***

33. Katerra operates three manufacturing facilities in India, which produce precast concrete construction materials that can be assembled onsite quicker than through traditional building techniques. Katerra's factory in Krishnagiri, Tamil Nadu produces precast concrete components, furniture, wood products, and building facades. Katerra's factory in Hyderabad, Telangana is an automated factory with the capacity to deliver 8 million square feet of building components every year. The newest facility in Taloja, Maharashtra commenced production in 2021 and serves the Western India region.

34. The India facilities support Katerra's off-site construction approach, and have enabled Katerra to complete approximately 25 large projects in India.

**2. Katerra's Operations and Building Platforms**

35. Though Katerra has faced challenges in its operations, the following projects have seen success in achieving Katerra's vision of providing innovative end-to-end design and construction solutions on an expedited timeline and smaller budget.

***Operations in the Kingdom of Saudi Arabia (non-Debtor entity)***

36. In the Kingdom of Saudi Arabia, Katerra has been awarded contracts to build over 14,000 affordable housing units for the Kingdom of Saudi Arabia's Housing Authority. Pursuant to this agreement, Katerra was able to leverage its unique off-site construction technology and five fully operational on-site factories with a production capacity of 40 to 60 villas per month per factory.

***Building Platforms***

37. One of the most unique ways Katerra is revolutionizing the constructing industry is through its building platforms (the "Katerra Building Platforms"). The Katerra Building Platforms take the risk out of construction by applying repeatable manufacturing to the entire building. As a result, Katerra buildings are made from manufactured components ready to be assembled on-site, including wall and floor panels, casework, and bathroom and kitchen kits. The Katerra Building Platform construction projects are predesigned, "componentized," and pre-manufactured before delivery to the site. The building components can be mixed and matched to accommodate the specific goals of the project or the client. The Katerra Building Platforms were designed to function anywhere in the contiguous 48 states and Katerra believes that a sucessful deployment of the Katerra Building Platforms is achievable.

38. The "K3" platform, also referred to as the "Garden Multifamily Platform," is one example of a Katerra Building Platform. K3 is a fully optimized building platform for market rate

multifamily residential housing. This platform is designed to achieve a high-quility, cost-effective product with maximum usability across geographies.




### 3. Katerra's Employees

39. As of the Petition Date, the Debtors directly employ a workforce of approximately 500 individuals, approximately 330 of which are employed by the LAS and Renovations businesses. Of the approximately 500 employees, 50 employees are compensated on a weekly basis, while approximately 450 employees are paid on a semi-monthly basis. The employees perform a wide variety of corporate and other job functions—including engineering, design, manufacturing, fabrication, health and safety oversight, construction, and project management—that are critical to the Debtors' business operations and the administration of these chapter 11 cases. In many instances, the employees are skilled personnel intimately familiar with the Debtors' processes, projects, and systems, many of which are highly technical and require unique training

and experience. Without the continued, uninterrupted services of the employees, the ability of the Debtors to maintain and administer their estates will be materially impaired.

## II. Organization and Prepetition Capital Structure

### A. Organizational Structure

40. A chart of Katerra's corporate organizational structure is attached hereto as Exhibit A.

### B. The Debtors' Prepetition Capital Structure

41. As of the Petition Date, the Debtors and certain of their non-debtor subsidiaries have an aggregate principal amount of approximately $1.29 billion to $1.55 billion in estimated obligations, consisting primarily of (i) prepetition funded debt of certain of the Debtors' foreign non-Debtor subsidiaries, (ii) surety bond obligations, (iii) letters of credit, and (iv) corporate guarantees. The aggregate outstanding amount of each debt obligation is as follows:

| *Funded Debt* | *Principal Amount (in USD)* |
|---|---|
| **Prepetition Foreign Funded Debt** | **$72.4 million** |
| *Prepetition Samba Credit Facility* | $16.7 million |
| *Prepetition SIDF Term Loan* | $16.3 million |
| *Prepetition YES Bank Facility* | $39.5 million |
| **Bonding and Letters of Credit** | **$699.1 million** |
| *Surety Bond Obligations* | $676.7 million |
| *Letters of Credit* | $22.3 million |
| **Corporate Guarantees** | **$514.8 million–$779.2 million** |
| **Total Debt Obligations** | **$1.29 billion–$1.55 billion** |

42. In addition to the debt obligations, Katerra Cayman has a total number of 12,195,150 shares on a fully diluted basis as of the Petition Date.

