# Exhibit 3

# KATERRA INC.

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION PROMISSORY NOTE

$35,000,000                                                                                              June [●], 2021

Subject to the terms and conditions of this Senior Secured Super-Priority Debtor-in-Possession Promissory Note (this "***Note***"), for value received, Katerra Inc., a Delaware corporation (the "***Company***") as debtor and debtor-in-possession, with chief executive offices at 2700 Post Oak Blvd Suite 2450 Houston, TX 77056, hereby promises to pay to the order of SB Investment Advisers (UK) Limited, a UK private limited company (in its capacity hereunder, including its registered assigns, the "***Holder***"), the principal sum of Thirty-Five Million Dollars ($35,000,000) (such amount the "***Aggregate Commitment***"), or such lesser amount as shall then equal the outstanding principal amount hereunder, together with interest accrued on the unpaid principal amount at the Applicable Rate (as defined below) pursuant to Section 3.2.

The following is a statement of the rights of Holder and the terms and conditions to which this Note is subject, and to which the Holder hereof, by the acceptance of this Note, agrees.

1.      **DEFINITION.**  The following definitions shall apply for purposes of this Note.

"***Acceptable Plan***" means, until the Balance has been indefeasibly repaid in full in cash, a Chapter 11 Plan that provides for the indefeasible repayment in full in cash of the Balance on the effective date thereof and that is otherwise reasonably satisfactory to the Holder and the DIP Note Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof in accordance with the terms thereof).

"***Affiliate***" has the meaning ascribed to it in Rule 144 promulgated under the Securities Act.  For the avoidance of doubt, SoftBank Vision Fund L.P., a limited partnership formed under the laws of Jersey, SoftBank Group Corp. and all persons or entities controlling, controlled by or under common control with either SoftBank Vision Fund L.P. or SoftBank Group Corp. are affiliates of each other.  For the avoidance of doubt, any entity managed by an affiliate of SoftBank Vision Fund L.P., SB Investment Advisors (UK) Limited or SB Investment Advisors (US) Inc. shall be deemed an Affiliate of the Holder.

"***Acceptable Sale***" means (x) a sale of the DIP Note Parties' assets constituting a business unit, a line of business, a business segment or project and (y) any other sale the Net Proceeds of which exceeds $500,000, in each case, pursuant to Section 363 of the Bankruptcy Code or a Chapter 11 Plan, subject to the following conditions:  (i) (a) the Holder shall have reviewed and approved in writing in its reasonable discretion any bid procedures and asset purchase agreement (including any asset purchase agreement with a "stalking horse") or (b) the sale order with respect to such sale shall provide for application of all Net Proceeds of such sale to the indefeasible repayment in full in cash of the Balance upon consummation of the sale in accordance with the terms herein, and (ii) the first such sale shall be consummated not later than seventy (70) days following the Petition Date.

"***Applicable Rate***" means a rate equal to the lower of:  (a) the Highest Lawful Rate; and (b) 10.00% per annum.

"***Approved Budget***" means the budget in the form of Exhibit D and initially furnished to the Holder on or prior to the Closing Date, as the same may be updated, modified or supplemented from time to time as provided in Section 8 of Exhibit A hereto.  The initial Approved Budget shall depict, on a cumulative

and line item basis, forecasted (i) cash receipts of the DIP Note Parties (the "**Cash Receipts**"), (ii) cash operating disbursements of the DIP Note Parties (the "**Cash Operating Disbursements**"), and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Note Parties, including all professional and advisory fees, expenses and charges related to the Chapter 11 Cases (the "**Cash Bankruptcy Disbursements**"), in each case for the first thirteen (13) fiscal week period from the Petition Date, and such initial Approved Budget shall be approved by the Holder in its reasonable discretion, which Approved Budget may be modified, supplemented or restated by the DIP Note Parties with the written consent of the Holder in its reasonable discretion and without further order of the Bankruptcy Court (it being acknowledged and agreed that the initial Approved Budget attached hereto as Exhibit D is approved by the Holder). Notwithstanding the foregoing, in no event will cash receipts or disbursements received or made on account of or in connection with construction trust fund statutes, laws, requirements or similar arrangements constitute Cash Receipts, Cash Operating Disbursements or Cash Bankruptcy Disbursements for purposes of this definition.

"**Automatic Stay**" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Balance**" means, at the applicable time, the sum of all then outstanding DIP Obligations (excluding, in each case, any contingent amount for which no claim has been made or asserted).

"**Bankruptcy Code**" shall mean Title 11, United States Code, as amended.

"**Bankruptcy Court**" has the meaning given to such term in the definition of "Chapter 11 Cases".

"**Borrowing Notice**" means a notice of a borrowing of Loans, pursuant to Section 2.1(b), which, if in writing, shall be substantially in the form of Exhibit E, or such other form as may be approved by the Holder (including any form on an electronic platform or electronic transmission system as shall be approved by the Holder), appropriately completed and signed by a responsible officer of the Company.

"**Business Day**" means a weekday on which banks are open for general banking business in San Carlos, California.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any indebtedness convertible into or exchangeable for any of the foregoing.

"**Carve-Out**" has the meaning set forth in the Interim DIP Order (and Final DIP Order, when applicable).

"**Case Milestones**" means the milestones set forth on Exhibit C.

"**Cash Management Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing on an interim basis, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Holder, which among other matters authorizes the DIP Note Parties to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to the Holder in all material respects.

"**Chapter 11 Cases**" mean the voluntary cases commenced by the DIP Note Parties in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

"**Chapter 11 Plan**" means a chapter 11 plan with respect to any or all of the DIP Note Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"**Claim**" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"**Closing Date**" means the date on which all conditions set forth in Section 9 are satisfied; the Closing Date occurred on June [●], 2021.

"**Collateral**" means (a) any and all "Collateral" or words of similar intent as defined in the Security Agreement and (b) the "DIP Collateral" referred to in the DIP Orders.

"**Company**" shall include, in addition to the Company identified in the opening paragraph of this Note, any corporation or other entity which succeeds to the Company's DIP Obligations, whether by permitted assignment, by merger or consolidation, operation of law or otherwise.

"**Company's Financial Advisor**" means Alvarez & Marsal.

"**Company's Investment Banker**" means Houlihan Lokey Capital, Inc.

"**Confirmation Order**" means an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final and non-appealable order and otherwise be in form and substance reasonably satisfactory to the Holder, together with all extensions, modifications, supplements, and amendments thereto and (y) to the extent the Balance has not yet otherwise been repaid, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment in full in cash, and the termination in full of all outstanding commitments under this Note.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event set forth in Section 6 that is, or with the passage of time or the giving of notice or both, in each case as set forth in such Section, would be, an Event of Default.

"**DIP Note Parties**" means the Company and the Guarantors, and each individually, a "**DIP Note Party**".

"**DIP Obligations**" shall mean all obligations of every nature of each DIP Note Party, including obligations from time to time owed to Holder, in each case, that arise under any Financing Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such DIP Note Party, would have accrued on any DIP Obligation, whether or not a claim is allowed or allowable against such DIP Note Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

"***DIP Order***" means, as applicable, and as the context may require, the Interim DIP Order or the Final DIP Order, whichever is then applicable, or the Interim DIP Order and the Final DIP Order as the "***DIP Orders***".

"***Disposition***" means any sale, transfer, lease or other disposition (including any sale or issuance of Capital Stock in a Subsidiary) of any property by any Person, including any sale, transfer or other disposition, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith. "Dispose" has the meaning correlative thereto.

"***Event of Default***" has the meaning set forth in Section 6.

"***Final DIP Order***" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Holder and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Holder waives such requirement), together with all extensions, modifications, and amendments thereto, which, among other matters but not by way of limitation, authorizes the DIP Note Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Note and the other Financing Documents, as the case may be, and provides for the super-priority of the Holder's Claims.

"***Financing Document***" means each of this Note, any Security Document, the DIP Orders and any other document entered into, executed or delivered under or for the purpose of providing collateral.

