**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
06/09/2021

|  |  |
|---|---|
| In re: | Chapter 11 |
| KATERRA INC., *et al.*,[1] | Case No. 21-31861 (DRJ) |
| Debtors. | (Jointly Administered) (Emergency Hearing Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**
(Docket No. 41)

Upon the motion, dated June 7, 2021 (the "Motion")[2] of Katerra Inc., a Delaware corporation (the "Company") and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), as debtors and debtors in possession (collectively, the "Debtors"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"):

(i)   authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $35,000,000 (the "DIP Facility" and,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/katerra.  The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

all amounts extended under the DIP Facility, the "DIP Loans"), pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-in-Possession Promissory Note* (as the same may be amended, restated, supplemented, extended, or otherwise modified from time to time, the "DIP Agreement" and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all notices, guarantees, security agreements, ancillary documents and agreements, and any mortgages contemplated thereby, each as amended, restated, supplemented, extended or otherwise modified from time to time the "DIP Documents"), by and among the Company (in such capacity, the "Borrower") and SB Investment Advisers (UK) Limited (the "DIP Lender"), substantially in the form attached hereto as **Schedule 1**;

(ii)        authorizing the Debtors to execute, deliver, enter into and otherwise perform their respective obligations under the DIP Documents and to perform such other acts as may be necessary or appropriate in connection with the same;

(iii)       authorizing the Debtors to borrow up to $25,000,000 (plus all interest paid in kind) under the DIP Facility (the "Initial Funding Amount") upon entry of this Interim Order to avoid immediate and irreparable harm;

(iv)       authorizing the Debtors, other than the Borrower, to guarantee the DIP Obligations (as defined below) pursuant to the DIP Documents;

(v)        granting all obligations under the DIP Facility and under, or secured by, the DIP Documents (collectively, the "DIP Obligations") the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases;

(vi)       granting to the DIP Lender, to secure the DIP Obligations, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below);

(vii)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable;

(viii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(ix)     scheduling a final hearing (the "Final Hearing") within 35 days of the Petition Date (as defined below) to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Matthew R. Niemann in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superiority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling A Final Hearing, and (E) Granting Related Relief*, the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously with the Motion, and the evidence submitted and arguments made at the interim hearing held on June 7, 2021 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, statements, and reservations of rights, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. **Petition Date**.  On June 7, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B. **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") has not appointed an official committee of

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

unsecured creditors in the Chapter 11 Cases (together with any statutory committee that may be appointed or formed in the Chapter 11 Cases or Successor Cases (as defined herein), the "Committee") pursuant to section 1102 of the Bankruptcy Code.

E. **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.  **Reserved.**

G. **Findings Regarding Postpetition Financing**.

(i)    *Request for Postpetition Financing*.  The Debtors seek authority to enter into the DIP Facility and incur the DIP Obligations on the terms described herein and in the DIP Documents to administer their Chapter 11 Cases and fund their operations.   At the Final Hearing, the Debtors will seek final approval of the DIP Facility pursuant to a proposed final order (the "Final Order") and authorization to borrow an additional $10,000,000 under the DIP Agreement upon entry of the Final Order (the "Final Funding Amount" and, together with the Initial Funding Amount, the "Funding Amount") which Final Order (a) shall be substantially the same as the Interim Order and otherwise acceptable to the DIP Lender except that (1) those provisions in the Interim Order that are subject to the entry of the Final Order (including the Stipulations (as defined below) in paragraph 37) shall be included in the Final Order without such qualification, and (2) where appropriate, references to this Interim Order shall be changed to references to the Final Order, and (b) with respect to any other modifications to the Interim Order, shall be consistent with the DIP Agreement and shall otherwise be in form and substance acceptable to the DIP Lender and the Debtors.  Notice of the Final Hearing and the proposed Final

Order will be provided in accordance with this Interim Order.

(ii)     *Immediate Need for Postpetition Financing*.   The Debtors have demonstrated an immediate and critical need to obtain credit in an amount equal to the Funding Amount pursuant to the DIP Facility as their cash on hand is *de minimis*.   The Debtors' immediate access to the DIP Facility is critical in order to, among other things, continue their ordinary course operations, administer these Chapter 11 Cases, and maximize the value of their estates.   The ability of the Debtors to maintain business relationships with their remaining vendors, suppliers, and customers, to pay their employees, to pay for certain costs and expenses related to the Chapter 11 Cases, conduct a marketing process for certain or all of their assets and to otherwise finance their operations until entry of the Final Order requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors, and other parties in interest.   The Debtors have extremely limited available sources of working capital to operate their businesses or maintain their properties in the ordinary course of business until the Final Order is entered without the authorization to borrow the Initial Funding Amount.   The Debtors' access to sufficient working capital and liquidity through the incurrence of indebtedness under the DIP Documents, and the other financial accommodations provided thereunder, is therefore necessary and vital to the preservation and maintenance of the value of the Debtors and their estates and to the successful prosecution of these Chapter 11 Cases. No other financing is available to the Debtors.

(iii)     *No Credit Available on More Favorable Terms*.   The DIP Facility is the best and only source of debtor-in-possession financing available to the Debtors.   Given the critical nature of their current financial condition, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender.   The Debtors have been unable to

obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis on better terms is not available without granting the DIP Lender (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral, with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order. Absent access to the DIP Facility, the Debtors would likely be immediately forced to convert each of these Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.

(iv)    *Use of Proceeds of the DIP Facility.*  As a condition to entry into the DIP Agreement and the extension of credit under the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that proceeds of the DIP Facility shall be used in a manner consistent in all material respects with the terms and conditions of this Interim Order and the DIP Documents and in accordance in all material respects with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to Permitted Variance (as defined in the DIP Agreement), and as set forth in paragraph 11 hereof, the "Budget")[4] (subject to Permitted Variances), solely for the purposes set forth in the DIP Agreement and this Interim Order, including: (a) ongoing working capital and other general corporate purposes of the Debtors; (b) permitted payment of costs of administration of the Chapter 11 Cases, including restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the U.S. Trustee

---

[4] A copy of the initial Budget is attached hereto as **Schedule 1**.

and allowed professional fees and expenses of the Debtors' professionals and professionals retained by a Committee (if any); (c) payment of prepetition expenses to the extent permitted by the DIP Facility; (d) payment of interest, fees, expenses, and other amounts (including, without limitation, legal and other professionals' fees and expenses of the DIP Lender) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation, documentation, and the Court's approval of the DIP Facility; and (e) payment of obligations arising from or related to the Carve-Out (as defined below), and making disbursements therefrom, including by funding the Carve-Out Reserve Account (as defined below).

(v)     *Application of Proceeds of DIP Collateral*.  As a condition to entry into the DIP Agreement and the extension of credit under the DIP Facility, the Debtors and the DIP Lender have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of the DIP Collateral in accordance with this Interim Order.

H. **Section 506(c)**.  Subject to and upon entry of the Final Order, in light of the DIP Lender's agreement (i) that its liens and superpriority claims shall be subject to any Prior Perfected Liens (as defined below) and the Carve-Out, and (ii) to the payment (in accordance in all material respects with the Budget) (subject to the Permitted Variance (as defined in the DIP Agreement)) and subject to the terms and conditions of this Interim Order and the DIP Documents) of certain expenses of administration of these Chapter 11 Cases, to the extent the DIP Collateral can be surcharged under section 506(c) of the Bankruptcy Code, the DIP Lender is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I. **Good Faith of the DIP Lender**.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases:  (i) the terms and conditions of the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best and only

available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the terms and conditions of the DIP Facility have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, with the assistance and counsel of their respective advisors; (iii) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Lender, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Lender in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (iv) the DIP Facility, the DIP Liens (as defined below), and the DIP Superpriority Claims (as defined below), shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

J. **Final Funding.**  The DIP Lender shall only be required to provide the Final Funding Amount upon (i) entry of the Final Order (as defined below) acceptable to the DIP Lender, (ii) the Stipulations in paragraph 37 becoming final and effective and not subject to further Challenge (as defined herein), and (iii) all other conditions in the DIP Agreement being satisfied or waived.

K. **Immediate Entry**.    Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

L. **Interim Hearing**.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties.

Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c), and Local Rules 2002-1 and 4001-1(b).

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. <u>DIP Facility Approved on Interim Basis</u>.  The DIP Facility, in an amount equal to $25,000,000 (plus all interest paid in kind), is hereby authorized and approved, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections, statements, and reservations of rights to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2. <u>Authorization of the DIP Facility</u>.  The DIP Facility is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, premiums, fees, payments, reasonable and documented expenses, and other amounts described in the DIP Documents as such amounts become earned, due and payable, without need to obtain further Court approval, whether or not such fees arose before or after the Petition Date

to implement all applicable reserves, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by, and subject to the terms of, this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3. <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' estates, upon the entry of this Interim Order through and including the earliest to occur of (a) entry of the Final Order or (b) the DIP Termination Date (as defined below), and subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request extensions of credit (in the form of DIP Loans) under the DIP Facility in an amount up to the aggregate outstanding principal of $25,000,000 (plus all interest paid in kind).

4. <u>Amendment of the DIP Documents</u>. The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court if the amendment, modification, or supplement is (a) non-material and (b) in accordance with the DIP Documents.  In the case of a material amendment, modification, or supplement to the DIP Documents, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to any Committee (if appointed), the U.S. Trustee, and the DIP Lender; (ii) provide notice to the Court; (iii) obtain written approval from the DIP Lender; and (iv) obtain approval of the Court.

5. <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute

and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against the Debtors, their estates, and any successors thereto, any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all DIP Loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender, in each case, under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued and unpaid interest, costs, fees, reasonable and documented expenses, and other amounts owing under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Date (as defined herein), except as provided in paragraph 20 herein and subject to the requirements of the Carve-Out.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable state law equivalents), shall constitute original issue discount, or shall be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6. <u>DIP Liens</u>.  Subject and subordinate solely to any Prior Perfected Liens and the

Carve-Out as set forth in this Interim Order, and effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all real and personal property, whether now existing or hereafter arising and wherever located, tangible, or intangible, of each of the Debtors (the "<u>DIP Collateral</u>"), including, without limitation, (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable), and investment property (including, without limitation, all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, leases, leaseholds, fee interests in real property owned by the Debtors, books and records, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) subject to and upon entry of the Final Order, the proceeds of any avoidance actions brought

pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "Avoidance Action Proceeds"); (e) subject to and upon entry of the Final Order, the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code; and (f) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and non-avoidable liens on the Petition Date, in each case other than Excluded Property (as defined in the DIP Documents).  Notwithstanding anything to the contrary herein, this Interim Order does not provide liens on or security interests in any assets of the Debtors that are held as trust funds, pursuant to contract, statute or otherwise, arising out of or relating to any contract or obligation that is the subject matter of any surety bonds or related indemnity agreements (in each case, if any, and solely to the extent such surety bonds or indemnity agreements or applicable law provide for such assets to be held as trust funds) issued by Zurich American Insurance Company, Fidelity and Deposit Company of Maryland, Liberty Mutual Insurance Company, and their respective subsidiaries, affiliates, and associated companies (collectively, the "Sureties"), and nothing in this Interim Order and/or the DIP Documents shall alter or modify the terms and conditions of such surety bonds and related indemnity agreements or impair any rights of subrogation under contract or applicable law that the Sureties may have. All rights of the Sureties are reserved pending the final hearing on the Motion and the entry of the Final Order.

7. <u>DIP Lien Priority</u>.  The DIP Liens shall have the following priority:

(a)     pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be first priority liens on all of the DIP Collateral that are not otherwise subject to any valid, perfected, enforceable, and non-avoidable liens on the Petition Date, regardless of where located;

- 14 -

(b)        pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be first priority liens on all of the DIP Collateral regardless of where located and regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, and which shall be subject and junior only to the Carve-Out and valid, perfected and non-avoidable liens, if any, in existence immediately prior to the Petition Date (any such lien, a "Prior Perfected Lien");

(c)        other than with respect to any Prior Perfected Lien and the Carve-Out, or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or perfected in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8. Superpriority Claims.    Subject to the Carve-Out, upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328,

330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof.

9. <u>No Obligation to Extend Credit</u>.  Except as required to fund the Carve-Out as set forth in this Interim Order, the DIP Lender shall have no obligation to make any loan or advance or to issue, amend, renew, or extend any letters of credit or bankers' acceptance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance under the DIP Documents and this Interim Order have been satisfied or waived by the DIP Lender in accordance with the terms of the DIP Agreement.

10. <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility consistent with the terms set forth in this Interim Order and the DIP Documents, and, in each case, in compliance in all material respects with the Budget (subject to the Permitted Variance and the terms and conditions in this Interim Order and the DIP Documents).

