United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 07, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re:<br><br>KATERRA INC., *et al.*,[1]<br><br>　　　　　　Wind-Down Debtors. | Chapter 11<br><br>Case No. 21-31861 (DRJ)<br><br>(Jointly Administered) |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

### LETTER OF REQUEST
*Request for International Judicial Assistance*
*Pursuant to the Hague Convention of 18 March 1970 on*
*the Taking of Evidence in Civil Commercial Matters*

By the United States Bankruptcy Court
Southern District of Texas
Hon. David R. Jones

**TO**:　　　　The Central Authority for England & Wales
　　　　　　The Senior Master
　　　　　　For the attention of the Foreign Process
　　　　　　Section, Room E16
　　　　　　Royal Courts of Justice
　　　　　　Strand
　　　　　　London WC2A 2LL

---

[1]　　A complete list of each of the Wind-Down Debtors in these chapter 11 cases may be obtained on the website of the Wind-Down Debtors' claims and noticing agent at https://cases.primeclerk.com/katerra. The Wind-Down Debtors' service address in these chapter 11 cases is 3101 N. Central Ave., Ste. 670, Phoenix, AZ 85012. The "Wind-Down Debtors" are: Katerra Inc.; CAPGro Construction Management, LLC; Katerra Inc. (Cayman); AlgoSquare Inc.; Katerra Architecture LLC; Edge @ LoHi, LLC; Katerra Construction LLC; Hillsboro 1 Project LLC; Katerra Engineering LLC; Katerra Pearson Ranch Investment LLC, Lord, Aeck & Sargent, Inc.; Katerra Pegasus RiNo Investment, LLC; Hillsboro 1 Project MM LLC; Katerra XSC Houston Investment LLC; Katerra RO2 Knipe Village Investment LLC; Apollo Technologies, Inc.; Hillsboro 2 Project LLC; Kirkland 1 Project LLC; Kirkland 1 Project MM LLC; Hillsboro 2 Project MM LLC; Bristlecone 28th Ave, LLC; Perimeter Building Services LLC; Kirkland 2 Project LLC; Bristlecone Residential, LLC; Katerra Affordable Housing, LLC; Construction Assurance Ltd.; Roots Software, LLC; Kirkland 2 Project MM LLC; Dangoo Electronics (USA) Co. Ltd.; Skyview Concrete LLC; UEB Builders, Inc.; Valpico Glenbriar Apartments LLC; and WM Aviation, LLC.

United Kingdom

**FROM**:   The Honorable David R. Jones
c/o Albert Alonzo, Case Manager
United States Bankruptcy Court for the Southern District of Texas
Bob Casey United States Courthouse
515 Rusk Avenue, Courtroom 400
Houston, Texas, USA 77002
Telephone: +1 (713) 250-5467
albert_alonzo@txs.uscourts.gov

The United States Bankruptcy Court for the Southern District of Texas presents its compliments to the judicial authority of the United Kingdom of Great Britain and Northern Ireland (the "United Kingdom"), or other office as is appropriate, and requests international judicial assistance to obtain documents from each of Greensill Capital (UK) Limited ("GCUK"), GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP), Saffery Champness LLP ("Saffery Champness"), Alexander David Greensill, Jonathan Edward Myott Lane, and Alastair Kenneth Eadie concerning the specific subject matters set forth in Schedules A to F, respectively, to this Letter.  GCUK is the claimant Greensill Limited's direct corporate parent, and is now in administration proceedings in the United Kingdom.  Saffery Champness is (or was) Greensill Limited's auditor.  And Mr. Greensill, Mr. Lane, and Mr. Eadie are former directors and officers, and principal decisionmakers, of Greensill Limited.  The Wind-Down Debtors have represented to the Court that GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie have, or are likely to have, important documents in their possession.

This request is made pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, as adopted and implemented in the United States of America at 28 U.S.C. § 1781.  The United States Bankruptcy Court for the Southern District of Texas is a competent court of law and equity that properly has jurisdiction over these

2

proceedings, and has the power to compel the attendance of witnesses and production of documents, both within and outside its jurisdiction.

The production of documents by GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie is intended for use at trial, and the defendant Wind-Down Debtors have represented to the Court that such documents will be highly relevant to the claims and defenses in the case, influencing the final resolution of Greensill Limited's $440 million in claims against them.[2]  This includes Greensill Limited's transaction at an undervalue claim under s. 238 of the Insolvency Act 1986, which is based on a December 30, 2020 Contribution and Exchange Agreement between Greensill Limited (which Mr. Lane executed on Greensill Limited's behalf) and certain of the defendant Wind-Down Debtors.

This request is made with the understanding that it will in no way require any person to commit any offense, or to undergo a broader form of inquiry than he or she would be subject if the litigation were conducted in the United Kingdom.  Further, this Court defers to the judicial authority of the United Kingdom, or other office as is appropriate, as to whether the specific requests set forth below or in <u>Schedules A to F</u> comply with applicable law or practice or whether any or all should be limited or precluded.

---

[2]   The Court notes that claimant Greensill Limited does not agree with certain of the Wind-Down Debtors' representations.  The Wind-Down Debtors have acknowledged that Greensill Limited has reserved all rights to object to the relevance and admissibility of any information that may be obtained as a result of this Letter of Request.

<u>**Letter of Request**</u>

**1.      Sender**

The Honorable David R. Jones
United States Bankruptcy Court for the Southern District of Texas
Bob Casey United States Courthouse
515 Rusk Avenue, Courtroom 400
Houston, Texas, USA 77002

**2.      Central Authority of the Requested State**

The Senior Master
For the attention of the Foreign Process
Section, Room E16
Royal Courts of Justice
Strand
LONDON WC2A 2LL
United Kingdom

**3.      Person to Whom the Executed Request is to be Returned**

*<u>Defendants' Legal Representative</u>*:
Richard Boynton
KIRKLAND & ELLIS INTERNATIONAL LLP
30 St Mary Axe
London EC3A 8AF

*<u>For onward transmission to</u>*:
Gabor Balassa, P.C.
Ravi Subramanian Shankar
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL, USA 60654
Telephone:      +1 (312) 862-2000

*<u>On behalf of</u>*:
United States Bankruptcy Court for the Southern District of Texas
Bob Casey United States Courthouse
515 Rusk Avenue, Courtroom 400
Houston, Texas, USA 77002

4.     **Specification of Date by which the Requesting Authority Requires Receipt of the Response to the Letter of Request**

The applicant requests a response at the earliest convenience, and in any event within 28 days of this request being received.

The Wind-Down Debtors have requested documents within that 28-day timeframe to have sufficient time to review them, conduct further discovery based on the documents received as a result of this Letter of Request, and meet the deadlines set by this Court, including a May 13, 2022 deadline for the issuance of expert reports and a June 27, 2022 deadline for the close of all discovery.  Trial is scheduled to begin on July 18, 2022.

5.     **In Conformity with Article 3 of the Convention, the Undersigned Applicant has the Honor to Submit the Following Request:**

a.     **Requesting Judicial Authority**

The Honorable David R. Jones
United States Bankruptcy Court for the Southern District of Texas
Bob Casey United States Courthouse
515 Rusk Avenue, Courtroom 400
Houston, Texas, USA 77002

b.     **To the Competent Authority of:**

The United Kingdom

c.     **Name of the Cases and any Identifying Numbers**

*In re Katerra, Inc.*, Case No. 21-31861 (Bankr. S.D. Tex.) (DRJ)

6.     **Names and Addresses of the Parties and Their Representatives**

a.     **Claimants**

Greensill Limited (in Liquidation)

      **b.**      **Claimant's Representatives**

The representatives of Greensill Limited are:

Lenard M. Parkins PLLC
PARKINS LEE & RUBIO LLP
700 Milam Street, Suite 1300
Houston, TX, USA 77002
Telephone:     +1 (713) 715-1660
lparkins@parkinslee.com

Ryan C. Wooten
ORRICK, HERRINGTON & SUTCLIFFE LLP
609 Main Street, 40th Floor
Houston, TX, USA 77002
Telephone:     +1 (713) 658-6400
katerranotice@orrick.com

      **c.**      **Defendants**

The Wind-Down Debtors (a complete list of the Wind-Down Debtors is included at footnote 1)

      **d.**      **Defendants' Representatives**

The representatives of all of the Wind-Down Debtors are:

Gabor Balassa, P.C.
Ravi Subramanian Shankar
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL, USA 60654
Telephone:     +1 (312) 862-2000
gabor.balassa@kirkland.com
ravi.shankar@kirkland.com

Martin R. Martos II
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, IL, USA 60654
Telephone:     +1 (312) 517-9291
mmartos@foxrothschild.com

Jack C. Praetzellis
FOX ROTHSCHILD LLP
345 California Street, Suite 2200
San Francisco, CA, USA 94104
Telephone:      +1 (415) 651-1424
jpraetzellis@foxrothschild.com

   **e.**   **Other Parties**

None

**7.**   **The Proceedings**

   **a.**   **Nature and Purpose of the Proceedings**

The claimant Greensill Limited seeks to unwind a commercial transaction, including a December 30, 2020 Contribution and Exchange Agreement, pursuant to s. 238 of the Insolvency Act 1986 (transaction at an undervalue). According to the Wind-Down Debtors, Greensill Limited is seeking such a remedy despite it and its corporate parents having received full value in the transaction.

The Wind-Down Debtors have represented that the documents being requested are relevant to at least the following legal and factual issues in this case: (i) whether Greensill Limited acted in good faith in entering into the Contribution and Exchange Agreement, (ii) the intended and actual use of the consideration the Greensill companies received in connection with Greensill Limited entering into that Agreement, (iii) Greensill Limited's solvency on or about December 30, 2020; (iv) the benefits that Greensill Limited received and obligations that it incurred under separate agreements that Greensill Limited's parent companies entered into related to the Contribution and Exchange Agreement, (v) whether GCUK had to indemnify Greensill Limited for any liabilities or losses it incurred from entering into the Contribution and Exchange Agreement, and (vi) the value of the consideration the various Greensill companies gave and received in connection with the Contribution and Exchange Agreement.

### b.  Summary of the Facts

The nature of the proceedings for which evidence is sought are $440 million claims filed by Greensill Limited, a company incorporated in England and Wales that is now in liquidation, against the Wind-Down Debtors.  Greensill Limited's claims arise from the termination of a December 9, 2019 Receivables Purchase Agreement between Greensill Limited and six of the Wind-Down Debtors.  The Receivables Purchase Agreement was a factoring arrangement whereby Greensill Limited purchased existing and future accounts receivable from the Wind-Down Debtors at a discount to their face value, with the expectation of later collecting the full payments on those receivables, earning a margin.

On December 30, 2020, the Wind-Down Debtors' ultimate corporate parent, Katerra Inc. ("Katerra Cayman"), executed an out-of-court capital-raise transaction led by its existing investors, SVF Abode (Cayman) Ltd. and SVF Habitat (Cayman) Ltd. (together with its affiliates, the "SoftBank Entities").

On the same date and as part of the Wind-Down Debtors' out-of-court recapitalization, Greensill Limited and certain of the Wind-Down Debtors executed a Contribution and Exchange Agreement to terminate the Receivables Purchase Agreement.  As part of the termination, Greensill Limited contributed, transferred, assigned, and delivered whatever claims, if any, "derived from, based upon, or secured by" the Receivables Purchase Agreement to Katerra Cayman, and agreed that all of Katerra's Receivables Purchase Agreement obligations were "released, discharged, and terminated."

In exchange, Katerra Cayman agreed to issue 762,144 shares of its Series A preferred stock (about 5% of its post-recapitalization equity) to Greensill Limited.  Greensill Limited then was obligated to convey those shares to the SoftBank Entities, which it did on December 30, 2020.