#### 1. Prepetition Foreign Funded Debt of Non-Debtor Subsidiaries

##### (a) Samba Credit Facility

43. As set forth in the Niemann Declaration,[4] on July 19, 2019, Katerra Inc. (Delaware, US) ("Katerra Delaware") and Katerra Cayman as guarantors, entered into that certain credit facility (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Samba Credit Agreement"), with non-Debtor subsidiary Katerra Saudi Arabia, LLC ("Katerra Saudi Arabia"), as borrower, and Samba Financial Group, as lender, to fund certain projects in the Middle East region. The Samba Credit Agreement provides an aggregate availability of approximately $133 million (the "Samba Credit Facility"). As of the Petition Date, the Debtors estimate that approximately $16.7 million is outstanding on account of the Samba Credit Facility.

**(b) SIDF Term Loan**

44. As set forth in the Niemann Declaration, on October 23, 2019, Katerra Cayman, as guarantor, entered into that certain term loan agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SIDF Term Loan Agreement"), with Katerra Saudi Arabia, as borrower, and Saudi Industrial Development Fund, as lender, for an aggregate principal amount of approximately USD $81.5 million (the "SIDF Term Loan") to fund certain projects in the Middle East region. The SIDF Term Loan is secured by a lien on all the fixed assets of non-Debtor subsidiary Katerra Saudi Arabia LLC – Branch Jeddah (Saudi Arabia). As of the Petition Date, the Debtors estimate that approximately $16.3 million is outstanding on account of the SIDF Term Loan.

**(c) YES Bank Facility**

45. As set forth in the Niemann Declaration, Katerra Delaware is party to that certain agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise

[4] The "Niemann Declaration" means the *Declaration of Matthew R. Niemann in Support of (A) DIP Financing and (B) All First Day Relief*, filed contemporaneously herewith.

modified from time to time, the "YES Bank Agreement") by and among non-Debtor subsidiary KEF Infrastructure India Pvt. Ltd., as borrower, Katerra Delaware and non-Debtor Katerra Operating Company Inc., as guarantors, and YES Bank Limited, as lender. The YES Bank Agreement consists of (a) term loans maturing on February 18, 2029 (the "YES Bank Term Loans") in the aggregate principal amount of approximately $34.7 million, and (b) a credit facility (the "YES Bank Credit Facility," and, together with the YES Bank Term Loans, the "YES Bank Facility") with approximately $11 million of availability, approximately $4.8 million of which is drawn. The YES Bank Term Loans accrue interest at a rate of 11.15% and the YES Bank Credit Facility accrues interest at a rate of 10.2%. The YES Bank Facility is secured by a standby letter of credit in the amount of $10 million. As of the Petition Date, the Debtors estimate that approximately $39.5 million is outstanding on account of the YES Bank Facility.

**2. Bonding and Letters of Credit**

**(a) Surety Bond Obligations**

46. In the ordinary course of business, the Debtors are required to provide surety bonds or other forms of similar credit support (collectively, the "Surety Bonds") to certain third parties to secure the payment or performance of obligations related to their construction projects (the "Surety Bond Program"). Failure to provide, maintain, or timely renew the Surety Bonds may jeopardize the Debtors' ability to continue operations. As of the Petition Date, the Debtors estimate that they have an aggregate liability of approximately $676.7 million on account of the Surety Bond Program.

47. The Debtors are also parties to, or may become parties to, certain indemnity agreements that set forth the sureties' (each a "Surety" and collectively, the "Sureties") rights to recover from the Debtors (collectively, the "Surety Indemnity Agreements") pursuant to which the Debtors agree to indemnify such Surety from any loss, cost, or expense that such Surety may incur

on account of the issuance of any bonds on behalf of the Debtors. In addition, certain Surety Indemnity Agreements allow the Sureties to request collateral security, including cash collateral (collectively, the "Surety Collateral"), from the Debtors from time to time. As of the Petition Date, the Sureties have a total of approximately $9.6 million held in certain bank accounts as Surety Collateral pursuant to the Surety Indemnity Agreements.

**(b) Letters of Credit**

48. The Debtors have issued certain letters of credit to various other parties (such letters of credit, the "Letters of Credit"). As of the Petition Date, the Debtors estimate that approximately $22.3 million in Letters of Credit remain outstanding.