"***First Day Orders***" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter and, except for the Cash Management Order, each of which shall be reasonably acceptable to the Holder (for the avoidance of doubt, neither the Interim DIP Order nor the Final DIP Order shall constitute a "First Day Order" for purposes of this definition).

"***Guarantors***" shall mean, collectively, the Parent and each Subsidiary of the Parent from time to time party to the Security Agreement, and each, a "**Guarantor**".

"***Guaranty***" shall mean the guaranty set forth the Security Agreement.

"***Highest Lawful Rate***" means the maximum non-usurious rate of interest, as in effect from time to time, which may be charged, contracted for, reserved, received or collected by Holder in connection with this Note under applicable law.

"***Indebtedness***" as applied to any Person means, without duplication:

       (a)      all indebtedness for borrowed money;

       (b)      that portion of obligations with respect to capital leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

       (c)      all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

4

(d)     any obligation of such Person owed for all or any part of the deferred purchase price of property or services;

(e)     all Indebtedness of others described in clauses (a) through (d) and (f) through (h) secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (A) the fair market value of the property to which such Lien relates or (B) the aggregate unpaid amount thereof);

(f)     the amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(g)     the guarantee by such Person of the Indebtedness of another; and

(h)     all net obligations of such Person in respect of any derivative transaction, including any hedge agreement, whether or not entered into for hedging or speculative purposes.

Notwithstanding the foregoing, Indebtedness shall not include (1) accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business, (2) deferred compensation, (3) amounts owed pursuant to any contractual arrangement with, and for services to be performed by, an original equipment manufacturer incurred in the ordinary course of business, (4) liabilities associated with customer prepayments and deposits, in each case incurred in the ordinary course of business, (5) obligations under operating leases entered into in the ordinary course of business, (6) contingent post-closing purchase price adjustments or earn out obligations to the extent not earned, due and payable, (7) trade payables or other accounts payable incurred in the ordinary course of such Person's business and (8) non-compete or consulting obligations.

"***Interim DIP Order***" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, supplements and amendments thereto, in each case, in form and substance satisfactory to the Holder, which, among other matters but not by way of limitation, authorizes, on an interim basis, the DIP Note Parties to execute and perform under the terms of this Note and the other Financing Documents. The Interim DIP Order is attached hereto as Exhibit F.

"***Interim Period Cap***" means $25,000,000.

"***Investment***" means (a) any purchase or other acquisition by any DIP Note Party of any of the securities of any other Person (other than any DIP Note Party), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance or capital contribution by any DIP Note Party to any other Person. The amount of any Investment outstanding as of any time shall be the original cost of such Investment (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Company's good faith estimate of the fair market value of such asset or property at the time such Investment is made) plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, less all returns received by the Company or any Subsidiary in respect thereof.

"***Lien***" shall mean any mortgage, deed of trust, pledge, hypothecation, collateral assignment, lien (statutory or otherwise), preference, priority, charge or other encumbrance of any nature, whether voluntary or involuntary, including the interest of any vendor or lessor under any conditional sale agreement, title retention agreement, capital lease or any other lease or arrangement having substantially the same effect as any of the foregoing.

"***Material Adverse Effect***" means a material adverse effect (whether the result of occurrences, events or circumstances involving the Company or any other DIP Note Party) on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company and the other DIP Note Parties on a consolidated basis and taken as a whole, other than (i) the effect of filing the Chapter 11 Cases, the events and conditions leading up to and resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Financing Documents or the DIP Orders and the Chapter 11 Cases themselves and (ii) any matters or transactions disclosed, contemplated or required to be taken in any First Day Order on a final basis, motions related thereto or in any supporting declarations thereof.

"***Maturity Date***" means the earlier of (a) the consummation of a sale of all or substantially all of the assets of the DIP Note Parties; (b) acceleration of the Balance of this Note pursuant to the terms hereof; (c) 35 days after entry of the Interim DIP Order (or such later date as the Holder in its sole discretion may agree in writing with the Company) if the Final DIP Order has not been entered on or prior to the expiration of such 35-day period; (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a Chapter 11 Plan that is confirmed pursuant to a final and non-appealable order entered by the Bankruptcy Court and (e) the Scheduled Maturity Date.

"***Mortgaged Properties***" has the meaning set forth in the Security Agreement.

"***Mortgages***" has the meaning set forth in the Security Agreement.

"***Net Proceeds***" means, with respect to any event, (a) the cash proceeds received in respect of such event (either directly or through a distribution of such proceeds from a Subsidiary) including any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid or payable to third parties (other than controlled Affiliates) in connection with such event; provided, however, that such fees shall not include any Exempt Professional Fees (as defined in the DIP Orders), (ii) in the case of a sale, transfer or other Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than the Loans) secured by such asset, (iii) any funded escrow established pursuant to the documents evidencing any such sale or other Disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or other Disposition, (iv) in the case of any Disposition by a non-wholly-owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Company or a wholly-owned Subsidiary as a result thereof and (v) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, that are attributable to such event (as determined reasonably and in good faith by a responsible officer of the Company in consultation with the Holder).

"***Note***" has the meaning given to such term in the preliminary statements to this Note.

"**_Parent_**" means Katerra Inc., a Cayman company.

"**_Permitted Debt_**" means any of the following:

(i)      Indebtedness incurred pursuant to this Note and the other Financing Documents;

(ii)     Indebtedness existing on the Closing Date and disclosed on Schedule 1 hereto or otherwise constituting Permitted Investments;

(iii)     [reserved];

(iv)     [reserved];

(v)     Indebtedness owed by a DIP Note Party to another DIP Note Party;

(vi)     guarantees by a DIP Note Party in respect of Indebtedness of a DIP Note Party otherwise permitted hereunder;

(vii)     Indebtedness arising from customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days of its incurrence;

(viii)     Indebtedness with respect to performance bonds, bid bonds, surety bonds, construction bonds, appeal bonds or customs bonds required in the ordinary course of business or completion guarantees or in connection with the enforcement of rights or claims of the Company or any of its Subsidiaries or in connection with judgments that do not result in an Event of Default;

(ix)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to a DIP Note Party or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(x)     Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(xi)     Indebtedness in respect of bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 45 days following the due date thereof;

(xii)     [reserved];

(xiii)     other Indebtedness in an aggregate outstanding principal amount not to exceed $50,000;

(xiv)     Indebtedness consisting of the financing of insurance premiums;

(xv)     Indebtedness expressly permitted by the DIP Orders, First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order; and

(xvi)    all premiums (if any), interest, fees, expenses, charges and additional or contingent interest on obligations described above.

"**_Permitted Dispositions_**" means any Disposition:

(a)    of inventory, goods held for sale and other assets, in each case in the ordinary course of business;

(b)    of used, obsolete, damaged, worn-out or surplus equipment, or property no longer useful in the conduct of the business or otherwise commercially desirable to maintain, whether now owned or hereafter acquired, in the ordinary course of business;

(c)    among the DIP Note Parties;

(d)    in connection with the settlement or write-off of accounts receivable or sale of overdue accounts receivable (including any discount or forgiveness thereof) for collection in the ordinary course of business;

(e)    of cash or cash equivalents in the ordinary course of business;

(f)    as a result of eminent domain, casualty, foreclosure or condemnation of realty;

(g)    in connection with the lease or sub-lease of any real or personal property in the ordinary course of business and the termination or non-renewal of any real property lease not used or not necessary to the operations of any DIP Note Party (other than the lease in respect of the Tracy Project);

(h)    [reserved];

(i)    from any Subsidiary that is not a DIP Note Party to any other Subsidiary that is not a DIP Note Party or to a DIP Note Party;

(j)    consisting of Permitted Investments, Permitted Debt or Permitted Encumbrances;

(k)    that is an Acceptable Sale; and

(l)    that is expressly permitted in the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"**_Permitted Encumbrances_**" means the following Liens:

(a)    Liens securing the DIP Obligations created pursuant to the Financing Documents;

(b)    Liens existing on the Closing Date and disclosed on Schedule 2;

(c)    Liens imposed by law, such as Liens of carriers, warehousemen, shippers, mechanics, materialmen and landlords, and other similar Liens incurred in the ordinary course of business for sums not constituting borrowed money that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if so required) or that do not materially detract from the value of the applicable property or assets;

(d)     Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or and other letters of credit and letter of credit rights, bids, tenders, statutory obligations, surety, surety and appeal bonds, performance bonds, stay, customs and appeal bonds, trade contracts, leases, government contracts and other similar obligations (in each case other than obligations for borrowed money);

(e)     Liens for taxes, assessments or other governmental charges or statutory obligations that are (i) not delinquent, (ii) remain payable without any penalty, (iii) are being contested in good faith appropriate proceedings and for which adequate reserves exist in accordance with GAAP or (iv) the nonpayment of which is permitted or required by the Bankruptcy Code;

(f)     purported Liens evidenced by the filing of UCC financing statements in respect of operating leases or consignment of goods;

(g)     with respect to any real property occupied, owned or leased by any DIP Note Party, (i) all easements, rights of way, covenants, licenses, agreements, declarations, restrictions, defects, encroachments, licenses and similar minor encumbrances on title and (ii) leases, subleases, tenancies, options, concession agreements, rental agreements occupancy agreements, franchise agreements, access agreements and any other agreements, whether or not of record and whether now in existence or hereafter entered into, of the real properties of such DIP Note Party granted by such Person to third parties, in each case entered into in the ordinary course of such Person's business and so long as, to the extent such real properties are subject to Liens, such Liens;

(h)     Liens arising by operation of law under Article 4 of the UCC in connection with collection of items provided for therein or under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(i)     rights of setoff or bankers' liens of banks or other financial institutions where any DIP Note Party maintain deposits in the ordinary course of business and which are within the general parameters customary in the banking industry;

(j)     Liens in favor of customs and revenues authorities or export/import brokers that secure payment of duties and fees in connection with the importation and exportation of goods;

(k)     the modification, refinancing, replacement, extension or renewal of any Permitted Encumbrance; *provided* that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Closing Date or the date such asset was acquired, as applicable;

(l)     Liens of landlords under leases where any DIP Note Party is the tenant, securing performance by the tenant under the lease arising by statute or under any lease or related contractual obligation entered into in the ordinary course of business;

(m)     (i) Liens that are customary contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of any DIP Note Party to permit satisfaction of overdraft or similar obligations or to secure negative cash balances incurred in the ordinary course of business of such DIP Note Party, (C) purchase orders and other agreements entered into with customers of such DIP Note Party in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to deposit accounts and (iv)

Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of proceeds to finance such transaction;

(n)      Liens arising out of conditional sale, title retention, consignment, bailment or similar arrangements for the purchase, sale or shipment of goods entered into in the ordinary course of business;

(o)      [reserved];

(p)      [reserved];

(q)      Liens given to a utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice or as otherwise required by or contemplated by the First Day Orders or Second Day Orders;

(r)      [reserved];

(s)      Liens securing any Indebtedness incurred under clause (xiv) of "Permitted Debt"; provided that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender or its Affiliates;

(t)      any Lien or other interest attaching to the Collateral as the result of entry into definitive documentation with respect to an Acceptable Sale;

(u)      Liens arising on account of funds held in escrow and constructive trust arrangements; and

(v)      any Lien expressly permitted in the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"***Permitted Investments***" means any of the following:

(a)      acquisition and holding accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business;

(b)      acquisition and holding cash and cash equivalents;

(c)      [reserved];

(d)      acquisitions and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(e)      Investments made by a DIP Note Party to or in another DIP Note Party;

(f)      Investments consisting of Permitted Debt, Permitted Dispositions or Permitted Encumbrances;

(g)      contingent obligations to the extent not constituting Indebtedness, incurred in the ordinary course of business, in each case to the extent constituting Investments;

(h)  promissory notes and other non-cash consideration received in connection with any asset sale permitted hereby;

(i)  Investments in deposit accounts, securities accounts and commodities accounts maintained by a DIP Note Party;

(j)  Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(k)  [reserved]; and

(l)  any Investments expressly permitted by or set forth in the then effective Approved Budget the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"**Person**" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other entity or any governmental authority.

"**Petition Date**" means the date on which the Chapter 11 Cases were commenced by the DIP Note Parties, which date was June [●], 2021.

"**Prepetition**" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Remedies Notice Period**" has the meaning specified in the Interim DIP Order (or Final DIP Order, when applicable).

"**Restricted Debt Payment**" any voluntary prepayment in cash in respect of principal of or interest on any indebtedness for borrowed money, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any indebtedness for borrowed money prior to the stated maturity thereof, in each case other than (i) with respect to this Note and (ii) with respect to indebtedness for borrowed money owed by a DIP Note Party to another DIP Note Party.

"**Restricted Payment**" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Parent; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Parent and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Parent now or hereafter outstanding.

"**Scheduled Maturity Date**" means [●], 2021.[1]

"**Second Day Orders**" means orders of the Bankruptcy Court in substantially the form of the respective First Day Orders (with only such modifications thereto as are reasonably necessary to convert such First Day Orders to final orders and such other modification as are satisfactory in form and substance to the Company and the Holder in their sole discretion (for the avoidance of doubt, neither the Interim DIP Order nor the Final DIP Order shall constitute a "Second Day Order" for purposes of this definition).

---

[1]  NTD - To be 75 days post-closing.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means that certain Security and Guaranty Agreement, dated as of the date hereof, by and among the Company, the other DIP Note Parties from time to time party thereto and the Holder, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Security Documents**" shall mean the Security Agreement, and all other pledge or security agreements, the Mortgages, if any, assignments or other similar agreements or instruments executed and delivered by any DIP Note Party pursuant to any Financing Document.

"**Subsidiary**" means, with respect to any Person, any corporation, association, limited liability company or other business entity of which more than 50% of the outstanding voting Capital Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof).  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Parent.

"**Tracy Project**" means the DIP Note Parties' automated plant in Tracy, California.

"**Unauthorized Prepetition Obligations**" means any Prepetition Claim the payment, satisfaction or discharge of which, whether in whole or in part, in each case, is not permitted by, set forth in or otherwise contemplated by the DIP Orders, the First Day Orders, the Second Day Orders or the Approved Budget.

2.     COMMITMENT AND BORROWINGS.

   2.1   **The Borrowings**.

   (a)     Subject to the terms and conditions set forth herein, the Holder agrees to make loans to the Company denominated in United States Dollars (collectively, as drawn and outstanding, the "**Loan**" and each, individually, a "**Loan**") on or after the Closing Date and prior to the Maturity Date in three drawings as follows: (i) one Loan in the principal amount of up to $15,000,000 upon the entry of the Interim DIP Order, (ii) one Loan in the principal amount of up to $10,000,000 after the Closing Date but prior to the entry in the Final DIP Order if prior to the borrowing of such Loan the DIP Note Parties shall have received, after the Petition Date, one or more indications of interest ("**IOI**") from third-party bidders with respect to an Acceptable Sale (an "**Acceptable Sale IOI**")(it being understood and agreed that such IOIs individually or in the aggregate shall be in respect of the material portion of the DIP Collateral but it is not required that the Net Proceeds of one or more of the sales subject to such IOIs has to be sufficient to repay the entire Balance of this Note in full in cash); <u>provided</u> that any IOI received prior to the Petition Date (unless re-affirmed or modified and re-affirmed after the Petition Date) shall not constitute an Acceptable Sale IOI and (iii) one Loan in the principal amount of up to $10,000,000 upon the entry of the Final DIP Order and subject to the Holder being satisfied with the form and substance of the Bankruptcy Court's order approving the retention of the Company's Investment Banker and the Company's Financial Advisor; <u>provided</u> however that notwithstanding any other provision of this Note (i) the aggregate principal amount of all Loans made hereunder prior to the entry of the Final DIP Order shall not exceed the Interim Period Cap, (ii) each borrowing shall be in a minimum amount of $1,000,000 (or less, if such lesser amount represents the remaining amount of the Interim Period Cap or the Aggregate Commitment, as applicable), (iii) each borrowing shall be in a minimum amount of $1,000,000 or a whole multiple of $100,000 in excess thereof (or less, if such lesser amount represents the remaining amount of the Interim Period Cap or the Aggregate Commitment, as

applicable) and (iv) the aggregate principal amount of all Loans made hereunder shall not exceed, in the aggregate (but excluding any capitalized interest), the Aggregate Commitment. Amounts borrowed under this <u>Section 2.1</u> and repaid or prepaid may not be reborrowed.