11. <u>Budget Maintenance</u>.  The Debtors shall use the proceeds of all borrowings under the DIP Facility in accordance with the Budget, subject in all respects to the Permitted Variance.  The Budget annexed hereto as **Schedule 2** shall constitute the initial Budget, which, for the avoidance of doubt, is acceptable to the DIP Lender.  By no later than 5:00 p.m. (Pacific Standard Time) on July 2, 2021 and by no later than 5:00 p.m. (Pacific Standard Time) by

the end of each fiscal month occurring thereafter, the Debtors shall provide to the DIP Lender an updated monthly statement of the Debtors' anticipated cash receipts and disbursements for the subsequent one-month period (a "Proposed Budget"), which Proposed Budget shall modify and supersede any prior Budget upon the approval of the DIP Lender.  Each Budget delivered to the DIP Lender shall be accompanied by such supporting documentation as reasonably requested by the DIP Lender or its legal and financial advisors, and each Budget shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery.  Once so approved by the DIP Lender, the Proposed Budget shall become the then-approved Budget; *provided* that, unless and until the DIP Lender approves such Proposed Budget, the then-current Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered.

12.     Budget and Reporting Compliance.   The Debtors shall comply in all material respects with the Budget, subject to the Permitted Variance, and the Debtors shall provide all reports and other information as required in the DIP Agreement.  The Debtors' failure to comply with the Budget (subject to the Permitted Variance) or to provide the reports and other information required in the DIP Agreement shall constitute an Event of Default (as defined below), following the expiration of any applicable grace period set forth in the DIP Agreement.

13.     Modification of Automatic Stay.   Subject to paragraph 24 hereof, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Lender may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities

and obligations to the DIP Lender under the DIP Agreement, the other DIP Documents, the DIP Facility, and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Interim Order.

14.     Perfection of DIP Liens.   This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted herein.   Notwithstanding the foregoing, the DIP Lender is authorized to file or record, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect its respective liens in the DIP Collateral in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.   The Debtors are authorized to execute and deliver, promptly upon reasonable request and in accordance with the DIP Documents, to the DIP Lender, all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request.   The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or

similar instrument, and all applicable officials are hereby directed to accept a photocopy of this Interim Order for filing or recordation for such purpose.

15. <u>Protections of Rights of DIP Lender</u>.

(a)    Unless the DIP Lender shall have provided its prior written consent, or all DIP Obligations have been indefeasibly paid in full in cash and the lending commitments under the DIP Facility have terminated, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following (unless such order provides for the simultaneous satisfaction of such obligations):  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens or the DIP Superpriority Claims, except as expressly set forth in this Interim Order or the DIP Documents; or (ii) any modification of any of the DIP Lender's rights under this Interim Order or the DIP Documents with respect to any DIP Obligations.

(b)    The Debtors will, until the DIP Obligations have been indefeasibly paid in full in cash:  (i) maintain the Debtors' books, records, and accounts; (ii) reasonably cooperate with, consult with, and provide to the DIP Lender all such information and documents reasonably requested by the DIP Lender, including all information and documents the Debtors are required to provide under the DIP Documents or the provisions of this Interim Order (in each case other than documents and/or information which may be not shared under applicable law or confidentiality obligations or otherwise is subject to attorney client privilege); (iii) authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate and consult with the DIP Lender; (iv) upon reasonable advance notice and during

normal business hours, permit the DIP Lender to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors; (v) permit the DIP Lender to, upon reasonable advance notice and during normal business hours, consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (vi) upon reasonable advance notice and during normal business hours, permit the DIP Lender to conduct, at its discretion, field audits, collateral examinations, and liquidation valuations at reasonable times in respect of any or all of the DIP Collateral.

16.     Credit Bidding.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, 1123, or 1129 of the Bankruptcy Code, the DIP Lender may credit bid up to the full amount of the outstanding DIP Obligations including any accrued and unpaid interest, expenses, fees, and other obligations for its collateral (a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code.  None of the Debtors or any Committee (if appointed) shall object to the DIP Lender's right to Credit Bid up to the full amount of the applicable outstanding DIP Obligations in any sale of any DIP Collateral, whether such sale is effected through section 363, 1123 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

17.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this

Interim Order at any time prior to the indefeasible repayment in full of all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be applied in accordance with this Interim Order and the DIP Documents.

18.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations, and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral, including as required under the DIP Documents, and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order entered by the Court (which order must be reasonably acceptable to the DIP Lender) including pursuant the *Interim Order (I) Authorizing The Debtors To (A) Continue To Operate Their Cash Management System And Maintain Existing Bank Accounts, (B) Maintain Existing Business Forms And Books And Records, And (C) Continue To Perform Intercompany Transactions And (II) Granting Related Relief* or the *Final Order (I) Authorizing The Debtors To (A) Continue To Operate Their Cash Management System And Maintain  Existing Bank Accounts, (B) Maintain Existing Business Forms And Books And Records, And (C) Continue To Perform Intercompany Transactions And (II) Granting Related Relief,* as applicable.

19.    <u>Disposition of DIP Collateral</u>.  Except to the extent permitted by the DIP Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction, or acquiescence by the DIP Lender) in accordance with the DIP Documents.

20.    <u>Mandatory Prepayments</u>.   The Debtors shall be required to make

mandatory prepayments of the DIP Facility in accordance with the terms of the DIP Agreement ("Mandatory Prepayments").  Mandatory Prepayments will result in a dollar-for-dollar permanent reduction of the then-outstanding DIP Loans in accordance with the DIP Agreement.

21.     DIP Termination Date.  On the DIP Termination Date, subject to the Carve-Out, all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as required in paragraph 30 with respect to the Carve-Out, and the DIP Lender shall be entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order, subject to paragraphs 24 and 32.

22.     Events of Default.  The occurrence of any of the following events, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Agreement, shall constitute an event of default (collectively, the "Events of Default" and each, an "Event of Default") under this Interim Order: the occurrence of an "Event of Default" as set forth in section 6 the DIP Agreement.

23.     Case Milestones.  As a condition to the DIP Facility, the Debtors shall comply with the milestones set forth on Exhibit D of the DIP Agreement (the "Case Milestones"). For the avoidance of doubt, the failure of the Debtors to comply with any of the Case Milestones, unless waived by the DIP Lender in writing (which includes by electronic mail) and in accordance with the terms of the DIP Agreement, shall (a) constitute an Event of Default under each of (i) the DIP Agreement and (ii) this Interim Order; and (b) permit the DIP Lender to exercise the rights and remedies provided for (and subject to) in this Interim Order and the DIP Documents.

24.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before,

or order of the Court, but subject to the terms of this Interim Order, (a) the DIP Lender may declare (i) all outstanding DIP Obligations to be immediately due and payable, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lender, without affecting any of the DIP Liens or the DIP Obligations, or the post-petition administrative superpriority claim status of the DIP Obligations, and (iv) that the application of the Carve-Out has occurred through the delivery of the Carve-Out Trigger Notice (as defined below) to the Debtors; and (b) the DIP Lender may declare a termination, reduction or restriction of the Debtors' ability to use any cash collateral (any such declaration shall be referred to as a "Termination Declaration" and the date on which a Termination Declaration is delivered shall be referred to as the "DIP Termination Date").   A Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S. Trustee; *provided* that, prior to the exercise of any right in clauses (a)(i) through (iv) and (b) of this paragraph, the DIP Lender shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "Stay Relief Motion") on at least five (5) business days' written notice to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee appointed in these Chapter 11 Cases (the "Remedies Notices Parties," and such five business day period, the "Remedies Notice Period"); *provided*, *however* that, during the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing from the Court for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and upon and after delivery of the Termination Notice, the DIP Lender consents to such emergency hearing.   At the hearing on the Stay Relief Motion, the Court may fashion an appropriate remedy upon a

determination that an Event of Default has occurred or has occurred and is continuing, which may include permitting the DIP Lender to exercise all rights and remedies available against the DIP Collateral permitted by law or equity, without further notice to, hearing on, or order from this Court, subject to the Carve-Out; *provided*, *further* that the automatic stay shall remain in effect until the Court has an opportunity to rule on the Stay Relief Motion.  The DIP Lender and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other intellectual property of the Debtors to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral including pursuant to any Court-approved sale process.

25.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

26.     Payment of Fees and Expenses.  Upon the Maturity Date, the Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the legal and financial advisors to the DIP Lender including, without limitation, the reasonable and documented fees and expenses of Weil, Gotshal & Manges LLP, as set forth in this paragraph 26.  Professionals of the DIP Lender shall not be required to comply

with the U.S. Trustee fee guidelines; however, any time that such professionals seek approval of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors; *provided*, *however*, that the Debtors, the U.S. Trustee, and the Committee (if appointed) reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to any attorney-client privilege. After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) days to raise an objection thereto.  If an objection is timely raised, such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such fee and expense statement or invoice shall be deemed approved by the Debtors for payment upon the Maturity Date as DIP Obligations.  Notwithstanding the foregoing, upon entry of this Interim Order the Debtors are authorized and directed to pay at the Maturity Date all reasonable and documented fees, costs, and out-of-pocket expenses of the legal and financial advisors to the DIP Lender incurred on or prior to such date without the need for any professional engaged by the DIP Lender to first deliver a copy of its invoice as provided for herein. No attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Lender are hereby

approved in full.

27.     <u>Reserved</u>.

28.     <u>Proofs of Claim</u>.  The DIP Lender will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any administrative expenses allowed herein.

29.     <u>Professional Fees Account</u>.

(a)     The Debtors shall (i) contemporaneously with the initial funding of the Loans (as defined in the DIP Agreement), transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly Allowed Professional Fees for the first two weekly periods set forth in the Budget and (ii) thereafter on a weekly basis transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the total budgeted weekly Allowed Professional Fees for the next unfunded week set forth in the Budget, in each case into a segregated account (the "<u>Professional Fees Account</u>").

(b)     The Debtors shall cause funds held in the Professional Fees Account to be used to pay Allowed Professional Fees solely as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court or otherwise; *provided* that when all allowed Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Professional Fees Account shall revert to the Debtors for use in accordance with the DIP Agreement and this Interim Order; *provided*, *further* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.

(c)     The Professional Fees Account, and all funds held in the Professional Fees Account, shall be held in trust exclusively for the benefit the Professional Persons (as defined below), including with respect to obligations arising out of the

Carve-Out.  Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the DIP Lender or to any other party pursuant to this Interim Order, shall not constitute DIP Collateral, and shall not be or be deemed to be property of any Debtor's estate; *provided* that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account, after all Allowed Professional Fees have been indefeasibly paid in full in cash (regardless of when such Allowed Professional Fees are allowed by the Court).

      30.    <u>Carve-Out</u>.

      (a)    <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means, upon delivery of the Carve-Out Trigger Notice, the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (excluding any unpaid fees and expenses of Houlihan Lokey Capital, Inc. and any transaction fee, success fee, or similar fees of any other Professional Person (as defined below) (the "<u>Exempt Professional Fees</u>")) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>" and, such fees and expenses of the Professional Persons, the "<u>Allowed Professional Fees</u>") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to

or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility or the occurrence of the Maturity Date (as defined in the DIP Agreement), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Lender to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (each, as defined in the DIP Agreement) (on a pro rata basis based on the then outstanding DIP Obligations), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand (including in the Professional Fees Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay any and all other claims.  On

the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Lender gives a Carve Out Trigger Notice, notwithstanding anything in the DIP Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date, the DIP Lender shall make available such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the

definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 30, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 30, prior to making any payments to the DIP Lender.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lender for application in accordance with the terms of this Interim Order DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute additional Loans (as defined in the DIP Agreement) (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve-Out Reserves) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Facility, the Carve Out

shall be senior to all liens and claims securing the DIP Facility and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

31.     <u>Limitations on Use of DIP Proceeds and Carve-Out</u>.  No proceeds of the DIP Facility or the DIP Collateral and no portion of the Carve-Out or Carve-Out Reserve Account may be used in connection with (a) preventing, hindering, or delaying the DIP Lender's realization upon any of the DIP Collateral or enforcement of any of its rights with respect thereto in

accordance with paragraph 24; (b) for any purpose that is prohibited under this Interim Order, the Final Order (when entered), the DIP Documents, or the Bankruptcy Code; (c) to finance in any way:  (i) any adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of the DIP Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or their respective rights and remedies under DIP Documents, the Interim Order, or the Final Order (when entered), including, without limitation, any actions under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents, or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Documents; (d) for the payment of any prepetition claims, other than payments expressly permitted in the Budget; (e) to make any distribution under a plan of reorganization in the Chapter 11 Cases that does not provide for the indefeasible payment of the DIP Loans in full and in cash; (f) except as expressly permitted by the Budget, to make any payment in settlement of any claim, action, or proceeding in excess of $100,000 in the aggregate without the prior written consent of the DIP Lender; (g) selling or otherwise disposing of the DIP Collateral without the consent of the DIP Lender; (h) incurring Indebtedness (as defined in the DIP Agreement), except to the extent permitted under the DIP Agreement; (i) seeking to amend or modify any of the rights granted to the DIP Lender under this Interim Order or the DIP Documents, subject to the terms hereof; or (j) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations; *provided*, *however*, that the proceeds of the DIP Facility may be used, subject to entry of the Final Order, for allowed fees and expenses, in an amount not to exceed $100,000 in the aggregate (the "Committee Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating the releases granted in paragraph 37 herein

(the "Committee Investigation") before the Challenge Deadline; *provided*, *however*, that nothing contained in this paragraph 31 shall prohibit the Debtors from (i) responding or objecting to or complying with discovery requests of any Committee, in whatever form, made in connection with a Committee Investigation or the payment from the DIP Collateral of professional fees related thereto or (ii) using the Carve Out to contest or challenge whether an Event of Default has in fact occurred.