### c.      Summary of Greensill Limited's Claims

Greensill Limited alleges that these transactions constitute a transaction at an undervalue under s. 238 of the Insolvency Act 1986.  Greensill Limited asserts that it received no meaningful consideration as a result of terminating the Receivables Purchase Agreement, but incurred actual or potential liabilities to noteholders with the ultimate economic interest in that Agreement. Greensill Limited alleges that those liabilities rendered it insolvent, to the extent it was not already insolvent.

Greensill Limited also has asserted claims for (i) pursuit of funds held in constructive trust; (ii) transaction defrauding creditors; (iii) knowing receipt; (iv) dishonest assistance, conspiracy, conspiracy to commit fraud and aiding and abetting; and (v) breach of contract.

### d.      Summary of the Wind-Down Debtors' Defence

The Wind-Down Debtors deny Greensill Limited's allegations.  Among other defenses, the Wind-Down Debtors assert that Greensill Limited and its corporate parents already received a full recovery on the Receivables Purchase Agreement and that Greensill Limited acted in good faith when it entered into the Contribution and Exchange Agreement.  Specifically, Greensill Limited's direct corporate parent, GCUK, received $440 million in November 2020, which funds were intended to be used to assume any losses on notes issued pursuant to the Receivables Purchase Agreement.  In exchange, GCUK and its corporate parent, on behalf of themselves and their affiliates and subsidiaries, including Greensill Limited, transferred their economic interest in the Receivables Purchase Agreement to the SoftBank Entities.  Further, GCUK promised to indemnify Greensill Limited for any losses it incurred "under or in connection with the Transaction Documents," including the Receivables Purchase Agreement.

8.     **Evidence**

    a.     **Evidence to be Obtained or Other Judicial Act to be Performed**

This Court requests the Appropriate Judicial Authority of the United Kingdom to compel each of GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie to produce to the Wind-Down Debtors documents responsive to the requests for production in <u>Schedules A to F</u> to this Letter of Request, to the extent that they are in the possession, control, or power of GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie, respectively; are not privileged under the applicable laws of the United Kingdom or the United States; and would not impose a burden greater than either would be subject if the litigation were conducted in the United Kingdom.  As set forth above, this Court defers to the judicial authority of the United Kingdom, or other office as is appropriate, as to whether the specific requests in <u>Schedules A to F</u> comply with applicable law or practice or whether any or all should be limited or precluded.

    b.     **Purpose of the Evidence or Judicial Act Sought**

The Wind-Down Debtors have represented to this Court that the purpose of this request is to obtain evidence which is to be used at the trial which is scheduled to begin on July 18, 2022, that the evidence would be likely to be relevant to issues in the proceedings (as explained in the following paragraphs), and that the evidence would be likely to be admissible at the trial. Specifically, the Wind-Down Debtors have represented that (i) GCUK's, GCUK's administrators, Saffery Champness', Mr. Greensill's, Mr. Lane's, and Mr. Eadie's documents are highly relevant to a number of their defenses; and (ii) they do not expect that Greensill Limited will have access to most of the materials sought here.

With respect to GCUK and its administrators, the Wind-Down Debtors have represented that GCUK and its administrators likely will have documents (i) concerning the intended and

actual use of the $440 million it received from the SoftBank Entities; (ii) concerning whether Greensill Limited had a contractual obligation to transfer any recoveries on the Receivables Purchase Agreement to the SoftBank Entities; (iii) concerning its indemnification obligations to Greensill Limited under their Participation Agreement; (iv) concerning its financial ability to honor those indemnification obligations; and (v) memorializing any direction from GCUK to Greensill Limited to enter into the Contribution and Exchange Agreement.  The Wind-Down Debtors have represented that these documents will be relevant at least to whether Greensill Limited's directors and officers acted in good faith in entering into the Contribution and Exchange Agreement; and whether, on balance, Greensill Limited gave up anything of material value when it entered into the Contribution and Exchange Agreement, such as because GCUK had the contractual obligation and financial ability to fully indemnify Greensill Limited for any liabilities Greensill Limited incurred as a result of entering into that Agreement.

With respect to Saffery Champness, the Wind-Down Debtors have represented that Saffery Champness was (or is) GCUK's and Greensill Limited's auditor and likely will have documents concerning their financial condition, including their solvency or ability to continue as a going concern; and their evaluation of any liabilities arising out of the Contribution and Exchange Agreement.  The Wind-Down Debtors have represented that these documents will be relevant to whether the Contribution and Exchange Agreement rendered Greensill Limited insolvent, one of the elements of a transaction at an undervalue claim; and Greensill Limited's and its auditor's understanding (or not) that the $440 million GCUK received in November 2020 was intended to be used to assume any losses or liabilities on notes issued pursuant to the Receivables Purchase Agreement.

With respect to Mr. Greensill, Mr. Lane, and Mr. Eadie, the Wind-Down Debtors have represented that these individuals are former directors or officers of Greensill Limited and/or GCUK, were principal decision makers at Greensill Limited and/or GCUK, and negotiated, structured, and/or approved the various transactions being challenged by Greensill Limited. The Wind-Down Debtors have represented that these individuals are likely to have documents in their possession relevant to each of the above issues.

For at least the above reasons, the Wind-Down Debtors have represented that they anticipate that the requested evidence will be highly relevant to their defenses and would be relied upon by those parties at trial.

### 9.     Identity and Address of Any Person(s) to be Examined

None, only documents are being sought.

### 10.     Questions to be Put to the Persons to be Examined or Statement of the Subject-Matter about which They are to be Examined

None, only documents are being sought.

### 11.     Documents or Other Property to be Inspected

Attached as Schedules A to F is a list documents the Wind-Down Debtors have requested that GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie produce, respectively.

### 12.     Any Requirement that the Evidence Be Given on Oath or Affirmation and Any Specific Form to Be Used

Oath or affirmation, no specific form is to be used.

### 13.     Special Methods or Procedures to be Followed

To the extent permitted by the applicable laws of the United Kingdom and/or any rights or objections asserted by GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, or Mr. Eadie, this Court respectfully requests that the Appropriate Judicial Authority of

the United Kingdom require that the documentary evidence requested in <u>Schedules A to F</u> be produced or provided for inspection and copying not later than 28 days after service.

**14.      Request for Notification of the Time and Place for the Execution of the Request and Identity and Address of any Person to be Notified**

Please notify counsel regarding the time and place for the execution of the Request:

Gabor Balassa, P.C.
Ravi Subramanian Shankar
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL, USA 60654
Telephone:      +1 (312) 862-2000
gabor.balassa@kirkland.com
ravi.shankar@kirkland.com

Martin R. Martos II
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, IL, USA 60654
Telephone:      +1 (312) 517-9291
mmartos@foxrothschild.com

Jack C. Praetzellis
FOX ROTHSCHILD LLP
345 California Street, Suite 2200
San Francisco, CA, USA 94104
Telephone:      +1 (415) 651-1424
jpraetzellis@foxrothschild.com

Lenard M. Parkins PLLC
PARKINS LEE & RUBIO LLP
700 Milam Street, Suite 1300
Houston, TX, USA 77002
Telephone:      +1 (713) 715-1660
lparkins@parkinslee.com

Ryan C. Wooten
ORRICK, HERRINGTON & SUTCLIFFE LLP
609 Main Street, 40th Floor
Houston, TX, USA 77002
Telephone:      +1 (713) 658-6400
katerranotice@orrick.com

**15.     Request for Attendance or Participation of Judicial Personnel of the Requesting Authority at the Execution of the Letter of Request**

No attendance of judicial personnel is requested.

**16.     Specification or Privilege or Duty to Refuse to Give Evidence under the Law of the State of Origin**

In addition to the privileges applicable under the laws of the United Kingdom, the Court understands that, under the laws of the United States, each of GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie may refuse to produce a document if such document would disclose a confidential communication between him and his attorney(s) in connection with seeking legal advice.

The Court also understands the confidential nature of the documents requested from each of GCUK, GCUK's administrators, Saffery Champness, Mr. Greensill, Mr. Lane, and Mr. Eadie, and there is a Stipulated Confidentiality Agreement and Protective Order (the "Protective Order") in this case to protect the confidentiality of any documents they produce.  The Protective Order is Addendum A to this Letter of Request.

This Court stands ready to extend similar assistance to the judicial tribunals of the United Kingdom.  To the extent that there are expenses associated with providing assistance in response to this Letter of Request, this Court will see that the Appropriate Judicial Authority of the United Kingdom is reimbursed by the Wind-Down Debtors.

**17.     The Fees and Costs Incurred, Which Are Reimbursable under the Second Paragraph of Article 14 or under Article 26 of the Convention, Will Be Borne by:**

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne, jointly and severally, by the Wind-Down Debtors.

## **Conclusion**

In the spirit of comity and reciprocity, and deferring to the judicial authority of the United Kingdom, or other office as is appropriate, as to whether any or all of the specific requests set forth here or in Schedules A to F comply with applicable law or practice or whether any or all should be limited or precluded, this Court hereby requests international judicial assistance in the form of this Letter of Request to obtain from each of Greensill Capital (UK) Limited; Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP, in their capacity as Greensill Capital (UK) Limited's administrators; Saffery Champness LLP; Alexander David Greensill; Jonathan Edward Myott Lane; and Alastair Kenneth Eadie the production of documents responsive to the requests set forth in Schedules A to F, respectively.   This Court expresses its sincere willingness to provide similar assistance to the judicial tribunals of the United Kingdom if future circumstances should require.

Signature and Seal of the Requesting Authority:

**Signed:  January 05, 2022.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**_____, Clerk of Court**

**by**

**Deputy Clerk**

**Seal**

15

**SCHEDULE A**

**REQUESTS FOR PRODUCTION TO GREENSILL CAPITAL (UK) LIMITED**

1.     All of Greensill Parent's and GCUK's board minutes, resolutions, and decisions from January 1, 2019 to March 8, 2021 concerning: (i) the Receivables Arrangement, (ii) the Participation Agreement, (iii) the SoftBank Agreements, (iv) the Katerra Agreements, (v) the Fairymead Notes, and/or (vi) the Wind-Down Debtors.

2.     All Documents shared with or presented to Greensill Parent's or GCUK's board of directors from January 1, 2019 to March 8, 2021 concerning: (i) the Receivables Arrangement, (ii) the Participation Agreement, (iii) the SoftBank Agreements, (iv) the Katerra Agreements, (v) the Fairymead Notes, and/or (vi) the Wind-Down Debtors.

3.     All (i) Documents prepared for or presented at, (ii) minutes of, (iii) resolutions and decisions from, and (iv) communications by Greensill Parent's directors concerning Greensill Parent's December 4, 2020 board of directors meeting.

4.     Any memoranda, presentations, or analysis between August 1, 2020 and March 8, 2021 concerning the Greensill Entities' and their representatives':

      a.     deliberations about, and evaluation whether to enter into, the Katerra Agreements;

      b.     valuation or other analysis of the consideration Greensill Limited gave and received under the Katerra Agreements;

      c.     evaluation whether entering into the Katerra Agreements would cause, or did cause, Greensill Limited to incur actual or potential liabilities; and

      d.     rationale and reasons for entering into the Katerra Agreements.

5.     Alexander David Greensill's communications between August 1, 2020 and March 8, 2021 about topics (a)-(d) in Request No. 4.

6.      Jonathan Lane's communications between August 1, 2020 and March 8, 2021 about topics (a)-(d) in Request No. 4.

7.      Sean Hanafin's communications between August 1, 2020 and March 8, 2021 about topics (a)-(d) in Request No. 4.

8.      Neil Garrod's communications between August 1, 2020 and March 8, 2021 about topics (a)-(d) in Request No. 4.

9.      Any communications between August 1, 2020 and March 8, 2021 from Greensill Parent or GCUK, on the one hand, to Greensill Limited, on the other hand, directing Greensill Limited to enter into the Katerra Agreements, or otherwise concerning Greensill Limited's entry into the Katerra Agreements.