**3. Corporate Guarantees**

49. Katerra Cayman and Katerra Delaware have guaranteed certain projects of Katerra Saudi Arabia. Under these guarantees, Katerra Cayman and Katerra Delaware are liable for unfunded obligations of Katerra Saudi Arabia under performance bonds, bid bonds, advance payment guarantees, and letters of credit provided in favor of project owners. As of the Petition Date, the Debtors estimate that they have guaranteed approximately $514.8 million to $779.2 million in project obligations of Katerra Saudi Arabia.

## III. Katerra's Common and Preferred Stock

### A. Historical Capital Raises

50. It is my understanding, as set forth in the Niemann Declaration, that historically, Katerra raised the majority of its financing through multiple rounds of equity investments. As a start-up, in 2015, Katerra raised approximately $14.5 million in capital through from two separate rounds of angel investing. The majority of the capital was provided by Katerra's three co-founders and certain of their companies.

| Investor | Angel (Individual) Feb-2015 Contributed Capital | Angel (Individual) Jun-2015 Contributed Capital |
|---|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $- | $2,000,000 |
| Paxion Capital | $- | $4,000,000 |
| Wolff-related entities | $20,000 | $4,000,000 |
| Michael Marks (Outside Paxion) | $475,900 | $- |
| Jim Davidson (Outside Paxion) | $98,000 | $- |
| Fritz Wolff (Outside Paxion) | $49,752 | $- |
| Others | $276,348 | $3,559,520 |
| Round Total | $920,000 | $13,559,520 |
| Total Invested to Date | $920,000 | $14,479,520 |
| $ / share | $0.005 | $0.50 |

51. In 2016, Katerra commenced a second round of venture capital funding, which raised approximately $77.35 million in capital.

| Investor | Early Stage VC Mar-2016 Contributed Capital |
|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $49,974,400 |
| Paxion Capital | $4,997,440 |
| Wolff-related entities | $2,989,540 |
| Jim Davidson (Outside Paxion) | $490,820 |
| Others | $18,895,824 |
| Round Total | $77,348,024 |
| Total Invested to Date | $91,827,544 |
| Post $ Valuation | $577,321,170 |
| $ / share | $2.231 |

52. The following year, in 2017, Katerra commenced a Series C financing, which raised another $141 million in capital.

| Investor | Series C Mar-2017 Contributed Capital |
|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $29,970,000 |
| Paxion Capital | $9,990,000 |
| Others | $101,009,112 |
| Round Total | $140,969,112 |
| Total Invested to Date | $232,796,656 |
| Post $ Valuation | $1,168,996,574 |
| $ / share | $3.70 |

53. In 2018 and 2019, Katerra initiated four different rounds of financing and raised a total of approximately $2.4 billion. During Katerra's Series D-1 and D-2 financing and Series E

financing, SVF contributed approximately $1.4 billion of financing and subsequently became Katerra's largest capital investor (though SVF did not hold a controlling stake in Katerra).

| **Investor** | **Series D-1 & D-2 Jan-2018 Contributed Capital** | **Series E (Incl. Extension) Dec-2018 / Jul-2019 Contributed Capital** | **Convertible Promissory Note Jul-2019 Contributed Capital** | **Middle East JV Q4 2018 & Jul-2019 Contributed Capital** |
|---|---|---|---|---|
| Softbank | $649,999,950 | $749,999,988 | $ 200,000,000 | $150,000,000 |
| Foxconn (iCreate & Foxconn Ventures) | $29,999,997 | $- | $- | $- |
| Michael Marks (Outside Paxion) | $- | $4,999,992 | $- | $- |
| Katerra | $- | $(52,000,000) | $- | $52,000,000 |
| Others | $390,775,676 | $242,001,091 | $- | $- |
| Round Total | $1,070,775,623 | $945,001,071 | $200,000,000 | $202,000,000 |
| Total Invested to Date | $1,303,572,279 | $2,248,573,350 | $2,448,573,350 | $2,650,573,350 |
| Post $ Valuation | $3,485,000,000 | **$5,999,762,400** | | |
| $ / share | $79.5000 | - | - | - |