(b)     Each borrowing of Loans shall be made upon the Company's notice to the Holder, which may be given by a Borrowing Notice (which may be delivered electronically). Each such notice must be received by the Holder not later than 1:00 p.m. Pacific Standard Time, three (3) (or, in the case of the initial borrowing, one (1)) Business Days prior to the requested date of any borrowing of Loans. Each notice by the Company pursuant to this <u>Section 2.1(b)</u> must be appropriately completed and signed by a responsible officer of the Company. Each Borrowing Notice shall specify:

(i)     the requested date of the borrowing (which shall be a Business Day),

(ii)     the principal amount to be borrowed, and

(iii)     wire instructions of the account(s) to which funds are to be disbursed.

(c)     Upon satisfaction of the applicable conditions set forth in <u>Section 9</u> for any borrowing, the Holder shall make the requested funds available to the Company by wire transfer of such funds, in each case in accordance with instructions provided by the Company to (and reasonably acceptable to) the Holder. Any payments under this Note that are made later than 5:00 p.m. Pacific Standard Time, shall be deemed to have been made on the next succeeding Business Day (but the Holder may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process). Except as otherwise expressly provided herein, if any payment to be made by the Company shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

**3.     PAYMENT AT MATURITY DATE; INTEREST.**

**3.1     <u>Payment at Maturity Date</u>**. The principal amount of this Note, all accrued and unpaid interest and the remaining Balance of this Note shall be due and payable in full in cash on the Maturity Date, without demand by Holder; <u>provided</u>, that, in the event the entire Balance of this Note except for any capitalized interest as of the date thereof is indefeasibly paid in full in cash on or prior to the date that is 60 days following the Petition Date, no such capitalized interest shall be payable in connection with such repayment. Payment on this Note shall be made to the address of Holder of this Note in lawful money of the United States.

**3.2     <u>Payment of Interest</u>**. Interest shall begin to accrue on the date of this Note, shall continue to accrue on the outstanding principal amount of this Note until the entire Balance is paid in full in cash, shall be computed based on the actual number of days elapsed and on a year of 365 days, and shall paid monthly in arrears on the last Business Day of each month by adding an amount equal to such interest to the principal amount of this Note outstanding at the time of such payment; <u>provided</u>, <u>however</u>, that to the extent and from the time when any DIP Note Party enters into a DIP financing facility with any third party without the repayment in full in cash of the entire Balance of this Note the interest on the outstanding principal amount of this Note shall be payable monthly in arrears in cash on the last Business Day of each month. Anything herein to the contrary notwithstanding, if during any period for which interest is computed hereunder, the amount of interest computed on the basis provided for in this Note, together with all fees, charges and other payments which are treated as interest under applicable law, as provided for herein or in

any other document executed in connection herewith, would exceed the amount of such interest computed on the basis of the Highest Lawful Rate, then the Company shall not be obligated to pay, and Holder shall not be entitled to charge, collect, receive, reserve or take, interest in excess of the Highest Lawful Rate, and during any such period the interest payable hereunder shall be computed on the basis of the Highest Lawful Rate.

### 3.3    Super-Priority Nature of DIP Obligations and Holder's Liens; Payment of DIP Obligations.

(a)     The priority of the Holder's Liens on the Collateral, claims and other interests shall be as set forth in the Interim DIP Order and the Final DIP Order.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations, the Holder shall be entitled to immediate payment of such DIP Obligations without further application to or order of the Bankruptcy Court.

(c)     The Holder shall have the right to credit bid up to and including the full amount of the DIP Obligations then outstanding.  Any such credit bid by the Holder may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition entity controlled or managed by the Holder or an Affiliate of the Holder.

### 3.4    Withholding Tax.  The parties agree that all amounts payable under this Note shall be paid without deduction or withholding for any tax, except as required by applicable law.  Pursuant to the exceptions provided in Treasury Regulation sections 1.1441-1(b)(4)(iv) and 1.1441-2(a)(3), the parties acknowledge that no withholding or deduction to tax is currently expected in relation to this Note for U.S. federal income tax purposes.  To the extent a party making a payment under this Note determines that any applicable law requires the deduction or withholding of tax from such payment, the party making such payment shall provide prompt notice to the party receiving such payment and shall cooperate with such receiving party to determine whether such receiving party is eligible for any reduction or exemption from such deduction or withholding.   To the extent that any amounts are deducted or withheld pursuant to this Section 3.4 and paid over to the appropriate tax authority (to the extent required by applicable law), such amounts shall be treated for all purposes of this Note as having been paid to the receiving party in respect of which such deduction and withholding was made.

### 4.    PREPAYMENT.

(a)     The Company may pay any unpaid Balance of this Note before it becomes due, without premium or penalty, without the consent of Holder.

(b)     Subject to the priority of Liens and application of funds set forth in the DIP Orders with respect to the Disposition of any asset of any DIP Note Loan Party or any of its Subsidiaries or any casualty event or condemnation in respect of any asset of any DIP Note Party, in the event and on each occasion that any Net Proceeds are received by or on behalf of any DIP Note Party in respect of (i) any asset sale (including any Acceptable Sale (other than, for the avoidance of doubt, in respect of Dispositions set forth in clause (d) of the definition of "Permitted Disposition")) or (ii) any single event or series of related events arising from (x) any loss, destruction or damage to the property of any DIP Note Party or (y) any condemnation, confiscation, requisition, seizure or taking thereof, in each case, resulting in any DIP Note Parties' receipt of Net Proceeds, the Company shall, within three (3) Business Days of the date such Net Proceeds are received, prepay the Loans in an amount equal to 100% of such Net Proceeds (without a reduction in any unused Aggregate Commitment); provided that a prepayment of the DIP Obligations pursuant to this

Section 4 shall only be required in the amount (if any) by which the Net Proceeds received by the DIP Note Parties during the term of this Note exceed $500,000 in the aggregate.  Any prepayments made pursuant to this Section 4 shall be made without premium or penalty of any kind.

**5.**     **APPLICATION OF PAYMENTS.**  All payments will be applied first to the repayment of accrued fees and expenses reimbursable under this Note, then to accrued interest until all then outstanding accrued interest has been paid in full, and then to the repayment of principal until all principal has been paid in full.