32.    Effect of Stipulations on Third Parties.

(a)    *Generally*.    The Debtors' admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Stipulations") shall be binding on the Debtors, any trustee, or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases.  Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the sixtieth (60th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause.  The Stipulations shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, a party in interest with standing and requisite authority (i) has timely commenced an appropriate adversary proceeding or contested matter required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 32) asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other

claims, counterclaims or causes of action, objections, contests or defenses against the DIP Lender, its affiliates, representatives, attorneys or advisors (each such proceeding or contested matter, a "Challenge") by no later than the date that is sixty (60) days from the formation of the Committee (the "Challenge Deadline"), as such deadline may be extended in writing from time to time in the sole discretion of the DIP Lender or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge and any such judgment has become a final judgment that is not subject to any further review or appeal, and then only to the extent of any such final judgment; provided that the Stipulations in paragraph 37 shall be effective upon (i) entry of the Final Order and (ii) the conclusion of the Board Investigation determining that the releases in paragraph 37 are a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors' estates. The DIP Lender's obligation to fund the Final Funding Amount shall be subject in all respects to the entry of the Final Order in form and substance acceptable to the DIP Lender (including the Stipulations in paragraph 37 herein becoming effective as set forth in this paragraph 32), and any other conditions in the DIP Agreement.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final and non-appealable judgment or order that is inconsistent with any of the Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Stipulations shall, pursuant to this Interim Order, become irrevocably binding on any person, entity, or party in interest in the Chapter 11 Cases, as well as their successors and assigns, and in any Successor Case for all purposes and shall

not be subject to further challenge or objection.  Notwithstanding anything to the contrary herein, if any Challenge is properly and timely commenced by a party in interest, the Stipulations shall nonetheless remain binding on all other parties in interest.  To the extent any Challenge is timely and properly commenced (i) the DIP Lender shall be entitled to, as adequate protection, payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves against any Challenge and (ii) in accordance with the terms of the DIP Documents, the DIP Lender shall be under no obligation to advance the Final Funding Amount to the Debtors.

33.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

34.    <u>Section 506(c) Claims</u>.  Subject to and upon entry of the Final Order, to the extent the DIP Collateral can be surcharged under sections 105 or 506(c) of the Bankruptcy Code, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Lender or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the express written consent of the DIP Lender, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

35.    <u>No Marshaling/Applications of Proceeds</u>.  Subject to and upon entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

36.    <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Documents or any other documents related thereto, shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Lender shall not, solely by reason of having made loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

37.    <u>Releases</u>.  Subject to entry of the Final Order and the Conflicts Committee of the Company's Board of Directors conducting an independent investigation (such investigation the "<u>Board Investigation</u>") and the Board Investigation concluding that granting the releases contemplated herein is a reasonable exercise of business judgment, and is in the best interest of the Debtors' estates, each of the Debtors (in their own right, on behalf of their estates, current and former affiliates, and each such entity's and its current and former affiliates' current and former directors and officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and subsidiaries, and each of such entity's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited

partners), representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, forever discharges and covenants not to sue the DIP Lender, its current and former affiliates, and each such entity's current and former directors and officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and subsidiaries, and each of such entity's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners) (the "Released Parties") (provided that, notwithstanding anything to the contrary herein, neither a portfolio company nor any employee of such portfolio company or director of such portfolio company who is otherwise unaffiliated with a Released Party shall constitute an "affiliate" or "representative") from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description, and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or successors), which the Releasing Parties have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract, in tort, including, without limitation, Bankruptcy Code chapter 5 causes of action, whether the law of the United States or any other country, union, organization of foreign countries or otherwise, liquidated or unliquidated, fixed or contingent, known or unknown,

suspected or unsuspected, disputed or undisputed, but excluding obligations under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims").  This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.  Notwithstanding the releases and covenants in favor of the Released Parties contained above in this paragraph, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under this Interim Order or the DIP Documents.  As of the date hereof, there exist no claims or causes of action against the DIP Lender with respect to, in connection with, related to, or arising from this Interim Order, the DIP Agreement, or the other DIP Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity.

38.    <u>Insurance Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

39.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

40.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Lender's rights to seek any other or supplemental relief; (b) any of the DIP Lender's rights under the Bankruptcy Code or applicable non-bankruptcy law, including,

without limitation, the right to (i) request modification of the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in these Chapter 11 Cases or any Successor Cases.

41.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

42.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry on the docket of this Court, the terms and provisions of this Interim Order shall become binding upon the Debtors, the DIP Lender, all other creditors of any of the Debtors, any Committee (if appointed), and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

43.     <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Agreement which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, any modification, stay, vacatur, or amendment to this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any action or inaction of the DIP Lender.

44.     <u>Discharge</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such plan, or the DIP Lender has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or liquidation or sale of a material portion of the Debtors' assets, or order confirming such plan or approving such sale, that, is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations (other than contingent indemnification obligations for which no claim has been asserted) promptly (and in no event later than the effective date of such plan of reorganization or liquidation or sale) and on terms acceptable to the DIP Lenders (a "<u>Prohibited Plan or Sale</u>"), without the written consent of the DIP Lender.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

45.     <u>Interim Order Controls</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, other than the Final Order, (including, without limitation, any interim or final order authorizing the Debtors' continued use of their cash management system), or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" any of the DIP Documents, the terms and provisions of this Interim Order shall govern.

46.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or any Successor Cases.  The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases notwithstanding the entry of any orders described in clauses (a)-(d) above, and all claims, liens, security interests, and other protections granted to the DIP Lender pursuant to this Interim Order and/or the DIP Documents shall maintain their validity and priority as provided by this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

47.     <u>Headings</u>.  Section headings used herein are for convenience only and are

not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

48.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for **July 12, 2021, at 2:00 p.m. (CT)** before the Honorable David R. Jones, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of Texas.  The Debtors shall serve, by United States mail, first-class postage prepaid, a copy of this Interim Order which shall serve as notice of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with a copy of the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **July 7, 2021, at 4:00 p.m. (CT)**.

49.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the DIP Facility, the DIP Documents, and/or this Interim Order.

    **Signed:  June 09, 2021.**

_____
**DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE**

## Schedule 1

**DIP Agreement**

# KATERRA INC.

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION PROMISSORY NOTE

$35,000,000 June 9, 2021

Subject to the terms and conditions of this Senior Secured Super-Priority Debtor-in-Possession Promissory Note (this "*Note*"), for value received, Katerra Inc., a Delaware corporation (the "*Company*") as debtor and debtor-in-possession, with chief executive offices at 2700 Post Oak Blvd Suite 2450 Houston, TX 77056, hereby promises to pay to the order of SB Investment Advisers (UK) Limited, a UK private limited company (in its capacity hereunder, including its registered assigns, the "*Holder*"), the principal sum of Thirty-Five Million Dollars ($35,000,000) (such amount the "*Aggregate Commitment*"), or such lesser amount as shall then equal the outstanding principal amount hereunder, together with interest accrued on the unpaid principal amount at the Applicable Rate (as defined below) pursuant to Section 3.2.

The following is a statement of the rights of Holder and the terms and conditions to which this Note is subject, and to which the Holder hereof, by the acceptance of this Note, agrees.

1. **DEFINITION.**  The following definitions shall apply for purposes of this Note.

"*Acceptable Plan*" means, until the Balance has been indefeasibly repaid in full in cash, a Chapter 11 Plan that provides for the indefeasible repayment in full in cash of the Balance on the effective date thereof and that is otherwise reasonably satisfactory to the Holder and the DIP Note Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof in accordance with the terms thereof).

"*Affiliate*" has the meaning ascribed to it in Rule 144 promulgated under the Securities Act.  For the avoidance of doubt, SoftBank Vision Fund L.P., a limited partnership formed under the laws of Jersey, SoftBank Group Corp. and all persons or entities controlling, controlled by or under common control with either SoftBank Vision Fund L.P. or SoftBank Group Corp. are affiliates of each other.  For the avoidance of doubt, any entity managed by an affiliate of SoftBank Vision Fund L.P., SB Investment Advisors (UK) Limited or SB Investment Advisors (US) Inc. shall be deemed an Affiliate of the Holder.

"*Acceptable Sale*" means (x) a sale of the DIP Note Parties' assets constituting a business unit, a line of business, a business segment or project and (y) any other sale the Net Proceeds of which exceeds $500,000, in each case, pursuant to Section 363 of the Bankruptcy Code or a Chapter 11 Plan, subject to the following conditions:  (i) (a) the Holder shall have reviewed and approved in writing in its reasonable discretion any bid procedures and asset purchase agreement (including any asset purchase agreement with a "stalking horse") or (b) the sale order with respect to such sale shall provide for application of all Net Proceeds of such sale to the indefeasible repayment in full in cash of the Balance upon consummation of the sale in accordance with the terms herein, and (ii) the first such sale shall be consummated not later than seventy (70) days following the Petition Date.

"*Applicable Rate*" means a rate equal to the lower of:  (a) the Highest Lawful Rate; and (b) 10.00% per annum.

"*Approved Budget*" means the budget in the form of Exhibit D and initially furnished to the Holder on or prior to the Closing Date, as the same may be updated, modified or supplemented from time to time as provided in Section 8 of Exhibit A hereto.  The initial Approved Budget shall depict, on a cumulative

and line item basis, forecasted (i) cash receipts of the DIP Note Parties (the "***Cash Receipts***"), (ii) cash operating disbursements of the DIP Note Parties (the "***Cash Operating Disbursements***"), and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Note Parties, including all professional and advisory fees, expenses and charges related to the Chapter 11 Cases (the "***Cash Bankruptcy Disbursements***"), in each case for the first twelve (12) fiscal week period from the Petition Date, and such initial Approved Budget shall be approved by the Holder in its reasonable discretion, which Approved Budget may be modified, supplemented or restated by the DIP Note Parties with the written consent of the Holder in its reasonable discretion and without further order of the Bankruptcy Court (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Exhibit D</u> is approved by the Holder). Notwithstanding the foregoing, in no event will cash receipts or disbursements received or made on account of or in connection with construction trust fund statutes, laws, requirements or similar arrangements constitute Cash Receipts, Cash Operating Disbursements or Cash Bankruptcy Disbursements for purposes of this definition.

"***Automatic Stay***" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"***Balance***" means, at the applicable time, the sum of all then outstanding DIP Obligations (excluding, in each case, any contingent amount for which no claim has been made or asserted).

"***Bankruptcy Code***" shall mean Title 11, United States Code, as amended.

"***Bankruptcy Court***" has the meaning given to such term in the definition of "Chapter 11 Cases".

"***Borrowing Notice***" means a notice of a borrowing of Loans, pursuant to <u>Section 2.1(b)</u>, which, if in writing, shall be substantially in the form of <u>Exhibit E</u>, or such other form as may be approved by the Holder (including any form on an electronic platform or electronic transmission system as shall be approved by the Holder), appropriately completed and signed by a responsible officer of the Company.

"***Business Day***" means a weekday on which banks are open for general banking business in San Carlos, California.

"***Capital Stock***" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any indebtedness convertible into or exchangeable for any of the foregoing.

"***Carve-Out***" has the meaning set forth in the Interim DIP Order (and Final DIP Order, when applicable).

"***Case Milestones***" means the milestones set forth on <u>Exhibit C</u>.

"***Cash Management Order***" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing on an interim basis, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Holder, which among other matters authorizes the DIP Note Parties to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to the Holder in all material respects.

"***Chapter 11 Cases***" mean the voluntary cases commenced by the DIP Note Parties in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").

2

"**_Chapter 11 Plan_**" means a chapter 11 plan with respect to any or all of the DIP Note Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"**_Claim_**" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"**_Closing Date_**" means the date on which all conditions set forth in Section 9 are satisfied; the Closing Date occurred on June 9, 2021.