10.     Any memoranda, presentations, or other documents between August 1, 2020 and March 8, 2021 recording the Greensill Entities' and their representatives':

        a.      deliberations about, and evaluation whether to enter into, the SoftBank Agreements;

        b.      valuation or other analysis of the consideration each of the Greensill Entities gave and received under the SoftBank Agreements; and

        c.      rationale and reasons for entering into the SoftBank Agreements.

11.     Alexander David Greensill's communications between August 1, 2020 and March 8, 2021 about topics (a)-(c) in Request No. 10.

12.     Jonathan Lane's communications between August 1, 2020 and March 8, 2021 about topics (a)-(c) in Request No. 10.

13.     Sean Hanafin's communications between August 1, 2020 and March 8, 2021 about topics (a)-(c) in Request No. 10.

14.     Neil Garrod's communications between August 1, 2020 and March 8, 2021 about topics (a)-(c) in Request No. 10.

15.    Any memoranda, presentations, or other Documents, which were shared with or presented to Greensill Parent's or GCUK's management between August 1, 2020 and March 8, 2021, concerning Greensill Parent's and/or GCUK's obligations or responsibilities under Recitals §§ (C) and (D) and section 2.4 of the November 2020 Omnibus Deed.

16.    Any memoranda, presentations, or other Documents, which were shared with or presented to Greensill Parent's or GCUK's management between August 1, 2020 and March 8, 2021, concerning the Greensill Entities' obligations under either (i) section 3 of the November 2020 Omnibus Deed (entitled "Katerra Programme Recoveries") or (ii) section 3 of Schedule 1 to the December 2020 Omnibus Deed (entitled "Katerra Programme Recoveries").

17.    Any Documents created between August 1, 2020 and March 8, 2021 for the purposes of giving effect to or memorializing any agreement by Greensill Limited to be bound by either (i) section 3 of the November 2020 Omnibus Deed (entitled "Katerra Programme Recoveries") or (ii) section 3 of Schedule 1 to the December 2020 Omnibus Deed (entitled "Katerra Programme Recoveries").

18.    Greensill Parent's, GCUK's, and Greensill Limited's credit files for the Receivables Arrangement.

19.    To the extent Greensill Parent, GCUK, and/or Greensill Limited did not maintain a credit file in response to Request No. 18, any credit-risk analysis or reports on the Receivables Arrangement, including of the value of the receivables thereunder as of December 30, 2020.

20.    Any Documents presented to the Greensill Entities' credit committee (or its equivalent) concerning the Receivables Arrangement.

21.    Any memoranda, presentations, or other Documents created between January 1, 2020 and March 8, 2021 concerning the expected amounts payable by GCUK or its affiliates

pursuant to the CDS Greensill First Loss 2020 – 2021, referenced at section 1.1(a) in the November 2020 Omnibus Deed.

22.     Ledgers and bank statements showing (i) the Greensill Entities' receipt of $440 million pursuant to the Convertible Note and (ii) the transfer or use of those funds from on or after November 10, 2020.

23.     Documents created between August 1, 2020 and March 8, 2021 recording GCUK and its affiliates' decision to use or contribute the $440 million received pursuant to the Convertible Note towards Greensill Bank and/or to fund the Greensill Entities' overall operations.

24.     Documents created between August 1, 2020 and March 8, 2021 recording GCUK and its affiliates' decision not to apply the $440 million received pursuant to the Convertible Note towards the Fairymead Notes.

25.     The February 2020 deposit agreement between GCUK and Greensill Parent, and any other agreements between GCUK and Greensill Parent concerning GCUK's receipt of $440 million from the Convertible Note.

26.     Any demands, claims, or assertions of indemnification rights by Greensill Limited against GCUK since August 1, 2020.

27.     Any evaluation or assessment since August 1, 2020 of any potential obligation by GCUK to indemnify Greensill Limited.

28.     All of Greensill Parent's and GCUK's (i) annual and interim audited and unaudited financial statements and (ii) annual reports, each since October 1, 2019.

29.     Any analysis of the value of Greensill Parent's shares as of either November 10, 2020 or December 23, 2020.

30.     Any analysis conducted in GCUK's administration proceedings of when and how GCUK become insolvent, including whether GCUK was insolvent as of December 30, 2020.

31.     Claims filed in GCUK's administration proceedings by (i) other Greensill Entities, (ii) SBG or its affiliates, (iii) Citibank, or (iv) Credit Suisse Asset Management.

32.     Any questionnaires and notes from any interviews that GCUK's administrators or their representatives conducted since March 8, 2021 (i) of Alexander David Greensill, Jonathan Edward Myott Lane, representatives of the Wind-Down Debtors, or representatives of SBG or its affiliates, or (ii) concerning the Katerra Agreements or the SoftBank Agreements.

33.     Communications since July 30, 2021 with Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives concerning claims by, or liabilities of, Greensill Limited, GCUK, and/or Greensill Parent relating to the Contribution Agreement.

## **DEFINITIONS**

1.     "Citibank" means Citibank N.A., London Branch, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2.     "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

3.     "Convertible Note" means the Instrument Constituting US$440,000,000.00 of Unsecured Convertible Loan Notes of Greensill Capital Pty Limited dated November 10, 2020.

4.     "Credit Suisse Asset Management" means Credit Suisse Asset Management (Schweiz) AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any Person or entity that acts, or purports to act, on its behalf.

5.      "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

6.      "Documents" means anything in which information of any description is recorded including without limitation e-mails, paper files, text. and any other types of electronic messages including WhatsApp and other messaging platforms.

7.      "Fairymead Notes" means the notes backed by the interests assigned to Hoffman S.à.r.l. under the the Master Assignment Agreement pursuant to a First Series Supplement, dated December 18, 2019, to a Master Trust Deed, dated October 13, 2017.

8.      "GCUK" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.      "Greensill Bank" means Greensill Bank AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

10.      "Greensill Entities" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

11.      "Greensill Limited" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

12.     "Greensill Parent" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

13.     "Katerra Agreements" means, collectively, the Contribution Agreement and the Transfer Agreement.

14.     "Katerra Cayman" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

15.     "Katerra Delaware" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

16.     "Liquidators" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

17.     "November 2020 Omnibus Deed" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

18.     "Omnibus Deeds" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

19.     "Participation Agreement" means the Participation Agreement dated December 19, 2019 between GCUK and Greensill Limited.

20.     "Receivables Arrangement" means the Receivables Purchase Agreement dated December 9, 2019 among Greensill Limited, Katerra Delaware, and others.

21.     "SBG" means SoftBank Group Corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

22.     "SoftBank Agreements" means, collectively, the Convertible Notes and the Omnibus Deeds.

23.     "Transfer Agreement" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

24.     "Wind-Down Debtors" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

25.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all."  "Any" means "any and all."  "Including" means "including but not limited to."  "And" and "or" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

## SCHEDULE B

### REQUESTS FOR PRODUCTION TO
### GREENSILL CAPITAL (UK) LIMITED'S ADMINISTRATORS

1.      Any demands, claims, or assertions of indemnification rights by Greensill Limited against GCUK since March 8, 2021.

2.      Any evaluation or assessment since March 8, 2021 of any potential obligation by GCUK to indemnify Greensill Limited.

3.      Any analysis created since March 8, 2021 of the value of Greensill Parent's shares as of either November 10, 2020 or December 23, 2020.

4.      Any analysis conducted in GCUK's administration proceedings of when and how GCUK become insolvent, including whether GCUK was insolvent as of December 30, 2020.

5.      Claims filed in GCUK's administration proceedings by (i) other Greensill Entities, (ii) SBG or its affiliates, (iii) Citibank, or (iv) Credit Suisse Asset Management.

6.      Any questionnaires and notes from any interviews that GCUK's administrators or their representatives conducted since March 8, 2021 (i) of Alexander David Greensill, Jonathan Edward Myott Lane, representatives of the Wind-Down Debtors, or representatives of SBG or its affiliates, or (ii) concerning the Katerra Agreements or the SoftBank Agreements.

7.      Communications since July 30, 2021 with Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives concerning claims by, or liabilities of, Greensill Limited, GCUK, or Greensill Parent relating to the Contribution Agreement.

## DEFINITIONS

1.      "Citibank" means Citibank N.A., London Branch, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2.      "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

3.      "Credit Suisse Asset Management" means Credit Suisse Asset Management (Schweiz) AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any Person or entity that acts, or purports to act, on its behalf.

4.      "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

5.      "GCUK" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

6.      "Greensill Entities" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

7.      "Greensill Limited" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

8.    "Greensill Parent" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.    "Katerra Agreements" means, collectively, the Contribution Agreement and the Transfer Agreement.

10.    "Katerra Cayman" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

11.    "Katerra Delaware" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

12.    "Liquidators" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

13.    "November 2020 Omnibus Deed" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

14.    "Omnibus Deeds" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

15.    "Receivables Arrangement" means the Receivables Purchase Agreement dated December 9, 2019 among Greensill Limited, Katerra Delaware, and others.

16.    "SBG" means SoftBank Group Corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

17.     "SoftBank Agreements" means, collectively, the Convertible Notes and the Omnibus Deeds.

18.     "Transfer Agreement" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

19.     "Wind-Down Debtors" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

20.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all."  "Any" means "any and all."  "Including" means "including but not limited to."  "And" and "or" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

## SCHEDULE C

## REQUESTS FOR PRODUCTION TO SAFFERY CHAMPNESS LLP

1.      Greensill Parent's, GCUK's, and Greensill Limited's audited and unaudited financial statements since January 1, 2019, to the extent not publicly available through Companies House.

2.      All of Your auditor's reports of Greensill Parent, GCUK, and Greensill Limited since January 1, 2019.

3.      All of Your audit work papers for Greensill Limited since January 1, 2019 concerning:

   a.      any change in Greensill Limited's assets or liabilities, revenues or expenses, or cash flows, resulting from Greensill Parent and GCUK entering into the Convertible Note and the Omnibus Deeds;

   b.      any change in assets or liabilities, revenues or expenses, or cash flows, resulting from Greensill Limited entering into the Katerra Agreements;

   c.      Greensill Limited's contribution, transfer, and assignment of the Greensill Indebtedness to Katerra Cayman; and

   d.      Greensill Limited's solvency or ability to continue as a going concern since January 1, 2019.

4.      All of Your audit work papers for GCUK since January 1, 2019 concerning:

   a.      Greensill Parent's obligations or responsibilities under Recitals §§ (C) and (D) and section 2.4 of the November 2020 Omnibus Deed;

   b.      GCUK's or Greensill Limited's obligations under section 3 of the November 2020 Omnibus Deed (entitled "Katerra Programme Recoveries");

   c.      GCUK's or Greensill Limited's obligations under section 3 of Schedule 1 to the December 2020 Omnibus Deed (entitled "Katerra Programme Recoveries");

   d.      Greensill Limited's contribution, transfer, and assignment of the Greensill Indebtedness to Katerra Cayman;

   e.      the $440 million received pursuant to the Convertible Note; and

      f.      GCUK's solvency or ability to continue as a going concern.

5.      All journal entries, ledgers, notes, and memoranda that Greensill Limited and GCUK provided to You about topics (a)-(d) in Request No. 3 and topics (a)-(f) in Request No. 4, respectively.

6.      Any communications between August 1, 2020 and March 8, 2021 with the Greensill Entities or their representatives concerning topics (a)-(d) in Request No. 3 and topics (a)-(f) in Request No. 4.

7.      Any communications with Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives since July 30, 2021 concerning either (i) topics (a)-(d) in Request No. 3 and topics (a)-(f) in Request No. 4, or (ii) the Liquidators' claims against the Wind-Down Debtors.

## DEFINITIONS

1.      "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

2.      "Convertible Note" means the Instrument Constituting US$440,000,000.00 of Unsecured Convertible Loan Notes of Greensill Capital Pty Limited dated November 10, 2020.