54. On December 9, 2019, Katerra Delaware entered into the Greensill receivables facility, by and among Katerra Delaware, a Delaware limited liability company, as a seller, the other sellers party thereto and Greensill, together with the Transaction Documents (as defined therein) (the "Greensill Receivables Facility"). Pursuant to the terms of the Greensill Receivables Facility, Greensill paid Katerra's suppliers in exchange for a security interest in Katerra's account receivables. Katerra would then pay Greensill directly on the terms set forth in the Greensill Receivables Facility agreement instead of its suppliers. Katerra relied on the Greensill Receivables Facility to fund operations instead of raising capital through rounds of equity financing from December 2019 to May 2020. By December 2020, Katerra owed approximately $440 million under the Greensill Receivables Facility.

55. In 2020, Katerra initiated additional rounds of equity financing, which were interrupted as further explained herein and in the Niemann Declaration.

### B. Current Equity Holdings

56. As of the Petition Date, Katerra Cayman has approximately 12,194,322 shares issued and outstanding consisting of approximately: 15,005 in common stock issued and outstanding; and 12,179,065 in preferred stock issued and outstanding. Additionally Katerra Cayman had approximately 252 options and restricted stock units issued and outstanding; and approximately 828 shares available for issuance under Katerra Cayman's equity incentive plan. As a result, the total number of shares of Katerra Cayman on a fully diluted basis is 12,195,150. As of April 30, 2021, the total book value of the equity in Katerra Cayman was approximately $203,187,107.

57. Before the Petition Date, Katerra Cayman's equity was primarily held by the following entities:

| Stakeholder | Series A Preferred | Ownership Percentage |
|---|---|---|
| SVF Abode (Cayman) Limited | 11,420,798 | 93.65% |
| SVF II Abode (Cayman) Limited | 762,144 | 6.25% |
| SVF Habitat (Cayman) Limited | 7,775 | 0.06% |

58. Although SVF and its affiliates own nearly 100% of the equity interests of Katerra, it has never held a majority of the seats of Katerra's board of directors and currently only has one appointee on Katerra's three-person board of directors.

## IV. Events Leading to These Chapter 11 Cases

### A. Katerra's Financial Challenges

59. Katerra experienced approximately $2.78 billion in financial losses in 2018, 2019, and 2020, which are attributable, in part, to Katerra's difficulty in controlling project costs and completion delays. The COVID-19 pandemic only exacerbated these issues. The Company's project backlog consisted of 147 unprofitable projects ("Loss Projects") out of 428 active jobs as

of April 30, 2021. Loss Projects caused a substantial decrease in profits and additional strains on the Company's liquidity.

60. In May 2020, Katerra commenced another round of financing (Series F) with one of its existing investors, SVF, to raise additional capital to fund operations. As described above, in 2018 and 2019, SVF contributed capital of approximately $1.4 billion in the aggregate as a part of Katerra's Series D-1 & D-2 financing and Series E financing. In 2019, SVF provided Katerra with an additional $200 million in exchange for a promissory note and another $150 million in exchange for an ownership stake in non-Debtor Katerra Middle East. Pursuant to the terms of the Series F financing, SVF provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately 45 days later. In addition, SVF exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

61. In late May 2020, however, Katerra identified potential improper revenue recognition practices related to Katerra's Renovations business. Within days, the Independent Committee was formed to oversee an investigation into potential accounting irregularities within Katerra's Renovations business unit and engaged Kirkland & Ellis LLP ("Kirkland") as special counsel to conduct an independent investigation. Katerra informed SVF that it was conducting an investigation and ceased additional equity fundraising while these investigations were ongoing, at which time SVF exercised its contractual right to not fund the $100 million in connection with the Series F financing.

62. The investigation found that certain Renovations employees intentionally recognized costs prematurely in 2018, 2019, and the first quarter of 2020, thereby rendering the revenue and operating margin line items in higher misstated amounts in Katerra's audited financial

statements for the fiscal years ended December 31, 2018 and December 31, 2019 and Katerra's unaudited financial statements for the three-month period ended March 31, 2020. Katerra took appropriate disciplinary and remedial action. In August 2020, Katerra voluntarily contacted the U.S. Securities and Exchange Commission (the "SEC") to inform the SEC of the findings of the Independent Committee investigation. In addition, Katerra informed its external auditor, Deloitte Touche Tohmatsu Limited ("Deloitte"), of the findings of the Independent Committee investigation.