**6.**     **EVENTS OF DEFAULT.**  Each of the following events shall constitute an "***Event of Default***" hereunder:

(a)     The Company or any other DIP Note Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due and payable, any interest on any Loan, or any fee due hereunder, any other amount payable hereunder or under any other Financing Document;

(b)     (i) other than as set forth in subclause (ii), below or any other provision of this Section 6, any DIP Note Party breaches any obligation to the Holder under any Financing Document, and does not cure such breach within five (5) Business Days after written notice thereof has been given by or on behalf of the Holder or (ii) any DIP Note Party shall fail to comply with Section 8(b) of Exhibit A;

(c)     Any representation, warranty or certification made by any DIP Note Party herein or in any other Financing Document shall prove to have been false or incorrect in any material respect on the date or dates as of which made;

(d)     At any time after the execution and delivery thereof (i) any Security Document to which any DIP Note Party is now or hereafter a party shall for any reason cease to be in full force and effect or cease to be effective to give the Holder a valid and perfected first priority security interest in and Lien upon the Collateral purported to be covered thereby, subject to no Liens other than Permitted Encumbrances, in each case unless by reason of (A) any act or failure to act on the part of the Holder (including the failure of the Holder to maintain possession of any Collateral actually delivered to it or the failure of the Holder to file UCC continuation statements), (B) a release of Collateral is pursuant to and in accordance with the terms thereof or (C) the occurrence of the Maturity Date or any other termination of such Security Document in accordance with the terms thereof; (ii) any DIP Note Party shall deny or disaffirm in writing such DIP Note Party's obligations under the Guaranty (other than as a result of the discharge of such Guarantor in accordance with the terms thereof) or the Guaranty shall cease to be in full force and effect; or (iii) the DIP Obligations shall cease to constitute senior indebtedness under the subordination provisions of any documents or instruments evidencing any indebtedness for borrowed money or such subordination provision shall be invalidated or otherwise cease, for any reason, to be valid, binding and enforceable obligations of the parties thereto (other than as a result of a termination in accordance with its terms);

(e)     Except as a result of commencement of the Chapter 11 Cases or entry into this Note, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Court prohibits or does not permit any DIP Note Party from applicable compliance, the occurrence and continuance of any event of default under any other Indebtedness for borrowed money with a principal amount in excess of $250,000;

15

(f)      except for any order of the Bankruptcy Court fixing the amount of any Claim in the Chapter 11 Cases, one or more final judgments for the payment of money in an aggregate amount in excess of $500,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Company or any Subsidiary thereof, or any combination thereof, and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any Collateral of the Company or any Subsidiary to enforce any such judgment, excluding, in each case, any judgment or action resulting in a sequestering of funds under constructive trust arrangements or the escrow of funds in favor of another third-party;

(g)      The DIP Note Parties fail to achieve the Case Milestones (other than as the result of any action or omission of the Holder), without a written waiver or other written modification agreed to by the Holder in its sole discretion;

(h)      any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Holder or any of the Collateral;

(i)      (i) the entry of an order by the Bankruptcy Court terminating the exclusive right of any DIP Note Party to file a Chapter 11 Plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Holder or (ii) any DIP Note Parties' exclusive right to file a Chapter 11 Plan expires;

(j)      Except as permitted by the Financing Documents or the applicable Order or contemplated by an Acceptable Plan, and other than with respect to the Carve-Out, any order by the Bankruptcy Court is entered granting any superpriority claim that is pari passu with or senior to those of the Holder or any Lien that is senior to or *pari passu* with the Liens securing the DIP Obligations, which claims(s) in the aggregate exceed a principal amount in excess of $250,000;

(k)      the DIP Note Parties or any of their Subsidiaries obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Holder or its affiliates other than as permitted by the DIP Orders;

(l)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(m)      the filing, or support or encouragement, by any of the DIP Note Parties of a Chapter 11 Plan other than an Acceptable Plan or any order in any of the Chapter 11 Cases is entered by the Bankruptcy Court confirming or sanctioning a Chapter 11 Plan other than an Acceptable Plan;

(n)      any DIP Note Party shall file, or support or encourage, a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay (other than in connection with any Acceptable Sale or in accordance with the Approved Budget) to permit actions that would have a Material Adverse Effect on the DIP Note Parties or their estates (taken as a whole);

(o)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (or a motion seeking such an order shall be filed) without the express prior

written consent of the Holder (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner adverse in any material respect to the Holder, (ii) to permit, unless otherwise contemplated by the DIP Orders, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the DIP Note Parties' Claims in respect of the DIP Obligations (other than the Carve-Out or as contemplated by an Acceptable Plan) or (iii) allowing a Challenge (as defined in the DIP Orders) to proceed;

(p)     any DIP Note Party files, or supports or encourages, any motion or application, or the Bankruptcy Court grants the motion or application of any other person, which seeks approval for or allowance of any claim, Lien, security interest ranking equal or senior in priority to the claims, Liens and security interests granted to the Holder under the DIP Orders or the Financing Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(q)     other than with respect to any Replacement DIP, the entry of an order by the Bankruptcy Court authorizing any DIP Note Party to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the Holder which is secured by liens of equal or greater priority than the liens securing the DIP Obligations;

(r)     if any creditor of any DIP Note Party receives any adequate protection payment or any Lien is granted as adequate protection;

(s)     except as permitted by the First Day Orders or as otherwise agreed to by the Holder (including by approving a proposed Approved Budget), any DIP Note Party shall make any payments on account of any Unauthorized Prepetition Obligations;

(t)     the DIP Note Parties shall seek or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by the DIP Note Parties or by oral argument) any Challenge (as defined in the DIP Orders) or any motion to, (i) disallow or subordinate in whole or in part any of the obligations arising under this Note or any other Financing Document, including, without limitation, the DIP Obligations, (ii) disallow in whole or in part any of the Indebtedness owed by the Company under this Note, or (iii) challenge the validity, enforceability or priority of the Liens or security interests granted under any of the Financing Documents or in the DIP Orders in favor of the Holder;

(u)     noncompliance in any material respect by any DIP Note Party with the terms of one or both of the DIP Orders;

(v)     the Bankruptcy Court shall enter an order granting relief from the Automatic Stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of the DIP Note Parties of fair market value exceeding $500,000 in aggregate from or permit other actions that would reasonably be expected to result in a Material Adverse Effect; or

(w)     the Bankruptcy Court enters an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under this Note;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Remedies Notice Period and the DIP Orders, upon the occurrence and during the continuance of any Event of Default, all

accrued but unpaid expenses, accrued but unpaid interest, all principal and the remaining Balance of this Note shall become immediately due and payable upon written notice by or on behalf of the Holder to the Company.

Upon the occurrence and during the continuance of any Event of Default, and, subject to the DIP Orders and the Remedies Notice Period, the Automatic Stay shall be deemed automatically vacated solely as to the Holder, without further action or order of the Bankruptcy Court, and the Holder shall be entitled to (A) exercise all rights and remedies available to it under this Note, the other Financing Documents and applicable law (including, without limitation, the right to direct any or all of the DIP Note Parties to sell or otherwise Dispose of any or all of the Collateral) or (B) take any and all actions described in the DIP Orders, including, without limitation, those actions specified in the DIP Orders after the occurrence of any Event of Default.

7.    **REPRESENTATIONS AND WARRANTIES.**  In order to induce the original Holder to enter into the Financing Documents and originally purchase this Note the Company hereby represents and warrants to the Holder as of the Closing Date:

7.1    **Organization, Good Standing and Qualification**.  Each DIP Note Party has been duly incorporated and organized and is validly existing in good standing under the laws of the applicable jurisdiction.  Each Note Company has the corporate, limited liability company, or other equivalent, as applicable, power and authority to, subject to the entry (and the terms) of the Interim DIP Order (and Final DIP Order, when applicable), own and operate its properties and assets and to carry on its business as currently conducted and as presently proposed to be conducted. Each DIP Note Party is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