"**_Collateral_**" means (a) any and all "Collateral" or words of similar intent as defined in the Security Agreement and (b) the "DIP Collateral" referred to in the DIP Orders.

"**_Company_**" shall include, in addition to the Company identified in the opening paragraph of this Note, any corporation or other entity which succeeds to the Company's DIP Obligations, whether by permitted assignment, by merger or consolidation, operation of law or otherwise.

"**_Company's Financial Advisor_**" means Alvarez & Marsal.

"**_Company's Investment Banker_**" means Houlihan Lokey Capital, Inc.

"**_Confirmation Order_**" means an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final and non-appealable order and otherwise be in form and substance reasonably satisfactory to the Holder, together with all extensions, modifications, supplements, and amendments thereto and (y) to the extent the Balance has not yet otherwise been repaid, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment in full in cash, and the termination in full of all outstanding commitments under this Note.

"**_Debtor Relief Laws_**" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**_Default_**" means any event set forth in Section 6 that is, or with the passage of time or the giving of notice or both, in each case as set forth in such Section, would be, an Event of Default.

"**_DIP Note Parties_**" means the Company and the Guarantors, and each individually, a "**DIP Note Party**".

"**_DIP Obligations_**" shall mean all obligations of every nature of each DIP Note Party, including obligations from time to time owed to Holder, in each case, that arise under any Financing Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such DIP Note Party, would have accrued on any DIP Obligation, whether or not a claim is allowed or allowable against such DIP Note Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

3

"***DIP Order***" means, as applicable, and as the context may require, the Interim DIP Order or the Final DIP Order, whichever is then applicable, or the Interim DIP Order and the Final DIP Order as the "***DIP Orders***".

"***Disposition***" means any sale, transfer, lease or other disposition (including any sale or issuance of Capital Stock in a Subsidiary) of any property by any Person, including any sale, transfer or other disposition, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  "Dispose" has the meaning correlative thereto.

"***Event of Default***" has the meaning set forth in Section 6.

"***Final DIP Order***" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Holder and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Holder waives such requirement), together with all extensions, modifications, and amendments thereto, which, among other matters but not by way of limitation, authorizes the DIP Note Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Note and the other Financing Documents, as the case may be, and provides for the super-priority of the Holder's Claims.

"***Financing Document***" means each of this Note, any Security Document, the DIP Orders and any other document entered into, executed or delivered under or for the purpose of providing collateral.

"***First Day Orders***" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter and, except for the Cash Management Order, each of which shall be reasonably acceptable to the Holder (for the avoidance of doubt, neither the Interim DIP Order nor the Final DIP Order shall constitute a "First Day Order" for purposes of this definition).

"***Guarantors***" shall mean, collectively, the Parent and each Subsidiary of the Parent from time to time party to the Security Agreement, and each, a "**Guarantor**".

"***Guaranty***" shall mean the guaranty set forth the Security Agreement.

"***Highest Lawful Rate***" means the maximum non-usurious rate of interest, as in effect from time to time, which may be charged, contracted for, reserved, received or collected by Holder in connection with this Note under applicable law.

"***Indebtedness***" as applied to any Person means, without duplication:

>    (a)    all indebtedness for borrowed money;

>    (b)    that portion of obligations with respect to capital leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

>    (c)    all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

WEIL:\97996190\13\75162.0029

(d)      any obligation of such Person owed for all or any part of the deferred purchase price of property or services;

(e)      all Indebtedness of others described in clauses (a) through (d) and (f) through (h) secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (A) the fair market value of the property to which such Lien relates or (B) the aggregate unpaid amount thereof);

(f)      the amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(g)      the guarantee by such Person of the Indebtedness of another; and

(h)      all net obligations of such Person in respect of any derivative transaction, including any hedge agreement, whether or not entered into for hedging or speculative purposes.

Notwithstanding the foregoing, Indebtedness shall not include (1) accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business, (2) deferred compensation, (3) amounts owed pursuant to any contractual arrangement with, and for services to be performed by, an original equipment manufacturer incurred in the ordinary course of business, (4) liabilities associated with customer prepayments and deposits, in each case incurred in the ordinary course of business, (5) obligations under operating leases entered into in the ordinary course of business, (6) contingent post-closing purchase price adjustments or earn out obligations to the extent not earned, due and payable, (7) trade payables or other accounts payable incurred in the ordinary course of such Person's business and (8) non-compete or consulting obligations.

"**_Interim DIP Order_**" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, supplements and amendments thereto, in each case, in form and substance satisfactory to the Holder, which, among other matters but not by way of limitation, authorizes, on an interim basis, the DIP Note Parties to execute and perform under the terms of this Note and the other Financing Documents.  The Interim DIP Order is attached hereto as Exhibit F.

"**_Interim Period Cap_**" means $25,000,000.

"**_Investment_**" means (a) any purchase or other acquisition by any DIP Note Party of any of the securities of any other Person (other than any DIP Note Party), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance or capital contribution by any DIP Note Party to any other Person.  The amount of any Investment outstanding as of any time shall be the original cost of such Investment (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Company's good faith estimate of the fair market value of such asset or property at the time such Investment is made) plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, less all returns received by the Company or any Subsidiary in respect thereof.

"*Lien*" shall mean any mortgage, deed of trust, pledge, hypothecation, collateral assignment, lien (statutory or otherwise), preference, priority, charge or other encumbrance of any nature, whether voluntary or involuntary, including the interest of any vendor or lessor under any conditional sale agreement, title retention agreement, capital lease or any other lease or arrangement having substantially the same effect as any of the foregoing.

"*Material Adverse Effect*" means a material adverse effect (whether the result of occurrences, events or circumstances involving the Company or any other DIP Note Party) on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company and the other DIP Note Parties on a consolidated basis and taken as a whole, other than (i) the effect of filing the Chapter 11 Cases, the events and conditions leading up to and resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Financing Documents or the DIP Orders and the Chapter 11 Cases themselves and (ii) any matters or transactions disclosed, contemplated or required to be taken in any First Day Order on a final basis, motions related thereto or in any supporting declarations thereof.

"*Maturity Date*" means the earlier of (a) the consummation of a sale of all or substantially all of the assets of the DIP Note Parties; (b) acceleration of the Balance of this Note pursuant to this Note; (c) 35 days after entry of the Interim DIP Order (or such later date as the Holder in its sole discretion may agree in writing with the Company) if the Final DIP Order has not been entered on or prior to the expiration of such 35-day period; (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a Chapter 11 Plan that is confirmed pursuant to a final and non-appealable order entered by the Bankruptcy Court and (e) the Scheduled Maturity Date.

"*Mortgaged Properties*" has the meaning set forth in the Security Agreement.

"*Mortgages*" has the meaning set forth in the Security Agreement.

"*Net Proceeds*" means, with respect to any event, (a) the cash proceeds received in respect of such event (either directly or through a distribution of such proceeds from a Subsidiary) including any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid or payable to third parties (other than controlled Affiliates) in connection with such event; provided, however, that such fees shall not include any Exempt Professional Fees (as defined in the DIP Orders), (ii) in the case of a sale, transfer or other Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than the Loans) secured by such asset, (iii) any funded escrow established pursuant to the documents evidencing any such sale or other Disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or other Disposition, (iv) in the case of any Disposition by a non-wholly-owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Company or a wholly-owned Subsidiary as a result thereof and (v) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, that are attributable to such event (as determined reasonably and in good faith by a responsible officer of the Company in consultation with the Holder).

"*Note*" has the meaning given to such term in the preliminary statements to this Note.

"**_Parent_**" means Katerra Inc., a Cayman company.

"**_Permitted Debt_**" means any of the following:

(i)      Indebtedness incurred pursuant to this Note and the other Financing Documents;

(ii)      Indebtedness existing on the Closing Date and disclosed on Schedule 1 hereto or otherwise constituting Permitted Investments;

(iii)      [reserved];

(iv)      [reserved];

(v)      Indebtedness owed by a DIP Note Party to another DIP Note Party;

(vi)      guarantees by a DIP Note Party in respect of Indebtedness of a DIP Note Party otherwise permitted hereunder;

(vii)      Indebtedness arising from customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days of its incurrence;

(viii)      Indebtedness with respect to performance bonds, bid bonds, surety bonds, construction bonds, appeal bonds or customs bonds required in the ordinary course of business or completion guarantees or in connection with the enforcement of rights or claims of the Company or any of its Subsidiaries or in connection with judgments that do not result in an Event of Default;

(ix)      Indebtedness owed to any Person providing property, casualty, liability, or other insurance to a DIP Note Party or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(x)      Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(xi)      Indebtedness in respect of bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 45 days following the due date thereof;

(xii)      [reserved];

(xiii)      other Indebtedness in an aggregate outstanding principal amount not to exceed $50,000;

(xiv)      Indebtedness consisting of the financing of insurance premiums;

(xv)      Indebtedness expressly permitted by the DIP Orders, First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order; and

(xvi)    all premiums (if any), interest, fees, expenses, charges and additional or contingent interest on obligations described above.

"***Permitted Dispositions***" means any Disposition:

(a)     of inventory, goods held for sale and other assets, in each case in the ordinary course of business;

(b)     of used, obsolete, damaged, worn-out or surplus equipment, or property no longer useful in the conduct of the business or otherwise commercially desirable to maintain, whether now owned or hereafter acquired, in the ordinary course of business;

(c)     among the DIP Note Parties;

(d)     in connection with the settlement or write-off of accounts receivable or sale of overdue accounts receivable (including any discount or forgiveness thereof) for collection in the ordinary course of business;

(e)     of cash or cash equivalents in the ordinary course of business;

(f)     as a result of eminent domain, casualty, foreclosure or condemnation of realty;

(g)     in connection with the lease or sub-lease of any real or personal property in the ordinary course of business and the termination or non-renewal of any real property lease not used or not necessary to the operations of any DIP Note Party (other than the lease in respect of the Tracy Project);

(h)     [reserved];

(i)     from any Subsidiary that is not a DIP Note Party to any other Subsidiary that is not a DIP Note Party or to a DIP Note Party;

(j)     consisting of Permitted Investments, Permitted Debt or Permitted Encumbrances;

(k)     that is an Acceptable Sale; and

(l)     that is expressly permitted in the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"***Permitted Encumbrances***" means the following Liens:

(a)     Liens securing the DIP Obligations created pursuant to the Financing Documents;

(b)     Liens existing on the Closing Date and disclosed on Schedule 2;

(c)     Liens imposed by law, such as Liens of carriers, warehousemen, shippers, mechanics, materialmen and landlords, and other similar Liens incurred in the ordinary course of business for sums not constituting borrowed money that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if so required) or that do not materially detract from the value of the applicable property or assets;

8

(d)     Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or and other letters of credit and letter of credit rights, bids, tenders, statutory obligations, surety, surety and appeal bonds, performance bonds, stay, customs and appeal bonds, trade contracts, leases, government contracts and other similar obligations (in each case other than obligations for borrowed money);

(e)     Liens for taxes, assessments or other governmental charges or statutory obligations that are (i) not delinquent, (ii) remain payable without any penalty, (iii) are being contested in good faith appropriate proceedings and for which adequate reserves exist in accordance with GAAP or (iv) the nonpayment of which is permitted or required by the Bankruptcy Code;

(f)     purported Liens evidenced by the filing of UCC financing statements in respect of operating leases or consignment of goods;

(g)     with respect to any real property occupied, owned or leased by any DIP Note Party, (i) all easements, rights of way, covenants, licenses, agreements, declarations, restrictions, defects, encroachments, licenses and similar minor encumbrances on title and (ii) leases, subleases, tenancies, options, concession agreements, rental agreements occupancy agreements, franchise agreements, access agreements and any other agreements, whether or not of record and whether now in existence or hereafter entered into, of the real properties of such DIP Note Party granted by such Person to third parties, in each case entered into in the ordinary course of such Person's business and so long as, to the extent such real properties are subject to Liens, such Liens;

(h)     Liens arising by operation of law under Article 4 of the UCC in connection with collection of items provided for therein or under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(i)     rights of setoff or bankers' liens of banks or other financial institutions where any DIP Note Party maintain deposits in the ordinary course of business and which are within the general parameters customary in the banking industry;

(j)     Liens in favor of customs and revenues authorities or export/import brokers that secure payment of duties and fees in connection with the importation and exportation of goods;

(k)     the modification, refinancing, replacement, extension or renewal of any Permitted Encumbrance; *provided* that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Closing Date or the date such asset was acquired, as applicable;

(l)     Liens of landlords under leases where any DIP Note Party is the tenant, securing performance by the tenant under the lease arising by statute or under any lease or related contractual obligation entered into in the ordinary course of business;