3.      "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

4.      "Documents" means anything in which information of any description is recorded including without limitation e-mails, paper files, text and any other types of electronic messages including WhatsApp and other messaging platforms.

5.      "GCUK" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2

6.      "Greensill Entities" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

7.      "Greensill Limited" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

8.      "Greensill Parent" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.      "Katerra Agreements" means, collectively, the Contribution Agreement and the Transfer Agreement.

10.      "Katerra Cayman" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

11.      "Katerra Delaware" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

12.      "Liquidators" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

13.      "November 2020 Omnibus Deed" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

14. "<u>Omnibus Deeds</u>" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

15. "<u>Saffery Champness</u>" means Saffery Champness LLP, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

16. "<u>SoftBank Agreements</u>" means, collectively, the Convertible Note and the Omnibus Deeds.

17. "<u>Transfer Agreement</u>" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

18. "<u>Wind-Down Debtors</u>" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

19. "<u>You</u>" or "<u>Your</u>" means Saffery Champness.

20. The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "<u>All</u>" means "any and all."  "<u>Any</u>" means "any and all."  "<u>Including</u>" means "including but not limited to."  "<u>And</u>" and "<u>or</u>" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

## SCHEDULE D

## REQUESTS FOR PRODUCTION TO ALEXANDER DAVID GREENSILL

1.    Documents created between August 1, 2020 and March 8, 2021 concerning:

    a.    deliberations about, and evaluation whether to enter into, the Katerra Agreements;

    b.    valuations or other analyses of the consideration Greensill Limited gave and received under the Katerra Agreements;

    c.    evaluations whether entering into the Katerra Agreements would cause, or did cause, Greensill Limited to incur actual or potential liabilities;

    d.    the rationale and reasons for entering into the Katerra Agreements;

    e.    deliberations about, and evaluation whether to enter into, the SoftBank Agreements;

    f.    valuations or other analyses of the consideration each of the Greensill Entities gave and received under the SoftBank Agreements; and

    g.    the rationale and reasons for entering into the SoftBank Agreements.

2.    Your communications, including personal emails and electronic messages, between August 1, 2020 and June 6, 2021 with the Wind-Down Debtors or their representatives concerning the negotiation of the Katerra Agreements and/or the SoftBank Agreements.

3.    Documents recording Your expectations or understanding on or before December 30, 2020 concerning the intended use of the $440 million that Greensill Parent and/or GCUK received pursuant to the Convertible Note.

4.    Your communications between August 1, 2020 and March 8, 2021 with the Greensill Entities' directors and management concerning the use of the $440 million received pursuant to the Convertible Note.

5.      Any communications since August 1, 2020 between You and Credit Suisse Assessment Management or its representatives, Citibank of its representatives, or any holder of the Fairymead Notes or its representatives concerning the failure to pay the Fairymead Notes.

6.      Any communications since March 8, 2021 with (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.) or their representatives, (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP) or their representatives, or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes, including the claims Greensill Limited's Liquidators have asserted against the Wind-Down Debtors.

7.      Any communications since March 8, 2021 about claims by (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.), (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP), or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) against the Wind-Down Debtors, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

8.      Any documents You have provided voluntarily or produced to Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives since July 30, 2021.

9.      Any agreements between You and Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP).

10.     Copies of any affidavits, declarations, questionnaires, or other witness statements You have executed concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

11.     Any written demands or claims against You arising out of or concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

12.     Any communications concerning the demands or claims referenced in Request No. 11, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

## DEFINITIONS

1.     "Citibank" means Citibank N.A., London Branch, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2.     "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

3.     "Convertible Note" means the Instrument Constituting US$440,000,000.00 of Unsecured Convertible Loan Notes of Greensill Capital Pty Limited dated November 10, 2020.

4.     "Credit Suisse Asset Management" means Credit Suisse Asset Management (Schweiz) AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

5.     "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

6.      "<u>Documents</u>" means anything in which information of any description is recorded including without limitation e-mails, paper files, text and any other types of electronic messages including WhatsApp and other messaging platforms.

7.      "<u>Fairymead Notes</u>" means the notes backed by the interests assigned to Hoffman S.à.r.l. under the the Master Assignment Agreement pursuant to a First Series Supplement, dated December 18, 2019, to a Master Trust Deed, dated October 13, 2017.

8.      "<u>GCUK</u>" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.      "<u>Greensill Bank</u>" means Greensill Bank AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

10.      "<u>Greensill Entities</u>" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

11.      "<u>Greensill Limited</u>" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf

12.      "<u>Greensill Parent</u>" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

13.     "Katerra Agreements" means, collectively, the Contribution Agreement and the Transfer Agreement.

14.     "Katerra Cayman" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

15.     "Katerra Delaware" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

16.     "Liquidators" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

17.     "November 2020 Omnibus Deed" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

18.     "Omnibus Deeds" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

19.     "Receivables Arrangement" means the Receivables Purchase Agreement dated December 9, 2019 among Greensill Limited, Katerra Delaware, and others.

20.     "SBG" means SoftBank Group Corp., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

21.     "SBIA" means SoftBank Investment Advisors, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

22.     "SoftBank Agreements" means, collectively, the Convertible Notes and the Omnibus Deeds.

23.     "SoftBank Entities" means SBG, SBIA, Vision Fund II, SVF II Abode, SVF II Wyatt, and each of their affiliates and subsidiaries, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

24.     "SVF II Abode" means SVF II Abode (Cayman) Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

25.     "SVF II Wyatt" means SVF II Wyatt Subco (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

26.     "Transfer Agreement" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

27.     "Vision Fund II" means SVF II Holdings (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

28.     "Wind-Down Debtors" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

29.     "You" or "Your" means Alexander David Greensill.

30.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "<u>All</u>" means "any and all."  "<u>Any</u>" means "any and all."  "<u>Including</u>" means "including but not limited to."  "<u>And</u>" and "<u>or</u>" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

## SCHEDULE E

## REQUESTS FOR PRODUCTION TO JONATHAN EDWARD MYOTT LANE

1.      Documents created between August 1, 2020 and March 8, 2021 concerning:

   a.      deliberations about, and evaluation whether to enter into, the Katerra Agreements;

   b.      valuations or other analyses of the consideration Greensill Limited gave and received under the Katerra Agreements;

   c.      evaluations whether entering into the Katerra Agreements would cause, or did cause, Greensill Limited to incur actual or potential liabilities;

   d.      the rationale and reasons for entering into the Katerra Agreements;

   e.      deliberations about, and evaluation whether to enter into, the SoftBank Agreements;

   f.      valuations or other analyses of the consideration each of the Greensill Entities gave and received under the SoftBank Agreements; and

   g.      the rationale and reasons for entering into the SoftBank Agreements.

2.      Your communications, including personal emails and electronic messages, between August 1, 2020 and June 6, 2021 with the Wind-Down Debtors or their representatives concerning the negotiation of the Katerra Agreements and/or the SoftBank Agreements.

3.      Documents recording Your expectations or understanding on or before December 30, 2020 concerning the intended use of the $440 million that Greensill Parent and/or GCUK received pursuant to the Convertible Note.

4.      Your communications between August 1, 2020 and March 8, 2021 with the Greensill Entities' directors and management concerning the use of the $440 million received pursuant to the Convertible Note.

1

5. Any communications since August 1, 2020 between You and Credit Suisse Assessment Management or its representatives, Citibank of its representatives, or any holder of the Fairymead Notes or its representatives concerning the failure to pay the Fairymead Notes.

6. Any communications since March 8, 2021 with (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.) or their representatives, (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP) or their representatives, or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes, including the claims Greensill Limited's Liquidators have asserted against the Wind-Down Debtors.

7. Any communications since March 8, 2021 about claims by (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.), (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP), or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) against the Wind-Down Debtors, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

8. Any documents You have provided voluntarily or produced to Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives since July 30, 2021.

9. Any agreements between You and Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP).

10.     Copies of any affidavits, declarations, questionnaires, or other witness statements You have executed concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

11.     Any written demands or claims against You arising out of or concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

12.     Any communications concerning the demands or claims referenced in Request No. 11, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

## DEFINITIONS

1.     "Citibank" means Citibank N.A., London Branch, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2.     "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

3.     "Convertible Note" means the Instrument Constituting US$440,000,000.00 of Unsecured Convertible Loan Notes of Greensill Capital Pty Limited dated November 10, 2020.

4.     "Credit Suisse Asset Management" means Credit Suisse Asset Management (Schweiz) AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

5.     "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

6.      "Documents" means anything in which information of any description is recorded including without limitation e-mails, paper files, text and any other types of electronic messages including WhatsApp and other messaging platforms.

7.      "Fairymead Notes" means the notes backed by the interests assigned to Hoffman S.à.r.l. under the the Master Assignment Agreement pursuant to a First Series Supplement, dated December 18, 2019, to a Master Trust Deed, dated October 13, 2017.

8.      "GCUK" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.      "Greensill Bank" means Greensill Bank AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

10.      "Greensill Entities" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

11.      "Greensill Limited" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf

12.      "Greensill Parent" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

13.    "<u>Katerra Agreements</u>" means, collectively, the Contribution Agreement and the Transfer Agreement.

14.    "<u>Katerra Cayman</u>" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

15.    "<u>Katerra Delaware</u>" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

16.    "<u>Liquidators</u>" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

17.    "<u>November 2020 Omnibus Deed</u>" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

18.    "<u>Omnibus Deeds</u>" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

19.    "<u>Receivables Arrangement</u>" means the Receivables Purchase Agreement dated December 9, 2019 among Greensill Limited, Katerra Delaware, and others.

20.    "<u>SBG</u>" means SoftBank Group Corp., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

21.    "<u>SBIA</u>" means SoftBank Investment Advisors, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

22.     "SoftBank Agreements" means, collectively, the Convertible Notes and the Omnibus Deeds.

23.     "SoftBank Entities" means SBG, SBIA, Vision Fund II, SVF II Abode, SVF II Wyatt, and each of their affiliates and subsidiaries, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

24.     "SVF II Abode" means SVF II Abode (Cayman) Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

25.     "SVF II Wyatt" means SVF II Wyatt Subco (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

26.     "Transfer Agreement" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

27.     "Vision Fund II" means SVF II Holdings (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

28.     "Wind-Down Debtors" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

29.     "You" or "Your" means Jonathan Edward Myott Lane.

30.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "<u>All</u>" means "any and all."  "<u>Any</u>" means "any and all."  "<u>Including</u>" means "including but not limited to."  "<u>And</u>" and "<u>or</u>" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

## SCHEDULE F

## REQUESTS FOR PRODUCTION TO ALASTAIR KENNETH EADIE

1.      Documents created between August 1, 2020 and March 8, 2021 concerning:

   a.      deliberations about, and evaluation whether to enter into, the Katerra Agreements;

   b.      valuations or other analyses of the consideration Greensill Limited gave and received under the Katerra Agreements;

   c.      evaluations whether entering into the Katerra Agreements would cause, or did cause, Greensill Limited to incur actual or potential liabilities;

   d.      the rationale and reasons for entering into the Katerra Agreements;

   e.      deliberations about, and evaluation whether to enter into, the SoftBank Agreements;

   f.      valuations or other analyses of the consideration each of the Greensill Entities gave and received under the SoftBank Agreements; and

   g.      the rationale and reasons for entering into the SoftBank Agreements.

2.      Your communications, including personal emails and electronic messages, between August 1, 2020 and June 6, 2021 with the Wind-Down Debtors or their representatives concerning the negotiation of the Katerra Agreements and/or the SoftBank Agreements.

3.      Documents recording Your expectations or understanding on or before December 30, 2020 concerning the intended use of the $440 million that Greensill Parent and/or GCUK received pursuant to the Convertible Note.