63. Deloitte then requested that additional investigation be undertaken into another part of the U.S. business to understand whether certain other improper practices or irregularities had occurred. The Independent Committee directed Kirkland to undertake such investigation, and Kirkland reported its findings to the Board of Katerra Cayman and, subsequently, to the SEC and Deloitte in November 2020. Katerra continues to cooperate with the SEC and to provide relevant information upon request, but cannot predict the outcome of this investigation. Together, Deloitte and Katerra determined that restatement of Katerra's audited financial statements for the fiscal year ended December 31, 2019 was not required.

64. During the investigation, and in part due to the freeze on raising capital, Katerra continued to face worsening liquidity that threatened its operations. Katerra experienced financial and technical setbacks on some of its legacy construction projects due to re-work issues related to earlier-completed work. The Company's exposure to expensive long-term, third-party commitments in real estate, IT, and software further restrained cash flow. Finally, the Greensill Receivables Facility was already fully drawn, and the debt level thereunder, combined with Katerra's inability to comply with the covenant criteria since early 2020, made it difficult to obtain bonding for new project starts, impeding Katerra's ability to secure new business.

65. Faced with this significant liquidity crisis, in August 2020, Katerra engaged Kirkland as restructuring counsel to explore strategic alternatives. To prevent an immediate chapter 11 filing in September 2020, SVF again offered financial support to Katerra and provided the additional $100 million in connection with the Series F financing that it had previously elected not to provide. The Company also contracted to sell its Lifebridge and Amberglen developments in Washington and Oregon, respectively, in September and October 2020.

66. Notwithstanding these efforts, Katerra continued to experience significant losses. Thus, in late September 2020, Katerra engaged A&M as restructuring advisor and Houlihan Lokey ("Houlihan Lokey") as investment banker. Katerra engaged these advisors to explore all restructuring options. With the assistance of Kirkland, A&M, and Houlihan Lokey, Katerra engaged its major constituents, as well as third parties, regarding potential restructuring transactions.

**B. Negotiations with SVF and the New Money Consortium**

67. It is my understanding, as set forth in the Niemann Declaration, that faced with the realities of its worsening liquidity situation and its dire need for additional capital, in October 2020, Katerra with the assistance of its advisors, began negotiations with SVF, and a consortium of new investors and existing stakeholders (the "Consortium") who expressed a desire to support Katerra's business. The proposed transaction contemplated a new-money investment by the Consortium and SVF of approximately $380 million in exchange for a 90% equity ownership stake of the Consortium in Katerra, with the remaining 10% of Katerra's equity reserved for management. In addition, the transaction contemplated the retirement of Katerra's outstanding Greensill Receivables Facility and the sale of Katerra's ownership interests in certain foreign ventures. Katerra, SVF, and the Consortium executed a non-binding letter of intent reflecting this transaction. The transaction, however, did not materialize.

68. Subsequently, Katerra continued to pursue out-of-court restructuring alternatives and reached out to a number of parties, both existing stakeholders and third parties, to provide additional financing.

**C. December 2020 Out-of-Court Transaction**

69. As set forth in the Niemann Declaration, in late November 2020, following the break-down of negotiations with SVF and the Consortium, SVF Abode indicated an interest in investing an additional $200 million to ensure Katerra would be able to meet its ongoing obligations. Katerra issued a promissory note to SVF Abode in exchange for a $25 million bridge loan while Katerra engaged with SVF Abode and other stakeholders to negotiate the terms of an out-of-court restructuring.

70. Ultimately, Katerra consummated a transaction at the end of December 2020 on the following terms:

- SVF Abode exercised its warrant to purchase ordinary shares of the Company and converted $300 million of promissory notes of the Company held by SVF Abode to equity;

- the Company (i) converted all existing preferred shares into ordinary shares of the Company, and (ii) issued a new class of preferred shares (the Series A preferred shares) to SVF Abode in exchange for $175 million in cash and extinguishment of a $25 million bridge loan owed to SVF Abode;

- Greensill extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-equity closing in Katerra, which equity was immediately transferred by Greensill to an affiliate of SVF II in connection with a transaction in which SVF II invested $440 million in the parent company of Greensill;

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved in a share pool for an equity incentive plan and related grants; and

- Katerra and Wolff settled and waived certain claims against Katerra, including the amendment of the "Substantial Completion Dates" of a number of active projects with Wolff and certain of its related parties, and in exchange, Katerra granted Wolff a lien on the CLT Facility.