7.2    **Due Authorization**.  Subject to entry of the Interim DIP Order (and Final DIP Order, when applicable), all corporate, limited liability company, or equivalent, as applicable, action on the part of  board of directors, shareholders, member, manager or other governing body, as applicable, necessary for the authorization, execution, delivery of, and the performance of all obligations of each Company under, the Financing Documents has been taken or will be taken prior to the Closing Date. Subject to entry (and the terms) of the Interim DIP Order (and Final DIP Order, when applicable), this Note constitutes, and the other Financing Documents to which such DIP Note Party is a party, when executed and delivered by such DIP Note Party, will constitute, valid and legally binding obligations of such DIP Note Party, enforceable against such DIP Note Party in accordance with their respective terms or as disclosed to the Holder on or prior to the date hereof, except as may be limited by (a) applicable Debtor Relief Laws and (b) the effect of rules of law governing the availability of equitable remedies. Except for the entry of, and pursuant to the terms of, the Interim DIP Order (and Final DIP Order, when and as applicable), no material consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any United States federal, state or local governmental authority or other foreign governmental authority is required on the part of such DIP Note Party in connection with the consummation of the transactions contemplated by this Note and the other Financing Documents, except for (i) filings required by applicable foreign or United States securities laws, rules or regulations, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect  and (iii) such other post-closing filings as may be required. Except as otherwise resulting from, related to or in connection with the commencement of the Chapter 11 Cases, no DIP Note Party is in violation or default (i) of any provisions of its organizational or governing documents, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, credit agreement, indenture, mortgage or other agreement with respect to indebtedness for borrowed money, or (iv) to its knowledge, of any provision of United States federal or state statute, rule or regulation or other foreign statute, rule or regulation applicable to the Company, in each case the violation of which or default

under would have a Material Adverse Effect. Subject to entry of the Interim DIP Order (and Final DIP Order, when applicable), the execution, delivery and performance of the Note Documents and the consummation of the transactions contemplated by the Note Documents will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the DIP Note Parties or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to any DIP Note Party, in each case the violation of, default under or conflict with which would have a Material Adverse Effect.

       7.3    **Corporate Power.**  Each DIP Note Party has the corporate, limited liability, or equivalent, as applicable, power and authority to execute and deliver the Financing Documents to which it is a signatory, to carry out and perform all its obligations under the Financing Documents and, in the case of the Company, to make the borrowing hereunder.

       7.4    **Security Documents.**

      (a)    Subject to the entry of the Interim DIP Order (and, when entered, the Final DIP Order) and subject to the Carve-Out in all respects, the Security Agreement and the Interim DIP Order (and, when entered, the Final DIP Order) are effective to create in favor of the Holder legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein), in each case, under applicable United States federal, state or local governmental law.

      (b)    Except for the entry of the Interim DIP Order (and Final DIP Order, when applicable), no filing or other action will be necessary to perfect such Liens under Section 7.4(a), in each case, under applicable United States federal, state or local governmental law.

       7.5    **No MAE.**  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or would reasonably be expected to have a Material Adverse Effect.

       7.6    **Chapter 11 Cases.**

      (a)    The Chapter 11 Cases were commenced on the Petition Date in each case in accordance in all material respects with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Financing Documents and the Interim DIP Order and the Final DIP Order, and (ii) the hearing for the entry of the Interim DIP Order.  The DIP Note Parties shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given to all parties specified in such orders, as applicable.

      (b)    After the entry of the Interim DIP Order, and pursuant to (and to the extent permitted) in the Interim DIP Order and the Final DIP Order, the DIP Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the DIP Note Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable.

      (c)    After the entry of the Interim DIP Order and pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, the DIP Obligations will be secured by a valid and perfected

first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve-Out, (ii) Permitted Encumbrances and (iii) to the extent set forth in the Interim DIP Order or the Final DIP Order.

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final DIP Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the DIP Obligations, the Holder shall, subject to the Remedies Notice Period, be entitled to immediate payment of such DIP Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## 8.    **GENERAL PROVISIONS.**

8.1    **Waivers**.  The Company and all endorsers of this Note hereby waive notice, presentment, protest and notice of dishonor.

8.2    **Fees and Expenses**.  Upon the Maturity Date, the Company shall pay all reasonable out-of-pocket expenses incurred by Holder, including the fees, charges and disbursements of one primary counsel to the Holder (including Weil, Gotshal & Manges LLP), one local counsel to the Holder in each relevant jurisdiction and any other third party advisor consented to by the Company (such consent not to be unreasonably denied, withheld or delayed), in connection with the Chapter 11 Cases, this Note (and any amendments, modifications or waivers hereof or thereof), the enforcement of rights in connection with this Note and the administration of this Note.

8.3    **Indemnity**.  The Holder (and its officers, directors, employees, advisors and agents) (each such person, an "*Indemnitee*") will have no liability for, and will be indemnified and held harmless against, any actual losses, claims, damages, liabilities or expenses (in the case of (i) legal fees and expenses, limited to reasonable and documented fees and out-of-pocket expenses of one primary counsel for all such Indemnitees taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Company has consented to the retention of such person) incurred or arising out of, in connection with, or as a result of, this Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by this Note and other Financing Documents, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, material breach by the Holder of its funding obligations hereunder or willful misconduct of the relevant Indemnitee.  Such indemnity shall not be available to the extent arising out of any actual loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Note Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its capacity or in fulfilling its role as Holder or any similar role under the Financing Documents).  To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against any DIP Note Party or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by this Note and other Financing Documents; provided that such waiver shall not limit any DIP Note Party's reimbursement or indemnification obligations under Sections 8.2 or 8.3, respectively.

8.4    **Transfer**.  No party hereto may assign or otherwise transfer its rights or obligations hereunder except with the prior written consent of the other parties hereto (in each case in such party's sole discretion); provided, that the Holder shall be permitted to assign to any Affiliate of the Holder without the consent of any DIP Note Party. Subject to the foregoing, the rights and obligations of the Company and Holder under this Note and the other Financing Documents shall be binding upon and benefit their respective permitted successors, assigns, heirs, administrators and transferees.

**8.5    Governing Law**.  Except to the extent governed by the Bankruptcy Code, this Note shall be governed by and construed under the laws of the State of New York, without giving effect to principles of conflicts of laws.

**8.6    Headings**.  The headings and captions used in this Note are used only for convenience and are not to be considered in construing or interpreting this Note.  All references in this Note to sections and exhibits shall, unless otherwise provided, refer to sections hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

**8.7    Notices**.  Unless otherwise provided herein, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively given (a) at the time of personal delivery, if delivery is in person; (b) one (1) Business Day after deposit with an express overnight courier for United States deliveries, or three (3) Business Days after deposit with an international express overnight air courier for deliveries outside of the United States, in each case with proof of delivery from the courier requested; or (c) four (4) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries, when addressed to the party to be notified at the address indicated for such party on Exhibit B hereto, or at such other address as any party hereto may designate for itself to receive notices by giving ten (10) days' advance written notice to all other parties in accordance with the provisions of this Section 8.7.

**8.8    Amendments and Waivers.**  This Note may only be amended and provisions may only be waived by the Holder and the Company.

**8.9    Severability**.  If one or more provisions of this Note are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note to the extent they are held to be unenforceable and the remainder of the Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

**8.10    Counterparts.**  This Note may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**9.    CONDITIONS**.

**9.1**    The Holder's purchase of this Note, the effectiveness of the terms hereunder and the Holder's making available any Loan to the Company on the Closing Date, in each case, is subject to the satisfaction (or written waiver by the Holder) of the following conditions precedent:

(a)    each of the representations and warranties of the DIP Note Parties contained in Section 7 shall be true and complete in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (or if made as of an earlier specified date, in all material respects as of such date);

(b)    the Company shall have performed and complied with all agreements, obligations, covenants and conditions contained in this Note and the other Financing Documents that are required to be performed or complied with by it on or before the Closing and shall have obtained all approvals, consents and qualifications necessary to consummate the transactions described herein;

(c)      the Holder shall have received the following, each dated as of the Closing Date:

(i)      a counterpart signed by the Company of this Note; and

(ii)      from each DIP Note Party, a counterpart signed by such DIP Note Party to the Security Agreement;

(d)      Subject to the Interim DIP Order, the Holder shall have been granted a perfected Lien on the Collateral by the Interim DIP Order on the terms and conditions set forth herein and in the other Financing Documents, with the priority set forth in the Interim DIP Order (and, upon entry of the Final DIP Order, the Final DIP Order) and the terms thereof;