(m)     (i) Liens that are customary contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of any DIP Note Party to permit satisfaction of overdraft or similar obligations or to secure negative cash balances incurred in the ordinary course of business of such DIP Note Party, (C) purchase orders and other agreements entered into with customers of such DIP Note Party in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to deposit accounts and (iv)

9

Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of proceeds to finance such transaction;

(n)      Liens arising out of conditional sale, title retention, consignment, bailment or similar arrangements for the purchase, sale or shipment of goods entered into in the ordinary course of business;

(o)      [reserved];

(p)      [reserved];

(q)      Liens given to a utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice or as otherwise required by or contemplated by the First Day Orders or Second Day Orders;

(r)      [reserved];

(s)      Liens securing any Indebtedness incurred under clause (xiv) of "Permitted Debt"; provided that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender or its Affiliates;

(t)      any Lien or other interest attaching to the Collateral as the result of entry into definitive documentation with respect to an Acceptable Sale;

(u)      Liens arising on account of funds held in escrow and constructive trust arrangements; and

(v)      any Lien expressly permitted in the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"***Permitted Investments***" means any of the following:

(a)      acquisition and holding accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business;

(b)      acquisition and holding cash and cash equivalents;

(c)      [reserved];

(d)      acquisitions and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(e)      Investments made by a DIP Note Party to or in another DIP Note Party;

(f)      Investments consisting of Permitted Debt, Permitted Dispositions or Permitted Encumbrances;

(g)      contingent obligations to the extent not constituting Indebtedness, incurred in the ordinary course of business, in each case to the extent constituting Investments;

WEIL:\97996190\13\75162.0029

(h)     promissory notes and other non-cash consideration received in connection with any asset sale permitted hereby;

(i)     Investments in deposit accounts, securities accounts and commodities accounts maintained by a DIP Note Party;

(j)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(k)     [reserved]; and

(l)     any Investments expressly permitted by or set forth in the then effective Approved Budget the DIP Orders, the First Day Orders or the Second Day Orders, to the extent the Holder did not object to the applicable Second Day Order.

"***Person***" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other entity or any governmental authority.

"***Petition Date***" means the date on which the Chapter 11 Cases were commenced by the DIP Note Parties, which date was June 6, 2021.

"***Prepetition***" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"***Remedies Notice Period***" has the meaning specified in the Interim DIP Order (or Final DIP Order, when applicable).

"***Restricted Debt Payment***" any voluntary prepayment in cash in respect of principal of or interest on any indebtedness for borrowed money, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any indebtedness for borrowed money prior to the stated maturity thereof, in each case other than (i) with respect to this Note and (ii) with respect to indebtedness for borrowed money owed by a DIP Note Party to another DIP Note Party.

"***Restricted Payment***" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Parent; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Parent and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Parent now or hereafter outstanding.

"***Scheduled Maturity Date***" means August 23, 2021.

"***Second Day Orders***" means orders of the Bankruptcy Court in substantially the form of the respective First Day Orders (with only such modifications thereto as are reasonably necessary to convert such First Day Orders to final orders and such other modification as are satisfactory in form and substance to the Company and the Holder in their sole discretion (for the avoidance of doubt, neither the Interim DIP Order nor the Final DIP Order shall constitute a "Second Day Order" for purposes of this definition).

"***Securities Act***" means the Securities Act of 1933, as amended.

"*Security Agreement*" means that certain Security and Guaranty Agreement, dated as of the date hereof, by and among the Company, the other DIP Note Parties from time to time party thereto and the Holder, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Security Documents*" shall mean the Security Agreement, and all other pledge or security agreements, the Mortgages, if any, assignments or other similar agreements or instruments executed and delivered by any DIP Note Party pursuant to any Financing Document.

"*Subsidiary*" means, with respect to any Person, any corporation, association, limited liability company or other business entity of which more than 50% of the outstanding voting Capital Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof).   Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Parent.

"*Tracy Project*" means the DIP Note Parties' automated plant in Tracy, California.

"*Unauthorized Prepetition Obligations*" means any Prepetition Claim the payment, satisfaction or discharge of which, whether in whole or in part, in each case, is not permitted by, set forth in or otherwise contemplated by the DIP Orders, the First Day Orders, the Second Day Orders or the Approved Budget.

2.      COMMITMENT AND BORROWINGS.

   2.1    **The Borrowings**.

   (a)     Subject to the terms and conditions set forth herein, the Holder agrees to make loans to the Company denominated in United States Dollars (collectively, as drawn and outstanding, the "*Loan*" and each, individually, a "*Loan*") on or after the Closing Date and prior to the Maturity Date in three drawings as follows: (i) one Loan in the principal amount of up to $15,000,000 upon the entry of the Interim DIP Order, (ii) one Loan in the principal amount of up to $10,000,000 after the Closing Date but prior to the entry in the Final DIP Order if prior to the borrowing of such Loan the DIP Note Parties shall have received, after the Petition Date, one or more indications of interest ("*IOI*") from third-party bidders with respect to an Acceptable Sale (an "*Acceptable Sale IOI*")(it being understood and agreed that such IOIs individually or in the aggregate shall be in respect of the material portion of the DIP Collateral but it is not required that the Net Proceeds of one or more of the sales subject to such IOIs has to be sufficient to repay the entire Balance of this Note in full in cash); provided that any IOI received prior to the Petition Date (unless re-affirmed or modified and re-affirmed after the Petition Date) shall not constitute an Acceptable Sale IOI and (iii) one Loan in the principal amount of up to $10,000,000 upon the entry of the Final DIP Order and subject to the Holder being satisfied with the form and substance of the Bankruptcy Court's order approving the retention of the Company's Investment Banker and the Company's Financial Advisor; provided however that notwithstanding any other provision of this Note (i) the aggregate principal amount of all Loans made hereunder prior to the entry of the Final DIP Order shall not exceed the Interim Period Cap, (ii) each borrowing shall be in a minimum amount of $1,000,000 (or less, if such lesser amount represents the remaining amount of the Interim Period Cap or the Aggregate Commitment, as applicable), (iii) each borrowing shall be in a minimum amount of $1,000,000 or a whole multiple of $100,000 in excess thereof (or less, if such lesser amount represents the remaining amount of the Interim Period Cap or the Aggregate Commitment, as applicable) and (iv) the aggregate principal amount of all Loans made hereunder shall not exceed,

in the aggregate (but excluding any capitalized interest), the Aggregate Commitment.  Amounts borrowed under this Section 2.1 and repaid or prepaid may not be reborrowed.

(b)      Each borrowing of Loans shall be made upon the Company's notice to the Holder, which may be given by a Borrowing Notice (which may be delivered electronically).  Each such notice must be received by the Holder not later than 1:00 p.m. Pacific Standard Time, three (3) (or, in the case of the initial borrowing, one (1)) Business Days prior to the requested date of any borrowing of Loans.  Each notice by the Company pursuant to this Section 2.1(b) must be appropriately completed and signed by a responsible officer of the Company.  Each Borrowing Notice shall specify:

> (i)      the requested date of the borrowing (which shall be a Business Day),
>
> (ii)     the principal amount to be borrowed, and
>
> (iii)    wire instructions of the account(s) to which funds are to be disbursed.

(c)      Upon satisfaction of the applicable conditions set forth in Section 9 for any borrowing, the Holder shall make the requested funds available to the Company by wire transfer of such funds, in each case in accordance with instructions provided by the Company to (and reasonably acceptable to) the Holder.  Any payments under this Note that are made later than 5:00 p.m. Pacific Standard Time, shall be deemed to have been made on the next succeeding Business Day (but the Holder may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process). Except as otherwise expressly provided herein, if any payment to be made by the Company shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

**3.**      PAYMENT AT MATURITY DATE; INTEREST.

**3.1**      **Payment at Maturity Date**.  The principal amount of this Note, all accrued and unpaid interest and the remaining Balance of this Note shall be due and payable in full in cash on the Maturity Date, without demand by Holder; provided, that, in the event the entire Balance of this Note except for any capitalized interest as of the date thereof is indefeasibly paid in full in cash on or prior to the date that is 60 days following the Petition Date, no such capitalized interest shall be payable in connection with such repayment.  Payment on this Note shall be made to the address of Holder of this Note in lawful money of the United States.

**3.2**      **Payment of Interest**.  Interest shall begin to accrue on the date of this Note, shall continue to accrue on the outstanding principal amount of this Note until the entire Balance is paid in full in cash, shall be computed based on the actual number of days elapsed and on a year of 365 days, and shall paid monthly in arrears on the last Business Day of each month by adding an amount equal to such interest to the principal amount of this Note outstanding at the time of such payment; provided, however, that to the extent and from the time when any DIP Note Party enters into a DIP financing facility with any third party without the repayment in full in cash of the entire Balance of this Note the interest on the outstanding principal amount of this Note shall be payable monthly in arrears in cash on the last Business Day of each month. Anything herein to the contrary notwithstanding, if during any period for which interest is computed hereunder, the amount of interest computed on the basis provided for in this Note, together with all fees, charges and other payments which are treated as interest under applicable law, as provided for herein or in any other document executed in connection herewith, would exceed the amount of such interest computed

on the basis of the Highest Lawful Rate, then the Company shall not be obligated to pay, and Holder shall not be entitled to charge, collect, receive, reserve or take, interest in excess of the Highest Lawful Rate, and during any such period the interest payable hereunder shall be computed on the basis of the Highest Lawful Rate.

3.3     **Super-Priority Nature of DIP Obligations and Holder's Liens; Payment of DIP Obligations**.

(a)     The priority of the Holder's Liens on the Collateral, claims and other interests shall be as set forth in the Interim DIP Order and the Final DIP Order.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations, the Holder shall be entitled to immediate payment of such DIP Obligations without further application to or order of the Bankruptcy Court.

(c)     The Holder shall have the right to credit bid up to and including the full amount of the DIP Obligations then outstanding.  Any such credit bid by the Holder may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition entity controlled or managed by the Holder or an Affiliate of the Holder.

3.4     **Withholding Tax**.  The parties agree that all amounts payable under this Note shall be paid without deduction or withholding for any tax, except as required by applicable law.  Pursuant to the exceptions provided in Treasury Regulation sections 1.1441-1(b)(4)(iv) and 1.1441-2(a)(3), the parties acknowledge that no withholding or deduction to tax is currently expected in relation to this Note for U.S. federal income tax purposes.  To the extent a party making a payment under this Note determines that any applicable law requires the deduction or withholding of tax from such payment, the party making such payment shall provide prompt notice to the party receiving such payment and shall cooperate with such receiving party to determine whether such receiving party is eligible for any reduction or exemption from such deduction or withholding.  To the extent that any amounts are deducted or withheld pursuant to this Section 3.4 and paid over to the appropriate tax authority (to the extent required by applicable law), such amounts will be treated for all purposes of this Note as having been paid to the receiving party in respect of which such deduction and withholding was made.

4.     **PREPAYMENT.**

(a)     The Company may pay any unpaid Balance of this Note before it becomes due, without premium or penalty, without the consent of Holder.

(b)     Subject to the priority of Liens and application of funds set forth in the DIP Orders with respect to the Disposition of any asset of any DIP Note Loan Party or any of its Subsidiaries or any casualty event or condemnation in respect of any asset of any DIP Note Party, in the event and on each occasion that any Net Proceeds are received by or on behalf of any DIP Note Party in respect of (i) any asset sale (including any Acceptable Sale (other than, for the avoidance of doubt, in respect of Dispositions set forth in clause (d) of the definition of "Permitted Disposition")) or (ii) any single event or series of related events arising from (x) any loss, destruction or damage to the property of any DIP Note Party or (y) any condemnation, confiscation, requisition, seizure or taking thereof, in each case, resulting in any DIP Note Parties' receipt of Net Proceeds, the Company shall, within three (3) Business Days of the date such Net Proceeds are received, prepay the Loans in an amount equal to 100% of such Net Proceeds (without a reduction in any unused Aggregate Commitment); provided that a prepayment of the DIP Obligations pursuant to this Section 4 shall only be required in the amount (if any) by which the Net Proceeds received by the

DIP Note Parties during the term of this Note exceed $500,000 in the aggregate. Any prepayments made pursuant to this <u>Section 4</u> shall be made without premium or penalty of any kind.

**5.**   **APPLICATION OF PAYMENTS.**   All payments will be applied <u>first</u> to the repayment of accrued fees and expenses reimbursable under this Note, <u>then</u> to accrued interest until all then outstanding accrued interest has been paid in full, and <u>then</u> to the repayment of principal until all principal has been paid in full.