4.      Your communications between August 1, 2020 and March 8, 2021 with the Greensill Entities' directors and management concerning the use of the $440 million received pursuant to the Convertible Note.

1

5.      Any communications since August 1, 2020 between You and Credit Suisse Assessment Management or its representatives, Citibank of its representatives, or any holder of the Fairymead Notes or its representatives concerning the failure to pay the Fairymead Notes.

6.      Any communications since March 8, 2021 with (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.) or their representatives, (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP) or their representatives, or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes, including the claims Greensill Limited's Liquidators have asserted against the Wind-Down Debtors.

7.      Any communications since March 8, 2021 about claims by (i) Greensill Parent's liquidators (Matthew J. Byrnes, Philip Campbell-Wilson, and Michael G. McCann of Grant Thornton Australia Ltd.), (ii) GCUK's administrators (Christine M. Laverty, Trevor P. O'Sullivan, and Will Stagg of Grant Thornton UK LLP), or (iii) Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) against the Wind-Down Debtors, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

8.      Any documents You have provided voluntarily or produced to Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP) or their representatives since July 30, 2021.

9.      Any agreements between You and Greensill Limited's Liquidators (Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP).

10.     Copies of any affidavits, declarations, questionnaires, or other witness statements You have executed concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

11.     Any written demands or claims against You arising out of or concerning the Receivables Arrangement, the Contribution Agreement, the Transfer Agreement, or the Fairymead Notes.

12.     Any communications concerning the demands or claims referenced in Request No. 11, except insofar as such documents are subject to legal professional privilege under the applicable laws of England and Wales or the United States.

## DEFINITIONS

1.     "Citibank" means Citibank N.A., London Branch, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

2.     "Contribution Agreement" means the Contribution and Exchange Agreement dated December 30, 2020 among Greensill Limited, Katerra Cayman, and Katerra Delaware.

3.     "Convertible Note" means the Instrument Constituting US$440,000,000.00 of Unsecured Convertible Loan Notes of Greensill Capital Pty Limited dated November 10, 2020.

4.     "Credit Suisse Asset Management" means Credit Suisse Asset Management (Schweiz) AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

5.     "December 2020 Omnibus Deed" shall mean the Amendment Deed dated December 23, 2020, among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

6.      "<u>Documents</u>" means anything in which information of any description is recorded including without limitation e-mails, paper files, text and any other types of electronic messages including WhatsApp and other messaging platforms.

7.      "<u>Fairymead Notes</u>" means the notes backed by the interests assigned to Hoffman S.à.r.l. under the the Master Assignment Agreement pursuant to a First Series Supplement, dated December 18, 2019, to a Master Trust Deed, dated October 13, 2017.

8.      "<u>GCUK</u>" means Greensill Capital (UK) Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

9.      "<u>Greensill Bank</u>" means Greensill Bank AG, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

10.      "<u>Greensill Entities</u>" means Greensill Parent, GCUK, and each of their affiliates and subsidiaries, including but not limited to Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

11.      "<u>Greensill Limited</u>" means Greensill Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf

12.      "<u>Greensill Parent</u>" means Greensill Capital Pty Limited, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

13.     "Katerra Agreements" means, collectively, the Contribution Agreement and the Transfer Agreement.

14.     "Katerra Cayman" means Katerra Inc., an exempted company incorporated with limited liability in the Cayman Islands, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

15.     "Katerra Delaware" means Katerra Inc., a Delaware corporation, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

16.     "Liquidators" means Greensill Limited's joint liquidators, Andrew Charters and Sarah O'Toole of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG.

17.     "November 2020 Omnibus Deed" shall mean the Omnibus Deed dated November 10, 2020 among Greensill Parent, GCUK, SoftBank Group Corporation, and others.

18.     "Omnibus Deeds" shall mean, collectively, the November 2020 Omnibus Deed and the December 2020 Omnibus Deed.

19.     "Receivables Arrangement" means the Receivables Purchase Agreement dated December 9, 2019 among Greensill Limited, Katerra Delaware, and others.

20.     "SBG" means SoftBank Group Corp., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

21.     "SBIA" means SoftBank Investment Advisors, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

22.     "SoftBank Agreements" means, collectively, the Convertible Notes and the Omnibus Deeds.

23.     "SoftBank Entities" means SBG, SBIA, Vision Fund II, SVF II Abode, SVF II Wyatt, and each of their affiliates and subsidiaries, and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on each one's behalf.

24.     "SVF II Abode" means SVF II Abode (Cayman) Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

25.     "SVF II Wyatt" means SVF II Wyatt Subco (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

26.     "Transfer Agreement" means the Transfer Agreement dated December 30, 2020 between Greensill Limited and SVF II Abode (Cayman) Limited.

27.     "Vision Fund II" means SVF II Holdings (Singapore) Pte. Ltd., and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on its behalf.

28.     "Wind-Down Debtors" means Katerra Cayman and its affiliated debtors in the case captioned *In re Katerra Inc.*, Case No. 21-31861 (U.S. Bankruptcy Court for the Southern District of Texas), and any and all agents, employees, representatives, consultants, attorneys, predecessors, successors, and/or any person or entity that acts, or purports to act, on their behalf.

29.     "You" or "Your" means Alastair Kenneth Eadie.

30.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "<u>All</u>" means "any and all."  "<u>Any</u>" means "any and all."  "<u>Including</u>" means "including but not limited to."  "<u>And</u>" and "<u>or</u>" encompasses both "and" and "or."  Words in the masculine, feminine, or neutral shall include each of the other genders.

# Exhibit 2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 03, 2021

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
| | ) | |
| Wind-Down Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

### ORDER DIRECTING
### ISSUANCE OF LETTER OF REQUEST UNDER THE HAGUE CONVENTION
(Docket No. 1516)

Upon the motion (the "Motion")[2] of Daniel R. Williams of JS Held, LLC (the "Plan Administrator"), the Plan Administrator for the above-captioned debtors and debtors in possession (collectively, the "Wind-Down Debtors") for entry of an order (this "Order") directing the issuance of a Letter of Request under the Hague Convention; and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Wind-Down Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Plan Administrator's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having determined that just cause for the relief granted herein exists; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

---

[1] A complete list of each of the Wind-Down Debtors in these chapter 11 cases may be obtained on the website of the Wind-Down Debtors' claims and noticing agent at https://cases.primeclerk.com/katerra. The Wind-Down Debtors' service address in these chapter 11 cases is 3101 N. Central Ave., Ste. 670, Phoenix, AZ 85012.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Motion.

1.      The Wind-Down Debtors' proposed Letter of Request pursuant to the Hague Convention is certified and issued to the designated Central Authority for England & Wales, and the Court will execute the Wind-Down Debtors' proposed Letter of Request.

2.      The Clerk of this Court shall (a) apply the seal of the Court to the Letter of Request, and (b) file a copy of the Letter of Request in the docket of the above-captioned matter.

3.      The Wind-Down Debtors shall initiate the necessary proceedings in the United Kingdom to effectuate the Letter of Request.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Wind-Down Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Signed:  December 03, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# **Exhibit 3**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 06, 2021

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
|  | ) |  |
| Wind-Down Debtors. | ) | (Jointly Administered) |
|  | ) | (Emergency Hearing Requested) |

## ORDER DIRECTING
## ISSUANCE OF LETTER OF REQUEST UNDER THE HAGUE CONVENTION

Upon the motion (the "Motion")[2] of Daniel R. Williams of JS Held, LLC (the "Plan Administrator"), the Plan Administrator for the above-captioned debtors and debtors in possession (collectively, the "Wind-Down Debtors") for entry of an order (this "Order") *directing the issuance of a Letter of Request under the Hague Convention*; and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the *relief* requested in the Motion is in the best interests of the Wind-Down Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Plan Administrator's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having determined that just cause for the relief granted herein exists; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

---

[1]    A complete list of each of the Wind-Down Debtors in these chapter 11 cases may be obtained on the website of the Wind-Down Debtors' claims and noticing agent at https://cases.primeclerk.com/katerra. The Wind-Down Debtors' service address in these chapter 11 cases is 3101 N. Central Ave., Ste. 670, Phoenix, AZ 85012.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Motion.

1.      The Wind-Down Debtors' proposed Letter of Request pursuant to the Hague Convention is certified and issued to the designated Central Authority for England & Wales, and the Court will execute the Wind-Down Debtors' proposed Letter of Request.

2.      The Clerk of this Court shall (a) apply the seal of the Court to the Letter of Request, and (b) file a copy of the Letter of Request in the docket of the above-captioned matter.

3.      The Wind-Down Debtors shall initiate the necessary proceedings in the United Kingdom to effectuate the Letter of Request.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Wind-Down Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: December 6 , 2021

The Honorable David R. Jones
Chief United States Bankruptcy Judge

# **<u>Exhibit 4</u>**

---

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part V. Procedure
            Chapter 117. Evidence; Depositions (Refs & Annos)

28 U.S.C.A. § 1781

## § 1781. Transmittal of letter rogatory or request

Currentness

**(a)** The Department of State has power, directly, or through suitable channels--

**(1)** to receive a letter rogatory issued, or request made, by a foreign or international tribunal, to transmit it to the tribunal, officer, or agency in the United States to whom it is addressed, and to receive and return it after execution; and

**(2)** to receive a letter rogatory issued, or request made, by a tribunal in the United States, to transmit it to the foreign or international tribunal, officer, or agency to whom it is addressed, and to receive and return it after execution.

**(b)** This section does not preclude--

**(1)** the transmittal of a letter rogatory or request directly from a foreign or international tribunal to the tribunal, officer, or agency in the United States to whom it is addressed and its return in the same manner; or

**(2)** the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner.

### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 949; Pub.L. 88-619, § 8(a), Oct. 3, 1964, 78 Stat. 996.)

### TREATIES AND CONVENTIONS

CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The States signatory to the present Convention,

Desiring to facilitate the transmission and execution of Letters of Request and to further the accommodation of the different methods which they use for this purpose.

Desiring to improve mutual judicial co-operation in civil or commercial matters.

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions--

CHAPTER I--LETTERS OF REQUEST

Article 1

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.

A Letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated.

The expression "other judicial act" does not cover the service of judicial documents or the issuance of any process by which judgments or orders are executed or enforced, or orders for provisional or protective measures.

Article 2

A Contracting State shall designate a Central Authority which will undertake to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them. Each State shall organize the Central Authority in accordance with its own law.

Letters shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State.

Article 3

A Letter of Request shall specify--

**(a)** the authority requesting its execution and the authority requested to execute it, if known to the requesting authority;

**(b)** the names and addresses of the parties to the proceedings and their representatives, if any;

**(c)** the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto;

**(d)** the evidence to be obtained or other judicial act to be performed.

Where appropriate, the Letter shall specify, inter alia--

**(e)** the names and addresses of the persons to be examined;

**(f)** the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined;

**(g)** the documents or other property, real or personal, to be inspected;

**(h)** any requirement that the evidence is to be given on oath or affirmation, and any special form to be used;

**(i)** any special method or procedure to be followed under Article 9.

A Letter may also mention any information necessary for the application of Article 11.

No legalization or other like formality may be required.

Article 4

A Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language.

Nevertheless, a Contracting State shall accept a Letter in either English or French, or a translation into one of these languages, unless it has made the reservation authorized by Article 33.

A Contracting State which has more than one official language and cannot, for reasons of internal law, accept Letters in one of these languages for the whole of its territory, shall, by declaration, specify the language in which the Letter or translation thereof shall be expressed for execution in the specified parts of its territory. In case of failure to comply with this declaration, without justifiable excuse, the costs of translation into the required language shall be borne by the State of origin.

A Contracting State may, by declaration, specify the language or languages other than those referred to in the preceding paragraphs, in which a Letter may be sent to its Central Authority.

Any translation accompanying a Letter shall be certified as correct, either by a diplomatic officer or consular agent or by a sworn translator or by any other person so authorized in either State.