As a part of this transaction, SVF was diluted to the same extent as all other investors (100,000.0:1.0), which resulted in the previous $1.95 billion invested by SVF equaling less than 0.1% of the post-recapitalization equity.

71. An additional transaction that Katerra was negotiating near the end of 2020, that did not materialize, was a joint venture agreement with the Public Interest Fund ("PIF"), a program established and supported by the Kingdom of Saudi Arabia. Pursuant to the proposed terms of the joint venture, PIF was to invest $147 million in Katerra Saudi Arabia in exchange for a 49% equity ownership stake (the "PIF Sale"). Katerra planned to use approximately $23 million from that investment to restore covenant compliance under the Samba Credit Facility and another approximately $47 million was expected to be paid directly to Katerra Cayman.

72. Despite Katerra's best efforts, negotiations between Katerra and PIF stalled and the PIF Sale was not executed. Because the sale fell through, Katerra Cayman was forced to use its own capital to pay off the approximately $23 million due under the Samba Credit Facility in March 2021 due to covenant compliance concerns.

**D. Greensill Insolvency Proceedings and the Greensill Receivables Facility**

73. In March 2021, Greensill filed for insolvency proceedings in the United Kingdom, Australia, and in the United States.[5] In connection with Greensill's insolvency proceedings, it was reported by the *Wall Street Journal* that SVF had injected $400 million into Greensill in exchange for Greensill's 5% equity in Katerra.[6] Immediately after this article was published, Katerra was

---

5 *See Greensill Cap. Inc.*, No. 21-10561 (MEW) (Bankr. S.D.N.Y. Mar. 25, 2021).

6 *See* Julie Steinberg, Ben Dummett, Duncan Mavin, and Maureen Farrell, *SoftBank Put $400 Million into Greensill Months Before Collapse*, Wall St. J., Mar. 9, 2021, https://www.wsj.com/articles/softbank-put-400-million-into-greensill-months-before-collapse-11615319255.

bombarded with inquiries from customers, employees, and other third parties about the financial viability of the Company.

74. On March 11, 2021, Katerra received a letter from a legal representative of Credit Suisse Asset Management, stating that it was the holder of notes totaling approximately $438 million, under whose terms, Katerra acts as a servicer for the notes program and performs all activities to bill and collect from customers. The firm asked Katerra to provide statements and documentation relating to collection activities starting November 1, 2020 to the date of the letter. In addition, the firm referenced the media reports that stated that Katerra's approximately $440 million debt owed to Greensill was forgiven by Greensill in exchange for a 5% equity stake in Katerra, and enquired whether such debt forgiveness had any relationship with the receivables sold or owed to Greensill.

75. Because of the news articles discussing Katerra's relationship with Greensill and SVF, certain of Katerra's contract counterparties stopped doing business with Katerra, expressing concerns that Katerra was still burdened with the Greensill Receivables Facility and that Katerra was going to be implicated into the Greensill proceedings. Katerra was quickly faced with a series of operational issues, including: (a) customers on existing projects looked to replace Katerra mid-project; (b) customers for new projects displayed a new-found reluctance to contract with Katerra; (c) customers and their lenders, in general, demanded Katerra provide bonds or blocked funds in escrow accounts under their control to protect themselves; (d) bonding and surety companies were increasingly difficult about providing bonding capacity for new projects; (e) in verbal conversations, banks were not willing to provide any borrowing facilities to Katerra based on recent history and the publication of recent news articles; and (f) Katerra's current capital raises were negatively impacted.

76. In mid-May 2021, in response to requests for support in the face of the Greensill downfall, SVF informed Katerra that it would not make any further investments to fund the Company's operations on a go-forward basis to cover Katerra's unexpected capital shortfall stemming from the failure of the PIF Sale, the Greensill insolvency proceedings, and the Company's historic losses. After investing approximately $2.5 billion in equity and capital in Katerra, including the approximately $440 million it paid to Greensill, SVF explained to Katerra that it could not reasonably invest additional funds into Katerra's business plan.