(e)      each UCC financing statement and each document required by any Security Document or any applicable Requirements of Law to be filed, registered or recorded in order to create in favor the Holder, for the benefit of the Secured Parties, a perfected first priority Lien (subject to Permitted Encumbrances) on the Collateral required to be delivered pursuant to each Security Document, shall be in proper form for filing, registration or recording;

(f)      (i) The Bankruptcy Court shall have entered the Interim DIP Order by no later than two (2) Business Days after the Petition Date and (ii) all motions, orders (including any "first day" orders on an interim basis and the Cash Management Order) and other documents shall be in form and substance reasonably satisfactory to the Holder and the Bankruptcy Court shall have approved and entered all "first day" orders on an interim basis, including, without limitation, the Cash Management Order and all such orders shall not have been vacated, stayed, reversed, modified or amended in any manner materially adverse to the Holder without the Holder's consent and shall otherwise be in full force and effect;

(g)      The Holder shall have received (i) the initial Approved Budget and (ii) the DIP Note Parties divestiture plan, in each case in form and substance acceptable to Holder;

(h)      The Holder shall have received (i) a copy of a fully executed engagement letter of the Company's Investment Banker and (ii) a copy of a fully executed engagement letter of the Company's Financial Advisor, in each case in form and substance acceptable to the Holder;

(i)      The Holder shall have received the Borrowing Notice with respect to the Loan to be made on the Closing Date;

(j)      At the time of and immediately after giving effect to the Loan made on the Closing Date, no Default or Event of Default shall have occurred and be continuing; and

(k)      the Company shall have paid all reasonable out-of-pocket costs and expenses of the Holder to the extent invoiced on or prior to the Closing Date, which amounts may be offset against the proceeds of the Loans.

**9.2**      The obligation of the Holder to make available to the Company any Loan after the Closing Date is subject to receipt of the Borrowing Notice therefor in accordance herewith and to the satisfaction (or waiver by the Holder) of the following conditions:

(a)      each of the representations and warranties of the DIP Note Parties contained in Section 7 shall be true and complete in all material respects on and as of, and after giving effect to,

the funding of the applicable Loans to the same extent as though made on and as of that date (or if made as of an earlier specified date, in all material respects as of such date);

(b)     At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing; and

(c)     (i) The Final DIP Order shall have been entered following the expiration of the Interim DIP Order; and (ii) the Interim DIP Order or the Final DIP Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended in any manner materially adverse to the Holder without the Holder's consent and shall otherwise be in full force and effect.

**10.     COVENANTS.**   Until the earlier of the Maturity Date or the date on which all DIP Obligations (other than contingent obligations not due and payable) have been paid and satisfied in full in accordance with the terms hereof, each DIP Note Party promises and agrees to comply with the covenants set forth on Exhibit A hereto.

**IN WITNESS WHEREOF**, the Company has caused this Note to be signed in its name as of the date first written above.

**THE COMPANY**

**KATERRA INC.**


By: _____

Name:

Title:

AGREED AND ACKNOWLEDGED:

**HOLDER**

**SB INVESTMENT ADVISERS (UK) LIMITED**


By: _____

Name:

Title:

## Exhibit A

## Covenants

1.    <u>Corporate Existence</u>.  Subject to the DIP Orders and the terms thereof and any required approval by the Bankruptcy Court, each DIP Note Party will comply in all material respects with all material applicable laws, rules, regulations and orders and preserve and maintain its corporate existence, rights, franchises, qualifications, and privileges to the extent that the failure to do so would reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution of any DIP Note Party into another DIP Note Party to the extent approved by the Bankruptcy Court.

2.    <u>Sales and Liens</u>.  After the Closing Date, no DIP Note Party will sell, assign (by operation of law or otherwise) or otherwise Dispose of, or create or suffer to exist any Lien upon or with respect to, any assets except Permitted Dispositions, the security interests in favor of Holder and Permitted Encumbrances.

3.    <u>Indebtedness and Investments</u>.  After the Closing Date, no DIP Note Party will (a) incur any Indebtedness (other than Permitted Debt) or (b) make any Investments (other than Permitted Investments).

4.    <u>Restricted Payments and Restricted Debt Payments</u>.  After the Closing Date, no DIP Note Party will (a) make any Restricted Payments, (b) make any Restricted Debt Payments or (c) make any payments on account of any Unauthorized Prepetition Obligations.

5.    <u>Audits and Visits; Reports by Independent Consultant</u>.

5.1    Each DIP Note Party will, at any time and from time to time during regular business hours as reasonably requested by Holder, permit Holder, or its agents or representatives, upon reasonable notice, (i) on a confidential basis, to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in its possession or under its control relating to the assets of such DIP Note Party and (ii) to visit its offices and properties for the purpose of examining and auditing such materials described in clause (i) above, and to discuss matters relating to the assets of the DIP Note Parties or its performance hereunder or under the related contracts with any of its officers or employees having knowledge of such matters; <u>provided</u> that the DIP Note Parties, taken as a whole, shall not, unless an Event of Default or Material Adverse Effect shall have occurred and remain continuing hereunder (in which case no such limit shall apply), be responsible for the costs and expenses of more than one such examination or visit during the term of this Note; <u>provided</u>, <u>further</u> that such requested information (i) does not constitute non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Holder (or its representatives or contractors) is not prohibited by Law or any binding agreement with any third party and  (iii) is not subject to attorney-client or similar privilege and does not constitute attorney work product.

6.    <u>Reporting Requirements</u>. The Company will provide to the Holder the following:

6.1    within 45 days after the end of each quarter of each fiscal year of the Company, an unaudited financial report of the Company containing a consolidated statement of assets, liabilities, and capital, consolidated statements of operations, and a consolidated income statement, in each case as of the last day of or for the period then ended;

6.2    within 30 days after the end of each month of each fiscal year of the Company, an unaudited financial report of the Company containing a consolidated statement of assets, liabilities, and

capital, consolidated statements of operations, and a consolidated income statement, in each case as of the last day of or for the period then ended;

6.3     within four (4) Business Days after the end of each week of each fiscal month of the Company, consolidated statements of cash flow as of the last day of the previous week;

6.4     [Reserved].

6.5     The DIP Note Parties shall host a weekly conference call for the Holder to discuss the Variance Report.  The DIP Note Parties will hold such conference call not later than five (5) Business Days from the time the DIP Note Parties have delivered the Variance Report.

6.6     The DIP Note Parties shall cause the Company's Investment Banker, to provide the Holder with weekly report (which, at the option of the Company, may be communicated via conference call or e-mail) on the status of (i) Acceptable Sales and other monetization of the DIP Note Parties' assets and (ii) the DIP Note Parties' efforts with respect to the refinancing of this Note;

6.7     by no later than 5:00 p.m. Pacific Standard Time on June 30, 2021 (or such later time as agreed to in writing (including via e-mail) by the Holder in its reasonable discretion), and by no later than 5:00 p.m. Pacific Standard Time by the end of each fiscal month occurring thereafter an updated budget substantially consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget.  Upon, and subject to, the approval of any such updated budget by the Holder, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the fiscal week immediately following the fiscal week in which it was delivered; *provided* that unless and until the Holder approves such supplemental budget, the then-current Approved Budget shall remain in effect;

6.8     as soon as possible after any responsible officer of the Company acquiring direct knowledge of the occurrence thereof (and in any event within five (5) Business Days after such responsible officer directly acquires such knowledge), written notice of any Event of Default or any matter that has resulted in a Material Adverse Effect;

7.     <u>Taxes</u>. Subject to the DIP Orders and the terms thereof and any required approval by the Bankruptcy Court, each DIP Note Party will pay any and all material taxes relating to the transactions contemplated under this Note; except for those taxes that such Person is contesting in good faith and for which adequate reserves have been taken or which taxes the nonpayment of which is permitted or required by the Bankruptcy Code.

8.     <u>Budget Covenant</u>.