**6.**   **EVENTS OF DEFAULT.**   Each of the following events shall constitute an "***Event of Default***" hereunder:

(a)   The Company or any other DIP Note Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due and payable, any interest on any Loan, or any fee due hereunder, any other amount payable hereunder or under any other Financing Document;

(b)   (i) other than as set forth in subclause (ii), below or any other provision of this Section 6, any DIP Note Party breaches any obligation to the Holder under any Financing Document, and does not cure such breach within five (5) Business Days after written notice thereof has been given by or on behalf of the Holder or (ii) any DIP Note Party shall fail to comply with Section 8(b) of <u>Exhibit A</u>;

(c)   Any representation, warranty or certification made by any DIP Note Party herein or in any other Financing Document shall prove to have been false or incorrect in any material respect on the date or dates as of which made;

(d)   At any time after the execution and delivery thereof (i) any Security Document to which any DIP Note Party is now or hereafter a party shall for any reason cease to be in full force and effect or cease to be effective to give the Holder a valid and perfected first priority security interest in and Lien upon the Collateral purported to be covered thereby, subject to no Liens other than Permitted Encumbrances, in each case unless by reason of (A) any act or failure to act on the part of the Holder (including the failure of the Holder to maintain possession of any Collateral actually delivered to it or the failure of the Holder to file UCC continuation statements), (B) a release of Collateral is pursuant to and in accordance with the terms thereof or (C) the occurrence of the Maturity Date or any other termination of such Security Document in accordance with the terms thereof; (ii) any DIP Note Party shall deny or disaffirm in writing such DIP Note Party's obligations under the Guaranty (other than as a result of the discharge of such Guarantor in accordance with the terms thereof) or the Guaranty shall cease to be in full force and effect; or (iii) the DIP Obligations shall cease to constitute senior indebtedness under the subordination provisions of any documents or instruments evidencing any indebtedness for borrowed money or such subordination provision shall be invalidated or otherwise cease, for any reason, to be valid, binding and enforceable obligations of the parties thereto (other than as a result of a termination in accordance with its terms);

(e)   Except as a result of commencement of the Chapter 11 Cases or entry into this Note, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Court prohibits or does not permit any DIP Note Party from applicable compliance, the occurrence and continuance of any event of default under any other Indebtedness for borrowed money with a principal amount in excess of $250,000;

15

(f)        except for any order of the Bankruptcy Court fixing the amount of any Claim in the Chapter 11 Cases, one or more final judgments for the payment of money in an aggregate amount in excess of $500,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Company or any Subsidiary thereof, or any combination thereof, and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any Collateral of the Company or any Subsidiary to enforce any such judgment, excluding, in each case, any judgment or action resulting in a sequestering of funds under constructive trust arrangements or the escrow of funds in favor of another third-party;

(g)        The DIP Note Parties fail to achieve the Case Milestones (other than as the result of any action or omission of the Holder), without a written waiver or other written modification agreed to by the Holder in its sole discretion;

(h)        any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Holder or any of the Collateral;

(i)        (i) the entry of an order by the Bankruptcy Court terminating the exclusive right of any DIP Note Party to file a Chapter 11 Plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Holder or (ii) any DIP Note Parties' exclusive right to file a Chapter 11 Plan expires;

(j)        Except as permitted by the Financing Documents or the applicable Order or contemplated by an Acceptable Plan, and other than with respect to the Carve-Out, any order by the Bankruptcy Court is entered granting any superpriority claim that is pari passu with or senior to those of the Holder or any Lien that is senior to or *pari passu* with the Liens securing the DIP Obligations, which claims(s) in the aggregate exceed a principal amount in excess of $250,000;

(k)        the DIP Note Parties or any of their Subsidiaries obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Holder or its affiliates other than as permitted by the DIP Orders;

(l)        an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(m)        the filing, or support or encouragement, by any of the DIP Note Parties of a Chapter 11 Plan other than an Acceptable Plan or any order in any of the Chapter 11 Cases is entered by the Bankruptcy Court confirming or sanctioning a Chapter 11 Plan other than an Acceptable Plan;

(n)        any DIP Note Party shall file, or support or encourage, a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay (other than in connection with any Acceptable Sale or in accordance with the Approved Budget) to permit actions that would have a Material Adverse Effect on the DIP Note Parties or their estates (taken as a whole);

(o)        an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (or a motion seeking such an order shall be filed) without the express prior

written consent of the Holder (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner adverse in any material respect to the Holder, (ii) to permit, unless otherwise contemplated by the DIP Orders, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the DIP Note Parties' Claims in respect of the DIP Obligations (other than the Carve-Out or as contemplated by an Acceptable Plan) or (iii) allowing a Challenge (as defined in the DIP Orders) to proceed;

(p)    any DIP Note Party files, or supports or encourages, any motion or application, or the Bankruptcy Court grants the motion or application of any other person, which seeks approval for or allowance of any claim, Lien, security interest ranking equal or senior in priority to the claims, Liens and security interests granted to the Holder under the DIP Orders or the Financing Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(q)    other than with respect to any Replacement DIP, the entry of an order by the Bankruptcy Court authorizing any DIP Note Party to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the Holder which is secured by liens of equal or greater priority than the liens securing the DIP Obligations;

(r)    if any creditor of any DIP Note Party receives any adequate protection payment or any Lien is granted as adequate protection;

(s)    except as permitted by the First Day Orders or as otherwise agreed to by the Holder (including by approving a proposed Approved Budget), any DIP Note Party shall make any payments on account of any Unauthorized Prepetition Obligations;

(t)    the DIP Note Parties shall seek or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by the DIP Note Parties or by oral argument) any Challenge (as defined in the DIP Orders) or any motion to, (i) disallow or subordinate in whole or in part any of the obligations arising under this Note or any other Financing Document, including, without limitation, the DIP Obligations, (ii) disallow in whole or in part any of the Indebtedness owed by the Company under this Note, or (iii) challenge the validity, enforceability or priority of the Liens or security interests granted under any of the Financing Documents or in the DIP Orders in favor of the Holder;

(u)    noncompliance in any material respect by any DIP Note Party with the terms of one or both of the DIP Orders;

(v)    the Bankruptcy Court shall enter an order granting relief from the Automatic Stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of the DIP Note Parties of fair market value exceeding $500,000 in aggregate from or permit other actions that would reasonably be expected to result in a Material Adverse Effect; or

(w)    the Bankruptcy Court enters an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under this Note;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Remedies Notice Period and the DIP Orders, upon the occurrence and during the continuance of any Event of Default, all

accrued but unpaid expenses, accrued but unpaid interest, all principal and the remaining Balance of this Note shall become immediately due and payable upon written notice by or on behalf of the Holder to the Company.

Upon the occurrence and during the continuance of any Event of Default, and, subject to the DIP Orders and the Remedies Notice Period, the Automatic Stay shall be deemed automatically vacated solely as to the Holder, without further action or order of the Bankruptcy Court, and the Holder shall be entitled to (A) exercise all rights and remedies available to it under this Note, the other Financing Documents and applicable law (including, without limitation, the right to direct any or all of the DIP Note Parties to sell or otherwise Dispose of any or all of the Collateral) or (B) take any and all actions described in the DIP Orders, including, without limitation, those actions specified in the DIP Orders after the occurrence of any Event of Default.

   **7.**  **REPRESENTATIONS AND WARRANTIES.**  In order to induce the original Holder to enter into the Financing Documents and originally purchase this Note the Company hereby represents and warrants to the Holder as of the Closing Date:

     **7.1**  **Organization, Good Standing and Qualification**.  Each DIP Note Party has been duly incorporated and organized and is validly existing in good standing under the laws of the applicable jurisdiction.  Each Note Company has the corporate, limited liability company, or other equivalent, as applicable, power and authority to, subject to it entry (and the terms) of the Interim DIP Order (and Final DIP Order, when applicable), own and operate its properties and assets and to carry on its business as currently conducted and as presently proposed to be conducted. Each DIP Note Party is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

     **7.2**  **Due Authorization**.  Subject to entry of the Interim DIP Order (and Final DIP Order, when applicable), all corporate, limited liability company, or equivalent, as applicable, action on the part of  board of directors, shareholders, member, manager or other governing body, as applicable, necessary for the authorization, execution, delivery of, and the performance of all obligations of each Company under, the Financing Documents has been taken or will be taken prior to the Closing Date. Subject to entry (and the terms) of the Interim DIP Order (and Final DIP Order, when applicable), this Note constitutes, and the other Financing Documents to which such DIP Note Party is a party, when executed and delivered by such DIP Note Party, will constitute, valid and legally binding obligations of such DIP Note Party, enforceable against such DIP Note Party in accordance with their respective terms or as disclosed to the Holder on or prior to the date hereof, except as may be limited by (a) applicable Debtor Relief Laws and (b) the effect of rules of law governing the availability of equitable remedies. Except for the entry of, and pursuant to the terms of, the Interim DIP Order (and Final DIP Order, when and as applicable), no material consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any United States federal, state or local governmental authority or other foreign governmental authority is required on the part of such DIP Note Party in connection with the consummation of the transactions contemplated by this Note and the other Financing Documents, except for (i) filings required by applicable foreign or United States securities laws, rules or regulations, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect  and (iii) such other post-closing filings as may be required. Except as otherwise resulting from, related to or in connection with the commencement of the Chapter 11 Cases, no DIP Note Party is in violation or default (i) of any provisions of its organizational or governing documents, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, credit agreement, indenture, mortgage or other agreement with respect to indebtedness for borrowed money, or (iv) to its knowledge, of any provision of United States federal or state statute, rule or regulation or other foreign statute, rule or regulation applicable to the Company, in each case the violation of which or default

under would have a Material Adverse Effect. Subject to entry of the Interim DIP Order (and Final DIP Order, when applicable), the execution, delivery and performance of the Note Documents and the consummation of the transactions contemplated by the Note Documents will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the DIP Note Parties or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to any DIP Note Party, in each case the violation of, default under or conflict with which would have a Material Adverse Effect.

7.3     **Corporate Power.**   Each DIP Note Party has the corporate, limited liability, or equivalent, as applicable, power and authority to execute and deliver the Financing Documents to which it is a signatory, to carry out and perform all its obligations under the Financing Documents and, in the case of the Company, to make the borrowing hereunder.

7.4     **Security Documents.**

(a)     Subject to the entry of the Interim DIP Order (and, when entered, the Final DIP Order) and subject to the Carve-Out in all respects, the Security Agreement and the Interim DIP Order (and, when entered, the Final DIP Order) are effective to create in favor of the Holder  legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein), in each case, under applicable United States federal, state or local governmental law.

(b)     Except for the entry of the Interim DIP Order (and Final DIP Order, when applicable), no filing or other action will be necessary to perfect such Liens under Section 7.4(a), in each case, under applicable United States federal, state or local governmental law.

7.5     **No MAE**.   Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or would reasonably be expected to have a Material Adverse Effect.

7.6     **Chapter 11 Cases**.

(a)     The Chapter 11 Cases were commenced on the Petition Date in each case in accordance in all material respects with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Financing Documents and the Interim DIP Order and the Final DIP Order, and (ii) the hearing for the entry of the Interim DIP Order.  The DIP Note Parties shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given to all parties specified in such orders, as applicable.

(b)     After the entry of the Interim DIP Order, and pursuant to (and to the extent permitted) in the Interim DIP Order and the Final DIP Order, the DIP Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the DIP Note Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable.

(c)     After the entry of the Interim DIP Order and pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, the DIP Obligations will be secured by a valid and perfected

first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve-Out, (ii) Permitted Encumbrances and (iii) to the extent set forth in the Interim DIP Order or the Final DIP Order.

(d)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final DIP Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the DIP Obligations, the Holder shall, subject to the Remedies Notice Period, be entitled to immediate payment of such DIP Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## 8.    **GENERAL PROVISIONS.**

8.1    **Waivers**.  The Company and all endorsers of this Note hereby waive notice, presentment, protest and notice of dishonor.

8.2    **Fees and Expenses**.  Upon the Maturity Date, the Company shall pay all reasonable out-of-pocket expenses incurred by Holder, including the fees, charges and disbursements of one primary counsel to the Holder (including Weil, Gotshal & Manges LLP), one local counsel to the Holder in each relevant jurisdiction and any other third party advisor consented to by the Company (such consent not to be unreasonably denied, withheld or delayed), in connection with the Chapter 11 Cases, this Note (and any amendments, modifications or waivers hereof or thereof), the enforcement of rights in connection with this Note and the administration of this Note.