Article 5

If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.

Article 6

If the authority to whom a Letter of Request has been transmitted is not competent to execute it, the Letter shall be sent forthwith to the authority in the same State which is competent to execute it in accordance with the provisions of its own law.

Article 7

The requesting authority shall, if it so desires, be informed of the time when, and the place where, the proceedings will take place, in order that the parties concerned, and their representatives, if any, may be present. This information shall be sent directly to the parties or their representatives when the authority of the State of origin so requests.

Article 8

A Contracting State may declare that members of the judicial personnel of the requesting authority of another Contracting State may be present at the execution of a Letter of Request. Prior authorization by the competent authority designated by the declaring State may be required.

Article 9

The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.

However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.

A Letter of Request shall be executed expeditiously.

Article 10

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.

Article 11

In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence--

**(a)** under the law of the State of execution; or

**(b)** under the law of the State of origin, and the privilege or duty has been specified in the Letter, or, at the instance of the requested authority, has been otherwise confirmed to that authority by the requesting authority.

A Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State of origin and the State of execution, to the extent specified in that declaration.

Article 12

The execution of a Letter of Request may be refused only to the extent that--

**(a)** in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or

**(b)** the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.

Article 13

The documents establishing the execution of the Letter of Request shall be sent by the requested authority to the requesting authority by the same channel which was used by the latter.

In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed immediately through the same channel and advised of the reasons.

Article 14

The execution of the Letter of Request shall not give rise to any reimbursement of taxes or costs of any nature.

Nevertheless, the State of execution has the right to require the State of origin to reimburse the fees paid to experts and interpreters and the costs occasioned by the use of a special procedure requested by the State of origin under Article 9, paragraph 2.

The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

CHAPTER II--TAKING OF EVIDENCE BY DIPLOMATIC OFFICERS, CONSULAR AGENTS AND COMMISSIONERS

Article 15

In a civil or commercial matter, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents.

A Contracting State may declare that evidence may be taken by a diplomatic officer or consular agent only if permission to that effect is given upon application made by him or on his behalf to the appropriate authority designated by the declaring State.

Article 16

A diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, also take the evidence, without compulsion, of nationals of the State in which he exercises his functions or of a third State, in aid of proceedings commenced in the courts of a State which he represents, if--

**(a)** a competent authority designated by the State in which he exercises his functions has given its permission either generally or in the particular case, and

**(b)** he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

Article 17

In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if--

**(a)** a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and

**(b)** he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

Article 18

A Contracting State may declare that a diplomatic officer, consular agent or commissioner authorized to take evidence under Articles 15, 16 or 17, may apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion. The declaration may contain such conditions as the declaring State may see fit to impose.

If the authority grants the application it shall apply any measures of compulsion which are appropriate and are prescribed by its law for use in internal proceedings.

Article 19

The competent authority, in giving the permission referred to in Articles 15, 16 or 17, or in granting the application referred to in Article 18, may lay down such conditions as it deems fit, *inter alia*, as to the time and place of the taking of the evidence. Similarly it may require that it be given reasonable advance notice of the time, date and place of the taking of the evidence; in such a case a representative of the authority shall be entitled to be present at the taking of the evidence.

Article 20

In the taking of evidence under any Article of this Chapter persons concerned may be legally represented.

Article 21

Where a diplomatic officer, consular agent or commissioner is authorized under Articles 15, 16 or 17 to take evidence--

**(a)** he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;

**(b)** a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;

**(c)** the request shall inform the person that he may be legally represented and, in any State that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;

**(d)** the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;

**(e)** a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

Article 22

The fact that an attempt to take evidence under the procedure laid down in this Chapter has failed, owing to the refusal of a person to give evidence, shall not prevent an application being subsequently made to take the evidence in accordance with Chapter I.

CHAPTER III--GENERAL CLAUSES

Article 23

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pretrial discovery of documents as known in Common Law countries.

Article 24

A Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence. However, Letters of Request may in all cases be sent to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

Article 25

A Contracting State which has more than one legal system may designate the authorities of one of such systems, which shall have exclusive competence to execute Letters of Request pursuant to this Convention.

Article 26

A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

Article 27

The provisions of the present Convention shall not prevent a Contracting State from--

**(a)** declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;

**(b)** permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;

**(c)** permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

Article 28

The present Convention shall not prevent an agreement between any two or more Contracting States to derogate from--

**(a)** the provisions of Article 2 with respect to methods of transmitting Letters of Request;

**(b)** the provisions of Article 4 with respect to the languages which may be used;

**(c)** the provisions of Article 8 with respect to the presence of judicial personnel at the execution of Letters;

**(d)** the provisions of Article 11 with respect to the privileges and duties of witnesses to refuse to give evidence;

**(e)** the provisions of Article 13 with respect to the methods of returning executed Letters to the requesting authority;

**(f)** the provisions of Article 14 with respect to fees and costs;

**(g)** the provisions of Chapter II.

Article 29

Between Parties to the present Convention who are also Parties to one or both of the Conventions on Civil Procedure signed at the Hague on the 17th of July 1905 [99 British Foreign and State Papers 990] and the 1st of March 1954 [286 UNTS 265], this Convention shall replace Articles 8-16 of the earlier Conventions.

Article 30

The present Convention shall not affect the application of Article 23 of the Convention of 1905, or of Article 24 of the Convention of 1954.

Article 31

Supplementary Agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention unless the Parties have otherwise agreed.

Article 32

Without prejudice to the provisions of Articles 29 and 31, the present Convention shall not derogate from conventions containing provisions on the matters covered by this Convention to which the Contracting States are, or shall become Parties.

Article 33

A State may, at the time of signature, ratification or accession exclude, in whole or in part, the application of the provisions of paragraph 2 of Article 4 and of Chapter II. No other reservation shall be permitted.

Each Contracting State may at any time withdraw a reservation it has made; the reservation shall cease to have effect on the sixtieth day after notification of the withdrawal.

When a State has made a reservation, any other State affected thereby may apply the same rule against the reserving State.

Article 34

A State may at any time withdraw or modify a declaration.

Article 35

A Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the designation of authorities, pursuant to Articles 2, 8, 24 and 25.

A Contracting State shall likewise inform the Ministry, where appropriate, of the following--

**(a)** the designation of the authorities to whom notice must be given, whose permission may be required, and whose assistance may be invoked in the taking of evidence by diplomatic officers and consular agents, pursuant to Articles 15, 16 and 18 respectively;

**(b)** the designation of the authorities whose permission may be required in the taking of evidence by commissioners pursuant to Article 17 and of those who may grant the assistance provided for in Article 18;

**(c)** declarations pursuant to Articles 4, 8, 11, 15, 16, 17, 18, 23 and 27;

**(d)** any withdrawal or modification of the above designations and declarations;

**(e)** the withdrawal of any reservation.

Article 36

Any difficulties which may arise between Contracting States in connection with the operation of this Convention shall be settled through diplomatic channels.

Article 37

The present Convention shall be open for signature by the States represented at the Eleventh Session of the Hague Conference on Private International Law.

It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

Article 38

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 37.

The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

Article 39

Any State not represented at the Eleventh Session of the Hague Conference on Private International Law which is a Member of this Conference or of the United Nations or of a specialized agency of that Organization, or a Party to the Statute of the International Court of Justice may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 38.

The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for a State acceding to it on the sixtieth day after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the sixtieth day after the deposit of the declaration of acceptance.

Article 40

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph.

Article 41

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 38, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 42

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 37, and to the States which have acceded in accordance with Article 39, of the following--

**(a)** the signatures and ratifications referred to in Article 37;

**(b)** the date on which the present Convention enters into force in accordance with the first paragraph of Article 38;

**(c)** the accessions referred to in Article 39 and the dates on which they take effect;

**(d)** the extensions referred to in Article 40 and the dates on which they take effect;

**(e)** the designations, reservations and declarations referred to in Articles 33 and 35;

**(f)** the denunciations referred to in the third paragraph of Article 41.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto, have signed the present Convention.

DONE at The Hague, on the 18th day of March 1970, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Eleventh Session of the Hague Conference on Private International Law. [Signatures omitted.]

_____

Convention on the taking of evidence abroad in civil or commercial matters. Done at The Hague March 18, 1970; entered into force for the United States October 7, 1972. TIAS 7444; 23 UST 2555

**Annotations to the Convention**

"Report of the U.S. Delegation on the Evidence Convention", 8 Int'l Legal Materials 804 (1969).

Amram, "Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil and Commercial Matters--Message from the President of the United States", Sen.Exec. A, 92nd Cong., 2d Sess. (Feb. 1, 1972).

Edwards, "Taking of Evidence Abroad in Civil or Commercial Matters", 18 Int'l and Comp.L.Q. 646 (1969).

Amram, "U.S. Ratification of the Hague Convention on the Taking of Evidence Abroad" 67 Am.J. Int'l L. 104 (1973).

_____

Model for Letters of Request Recommended for Use in Applying the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters

Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence in Civil or Commercial Matters

> <N.B. Under the first paragraph of article 4, the Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language. However, the provisions of the second and third paragraphs may permit use of other languages.>

> <In order to avoid confusion, please spell out the name of the month in each date.>

I.      *(Items to be included in all Letters of Request.)*

1.      Sender                          _____*(identity and address)*....................................................

2.      Central Authority of the

        Requested State                 _____*(identity and address)*....................................................

3.      Person to whom the execut-

        ed request is to be returned    _____*(identity and address)*....................................................

II.     *(Items to be included in all Letters of Request.)*

4.      In conformity with article 3 of the Convention, the undersigned applicant has the honour to submit the following request:

5.      a.      Requesting judicial au-

                thority (article 3, a)  _____*(identity and address)*....................................................

        b.      To the competent au-

thority of (article 3, a)                         _____(the requested State).......................................................

6.      Names and addresses of the

parties and their represen-

tatives (article 3, b)

        a.      Plaintiff

        b.      Defendant

        c.      Other parties

7.      Nature and purpose of the

proceedings and summary

of the facts (article 3, c)

8.      Evidence to be obtained or

other judicial act to be per-

formed (article 3, d)

III.    *(Items to be completed where applicable.)*

9.      Identity and address of any

person to be examined (article

3, e)

10.     Questions to be put to the

persons to be examined or

statement of the subject-                         _____(or see attached list)....................................................

matter about which they

are to be examined (article 3, f)

11.     Documents or other proper-

ty to be inspected (article                       _____(specify whether it is to be

3, g)                                             *produced, copied, valued, etc.)*.......................................................

12.     Any requirement that the

evidence be given on oath                         _____(In the event that the evi-

or affirmation and any spe-                       *dence cannot be taken in the man-*

cial form to be used (article                     *ner requested, specify whether it*

3, h)                                              *is to be taken in such manner as*

*provided by local law for the form-*

*al taking of evidence.)*..........................................................

13.    Special methods or proce-
       dure to be followed (arti-
       cles 3, i and 9)

14.    Request for notification of
       the time and place for the
       execution of the Request
       and identity and address
       of any person to be notified
       (article 7)

15.    Request for attendance or
       participation of judicial
       personnel of the requesting
       authority at the execution
       of the letter of Request

16.    Specification of privilege
       or duty to refuse to give
       evidence under the law of
       the State of origin (article
       11, b)

17.    The fees and costs incurred
       which are reimbursable un-          _____*(identity and address)*..................................................
       der the second paragraph
       of article 14 or under arti-
       cle 26 of the Convention
       will be borne by

IV.    *(Items to be included in all Letters of Request.)*

18.    Date of request

19.    Signature and seal of the

        requesting authority

### TREATIES AND CONVENTIONS

INTER-AMERICAN CONVENTION ON LETTERS ROGATORY

The Governments of the Member States of the Organization of American States, desirous of concluding a convention on letters rogatory, have agreed as follows:

I. USE OF TERMS

Article 1

For the purposes of this Convention the terms "exhortos" and "cartas rogatorias" are synonymous in the Spanish text. The terms "letters rogatory", "commissions rogatoires", and "cartas rogatórias" used in the English, French and Portuguese texts, respectively, cover both "exhortos" and "cartas rogatorias".