**E. Katerra's Liquidity Constraints and Actions Taken to Preserve Assets**

77. On May 17, 2021, three senior members of Katerra's management team resigned. Shortly thereafter, Katerra created the Special Committee and re-engaged A&M to provide certain officers and restructuring personnel and Houlihan Lokey, as investment banker, to seek alternative financing and market certain of its assets. Together, Katerra, the Special Committee, Kirkland, A&M, and Houlihan Lokey began exploring a number of restructuring options on an expedited basis. Katerra and its advisors engaged their major constituents, as well as third parties, regarding potential restructuring transactions that could be effectuated either in-court or out-of-court.

78. Despite Katerra's best efforts, it was unable to find an investor willing and able to provide the financing necessary for Katerra to meet its ongoing obligations. As a result, by the end of May 2021, Katerra faced a critical liquidity shortfall such that it projected a negative cash balance, requiring an immediate capital infusion to conduct a marketing process for its assets and effectuate an orderly wind-down of its domestic businesses.

79. To preserve liquidity and retain as many employees as possible while searching for solutions, on June 1, 2021, Katerra decided to cease a majority of its operations in the United States, which resulted in winding down approximately 82 projects representing 76.9% of its active project revenue. As part of this wind down, Katerra also implemented a reduction in force and

terminated 730 of its 1,300 employees in the United States. Katerra has retained its capability to serve its Wolff, Lifebridge, and Amberglen projects.

80. Katerra's decision to wind down certain projects was based primarily on a project's expected profitability once completed and/or "marketability" in an asset sale. Katerra is continuing to work on its approximately 346 active projects, mainly in its Renovations and LAS businesses.

**F. DIP Promissory Note**

81. To provide Katerra with liquidity to commence a smooth landing into these chapter 11 cases, SB Investment Advisers (UK) Limited agreed to provide a $35 million senior secured superpriority DIP Promissory Note. The purpose of the DIP Promissory Note is to provide Katerra with enough liquidity to run an in-court marketing process with the goal of consummating one or more sales of Katerra's assets and an orderly wind down of the Company. Given its position as equity holder in Katerra, its familiarity with Katerra's business and assets, and Katerra's impending liquidity shortfall, SB Investment Advisers (UK) Limited was best positioned to provide the DIP Promissory Note to facilitate Katerra's soft landing into chapter 11.

82. Because time is of the essence to minimize costs while preserving the value of key assets, the Debtors propose the following case timeline:

- On or before 5 days after the Petition Date, the Debtors shall file a Bidding Procedures Motion;
- On or before 45 days after the Petition Date, the Court shall enter an order approving the bid procedures;
- On or before 60 days after the Petition Date, the Court shall enter one or more sale orders;
- On or before 60 days after the Petition Date, the Debtors shall file a Plan and Disclosure Statement;

- On or before 90 days after the Petition Date, the Court shall enter an order approving the Disclosure Statement;
- On or before 120 days after the Petition Date, the Court shall enter an order confirming the Plan; and
- On or before 135 days after the Petition Date, the effective date of the Plan shall occur.

83. During this chapter 11 process, the Debtors are focused on marketing Katerra's key assets and operations, including: (a) the CLT Facility, equipment, and land; (b) the Tracy Factory equipment; (c) Katerra Saudi Arabia; (d) operations in India; and (e) the K3 building platform. As of the Petition Date, the Debtors have entered into term sheet commitments to sell the following businesses, subject to Court approval, LAS and Renovations. The Debtors expect to have final terms sheets to sell non-Debtors MGA and Equilibrium in the near future.

84. The Debtors believe that a chapter 11 process provides the best avenue for the Company to maximize value for stakeholders by continuing to market the assets of the business and effectuating an orderly wind-down of operations.

**G. WARN Notices**

85. Prior to filing the chapter 11 petitions, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") to employees that are expected to be impacted by a qualified "mass layoff" or "plant closing" and certain governmental entities (collectively, the "WARN Act Notices"). Some of the WARN Act Notices were conditional, providing that, in the event that a sale of certain business lines does not occur, or occurs in a manner different than anticipated, and the Debtors are not able to secure additional financing, employees at those locations may experience an employment loss under the WARN Act.