(a)     By no later than 5:00 p.m. Pacific Standard Time on the fourth (4th) Business Day following the end of each fiscal week (or such later time as agreed to in writing (including via e-mail) by the Holder in its reasonable discretion) commencing on the date that is the last Business Day following the second (2nd) full fiscal week after the Petition Date (which date is June [●], 2021), the DIP Note Parties shall provide the Holder with rolling two-week variance reporting for Cash Receipts, and Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) reasonably detail the material variance, if any, of Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements from the Approved Budget and (ii) provide an explanation of any material per item variance (the "***Variance Report***").

(b)     Commencing at the end of the second (2nd) full fiscal week following the Petition Date and as at the end of each fiscal week thereafter (each such date on which the DIP Note Parties' compliance with the Approved Budget is tested, a "***Testing Date***"), as of any applicable Testing Date, (i) the rolling two-week Cash Operating Disbursements as of such Testing Date shall not vary from the Approved Budget by more than 10% and (ii) the rolling two-week Cash Bankruptcy Disbursements as of such Testing Date shall not vary from the Approved Budget by more than 20% with respect to the first two Testing Periods and 15% with respect to any subsequent Testing Period (such percentage in clauses (i) and (ii) above, the "***Permitted Variance***").

(c)     For purposes of <u>Section 8(b)</u>, the DIP Note Parties shall be deemed to be in compliance with the Approved Budget for all purposes under this Note, the Financing Documents and the DIP Orders unless, as of any applicable date of determination, the DIP Note Parties' Cash Operating Disbursements on a rolling two-week basis for such Testing Date vary from the Approved Budget by more than the Permitted Variance as measured on any Testing Date.

**9.**     <u>Use of Proceeds</u>.  The Company shall use the proceeds of the Loans to finance, in each case consistent in all material respects with the Approved Budget (subject to Permitted Variances):  (i) working capital, letters of credit, surety and performance bonds, and general corporate purposes of the DIP Note Parties, including capital expenditures and Permitted Investments, (ii) the negotiation, documentation, pursuit and/or consummation of an Acceptable Sale, (iii) costs, fees, expenses and charges, in each case, related to, arising out of or in connection with the Chapter 11 Cases, subject to the Carve-Out, and (iv) certain other prepetition and pre-filing expenses that are approved by the Bankruptcy Court and permitted by the Approved Budget.

**10.**     <u>Further Instruments</u>.  Each DIP Note Party will, at its expense, promptly execute and deliver all further instruments and documents, and take all further action that the Holder may reasonably request, from time to time, in order to perfect, protect or more fully evidence the full and complete ownership and security interest in the Collateral, or to enable the Holder to exercise or, subject to the following sentence, enforce the rights of the Holder hereunder or under any Collateral, in each case subject to the terms and conditions of this Note.

**11.**     <u>DIP Refinancing</u>.  The Company shall, and shall cause other DIP Note Parties to, use its reasonable best efforts to refinance this Note or otherwise repay all DIP Obligations in full in cash with the proceeds of one or more debtor-in-possession financings (the "***Replacement DIP***") or Dispositions prior to the Scheduled Maturity Date.

**12.**     <u>Employee Related Payments</u>.  After the Closing Date, without the prior written consent of the Holder (including by approving a proposed Approved Budget, to the extent specifically identified therein), no DIP Note Party will enter into any new agreement to make or will make any WARN, severance, bonus, retention,  incentive or any other payments to their respective employees except for (i) retention payments contemplated in the Approved Budget filed with the DIP Motion and (ii) payments in the ordinary course of business.

**13.**     <u>Bankruptcy-Related Matters</u>.  The Company shall, and shall cause other DIP Note Parties to, provide (i) no later than the later of (x) three (3) days in advance of filing with the Bankruptcy Court or (y) or as soon as reasonably practicable in advance of filing thereof, draft copies of all material motions, applications, proposed orders and pleadings related to the Chapter 11 Cases and/or any asset sale (including any Acceptable Sale), the Chapter 11 Plan and the Disclosure Statement and (ii) substantially simultaneously with the filing with the Bankruptcy Court, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the DIP Note Parties or their Subsidiaries or the Chapter 11 Cases that are filed with the Bankruptcy Court.  Each of the material

motions, applications, proposed orders and pleadings must be in form and substance reasonably acceptable to the Holder, except as otherwise provided herein.

**Exhibit B**

**Notice Addresses**

If to the Company:

Katerra Inc.
2700 Post Oak Blvd Suite 2450 Houston, TX 77056
Attention: Marc Liebman
E-Mail: Marc.Liebman@alvarezandmarsal.com

With a copy to (which shall not constitute notice):


Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attention:  Joshua A. Sussberg, P.C.
            Christine Okike, P.C.

E-mail:     joshua.sussberg@kirkland.com
            christine.okike@kirkland.com

- and-

Kirkland & Ellis LLP
300 North LaSalle, Suite 2400
Chicago, IL 60654
Attention:  Michelle Kilkenney, P.C.
            Sean Hilson

E-mail:     mkilkenney@kirkland.com
            sean.hilson@kirkland.com


If to the Holder:

SB Investment Advisers (UK) Limited, a UK private limited company
c/o SB Investment Advisers (US) Inc.
1 Circle Star Way
San Carlos, CA 94070

Attention: Legal
E-mail: sbia-legal@softbank.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153
Attention: Dan Dokos

Gary Holtzer
Jessica Liou

E-mail: daniel.dokos@weil.com
           gary.holtzer@weil.com
           jessica.liou@weil.com

**Exhibit D**

**Case Milestones**

The DIP Note Parties shall pursue and achieve the following milestones in form and substance acceptable to the Holder:

(a)      on or before the date that is two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(b)      on or before the date that is five (5) days after the Petition Date, the DIP Note Parties shall file with the Bankruptcy Court a sale motion and bid procedures motion in form and substance reasonably acceptable to the Holder;

(c)      on or before the date that is thirty five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(d)      on or before the date that is forty-five (45) days after the Petition Date (i) the Bankruptcy Court shall have entered an order establishing bid procedures in form and substance reasonably acceptable to the Holder (the "***Bid Procedures Order***") which shall, among other things, provide that the deadline for bidding be a date not later than fifty-five (55) days from the Petition Date and the Bid Procedures Order shall approve entry into one or more agreements that provide for one or more Acceptable Sale(s), or (ii) the Company shall have obtained a binding commitment for a Replacement DIP and filed a motion with the Bankruptcy Court seeking entry of an order approving such Replacement DIP and the indefeasible repayment in full in cash of the Balance;

(e)      on or before the date that is sixty (60) days after the Petition Date, either (i) one or more sale orders in form and substance acceptable to the Holder with respect to one or more Acceptable Sales shall have been entered by the Bankruptcy Court, or (ii) the Bankruptcy Court shall have entered one or more orders approving the Debtors' entry into a Replacement DIP and the indefeasible repayment in full in cash of the Balance (the "***DIP Refinancing Order***");

(f)       if the DIP Refinancing Order is entered, on or before the date that is three (3) days after entry of the DIP Refinancing Order, the Balance shall be repaid in full in cash with the net cash proceeds of the Replacement DIP;

(g)      on or before the date that is sixty (60) days after the Petition Date, the DIP Note Parties shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect to such Acceptable Plan (the "***Disclosure Statement***"); provided, that the DIP Note Parties' compliance with this milestone shall not be affected by technical and immaterial changes and other changes, modifications and supplements to such Acceptable Plan and Disclosure Statement that are reasonably acceptable to the Holder filed with the Bankruptcy Court subsequent to the original filing of such Acceptable Plan and Disclosure Statement;

(h)      on or before the date that is seventy (70) days after the Petition Date, one or more Acceptable Sales shall be consummated;

(i)       on or before the date that is ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(j)        on or before the date that is one hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(k)        on or before the date that is one hundred thirty five (135) days after the Petition Date, the Acceptable Plan shall be effective.

**SCHEDULE 1**

**Existing Indebtedness**

Separately attached.

**SCHEDULE 2**

**Existing Liens**

Separately attached.