8.3    **Indemnity**.  The Holder (and its officers, directors, employees, advisors and agents) (each such person, an "*Indemnitee*") will have no liability for, and will be indemnified and held harmless against, any actual losses, claims, damages, liabilities or expenses (in the case of (i) legal fees and expenses, limited to reasonable and documented fees and out-of-pocket expenses of one primary counsel for all such Indemnitees taken as a whole, which, in each case, shall exclude allocated costs of in-house counsel and (ii) any other advisor or consultant, solely to the extent the Company has consented to the retention of such person) incurred or arising out of, in connection with, or as a result of, this Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by this Note and other Financing Documents, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, material breach by the Holder of its funding obligations hereunder or willful misconduct of the relevant Indemnitee.  Such indemnity shall not be available to the extent arising out of any actual loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Note Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its capacity or in fulfilling its role as Holder or any similar role under the Financing Documents).  To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against any DIP Note Party or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Note, any other Financing Document, any Loan, the use of the proceeds thereof or the financing contemplated by this Note and other Financing Documents; provided that such waiver shall not limit any DIP Note Party's reimbursement or indemnification obligations under Sections 8.2 or 8.3, respectively.

8.4    **Transfer**.  No party hereto may assign or otherwise transfer its rights or obligations hereunder except with the prior written consent of the other parties hereto (in each case in such party's sole discretion); provided, that the Holder shall be permitted to assign to any Affiliate of the Holder without the consent of any DIP Note Party. Subject to the foregoing, the rights and obligations of the Company and Holder under this Note and the other Financing Documents shall be binding upon and benefit their respective permitted successors, assigns, heirs, administrators and transferees.

**8.5**     <u>Governing Law</u>.  Except to the extent governed by the Bankruptcy Code, this Note shall be governed by and construed under the laws of the State of New York, without giving effect to principles of conflicts of laws.

**8.6**     <u>Headings</u>.  The headings and captions used in this Note are used only for convenience and are not to be considered in construing or interpreting this Note.  All references in this Note to sections and exhibits shall, unless otherwise provided, refer to sections hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

**8.7**     <u>Notices</u>.  Unless otherwise provided herein, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively given (a) at the time of personal delivery, if delivery is in person; (b) one (1) Business Day after deposit with an express overnight courier for United States deliveries, or three (3) Business Days after deposit with an international express overnight air courier for deliveries outside of the United States, in each case with proof of delivery from the courier requested; or (c) four (4) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries, when addressed to the party to be notified at the address indicated for such party on <u>Exhibit B</u> hereto, or at such other address as any party hereto may designate for itself to receive notices by giving ten (10) days' advance written notice to all other parties in accordance with the provisions of this Section 8.7.

**8.8**     <u>Amendments and Waivers</u>.  This Note may only be amended and provisions may only be waived by the Holder and the Company.

**8.9**     <u>Severability</u>.  If one or more provisions of this Note are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note to the extent they are held to be unenforceable and the remainder of the Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

**8.10**     <u>Counterparts.</u>  This Note may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**9.**     <u>CONDITIONS</u>.

**9.1**     The Holder's purchase of this Note, the effectiveness of the terms hereunder and the Holder's making available any Loan to the Company on the Closing Date, in each case, is subject to the satisfaction (or written waiver by the Holder) of the following conditions precedent:

(a)     each of the representations and warranties of the DIP Note Parties contained in Section 7 shall be true and complete in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (or if made as of an earlier specified date, in all material respects as of such date);

(b)     the Company shall have performed and complied with all agreements, obligations, covenants and conditions contained in this Note and the other Financing Documents that are required to be performed or complied with by it on or before the Closing and shall have obtained all approvals, consents and qualifications necessary to consummate the transactions described herein;

(c)      the Holder shall have received the following, each dated as of the Closing Date:

(i)      a counterpart signed by the Company of this Note; and

(ii)      from each DIP Note Party, a counterpart signed by such DIP Note Party to the Security Agreement;

(d)      Subject to the Interim DIP Order, the Holder shall have been granted a perfected Lien on the Collateral by the Interim DIP Order on the terms and conditions set forth herein and in the other Financing Documents, with the priority set forth in the Interim DIP Order (and, upon entry of the Final DIP Order, the Final DIP Order) and the terms thereof;

(e)      each UCC financing statement and each document required by any Security Document or any applicable Requirements of Law to be filed, registered or recorded in order to create in favor the Holder, for the benefit of the Secured Parties, a perfected first priority Lien (subject to Permitted Encumbrances) on the Collateral required to be delivered pursuant to each Security Document, shall be in proper form for filing, registration or recording;

(f)      (i) The Bankruptcy Court shall have entered the Interim DIP Order by no later than two (2) Business Days after the Petition Date and (ii) all motions, orders (including any "first day" orders on an interim basis and the Cash Management Order) and other documents shall be in form and substance reasonably satisfactory to the Holder and the Bankruptcy Court shall have approved and entered all "first day" orders on an interim basis, including, without limitation, the Cash Management Order and all such orders shall not have been vacated, stayed, reversed, modified or amended in any manner materially adverse to the Holder without the Holder's consent and shall otherwise be in full force and effect;

(g)      The Holder shall have received (i) the initial Approved Budget and (ii) the DIP Note Parties' asset sale plan (the "**_Asset Sale Plan_**"), in each case in form and substance acceptable to Holder;

(h)      The Holder shall have received (i) a copy of a fully executed engagement letter of the Company's Investment Banker and (ii) a copy of a fully executed engagement letter of the Company's Financial Advisor, in each case in form and substance acceptable to the Holder;

(i)      The Holder shall have received the Borrowing Notice with respect to the Loan to be made on the Closing Date;

(j)      At the time of and immediately after giving effect to the Loan made on the Closing Date, no Default or Event of Default shall have occurred and be continuing; and

(k)      the Company shall have paid all reasonable out-of-pocket costs and expenses of the Holder to the extent invoiced on or prior to the Closing Date, which amounts may be offset against the proceeds of the Loans.

**9.2**      The obligation of the Holder to make available to the Company any Loan after the Closing Date is subject to receipt of the Borrowing Notice therefor in accordance herewith and to the satisfaction (or waiver by the Holder) of the following conditions:

(a)      each of the representations and warranties of the DIP Note Parties contained in Section 7 shall be true and complete in all material respects on and as of, and after giving effect to,

the funding of the applicable Loans to the same extent as though made on and as of that date (or if made as of an earlier specified date, in all material respects as of such date);

(b)        At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing; and

(c)        (i) The Final DIP Order shall have been entered following the expiration of the Interim DIP Order; and (ii) the Interim DIP Order or the Final DIP Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended in any manner materially adverse to the Holder without the Holder's consent and shall otherwise be in full force and effect.

**10.    COVENANTS.**   Until the earlier of the Maturity Date or the date on which all DIP Obligations (other than contingent obligations not due and payable) have been paid and satisfied in full in accordance with the terms hereof, each DIP Note Party promises and agrees to comply with the covenants set forth on Exhibit A hereto.

WEIL:\97996190\13\75162.0029

**IN WITNESS WHEREOF**, the Company has caused this Note to be signed in its name as of the date first written above.

**THE COMPANY**

**KATERRA INC.**


By: _____

Name:

Title:

AGREED AND ACKNOWLEDGED:

**HOLDER**

**SB INVESTMENT ADVISERS (UK) LIMITED**


By: _____

Name:

Title:

**Exhibit A**

**Covenants**

1.      <u>Corporate Existence</u>.  Subject to the DIP Orders and the terms thereof and any required approval by the Bankruptcy Court, each DIP Note Party will comply in all material respects with all material applicable laws, rules, regulations and orders and preserve and maintain its corporate existence, rights, franchises, qualifications, and privileges to the extent that the failure to do so would reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution of any DIP Note Party into another DIP Note Party to the extent approved by the Bankruptcy Court.

2.      <u>Sales and Liens</u>.  After the Closing Date, no DIP Note Party will sell, assign (by operation of law or otherwise) or otherwise Dispose of, or create or suffer to exist any Lien upon or with respect to, any assets except Permitted Dispositions, the security interests in favor of Holder and Permitted Encumbrances.

3.      <u>Indebtedness and Investments</u>.  After the Closing Date, no DIP Note Party will (a) incur any Indebtedness (other than Permitted Debt) or (b) make any Investments (other than Permitted Investments).

4.      <u>Restricted Payments and Restricted Debt Payments</u>.  After the Closing Date, no DIP Note Party will (a) make any Restricted Payments, (b) make any Restricted Debt Payments or (c) make any payments on account of any Unauthorized Prepetition Obligations.

5.      <u>Audits and Visits; Reports by Independent Consultant</u>.

5.1      Each DIP Note Party will, at any time and from time to time during regular business hours as reasonably requested by Holder, permit Holder, or its agents or representatives, upon reasonable notice, (i) on a confidential basis, to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in its possession or under its control relating to the assets of such DIP Note Party and (ii) to visit its offices and properties for the purpose of examining and auditing such materials described in clause (i) above, and to discuss matters relating  to  the assets of the DIP Note Parties or its performance hereunder or under the related contracts with any of its officers or employees having knowledge of such matters; <u>provided</u> that the DIP Note Parties, taken as a whole, shall not, unless an Event of Default or Material Adverse Effect shall have occurred and remain continuing hereunder (in which case no such limit shall apply), be responsible for the costs and expenses of more than one such examination or visit during the term of this Note; <u>provided</u>, <u>further</u> that such requested information (i) does not constitute non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Holder (or its representatives or contractors) is not prohibited by Law or any binding agreement with any third party and  (iii) is not subject to attorney-client or similar privilege and does not constitute attorney work product.

6.      <u>Reporting Requirements</u>. The Company will provide to the Holder the following:

6.1      within 45 days after the end of each quarter of each fiscal year of the Company, an unaudited financial report of the Company containing a consolidated statement of assets, liabilities, and capital, consolidated statements of operations, and a consolidated income statement, in each case as of the last day of or for the period then ended;

6.2      within 30 days after the end of each month of each fiscal year of the Company, an unaudited financial report of the Company containing a consolidated statement of assets, liabilities, and

capital, consolidated statements of operations, and a consolidated income statement, in each case as of the last day of or for the period then ended;

6.3     within four (4) Business Days after the end of each week of each fiscal month of the Company, consolidated statements of cash flow as of the last day of the previous week;

6.4     commencing on June 18, 2021 and on the last Business Day of each subsequent fiscal two-week period of the Company, the updated Asset Sale Plan;

6.5     The DIP Note Parties shall host a weekly conference call for the Holder to discuss the Variance Report.  The DIP Note Parties will hold such conference call not later than five (5) Business Days from the time the DIP Note Parties have delivered the Variance Report.

6.6     The DIP Note Parties shall cause the Company's Investment Banker, to provide the Holder with weekly report (which, at the option of the Company, may be communicated via conference call or e-mail) on the status of (i) Acceptable Sales and other monetization of the DIP Note Parties' assets and (ii) the DIP Note Parties' efforts with respect to the refinancing of this Note;

6.7     by no later than 5:00 p.m. Pacific Standard Time on June 30, 2021 (or such later time as agreed to in writing (including via e-mail) by the Holder in its reasonable discretion), and by no later than 5:00 p.m. Pacific Standard Time by the end of each fiscal month occurring thereafter an updated budget substantially consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget.  Upon, and subject to, the approval of any such updated budget by the Holder, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the fiscal week immediately following the fiscal week in which it was delivered; *provided* that unless and until the Holder approves such supplemental budget, the then-current Approved Budget shall remain in effect;

6.8     as soon as possible after any responsible officer of the Company acquiring direct knowledge of the occurrence thereof (and in any event within five (5) Business Days after such responsible officer directly acquires such knowledge), written notice of any Event of Default or any matter that has resulted in a Material Adverse Effect;

7.     Taxes. Subject to the DIP Orders and the terms thereof and any required approval by the Bankruptcy Court, each DIP Note Party will pay any and all material taxes relating to the transactions contemplated under this Note; except for those taxes that such Person is contesting in good faith and for which adequate reserves have been taken or which taxes the nonpayment of which is permitted or required by the Bankruptcy Code.

8.     Budget Covenant.

(a)     By no later than 5:00 p.m. Pacific Standard Time on the fourth (4th) Business Day following the end of each fiscal week (or such later time as agreed to in writing (including via e-mail) by the Holder in its reasonable discretion) commencing on the date that is the last Business Day following the second (2nd) full fiscal week after the Petition Date (which date is June 25, 2021), the DIP Note Parties shall provide the Holder with rolling two-week variance reporting for Cash Receipts, and Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) reasonably detail the material variance, if any, of Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements from the Approved Budget and (ii) provide an explanation of any material per item variance (the "***Variance Report***").

(b)        Commencing at the end of the second (2nd) full fiscal week following the Petition Date and as at the end of each fiscal week thereafter (each such date on which the DIP Note Parties' compliance with the Approved Budget is tested, a "***Testing Date***"), as of any applicable Testing Date, (i) the rolling two-week Cash Operating Disbursements as of such Testing Date shall not vary from the Approved Budget by more than 10% and (ii) the rolling two-week Cash Bankruptcy Disbursements as of such Testing Date shall not vary from the Approved Budget by more than 20% with respect to the first two Testing Periods and 15% with respect to any subsequent Testing Period (such percentage in clauses (i) and (ii) above, the "***Permitted Variance***").