II. SCOPE OF THE CONVENTION

Article 2

This Convention shall apply to letters rogatory, issued in conjunction with proceedings in civil and commercial matters held before the appropriate judicial or other adjudicatory authority of one of the States Parties to this Convention, that have as their purpose:

a. The performance of procedural acts of a merely formal nature, such as service of process, summonses or subpoenas abroad;

b. The taking of evidence and the obtaining of information abroad, unless a reservation is made in this respect.

Article 3

This Convention shall not apply to letters rogatory relating to procedural acts other than those specified in the preceding article; and in particular it shall not apply to acts involving measures of compulsion.

III. TRANSMISSION OF LETTERS ROGATORY

Article 4

Letters rogatory may be transmitted to the authority to which they are addressed by the interested parties, through judicial channels, diplomatic or consular agents, or the Central Authority of the State of origin or of the State of destination, as the case may be.

Each State Party shall inform the General Secretariat of the Organization of American States of the Central Authority competent to receive and distribute letters rogatory.

## IV. REQUIREMENTS FOR EXECUTION

Article 5

Letters rogatory shall be executed in the States Parties provided they meet the following requirements:

a. The letter rogatory is legalized, except as provided for in Articles 6 and 7 of this Convention. The letter rogatory shall be presumed to be duly legalized in the State of origin when legalized by the competent consular or diplomatic agent;

b. The letter rogatory and the appended documentation are duly translated into the official language of the State of destination.

Article 6

Whenever letters rogatory are transmitted through consular or diplomatic channels or through the Central Authority, legalization shall not be required.

Article 7

Courts in border areas of the States Parties may directly execute the letters rogatory contemplated in this Convention and such letters shall not require legalization.

Article 8

Letters rogatory shall be accompanied by the following documents to be delivered to the person on whom process, summons or subpoena is being served:

a. An authenticated copy of the complaint with its supporting documents, and of other exhibits or rulings that serve as the basis for the measure requested;

b. Written information identifying the judicial or other adjudicatory authority issuing the letter, indicating the time-limits allowed the person affected to act upon the request, and warning of the consequences of failure to do so;

c. Where appropriate, information on the existence and address of the court-appointed defense counsel or of competent legal-aid societies in the State of origin.

Article 9

Execution of letters rogatory shall not imply ultimate recognition of the jurisdiction of the judicial or other adjudicatory authority issuing the letter rogatory or a commitment to recognize the validity of the judgment it may render or to execute it.

## V. EXECUTION

Article 10

Letters rogatory shall be executed in accordance with the laws and procedural rules of the State of destination.

At the request of the judicial or other adjudicatory authority issuing the letter rogatory, the authority of the State of destination may execute the letter through a special procedure, or accept the observance of additional formalities in performing the act requested, provided this procedure or the observance of those formalities is not contrary to the law of the State of destination.

Article 11

The authority of the State of destination shall have jurisdiction to determine any issue arising as a result of the execution of the measure requested in the letter rogatory.

Should such authority find that it lacks jurisdiction to execute the letter rogatory, it shall ex officio forward the documents and antecedents of the case to the authority of the State which has jurisdiction.

Article 12

The costs and other expenses involved in the processing and execution of letters rogatory shall be borne by the interested parties.

The State of destination may, in its discretion, execute a letter rogatory that does not indicate the person to be held responsible for costs and other expenses when incurred. The identity of the person empowered to represent the applicant for legal purposes may be indicated in the letter rogatory or in the documents relating to its execution.

The effects of a declaration in forma pauperis shall be regulated by the law of the State of destination.

Article 13

Consular or diplomatic agents of the States Parties to this Convention may perform the acts referred to in Article 2 in the State in which they are accredited, provided the performance of such acts is not contrary to the laws of that State. In so doing, they shall not perform any acts involving measures of compulsion.

VI. GENERAL PROVISIONS

Article 14

States Parties belonging to economic integration systems may agree directly between themselves upon special methods and procedures more expeditious than those provided for in this Convention. These agreements may be extended to include other States in the manner in which the parties may agree.

Article 15

This Convention shall not limit any provisions regarding letters rogatory in bilateral or multilateral agreements that may have been signed or may be signed in the future by the States Parties or preclude the continuation of more favorable practices in this regard that may be followed by these States.

Article 16

The States Parties to this Convention may declare that its provisions cover the execution of letters rogatory in criminal, labor, and "contentious-administrative" cases, as well as in arbitrations and other matters within the jurisdiction of special courts. Such declarations shall be transmitted to the General Secretariat of the Organization of American States.

Article 17

The State of destination may refuse to execute a letter rogatory that is manifestly contrary to its public policy ("ordre public").

Article 18

The States Parties shall inform the General Secretariat of the Organization of American States of the requirements stipulated in their laws for the legalization and the translation of letters rogatory.

VII. FINAL PROVISIONS

Article 19

This Convention shall be open for signature by the Member States of the Organization of American States.

Article 20

This Convention is subject to ratification. The instruments of ratification shall be deposited with the General Secretariat of the Organization of American States.

Article 21

This Convention shall remain open for accession by any other State. The instrument of accession shall be deposited with the General Secretariat of the Organization of American States.

Article 22

This Convention shall enter into force on the thirtieth day following the date of deposit of the second instrument of ratification.

For each State ratifying or acceding to the Convention after the deposit of the second instrument of ratification, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

Article 23

If a State Party has two or more territorial units in which different systems of law apply in relation to the matters dealt with in this Convention, it may, at the time of signature, ratification or accession, declare that this Convention shall extend to all its territorial units or only to one or more of them.

Such declaration may be modified by subsequent declarations, which shall expressly indicate the territorial unit or units to which the Convention applies. Such subsequent declarations shall be transmitted to the General Secretariat of the Organization of American States, and shall become effective thirty days after the date of their receipt.

Article 24

This Convention shall remain in force indefinitely, but any of the States Parties may denounce it. The instrument of denunciation shall be deposited with the General Secretariat of the Organization of American States. After one year from the date of deposit of the instrument of denunciation, the Convention shall no longer be in effect for the denouncing State, but shall remain in effect for the other States Parties.

Article 25

The original instrument of this Convention, the English, French, Portuguese and Spanish texts of which are equally authentic, shall be deposited with the General Secretariat of the Organization of American States. The Secretariat shall notify the Member

States of the Organization of American States and the States that have acceded to the Convention of the signatures, deposits of instruments of ratification, accession, and denunciation as well as of reservations, if any. It shall also transmit the information mentioned in the second paragraph of Article 4 and in Article 18 and the declarations referred to in Articles 16 and 23 of this Convention.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Convention.

DONE AT PANAMA CITY, Republic of Panama, this thirtieth day of January one thousand nine hundred and seventy-five.

[Signatures omitted]

_____

Inter-American Convention on Letters Rogatory.

Done at Panama January 30, 1975; entered into force for the United States August 27, 1988.

ADDITIONAL PROTOCOL TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY

The Governments of the Member States of the Organization of American States, desirous of strengthening and facilitating international cooperation in judicial procedures as provided for in the Inter-American Convention on Letters Rogatory done in Panama on January 30, 1975, have agreed as follows:

I. SCOPE OF PROTOCOL

Article 1

This Protocol shall apply only to those procedural acts set forth in Article 2(a) of the Inter-American Convention on Letters Rogatory, hereinafter referred to as "the Convention". For the purposes of this Protocol, such acts shall be understood to mean procedural acts (pleadings, motions, orders, and subpoenas) that are served and requests for information that are made by a judicial or other adjudicatory authority of a State Party to a judicial or administrative authority of another State Party and are transmitted by a letter rogatory from the Central Authority of the State of origin to the Central Authority of the State of destination.

II. CENTRAL AUTHORITY

Article 2

Each State Party shall designate a central authority that shall perform the functions assigned to it in the Convention and in this Protocol. At the time of deposit of their instruments of ratification or accession to this Protocol, the States Parties shall communicate the designations to the General Secretariat of the Organization of American States, which shall distribute to the States Parties to the Convention a list containing the designations received. The Central Authority designated by a State Party in accordance with Article 4 of the Convention may be changed at any time. The State Party shall inform the above-mentioned Secretariat of such change as promptly as possible.

III. PREPARATION OF LETTERS ROGATORY

Article 3

Letters rogatory shall be prepared on forms that are printed in the four official languages of the Organization of American States or in the languages of the State of origin and of the State of destination and conform to Form A contained in the Annex to this Protocol.

Letters rogatory shall be accompanied by the following:

a. Copy of the complaint or pleading that initiated the action in which the letter rogatory was issued, as well as a translation thereof into the language of the State of destination;

b. Untranslated copy of the documents attached to the complaint or pleading;

c. Untranslated copy of any rulings ordering issuance of the letter rogatory;

d. Form conforming to Form B annexed to this Protocol and containing essential information for the person to be served or the authority to receive the documents; and

e. Certificate conforming to Form C annexed to this Protocol on which the Central Authority of the State of destination shall attest to execution or non-execution of the letter rogatory.

The copies shall be regarded as authenticated for the purposes of Article 8(a) of the Convention if they bear the seal of the judicial or other adjudicatory authority that issued the letter rogatory.

A copy of the letter rogatory together with Form B and the copies referred to in items a, b, and c of this Article shall be delivered to the person notified or to the authority to which the request is addressed. One of the copies of the letter rogatory and the documents attached to it shall remain in the possession of the State of destination; the untranslated original, the certificate of execution and the documents attached to them shall be returned to the Central Authority of the State of origin through appropriate channels.

If a State Party has more than one official language, it shall, at the time of signature, ratification or accession to this Protocol, declare which language or languages shall be considered official for the purposes of the Convention and of this Protocol. If a State Party comprises territorial units that have different official languages, it shall, at the time of signature, ratification or accession to this Protocol, declare which language or languages in each territorial unit shall be considered official for the purposes of the Convention and of this Protocol. The General Secretariat of the Organization of American States shall distribute to the States Parties to this Protocol the information contained in such declarations.

IV. TRANSMISSION AND PROCESSING OF LETTERS ROGATORY

Article 4

Upon receipt of a letter rogatory from the Central Authority in another State Party, the Central Authority in the State of destination shall transmit the letter rogatory to the appropriate judicial or administrative authority for processing in accordance with the applicable local law.

Upon execution of the letter rogatory, the judicial or administrative authority or authorities that processed it shall attest to the execution thereof in the manner prescribed in their local law, and shall transmit it with the relevant documents to the Central Authority. The Central Authority of the State Party of destination shall certify execution of the letter rogatory to the Central Authority of the State Party of origin on a form conforming to Form C of the Annex, which shall not require legalization. In

addition, the Central Authority of the State of destination shall return the letter rogatory and attached documents to the Central Authority of the State of origin for delivery to the judicial or other adjudicatory authority that issued it.

## V. COSTS AND EXPENSES

### Article 5

The processing of letters rogatory by the Central Authority of the State Party of destination and its judicial or administrative authorities shall be free of charge. However, this State Party may seek payment by parties requesting execution of letters rogatory for those services which, in accordance with its local law, are required to be paid for directly by those parties.

The party requesting the execution of a letter rogatory shall, at its election, either select and indicate in the letter rogatory the person who is responsible in the State of destination for the cost of such services or, alternatively, shall attach to the letter rogatory a check for the fixed amount that is specified in Article 6 of this Protocol for its processing by the State of destination and will cover the cost of such services or a document proving that such amount has been transferred by some other means to the Central Authority of the State of destination.