86. Unless an exception applies, the WARN Act generally requires 60 days' advance notice to affected employees and governmental entities prior to the implementation of a "mass layoff" or "plant closing." The WARN Notices were not issued 60 days before the anticipated terminations due to the applicability of the "faltering company," "unforeseeable business circumstances," and "natural disaster" exceptions under the WARN Act, which relieve Debtors from any obligation to provide additional pay or benefits in the event that employees do not receive pay and benefits for a full 60 days after receiving the notice.[7]

## V. Evidentiary Support for First Day Motions[8]

87. Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and minimize disruption. I understand the Debtors intend to seek the entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas. If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

88. The First Day Motions seek authority to, among other things, obtain DIP financing on an interim basis, reject burdensome executory contracts and unexpired leases, honor employee-related wages and benefits obligations, and ensure the continuation of the Debtors'

[7] In the event these exceptions are challenged and are found not to apply, Katerra's position is that any claim under the WARN Act should be considered prepetition. *See In re Powermate Holding Corp.*, 394 B.R. 765 (Bankr. D. Del. 2008) (finding that WARN Act claims vested prepetition where employees were terminated without prior notices under the WARN Act prior to bankruptcy filing).

[8] Capitalized terms used but not defined below have the meanings given to them in the applicable First Day Motion.

surety program, insurance, cash management systems, and other business operations without interruption.

89. Each of the first day relief is necessary and appropriate to maximize the value of the Debtors' assets being sold and facilitate an orderly wind down of the remaining business. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors an opportunity to maximize the value of their estates.

90. Several of the First Day Motions request authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable value-destructive harm to the Debtors and their estates, to the detriment of all stakeholders. Other relief will be deferred for consideration at a later hearing.

91. The First Day Motions include the following:

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief*;
- *Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent*;
- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personal Identification Information, (II) Approving the Form and Manner of Notice of Commencement, and (III) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of (A) Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Maintain Existing Books and Records, and (C) Continue to Perform Intercompany Transactions and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs*;

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests*;

- *Debtors' Emergency Motion for Entry of an Order Approving Continuation of the Surety Bond Program*;

- *Debtors' Emergency Motion for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock*;

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder, and (IV) Enter into New Premium Financing Agreements*;

- *Debtors' Emergency Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief*;

- *Debtors' Emergency Motion Seeking Entry of an Order Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases*;

- *Debtors' First Emergency Omnibus Motion for Entry of an Order Authorizing (I) The Rejection of Certain Unexpired Leases and (II) The Rejection of Certain Unexpired Executory Contracts, Each as if Effective as of the Petition Date, and (III) Granting Related Relief;*

- *Debtors' Second Emergency Omnibus Motion for Entry of an Order Authorizing (I) The Rejection of Certain Unexpired Leases and (II) The Rejection of Certain Unexpired Executory Contracts, Each as if Effective as of the Petition Date, and (III) Granting Related Relief;*

- *Debtors' Third Emergency Omnibus Motion for Entry of an Order Authorizing (I) The Rejection of Certain Unexpired Leases and (II) The Rejection of Certain Unexpired Executory Contracts, Each as if Effective as of the Petition Date, and (III) Granting Related Relief*;

- *Debtors' Fourth Emergency Omnibus Motion for Entry of an Order Authorizing (I) The Rejection of Certain Unexpired Leases and (II) The Rejection of Certain Unexpired Executory Contracts, Each as if Effective as of the Petition Date, and (III) Granting Related Relief*; and

- *Debtors' Fifth Emergency Omnibus Motion for Entry of an Order Authorizing (I) The Rejection of Certain Unexpired Leases and (II) The Rejection of Certain Unexpired Executory Contracts, Each as if Effective as of the Petition Date, and (III) Granting Related Relief*.

92. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization, and (c) is in the best interest of the Debtors' estates and stakeholders. I have reviewed each of the First Day Motions and the facts set forth therein are true and correct to the

best of my knowledge, information, and belief after reasonable inquiry and incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts set forth in such motions.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 7, 2021

*/s/ Marc Liebman*
Marc Liebman
Chief Transformation Officer
Katerra Inc. (Cayman)

# EXHIBIT A

## Corporate Organizational Structure

# Katerra Legal Entity Structure – Katerra Inc. (Cayman)







1. Katerra, Inc. maintains certain call option agreements pursuant to which it may purchase the equity stakes of individual persons owning interests in Katerra architecture and engineering entities at a nominal amount.

# Katerra Legal Entity Structure – Katerra Inc. (Cayman)