(c)        For purposes of <u>Section 8(b)</u>, the DIP Note Parties shall be deemed to be in compliance with the Approved Budget for all purposes under this Note, the Financing Documents and the DIP Orders unless, as of any applicable date of determination, the DIP Note Parties' Cash Operating Disbursements on a rolling two-week basis for such Testing Date vary from the Approved Budget by more than the Permitted Variance as measured on any Testing Date.

9.        <u>Use of Proceeds</u>.  The Company shall use the proceeds of the Loans to finance, in each case consistent in all material respects with the Approved Budget (subject to Permitted Variances):  (i) working capital, letters of credit, surety and performance bonds, and general corporate purposes of the DIP Note Parties, including capital expenditures and Permitted Investments, (ii) the negotiation, documentation, pursuit and/or consummation of an Acceptable Sale, (iii) costs, fees, expenses and charges, in each case, related to, arising out of or in connection with the Chapter 11 Cases, subject to the Carve-Out, and (iv) certain other prepetition and pre-filing expenses that are approved by the Bankruptcy Court and permitted by the Approved Budget.

10.        <u>Further Instruments</u>.  Each DIP Note Party will, at its expense, promptly execute and deliver all further instruments and documents, and take all further action that the Holder may reasonably request, from time to time, in order to perfect, protect or more fully evidence the full and complete ownership and security interest in the Collateral, or to enable the Holder to exercise or, subject to the following sentence, enforce the rights of the Holder hereunder or under any Collateral, in each case subject to the terms and conditions of this Note.

11.        <u>DIP Refinancing</u>.  The Company shall, and shall cause other DIP Note Parties to, use its reasonable best efforts to refinance this Note or otherwise repay all DIP Obligations in full in cash with the proceeds of one or more debtor-in-possession financings (the "***Replacement DIP***") or Dispositions prior to the Scheduled Maturity Date.

12.        <u>Employee Related Payments</u>.  After the Closing Date, without the prior written consent of the Holder (including by approving a proposed Approved Budget, to the extent specifically identified therein), no DIP Note Party will enter into any new agreement to make or will make any WARN, severance, bonus, retention,  incentive or any other payments to their respective employees except for (i) retention payments contemplated in the Approved Budget filed with the DIP Motion and (ii) payments in the ordinary course of business.

13.        <u>Bankruptcy-Related Matters</u>.  The Company shall, and shall cause other DIP Note Parties to, provide (i) no later than the later of (x) three (3) days in advance of filing with the Bankruptcy Court or (y) or as soon as reasonably practicable in advance of filing thereof, draft copies of all material motions, applications, proposed orders and pleadings related to the Chapter 11 Cases and/or any asset sale (including any Acceptable Sale), the Chapter 11 Plan and the Disclosure Statement and (ii) substantially simultaneously with the filing with the Bankruptcy Court, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the DIP Note Parties or their Subsidiaries or the Chapter 11 Cases that are filed with the Bankruptcy Court.  Each of the material

motions, applications, proposed orders and pleadings must be in form and substance reasonably acceptable to the Holder, except as otherwise provided herein.

**Exhibit B**

**Notice Addresses**

If to the Company:

Katerra Inc.
2700 Post Oak Blvd Suite 2450 Houston, TX 77056
Attention: Marc Liebman, Chief Transformation Officer
E-Mail: Marc.Liebman@alvarezandmarsal.com

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attention:  Joshua A. Sussberg, P.C.
            Christine Okike, P.C.

E-mail:     joshua.sussberg@kirkland.com
            christine.okike@kirkland.com

- and-

Kirkland & Ellis LLP
300 North LaSalle, Suite 2400
Chicago, IL 60654
Attention:  Michelle Kilkenney, P.C.
            Sean Hilson

E-mail:     mkilkenney@kirkland.com
            sean.hilson@kirkland.com

If to the Holder:

SB Investment Advisers (UK) Limited, a UK private limited company
c/o SB Investment Advisers (US) Inc.
1 Circle Star Way
San Carlos, CA 94070

Attention: Legal
E-mail: sbia-legal@softbank.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153
Attention: Dan Dokos
            Gary Holtzer
            Jessica Liou

E-mail: daniel.dokos@weil.com
_____gary.holtzer@weil.com
_____jessica.liou@weil.com

## Exhibit D

## Case Milestones

The DIP Note Parties shall pursue and achieve the following milestones in form and substance acceptable to the Holder:

(a)      on or before the date that is two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(b)      on or before the date that is five (5) days after the Petition Date, the DIP Note Parties shall file with the Bankruptcy Court a sale motion and bid procedures motion in form and substance reasonably acceptable to the Holder;

(c)      on or before the date that is thirty five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(d)      on or before the date that is forty-five (45) days after the Petition Date (i) the Bankruptcy Court shall have entered an order establishing bid procedures in form and substance reasonably acceptable to the Holder (the "**Bid Procedures Order**") which shall, among other things, provide that the deadline for bidding be a date not later than fifty-five (55) days from the Petition Date and the Bid Procedures Order shall approve entry into one or more agreements that provide for one or more Acceptable Sale(s), or (ii) the Company shall have obtained a binding commitment for a Replacement DIP and filed a motion with the Bankruptcy Court seeking entry of an order approving such Replacement DIP and the indefeasible repayment in full in cash of the Balance;

(e)      on or before the date that is sixty (60) days after the Petition Date, either (i) one or more sale orders in form and substance acceptable to the Holder with respect to one or more Acceptable Sales shall have been entered by the Bankruptcy Court, or (ii) the Bankruptcy Court shall have entered one or more orders approving the Debtors' entry into a Replacement DIP and the indefeasible repayment in full in cash of the Balance (the "**DIP Refinancing Order**");

(f)       if the DIP Refinancing Order is entered, on or before the date that is three (3) days after entry of the DIP Refinancing Order, the Balance shall be repaid in full in cash with the net cash proceeds of the Replacement DIP;

(g)      on or before the date that is sixty (60) days after the Petition Date, the DIP Note Parties shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect to such Acceptable Plan (the "**Disclosure Statement**"); provided, that the DIP Note Parties' compliance with this milestone shall not be affected by technical and immaterial changes and other changes, modifications and supplements to such Acceptable Plan and Disclosure Statement that are reasonably acceptable to the Holder filed with the Bankruptcy Court subsequent to the original filing of such Acceptable Plan and Disclosure Statement;

(h)      on or before the date that is seventy (70) days after the Petition Date, one or more Acceptable Sales shall be consummated;

(i)       on or before the date that is ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(j)        on or before the date that is one hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(k)        on or before the date that is one hundred thirty five (135) days after the Petition Date, the Acceptable Plan shall be effective.

**SCHEDULE 1**

**Existing Indebtedness**

Separately attached.

**SCHEDULE 2**

**Existing Liens**

Separately attached.

## **Schedule 2**

**Initial DIP Budget**

# Katerra Inc.
## Debtor-in-Possession (DIP) Financing Budget
As of 06/05/21

| ($000s) Week Ended | 1 06/11/21 | 2 06/18/21 | 3 06/25/21 | 4 07/02/21 | 5 07/09/21 | 6 07/16/21 | 7 07/23/21 | 8 07/30/21 | 9 08/06/21 | 10 08/13/21 | 11 08/20/21 | 12 08/27/21 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | |
| Job-Related Collections | - | - | - | - | - | - | - | - | 9,050 | - | - | - | 9,050 |
| Joint Check Funding, net | - | - | - | 416 | - | - | - | 416 | - | - | - | - | 833 |
| BU Optg Receipts (LAS, Reno) | 5,906 | 2,908 | 2,840 | 4,247 | - | - | - | - | - | - | - | - | 15,901 |
| Asset Sales (1) | - | - | - | - | 2,500 | - | - | - | 1,000 | 50,000 | - | - | 53,500 |
| Other Receipts | - | - | 4,563 | - | - | - | - | - | - | - | 2,010 | - | 6,573 |
| **Total Cash Receipts** | 5,906 | 2,908 | 7,403 | 4,664 | 2,500 | - | - | 416 | 10,050 | 50,000 | 2,010 | - | 85,857 |
| **Operating Disbursements:** | | | | | | | | | | | | | |
| Payroll & Benefits (excl BUs) | (1,731) | - | (1,731) | - | (1,772) | - | (1,541) | (92) | (1,448) | (686) | (1,541) | (2,246) | (12,789) |
| Sub-Contractors / COGS | (7,976) | (10,523) | (3,333) | (2,623) | (2,000) | (2,000) | (3,333) | (1,000) | (2,623) | (3,034) | - | (1,333) | (39,780) |
| Rent | - | - | - | (1,071) | - | - | - | - | (1,071) | - | - | - | (2,143) |
| Insurance | - | - | - | (1,018) | - | - | - | - | - | (1,018) | - | (1,018) | (3,053) |
| BU Optg Expenses (LAS, Reno) | (4,154) | (2,698) | (4,384) | (5,039) | - | - | - | - | - | - | - | - | (16,275) |
| Corporate Expenses | (458) | (453) | (724) | (453) | (458) | (453) | (458) | (453) | (458) | (453) | (458) | (453) | (5,729) |
| Other/Misc | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | (14,318) | (13,674) | (10,172) | (10,205) | (4,230) | (2,453) | (5,332) | (1,545) | (6,619) | (4,173) | (1,998) | (5,050) | (79,768) |
| **Net Cash Flows** | (8,412) | (10,767) | (2,769) | (5,541) | (1,730) | (2,453) | (5,332) | (1,129) | 3,432 | 45,827 | 12 | (5,050) | 6,089 |
| **Other Disbursements:** | | | | | | | | | | | | | |
| Professional Fees (2) (3) | (1,512) | (1,512) | (1,609) | (1,609) | (1,717) | (1,402) | (1,213) | (1,686) | (1,213) | (5,027) | (1,583) | (3,252) | (23,336) |
| Other Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Other Disbursements** | (1,512) | (1,512) | (1,609) | (1,609) | (1,717) | (1,402) | (1,213) | (1,686) | (1,213) | (5,027) | (1,583) | (3,252) | (23,336) |
| **Net Cash Flows** | (9,924) | (12,279) | (4,378) | (7,150) | (3,447) | (3,855) | (6,545) | (2,815) | 2,218 | 40,800 | (1,571) | (8,302) | (17,246) |
| **Beginning Book Cash Balance** | 20,053 | 25,128 | 12,850 | 8,472 | 1,322 | 5,875 | 2,021 | 5,476 | 2,661 | 3,879 | 12,679 | 11,109 | 20,053 |
| Net Cash Flow | (9,924) | (12,279) | (4,378) | (7,150) | (3,447) | (3,855) | (6,545) | (2,815) | 2,218 | 40,800 | (1,571) | (8,302) | (17,246) |
| DIP Funding | 15,000 | - | - | - | 10,000 | - | 10,000 | - | - | - | - | - | 35,000 |
| DIP Paydowns | - | - | - | - | (2,000) | - | - | - | (1,000) | (32,000) | - | - | (35,000) |
| **Ending Book Cash Balance** | 25,128 | 12,850 | 8,472 | 1,322 | 5,875 | 2,021 | 5,476 | 2,661 | 3,879 | 12,679 | 11,109 | 2,806 | 2,806 |
| **DIP Beginning Balance** | - | 15,000 | 15,000 | 15,000 | 15,000 | 23,000 | 23,000 | 33,000 | 33,000 | 32,000 | - | - | - |
| DIP Funding | 15,000 | - | - | - | 10,000 | - | 10,000 | - | - | - | - | - | 35,000 |
| DIP Draws | - | - | - | - | (2,000) | - | - | - | (1,000) | (32,000) | - | - | (35,000) |
| **Ending DIP Balance** | 15,000 | 15,000 | 15,000 | 15,000 | 23,000 | 23,000 | 33,000 | 33,000 | 32,000 | - | - | - | - |

**Notes:**
(1) Net Sales; Timing of consumated sells TBD
(2) Professional Fees (excl DIP Lender Fees) on an as incurred/accrued basis vs. cash basis; Actual cash flow timing dependent on professional fee retentions and orders
(3) DIP Lender Fees paid at time of DIP payoff

| | 06/11/21 | 06/18/21 | 06/25/21 | 07/02/21 | 07/09/21 | 07/16/21 | 07/23/21 | 07/30/21 | 08/06/21 | 08/13/21 | 08/20/21 | 08/27/21 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(4)  LAS/Reno Net Cash Flows* | 1,752 | 209 | (1,544) | (792) | - | - | - | - | - | - | - | - | (375) |