The fact that the cost of such services ultimately exceeds the fixed amount shall not delay or prevent the processing or execution of the letter rogatory by the Central Authority or the judicial or administrative authorities of the State of destination. Should the cost exceed that amount, the Central Authority of the State of destination may, when returning the executed letter rogatory, seek payment of the outstanding amount due from the party requesting execution of the letter rogatory.

### Article 6

At the time of deposit of its instrument of ratification or accession to this Protocol with the General Secretariat of the Organization of American States, each State Party shall attach a schedule of the services and the costs and other expenses that, in accordance with its local law, shall be paid directly by the party requesting execution of the letter rogatory. In addition, each State Party shall specify in the above-mentioned schedule the single amount which it considers will reasonably cover the cost of such services, regardless of the number or nature thereof. This amount shall be paid when the person requesting execution of the letter rogatory has not designated a person responsible for the payment of such services in the State of destination but has decided to pay for them directly in the manner provided for in Article 5 of this Protocol.

The General Secretariat of the Organization of American States shall distribute the information received to the States Parties to this Protocol. A State Party may at any time notify the General Secretariat of the Organization of American States of changes in the above-mentioned schedules, which shall be communicated by the General Secretariat to the other States Parties to this Protocol.

### Article 7

States Parties may declare in the schedules mentioned in the foregoing articles that, provided there is reciprocity, they will not charge parties requesting execution of letters rogatory for the services necessary for executing them, or will accept in complete satisfaction of the cost of such services either the single fixed amount specified in Article 6 or another specified amount.

### Article 8

This Protocol shall be open for signature and subject to ratification or accession by those Member States of the Organization of American States that have signed, ratified, or acceded to the Inter-American Convention on Letters Rogatory signed in Panama on January 30, 1975.

This Protocol shall remain open for accession by any other State that accedes or has acceded to the Inter-American Convention on Letters Rogatory, under the conditions set forth in this article.

The instruments of ratification and accession shall be deposited with the General Secretariat of the Organization of American States.

Article 9

This Protocol shall enter into force on the thirtieth day following the date on which two States Parties to the Convention have deposited their instruments of ratification or accession to this Protocol.

For each State ratifying or acceding to the Protocol after its entry into force, the Protocol shall enter into force on the thirtieth day following deposit by such State of its instrument of ratification or accession, provided that such State is a Party to the Convention.

Article 10

If a State Party has two or more territorial units in which different systems of law apply in relation to matters dealt with in this Protocol, it may, at the time of signature, ratification or accession, declare that this Protocol shall extend to all its territorial units or only to one or more of them.

Such declaration may be modified by subsequent declarations that shall expressly indicate the territorial unit or units to which this Protocol applies. Such subsequent declarations shall be transmitted to the General Secretariat of the Organization of American States, and shall become effective thirty days after the date of their receipt.

Article 11

This Protocol shall remain in force indefinitely, but any of the States Parties may denounce it. The instrument of denunciation shall be deposited with the General Secretariat of the Organization of American States. After one year from the date of deposit of the instrument of denunciation, the Protocol shall no longer be in effect for the denouncing State, but shall remain in effect for the other States Parties.

Article 12

The original instrument of this Protocol and its Annex (Forms A, B and C), the English, French, Portuguese and Spanish texts of which are equally authentic, shall be deposited with the General Secretariat of the Organization of American States, which will forward an authenticated copy of the text to the Secretariat of the United Nations for registration and publication in accordance with Article 102 of its Charter. The General Secretariat of the Organization of American States shall notify the Member States of that Organization and the States that have acceded to the Protocol of the signatures, deposits of instruments of ratification, accession and denunciation, as well as of reservations, if any. It shall also transmit to them the information mentioned in Article 2, the last paragraph of Article 3, and Article 6 and the declarations referred to in Article 10 of this Protocol.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE AT MONTEVIDEO, Republic of Uruguay, this eighth day of May, one thousand nine hundred and seventy-nine.

[Signatures omitted]

**ANNEX TO THE ADDITIONAL PROTOCOL**

**TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY**

FORM A

**LETTER ROGATORY** [1]

| 1 | 2 |
|---|---|
| REQUESTING JUDICIAL OR OTHER<br><br>ADJUDICATORY AUTHORITY<br><br>Name<br><br><br>Address | CASE:<br><br>DOCKET No.: |
| 3 | 4 |
| CENTRAL AUTHORITY OF THE<br><br>STATE OF ORIGIN<br><br>Name<br><br><br>Address | CENTRAL AUTHORITY OF THE<br><br>STATE OF DESTINATION<br><br>Name<br><br><br>Address |
| 5 | 6 |
| REQUESTING PARTY<br><br>Name<br><br><br>Address | COUNSEL TO THE<br><br>Name<br><br><br>Address |

PERSON DESIGNATED TO ACT IN CONNECTION WITH THE LETTER ROGATORY

Name

Is this person responsible for

costs and expenses?

YES ☐ NO ☐

Address

| | |
|---|---|
| | *    If not, check in the amount |
| |     of _____ is attached |
| | *    Or proof of payment is |

The Central Authority signing this letter rogatory has the honor to transmit to you in triplicate the documents listed below and, in conformity with the Protocol to the Inter-American Convention on Letters Rogatory:

    *     A.     Requests their prompt service on:

The undersigned authority requests that service be carried out in the following manner:

    *     (1).     In accordance with the special procedure or additional formalities that are described below, as provided for in the second paragraph of Article 10 of the above-mentioned Convention; or

    *     (2).     By service personally on the identified addressee or, in the case of a legal entity, on its authorized agent; or

    *     (3).     If the person or the authorized agent of the entity to be served is not found, service shall be made in accordance with the law of the State of destination.

    *     B.     Requests the delivery of the documents listed below to the following judicial or administrative authority:

       Authority ......................................................................................................................................................

    *     C.     Requests the Central Authority of the State of destination to return to the Central Authority of the State of origin one copy of the documents listed below and attached to this letter rogatory, and an executed Certificate on the attached Form C.

       Done at _____ this _____ date of _____, 19____.

Signature and stamp of the               Signature and stamp of the

judicial or other adjudicatory           Central Authority of the

authority of the State of origin          State of origin

Title or other identification of each document to be delivered:

    (Attach additional pages, if necessary.)

[1] Complete the original and two copies of this form; if A(1) is applicable, attach the original and two copies of the translation of this item in the language of the State of destination.

* Delete if inapplicable.

**ANNEX TO THE ADDITIONAL PROTOCOL**

**TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY**

FORM B

ESSENTIAL INFORMATION FOR THE ADDRESSEE [1]

To     (Name and address of the person being served)................................................................................................

You are hereby informed that (Brief statement of nature of service) ......................................................................................

A copy of the letter rogatory that gives rise to the service or delivery of these documents is attached to this document. This copy also contains essential information for you. Also attached are copies of the complaint or pleading initiating the action in which the letter rogatory was issued, of the documents attached to the complaint or pleading, and of any rulings that ordered the issuance of the letter rogatory.

ADDITIONAL INFORMATION

I*

FOR SERVICE

A.     The document being served on you (original or copy) concerns the following:

B.     The remedies sought or the amount in dispute is as follows:

C.     By this service, you are requested:

D.     *     In case of service on you as a defendant you can answer the complaint before the judicial or other adjudicatory authority specified in Form A, Box 1 (State place, date and hour): .....................................................................

     *     You are being summoned to appear as: ...............................................................................................

     *     If some other action is being requested of the person served, please

      describe: .....................................................................................................................................................

E.     If you fail to comply, the consequences might be: ........................................................................................

F.     You are hereby informed that a defense counsel appointed by the Court or the following legal aid societies are available to you at the place where the proceeding is pending.

     Name: ...............................................................................................................................................................

     Address: ...........................................................................................................................................................

     The documents listed in Part III are being furnished to you so that you may better understand and defend your interests.

II *

FOR INFORMATION FROM JUDICIAL OR ADMINISTRATIVE AUTHORITY

To:

(Name and address of the judicial or administrative authority)

You are respectfully requested to furnish the undersigned authority with the following information: .........................................

    The documents listed in Part III are being furnished to you to facilitate your reply.

III

LIST OF ATTACHED DOCUMENTS

(Attach additional pages if necessary.)

Done at _____ this _____ day of _____, 19___

| Signature and stamp of the | Signature and stamp of |
|---|---|
| judicial or other adjudicatory | the Central Authority |
| authority of the State of origin | of the State of Origin |

[1] Complete the original and two copies of this form in the language of the State of origin and two copies in the language of the State of destination.

* Delete if inapplicable.

ANNEX TO THE ADDITIONAL PROTOCOL

TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY

FORM C

CERTIFICATE OF EXECUTION[1]

To:

(Name and address of judicial or other adjudicatory authority that issued the letter rogatory)

In conformity with the Additional Protocol to the Inter-American Convention on Letters Rogatory, signed at Montevideo on May 8, 1979, and in accordance with the attached original letter rogatory, the undersigned Central Authority has the honor to certify the following:

*A.    That one copy of the documents attached to this Certificate has been served or delivered as follows:

Date: ...........................................................................................................................................................................

At (Address) ................................................................................................................................................................

By one of the following methods authorized by the Convention.

*(1)    In accordance with the special procedure or additional formalities that are described below, as provided for in the second paragraph of Article 10 of the above-mentioned Convention, or

*(2)    By service personally on the identified addressee or, in the case of a legal entity, on its authorized agent, or

*(3)    If the person or the authorized agent of the entity to be served was not found, in accordance with the law of the State of destination: (Specify method used)

*B.    That the documents referred to in the letter rogatory have been delivered to:

Identity of person .......................................................................................................................................................

Relationship to the addressee .....................................................................................................................................

(family, business or other)

*C.    That the documents attached to the Certificate have not been served or delivered for the following reason(s):

*D.    In conformity with the Protocol, the party requesting execution of the letter rogatory is requested to pay the outstanding balance of costs in the amount indicated in the attached statement.

Done at _____ the _____ day of _____ 19___

Signature and stamp of Central Authority of the State of destination

Where appropriate, attach originals or copies

of any additional documents proving service

or delivery, and identify them.

[1] Complete the original and one copy in the language of the State of destination.

* Delete if inapplicable.

Additional Protocol to the Inter-American Convention on Letters Rogatory, with Annex. Done at Montevideo May 8, 1979; entered into force for the United States August 27, 1988.

Notes of Decisions (60)

28 U.S.C.A. § 1781, 28 USCA § 1781
Current through PL 117-54.

**End of Document**                                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# **Exhibit 5**

# Civil Procedure Rules 1998/3132
## rule 34.17 Application for order

 **Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Civil evidence

**Keywords**
Applications; Evidence for foreign courts
[

**34.17.— Application for order**

(1) An application for an order under the 1975 Act for evidence to be obtained must be made to the High Court and may be made without notice.

(2) The application may be made either—

(a) by an application notice under Part 23, which must be—

(i) supported by written evidence; and

(ii) accompanied by the request as a result of which the application is made, and where appropriate, a translation of the request into English; or

(b) where—

(i) the requesting state is a party to the Hague Evidence Convention, by a Letter of Request using the Model Form published by the Permanent Bureau of the Hague Conference on Private International Law (which is annexed to Practice Direction 34A); or

(ii) the requesting state is not a party to the Hague Evidence Convention, by a Letter of Request submitted via the Foreign and Commonwealth Office.

][1]


## Notes

1        Substituted by Civil Procedure (Amendment No. 3) Rules 2020/747 rule 9(4) (December 31, 2020: substitution has effect from December 31, 2020 immediately after the amendments made by SI 2019/521 reg.12)

---

*Part 34 WITNESSES, DEPOSITIONS AND EVIDENCE FOR FOREIGN COURTS*
*> Part II EVIDENCE FOR FOREIGN COURTS > rule 34.17 Application for order*


Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

---

© 2021 Thomson Reuters.