# **<u>Exhibit D</u>**

*Solicitation Version*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| KATERRA INC., *et al.*, [1] | Case No. 21-31861 (DRJ) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE AMENDED JOINT
## CHAPTER 11 PLAN OF KATERRA INC. AND ITS DEBTOR SUBSIDIARIES

<table>
<tr>
<td>

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
        jwertz@jw.com
        mstull@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

</td>
<td>

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
        christine.okike@kirkland.com

-and-

Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: josh.altman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

</td>
</tr>
</table>

---

[1]      A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]**

---

THE DEADLINE TO VOTE ON THE PLAN IS
September 24, 2021 at 4:00 p.m. (prevailing Central Time)

THE DEADLINE TO OBJECT TO THE PLAN IS
September 24, 2021 at 4:00 p.m. (prevailing Central Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY
PRIME CLERK LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT CHAPTER 11 PLAN OF KATERRA INC. AND ITS DEBTOR SUBSIDIARIES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS AND/OR ARRANGEMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

---

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement or the Plan, as applicable.

i

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN WHAT IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTORS' ABILITY TO SATISFY ALL CLAIMS TO BE PAID UNDER THE PLAN. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; AND ADVERSE TAX CHANGES.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1
II. PRELIMINARY STATEMENT ....................................................................................1
    A. Katerra's Founding ..............................................................................................1
    B. SEC Investigation and 2020 Recapitalization .....................................................2
    C. Events Leading to Chapter 11 Filing ...................................................................3
    D. Sale Process .........................................................................................................4
    E. The Plan ...............................................................................................................6
III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN ..............................................................................8
    A. What is chapter 11? ..............................................................................................8
    B. Why are the Debtors sending me this Disclosure Statement? .............................8
    C. Am I entitled to vote on the Plan? .......................................................................8
    D. What will I receive from the Debtors if the Plan is consummated? ....................9
    E. How are Administrative Claims treated under the Plan? ...................................11
    F. How are Priority Tax Claims treated under the Plan? .......................................12
    G. What happens to my recovery if the Plan is not confirmed or does not go effective? ...................12
    H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ..............................................12
    I. What are the sources of Cash and other consideration required to fund the Plan?............13
    J. Is there potential litigation related to Confirmation of the Plan? ......................13
    K. Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan? ....................13
    L. Will there be releases and exculpation granted to parties in interest as part of the Plan? .............14
    M. Who is not Released under the Plan? .................................................................15
    N. What is the deadline to vote on the Plan? .........................................................15
    O. How do I vote for or against the Plan? ..............................................................15
    P. What are the consequences of filing a late proof of claim? ..............................15
    Q. Why is the Bankruptcy Court holding a Confirmation Hearing? ......................15
    R. When is the Confirmation Hearing set to occur? ..............................................16
    S. What is the purpose of the Confirmation Hearing?...........................................16
    T. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................16
    U. Do the Debtors recommend voting in favor of the Plan?..................................16
IV. THE DEBTORS' PLAN ...............................................................................................17
    A. The Plan .............................................................................................................17
    B. Release of Liens .................................................................................................24
    C. Release by the Debtors.......................................................................................25
    D. Third-Party Release............................................................................................26
    E. Exculpation ........................................................................................................27
    F. Injunction ...........................................................................................................27
V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND Prepetition BUSINESS OVERVIEW ...............................28
    A. Katerra's Corporate History ..............................................................................28
    B. The Debtors' Business Operations .....................................................................28
    C. The Debtors' Prepetition Capital Structure .......................................................30

| VI. | | Katerra's Common and Preferred Stock | 32 |
|---|---|---|---|
| | A. | Historical Capital Raises | 32 |
| | B. | Current Equity Holdings | 34 |
| VII. | | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 34 |
| | A. | Katerra's Financial Challenges | 34 |
| | B. | Negotiations with SVF and the New Money Consortium | 35 |
| | C. | December 2020 Out-of-Court Transaction | 36 |
| | D. | Greensill Insolvency Proceedings and the Greensill Receivables Facility | 37 |
| | E. | Katerra's Liquidity Constraints and Actions Taken to Preserve Assets | 37 |
| | F. | WARN Notices and Litigation | 38 |
| VIII. | | MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 39 |
| | A. | DIP Financing | 39 |
| | B. | First Day Relief | 40 |
| | C. | Other Procedural and Administrative Motions | 40 |
| | D. | Sale Process | 42 |
| | E. | India and Saudi Arabian Business | 43 |
| | F. | Wolff Claim Settlement | 43 |
| | G. | Schedules and Statements | 43 |
| | H. | Appointment of Official Committee | 44 |
| | I. | Greensill Limited Liquidation | 44 |
| | J. | Litigation Matters | 46 |
| | K. | Rejection and Assumption of Executory Contracts and Unexpired Leases | 46 |
| | L. | The Wind-Down Debtors, and Wind Down | 47 |
| | M. | Recommendation to Support Plan | 48 |
| IX. | | RISK FACTORS | 48 |
| | A. | Bankruptcy Law Considerations | 48 |
| | B. | Risks Related to the Debtors' Businesses | 51 |
| X. | | SOLICITATION AND VOTING PROCEDURES | 52 |
| | A. | Holders of Claims Entitled to Vote on the Plan | 52 |
| | B. | Voting Record Date | 52 |
| | C. | Voting on the Plan | 53 |
| | D. | Ballots Not Counted | 53 |
| XI. | | CONFIRMATION OF THE PLAN | 54 |
| | A. | Requirements for Confirmation of the Plan | 54 |
| | B. | Best Interests of Creditors | 54 |
| | C. | Feasibility | 55 |
| | D. | Acceptance by Impaired Classes | 55 |
| | E. | Confirmation without Acceptance by All Impaired Classes | 56 |
| XII. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 57 |
| | A. | Introduction | 57 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors | 58 |
| | C. | Cayman Tax Consequences to the Debtors | 58 |
| | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S. Holders of Claims Entitled to Vote | 59 |
| | E. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-U.S. Holders of Claims | 61 |
| | F. | Information Reporting and Backup Withholding | 62 |

**XIII.    RECOMMENDATION** ................................................................................................**64**

**EXHIBITS**

EXHIBIT A     Plan

EXHIBIT B     Recovery Analysis

EXHIBIT C     Non-Released D&O Parties

## I.     INTRODUCTION

Katerra Inc. (Cayman) ("Katerra Cayman") and its debtor subsidiaries, as debtors and debtors in possession (collectively, the "Debtors" or "Katerra"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of Katerra Inc. and Its Debtor Subsidiaries* [Docket No. 943], dated August 26, 2021 (as may be amended, supplemented, or modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES.  THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

### A.     Katerra's Founding

Katerra was co-founded in 2015 by Michael Marks, Jim Davidson, and Fritz Wolff as an innovative and eco-conscious construction company that developed, manufactured, and marketed products and services in the commercial and residential construction spaces.  With the mission of revolutionizing a stagnant construction industry that has failed to keep pace with technological advancements, Katerra focused on end-to-end integration of all products and services to drive innovation, efficiency, and sustainability.  Over its six years in operation, Katerra raised close to $3 billion in equity investments but was unable to generate a profit.

Katerra's manufacturing network specialized in "productized design," whereby Katerra manufactured building components as repeatable modules.  In furtherance of productized design, in 2019, Katerra launched "K3," a building platform focused on the construction and assembly of high-quality apartment buildings through the use of modular building components that are assembled onsite.  Under the K3 platform, building components were manufactured in a factory similar to "building blocks," enabling a higher level of quality control and standardization than if those components had been built onsite.  Those "building blocks" were then assembled at the construction site.  As a result, contractors utilized the K3 platform to develop and build a predesigned, componentized, and manufacturable 24-unit walk-up apartment building on an expedited timetable with a smaller budget and less waste.

Katerra has also pioneered the use of new building technologies, such as cross-laminated timber ("CLT"), which is an engineered solid-wood building material composed of lumber stacked crosswise at 90-degree angles in multiple layers and bonded together under high pressure using structural adhesives.  The large format size, cross-layer makeup, and high strength-to-weight ratio of CLT products make them sustainable high-performance substitutes for conventional building materials, such as steel or masonry.

In pursuit of a fully integrated business model, Katerra acquired several general contractor businesses specializing in commercial, residential, and multi-family projects in the West, Northeast, Mid-Atlantic, and Southeast regions.

Although Katerra won numerous projects, rapidly expanded its national footprint, and completed a series of successful capital raises, it was unable to generate a profit. Over time, Katerra experienced significant cost overruns on contracted projects, resulting in massive, ongoing losses, especially when Katerra had to honor the maximum price guarantees and discounts it had provided to certain legacy customers. In hindsight, those discounts were value destructive.

In May 2020, Katerra commenced a sixth round of financing, Series F, with one of its existing investors, SVF Abode (Cayman) Limited ("SVF Abode"), to raise additional capital (on top of the close to $3 billion previously raised) to fund its operations. Pursuant to the terms of the Series F financing, SVF Abode provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately 45 days later. In addition, SVF Abode exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

### B.    SEC Investigation and 2020 Recapitalization

At the end of May 2020, Katerra identified potential improper revenue recognition practices related to its Katerra Renovations, LLC ("Renovations") business. Within days, an independent committee (the "Independent Committee") of the Board of Directors of Katerra Cayman was formed to oversee an investigation into these potential accounting irregularities, and Katerra elected to freeze its equity raises while that investigation was ongoing. As a result of this investigation, SVF Abode elected to exercise its contractual right to withhold the additional $100 million of financing on the 45-day timeline.

During the investigation, and in part due to the freeze on raising capital, Katerra continued to face worsening liquidity that threatened its operations. Katerra experienced financial and technical setbacks on some of its legacy construction projects due to re-work issues related to earlier-completed work. Katerra's exposure to expensive long-term, third-party commitments in real estate, IT, and software further restrained cash flow. Finally, a receivables facility (described at Article VIII.I. hereof) that had been entered into by certain of the Katerra entities, as sellers, and Greensill Limited, as buyer, the Greensill Receivables Facility (as defined herein), was already fully drawn, and the debt level thereunder, combined with Katerra's inability to comply with the covenant criteria since early 2020, made it difficult to obtain bonding for new project starts, impeding Katerra's ability to secure new business. In July 2020, Katerra appointed new management to address its constrained liquidity, which was preventing investment in new growth areas and timely vendor payments, straining those relationships, and placing projects at risk. Further, due to COVID-19, Katerra, along with the rest of the global construction industry, experienced unprecedented economic disruption, including project delays, shutdowns, and cancellations. Despite its best efforts, Katerra was unable to reduce its heavy operating-cost structure and high cash burn to optimize its business.

Given these difficulties, Katerra engaged restructuring advisors and investment bankers in August and September 2020 to evaluate its restructuring alternatives, including raising additional capital. Also in September 2020, Katerra appointed two independent directors with extensive restructuring experience to the Board of Directors of Katerra Cayman. Around this time, Katerra also voluntarily contacted the SEC to inform the SEC of the findings of the Independent Committee investigation. Katerra also contracted to sell its Lifebridge and Amberglen developments in Washington and Oregon, respectively, in September and October 2020.

After several months of exploring options to restructure its business and balance sheet (including negotiating a prospective transaction with a consortium of new and existing investors that ultimately did

not materialize), in late November 2020, Katerra reached a non-binding term sheet with the only investor willing to engage in an out-of-court restructuring, SVF Abode, and other key stakeholders, agreeing to a series of transactions that resulted in the financial recapitalization and restructuring of Katerra's material obligations, whereby, among other things:

- SVF Abode agreed to invest $200 million in new money in exchange for approximately 75% of Katerra Cayman's post-closing equity;

- Certain of Katerra's contract counterparties agreed to global amendments to their project contracts to amend and extend project timelines and completion dates in exchange for releases of certain claims regarding active projects;

- Greensill Limited extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-closing equity in Katerra Cayman, which equity was immediately transferred by Greensill Limited to an affiliate of SoftBank Vision Fund II ("SVF II") in connection with a transaction in which Katerra asserts that SVF II invested $440 million in the indirect parent company of Greensill Limited; and

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved for an equity incentive plan and related grants.

The transaction was implemented, allowing Katerra to avoid a near-term chapter 11 filing and it was expected to provide Katerra with sufficient liquidity to address its immediate ongoing obligations and continue operating in the ordinary course of business pursuant to a new business plan.

While negotiating the December 2020 transaction, Katerra was also negotiating the final terms of the PIF Sale, as defined and further discussed herein, which was expected to generate approximately $147 million of additional capital, $47 million of which was expected to go directly to Katerra Cayman. The PIF Sale was not expected to close until early 2021.

C.      **Events Leading to Chapter 11 Filing**

In 2021, Greensill Limited and certain of its affiliates commenced the Greensill Insolvency Proceedings (as defined and discussed further herein). In light of market uncertainty regarding how and to what degree the Greensill Insolvency Proceedings would impact Katerra, certain of Katerra's important bond providers demanded significant cash collateral (which Katerra did not have available) to facilitate construction and certain of Katerra's contract counterparties stopped doing business with Katerra altogether. In addition, the PIF Sale did not close and Katerra Cayman needed to use $23 million of its own liquidity to address covenant compliance concerns under the Samba Credit Facility. Katerra was thus unable to bond certain contract projects, exacerbating its existing operational issues because, without appropriate bonding, it was unable to provide the security of payment and performance of its obligations under certain projects. All of which created massive liquidity constraints and, in some instances, a halt to existing construction projects.

After providing Katerra with over $2 billion in equity funding to support ongoing operations and the alleged investment by SoftBank Vision Fund II in Greensill Capital Pty Limited of $440 million to facilitate the 2020 recapitalization, in May 2021, SoftBank Vision Fund I ("SVF") explained to Katerra that it could not responsibly continue to support Katerra with go-forward equity. Immediately thereafter, on May 17, 2021, three members of Katerra's senior management team resigned, further straining Katerra's already tenuous position.

In response, Katerra Cayman's board of directors formed a special committee comprised of its two independent directors (the "Special Committee"). The Special Committee called upon the same legal and financial advisors to once again start exploring strategic alternatives. Unfortunately, Katerra's liquidity continued to rapidly deteriorate and, by the end of May 2021, the company found itself facing an overdrawn cash position unless it received an immediate capital infusion. Katerra immediately shut down several unprofitable and unmarketable active projects to preserve liquidity and implemented a substantial reduction in force (approximately 730 employees). Katerra continued to work on certain projects to preserve value so that certain business lines might be sold during these Chapter 11 Cases.

Notwithstanding that SVF (together with its affiliates) has invested over $2 billion into Katerra and is unlikely to receive a distribution in these Chapter 11 Cases, SB Investment Advisers (UK) Limited, an affiliate of SVF, agreed to provide $35 million of postpetition financing as a sign of continuing support to facilitate a marketing process for the Debtors' remaining assets and an orderly wind down of the Debtors' business for the benefit of the Debtors' estates. The Debtors commenced these Chapter 11 Cases on June 6, 2021, to market and sell their assets and conduct an orderly wind down of their operations.

As described in more detail below, as of the date hereof, the DIP facility has been fully repaid and the estates have generated over $99 million in value from asset sales, settlements, and consensual assumptions and assignments of ongoing projects. The Debtors have already consummated the Sale Transaction relating to some of their most valuable and substantial assets. Now, with limited opportunities to generate additional revenue, the Debtors intend to move expeditiously to complete value-maximizing sales for the benefit of all stakeholders and confirm a chapter 11 plan to bring finality to these Chapter 11 Cases.

**D.    Sale Process**

**1.    Bidding Procedures**

In connection with the Debtors' sale efforts, on the Petition Date, the Debtors filed the *Motion for Entry of (A) an Order Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into Definitive Purchase Agreements* [Docket No. 30], outlining the procedures by which the Debtors conducted the sale of certain of their assets (such procedures, the "Bidding Procedures"). On July 6, 2021, the Court entered an order approving the Bidding Procedures [Docket No. 370], certain deadlines of which were further amended by court order on July 28, 2021 [Docket No. 732].

Pursuant to the Bidding Procedures, on July 22, 2021, the Debtors filed the *Notice of Selection of Stalking Horse Bidder for Spokane, WA (CLT) and Related Assets* [Docket No. 662], selecting Blue Varsity LLC to act as the stalking horse bidder for the Spokane, Washington CLT Facility (as defined below) and related assets for a purchase price consisting of (a) a cash payment of $50,000,000 minus the Real and Personal Property Tax adjustment (as defined therein) and (b) the assumption of the Assumed Liabilities (as defined therein). On July 28, 2021, the Debtors filed the *Notice of Selection of Stalking Horse Bidder for Tracy, CA Facility and Related Assets* [Docket No. 721], selecting VBC Tracy LLC to act as the stalking horse bidder for the Tracy Factory (as defined below) and related assets for a purchase price consisting of (a) a cash payment of $21,250,000.00 minus the Real and Personal Property Tax Adjustment (as defined therein), and (b) the assumption of the Assumed Liabilities (as defined therein). The Qualified Bid Deadline with respect to the CLT Facility and the Tracy Factory (each as defined below) occurred on July 29, 2021, at 5:00 p.m., prevailing Central Time. The Debtors did not receive any Qualified Bids (other than the respective stalking horse bids). On August 3, 2021, the Bankruptcy Court entered orders approving the

sales of the CLT Assets and Tracy Assets (each as defined below), which provided an aggregate $70 million in cash proceeds to the Debtors' estates.[1]  On August 12, 2021, the Debtors also filed a notice of stalking horse bidder with respect to their Apollo assets, indicating that BMC Corporate Services, LLC will purchase such assets for $4,500,000.  *See Notice of the Selection of Stalking Horse Bidder for the Apollo Assets* [Docket No. 845].  The Debtors did not receive any Qualified Bids (other than the stalking horse bid), and at a hearing on August 26, 2021, the Bankruptcy Court approved the sale of the Apollo assets.

In addition, Katerra is in the process of marketing and selling certain assets of non-Debtor subsidiaries, including the Debtors' operations in the Kingdom of Saudi Arabia and India.

The Debtors' marketing efforts pursuant to the Bidding Procedures are discussed further herein.

### 2.     Private Sales and Assumption/Assignment of Projects

In addition to the marketing process pursuant to the Bidding Procedures, the Debtors have effectuated a number of private sales and negotiated settlements related to projects since the Petition Date. These include:

- **Renovation Business**.  On June 15, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Private Sale of The Debtors' Renovation Business Free and Clear of All Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* [Docket No. 176], seeking a private sale of the Renovation business, a nationwide renovation services business comprised of a team with in-depth industry knowledge and experience.  The sale saved approximately 130 jobs and avoided disruption to customers.  The sale consideration was (a) $1 million of cash; (b) the payment of up to $6 million in cash serving as collateral for letters of credit associated with projects acquired by the purchaser to be paid to the Debtors as those projects are completed; (c) reimbursement of cash outflows during the period from the Petition Date through the Close of the sale; and (d) $27 million or more of assumed liabilities in connection with the assumed projects.  In addition, the sale allowed the Debtors to avoid approximately $50 million to $60 million in contractual liabilities.  On July 8, 2021, the Bankruptcy Court entered an order approving the sale of the Renovation business [Docket No. 414].

- **Lord Aeck Sargent**.  On June 16, 2021, the Debtors filed the *Debtors' Motion For Entry of an Order (I) Approving the Private Sale of Lord Aeck Sargent Pursuant to 11 U.S.C. § 363 of the Bankruptcy Code, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts In Connection Therewith, and (III) Granting Related Relief* [Docket No. 187] seeking a private sale of their Lord Aeck Sargent business ("LAS"), a leading award-winning architecture, interior design, and planning firm.  In order to avoid shutting down LAS on the Petition Date and the inevitable loss of jobs, disruption of client projects, and increase in damages claims, the Debtors and their advisors engaged in discussions with the proposed purchaser to explore a sale transaction, resulting in a mutually beneficial transaction, comprised of:  (a) $1.7 million of cash; and (b) approximately $2.3 million of assumed liabilities in connection with the assumed projects.  The sale allowed the Debtors to avoid approximately $3 million in contractual liabilities that may have been asserted against the Debtors in connection with ongoing projects that would have otherwise been rejected by the Debtors due to their inability to perform on

---

[1]     See *Order (I) Authorizing the Sale of the Acquired Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Asset Purchase Agreement, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 780] and *Order (I) Authorizing the Sale of the Acquired Assets Free And Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter into and Perform Under the Asset Purchase Agreement, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 781].

such contracts.  On July 8, 2021, the Bankruptcy Court entered an order approving the sale of LAS [Docket No. 412].

- **ACG / Artemis**.  On July 1, 2021, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release Agreement By and Among the Debtors and Certain Project Owners, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts In Connection Therewith, and (III) Granting Related Relief* [Docket No. 328] seeking authorization for the Debtors to enter into a settlement and release agreement to provide finality in connection with the Lifebridge Kirkland Apartments, Lifebridge Kirkland Senior Living, Amberglen Apartments, and Amberglen Senior Living projects, which provided substantial liquidity to the Debtors' estates in the form of a $3.0 million cash payment, granted comfort to the Project Owners (as defined therein) regarding the future of the prospective Projects (as defined therein), allowed the Debtors to cease work on the Projects and reduce costs to their estates, and provided finality with respect to the Deferred Purchase Payments (as defined therein) in connection with the Projects.  On July 12, 2021, the Bankruptcy Court entered an order approving the Lifebridge/Amberglen Settlement Motion [Docket No. 533].

- **Monetization of Miscellaneous Equipment**.  On July 23, 2021, the Debtors filed the *Debtors' Emergency Motion for an Order (I) Approving the Equipment Sales Agreement Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 684], to seek the approval of the private sale of certain equipment of the Debtors from its production facility in Phoenix, Arizona,[2] free and clear of all liens, claims, and encumbrances to Davis Company Inc.  Of the 10 indications of interest in all or part of the aforementioned equipment, Davis Company Inc. submitted the highest and otherwise best bid at $1.85 million.  On July 26, 2021, the Court entered an *Order (I) Approving the Equipment Sales Agreement Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 715].

    E.    **The Plan**

The Plan contemplates a basic "waterfall" structure whereby the estate liquidates its assets and all proceeds thereof are distributed to Holders of Allowed Claims pursuant to the priority established by the Bankruptcy Code.  To effectuate this, a Plan Administrator will be appointed on the Effective Date to wind down the Debtors' estates (such process, the "Wind Down"), monetize any remaining assets, and make distributions to creditors in accordance with the Plan.  The Plan Administrator will be identified no less than seven days prior to the Confirmation Hearing as part of the Plan Supplement.  Upon completion of the Wind Down, the Plan Administrator will take steps to dissolve any remaining Debtor entities.  One or more Debtors may continue to exist after the Effective Date only to facilitate the conclusion of the Wind Down.  Specifically, under the terms of the Plan, Holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and in exchange for such Holders' Claims and Interests:

- Holders of Allowed Secured Claims will receive:  (a) payment in full in Cash of such Holder's Allowed Secured Claim, (b) the collateral securing such Holder's Allowed Secured Claim, or (c) such other treatment rendering such Holder's Allowed Secured Claim Unimpaired.

---

[2]    Such equipment includes panel saws, edge banders, CNC router machines, and dowel drilling machines used to produce cabinetry from raw material items, a fully automated wall line that builds individual wall panels, a fully automated floor panel line that sets floor trusses and applies sheathing to manufacture floor panels, and two Hundegger saws.  The facility in Phoenix was decommissioned in 2019 and is of no benefit to the Debtors.

- Each Holder of an Allowed Other Priority Claim shall receive: (a) payment in full in Cash of such Holder's Allowed Other Priority Claim, or (b) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

- On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery.

- Each Allowed Other Intercompany Claim shall, at the option of the Debtors or the Wind-Down Debtors, either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed without any distribution on account of such Intercompany Claim.

- On the Effective Date, Intercompany Interests shall, at the option of the Debtors or the Wind-Down Debtors, either be: (a) Reinstated; or (b) discharged, canceled, released, and extinguished and of no further force or effect without any distribution on account of such Intercompany Interests.

- Each Allowed Existing Interest in the Debtors shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Interests in the Debtors shall be entitled to any recovery or distribution under the Plan on account of such Existing Interests.

- Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims, if any, will not receive any distribution on account of such Allowed Section 510(b) Claims.

**<u>The Plan also contemplates that Holders of Claims may be released by the Debtors:</u>**

**Holders of Claims that vote to accept the Plan, and all other Holders of Claims and Interests *who do not affirmatively opt out* of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan (whether or not such Holder votes on the Plan), shall be deemed "Releasing Parties" and will receive a release from the Debtors. This release includes any Avoidance Actions the Debtors could bring against such Holder. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to all stakeholders.**

The Plan provides the best available alternative for the Debtors' estates and creditor recoveries. If the Debtors' business were liquidated in a chapter 7, the orderly sale process currently underway likely would be stopped in its tracks, leaving an extremely large and complex liquidation to be managed by a chapter 7 trustee unfamiliar with the Debtors' business. The needless loss of value to creditors and the Debtors' estates would be enormous. Creditors would receive lower recoveries in chapter 7 because the Debtors' estates would necessarily bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

The Debtors believe that the Plan maximizes stakeholder recoveries in these Chapter 11 Cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Prime Clerk LLC, the Debtors' notice, claims, and balloting agent (the "<u>Notice, Claims, and Balloting Agent</u>"), *actually receives* such Ballots by the

Voting Deadline, *i.e.*, September 24, 2021 at 4:00 p.m. prevailing Central Time. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN <u>EXHIBIT B</u> ATTACHED HERETO ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES[3] | | | |
|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims |
| 1 | Secured Claims[4] | Each Holder of an Allowed Secured Claim shall receive:<br><br>(i)   payment in full in Cash of such Holder's Allowed Secured Claim;<br><br>(ii)  the collateral securing such Holder's Allowed Secured Claim; or<br><br>(iii) such other treatment rendering such Holder's Allowed Secured Claim Unimpaired. | $5 million |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive:<br><br>(i)   payment in full in Cash of such Holder's Allowed Other Priority Claim; or<br><br>(ii)  such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $11 million – $18 million |
| 3 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery until paid in full. | $800 million – $1.6 billion[5] |

---

[3]    The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code.  Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

[4]    Based on their review of the applicable proofs of claim, the Debtors believe certain claims were filed as secured claims on account of contracts that were assigned to various project owners and/or where third parties have remitted payment on account of such liabilities.  Therefore, the Debtors do not believe such liabilities are owed by the Debtors and the Debtors have excluded such claims from their analysis of potential distributions and recoveries.

[5]    For more information, please refer to **Exhibit B**, attached hereto.

| SUMMARY OF EXPECTED RECOVERIES[3] | | | |
|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims |
| 4 | Intercompany Claims | Each Allowed Other Intercompany Claim shall, at the option of the Debtors or the Wind-Down Debtors, either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed without any distribution on account of such Intercompany Claim. | N/A |
| 5 | Intercompany Interests | On the Effective Date, Intercompany Interests shall, at the option of the Debtors or the Wind-Down Debtors, either be: (a) Reinstated; or (b) discharged, canceled, released, and extinguished and of no further force or effect without any distribution on account of such Intercompany Interests. | N/A |
| 6 | Existing Interests | Each Allowed Existing Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Interests shall be entitled to any recovery or distribution under the Plan on account of such Existing Interests. | N/A |
| 7 | Section 510(b) Claims[6] | Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims, if any, will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A |

### E. How are Administrative Claims treated under the Plan?

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of

---

[6] The Debtors do not anticipate that there will be any Allowed Section 510(b) Claims, but have included Class 7, Section 510(b) Claims, as part of the Plan out of an abundance of caution.

such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**F.      How are Priority Tax Claims treated under the Plan?**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or Wind-Down Debtors against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions and therefore no assurance that any creditors will receive any recovery from the estates.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors."

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.  Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority, and potential disputes with the Purchaser in relation to the Debtors' obligations under the Purchase Agreement (if any) or related documents.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article XI of this Disclosure Statement entitled "CONFIRMATION OF THE PLAN" for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (i) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (ii) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (iii) commencement of distributions under the Plan.

I.      **What are the sources of Cash and other consideration required to fund the Plan?**

The Wind-Down Debtors, through the Plan Administrator, will fund distributions under the Plan with Cash available on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors including the proceeds of the Sale Transaction and the proceeds of any non-Cash assets held by the Wind-Down Debtors.  For the avoidance of doubt, the Sale Transaction Cash Proceeds of any Sale Transaction shall be distributed to the creditors of the Debtor that sold the applicable assets in accordance with the priority scheme set forth in the Bankruptcy Code.

J.      **Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.A.3 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

K.      **Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate that General Unsecured Claims in the aggregate amount of approximately $800 million to $1.6 billion will be Allowed in these Chapter 11 Cases.  Except to the extent there is any Distributable Cash in excess of amounts necessary to satisfy in full all senior claims, including Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims, each Allowed General Unsecured Claim against the Debtors shall receive no distribution on account of such Allowed General Unsecured Claim.  Holders of General Unsecured Claims will receive their Pro Rata share of any such excess Distributable Cash.  In addition, Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Releasing Party for all purposes under the Plan. Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be materially higher or lower than the Debtors' estimates provided herein.

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors, the Plan Administrator, the Committee, or other parties in interest may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of

Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**L.   Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.

Under the Plan, a Released Party is defined as collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee and each of its members; (d) the Plan Administrator; (e) the DIP Lender; (f) the Releasing Parties; and (g) each Related Party of each Entity in clauses (a) through (f); *provided* that (i) the Non-Released D&O Parties; (ii) the parties not released as part of the "Non-Released Claims" described and preserved in paragraph 29 of the order entered at Docket No. 414; and (iii) any Holder of a Claim or Interest that opts out of, or objects to, the releases contained in the Plan, in each case, shall not be a "Released Party." An Exculpated Party is defined as collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee and each of its members; (d) the Plan Administrator; (e) the DIP Lender; (f) the A&M Officers; (g) Madhav Dhar; and (h) each Related Party of each Entity in clauses (a) through (e); *provided* that each of the Non-Released D&O Parties shall not be an "Exculpated Party." For the avoidance of doubt, any party that does not opt out of the third-party release will also receive a release from the Debtor related to any potential Avoidance Actions.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all Holders of Claims or Interests that vote to accept the Plan; (b) all Holders of Claims or Interests that are deemed to accept the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (c) all Holders of Claims or Interests that are deemed to reject the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims or Interests that abstain from voting on the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; and (e) all Holders of Claims or Interests that vote to reject the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan. You will receive the same recovery and treatment on account of your Claim or Interest under the Plan regardless of whether you elect not to grant the releases contained in Article VIII.D of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV of this Disclosure Statement.

**M.     Who is not Released under the Plan?**

Parties that are not Released under the Plan include:  (i) the Non-Released D&O Parties and any party subject to a Non-Released D&O Claim; (ii) the parties not released as part of the "Non-Released Claims" described and preserved in paragraph 29 of the order entered at Docket No. 414; and (iii) any Holder of a Claim or Interest that opts out of, or objects to, the releases contained in the Plan.

The Non-Released D&O Claims include claims for breach of fiduciary duty and other related claims against the Non-Released D&O Parties dating back to the formation of the Company.  Attached hereto as **Exhibit C** is a list of the Non-Released D&O Parties to the best of the Debtors' knowledge, information, and belief.

**N.     What is the deadline to vote on the Plan?**

The Voting Deadline is September 24, 2021 at 4:00 p.m. (prevailing Central Time).

**O.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Notice, Claims, and Balloting Agent **on or before the Voting Deadline, _i.e._, September 24, 2021 at 4:00 p.m. prevailing Central Time**.   _See_ Article X of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES."

**P.     What are the consequences of filing a late proof of claim?**

Pursuant to the terms of the Bar Date Order,[7] if Proofs of Claim are not received by the Notice, Claims and Balloting Agent on or before the Claims Bar Date or the Governmental Bar Date, as applicable, and except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall be barred from asserting such Claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not received by the Notice, Claims, and Balloting Agent before the Bar Date or the Governmental Bar Date, as applicable, and not subject to an exception as set forth above; _provided_ that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.

**Q.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

---

[7]     Capitalized terms used but not defined in this section shall have the meaning ascribed to them in the _Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates_ [Docket No. 427] (the "Bar Date Order"), as applicable.

**R.     When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for September 30, 2021 at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than September 24, 2021 at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**S.     What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**T.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice, Claims, and Balloting Agent, Prime Clerk LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
>
> Katerra Inc. Inquiry Processing Center
> c/o Prime Clerk LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY  11232
>
> *By electronic mail to:*
> KaterraInfo@primeclerk.com
>
> *By telephone (toll free) at*:
> (877) 329-1824 (toll-free) or (347) 532-7909 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Notice, Claims, and Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Notice, Claims, and Balloting Agent at https://cases.primeclerk.com/Katerra (free of charge) or the Bankruptcy Court's website at http://ecf.txsb.uscourts.gov (for a fee).

**U.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    THE DEBTORS' PLAN

As discussed in Article III herein, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms, followed by the Wind Down of the Debtors' operations.

Under the Plan, the remaining assets of the Debtors will be distributed to creditors in accordance with the waterfall outlined therein and in accordance with the Bankruptcy Code. Furthermore, the Plan Administrator will assume control of the Debtors' business operations as of the Effective Date and oversee the distributions under the Plan. Notably, the Plan contains certain releases for the Debtors and certain third-parties, as well as exculpation provisions as further discussed therein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Plan includes the following key terms, among others described herein and therein:

### A.    The Plan

#### 1.    Restructuring Transactions

On the Effective Date, to the extent not inconsistent with any Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described in the Plan, including, as applicable, consummation of any Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; *provided, however*, that no such restructuring transactions may violate the terms of any Executory Contract or Unexpired Lease assumed by the Debtors.

2.    **Sale Transaction; Sources of Consideration for Plan Distributions**

As of the date hereof, the Debtors have already consummated the Sale Transaction relating to their most valuable and substantial assets. As discussed more fully below, the Debtors intend to appoint a Plan Administrator with knowledge of the company and its business to liquidate the remaining assets and wind down the Debtors' estates.

The Plan Administrator and/or Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including any remaining Sale Transaction Cash Proceeds after giving effect to the wind-down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan or transferred to the Purchaser pursuant to the Purchase Agreement on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.

3.    **Wind-Down Debtors**

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (b) performing their obligations under any Purchase Agreement or any transition services agreement entered into before, on, or after the Effective Date by and between the Wind-Down Debtors and the Purchaser, (c) resolving any Disputed Claims, (d) making distributions on account of Allowed Claims in accordance with the Plan, (e) filing appropriate tax returns, and (f) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any non-Cash Estate assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and consummating the Plan. Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

4.    **Wind-Down Debtors Document Retention Obligations**

On and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, as applicable, may maintain or dispose of documents in accordance with their discretion; *provided* that the Wind-Down Debtors and any successors in interest thereto shall retain and preserve all books, records, emails, and other documents relating to (i) the Debtors' Renovations and/or U.S. Construction businesses from and after January 1, 2018 that are in the possession of the Wind-Down Debtors immediately following the Effective Date, and shall provide the SEC with reasonable access to all such documents and (ii) any Retained Causes of Action, including, but not limited to, the Non-Released D&O Claims. The Wind-Down Debtors shall not destroy or otherwise abandon any such documents or records in clause (i) of the preceding sentence without providing the SEC at least sixty (60) days' prior written notice of its intent to abandon or destroy

such materials, and a reasonable opportunity to obtain possession thereof. Such notice shall be provided via email to: Amy L. Friedman at friedmana@sec.gov.

## 5.      Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have been resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into in connection therewith.

The powers and responsibilities of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including:  (a) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of the Sale Transaction; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (c) resolving any Disputed Claims; (d) making distributions on account of Allowed Claims in accordance with the Plan; (e) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (f) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (g) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (h) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (i) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; (j) providing not less than quarterly reports concerning the Wind Down on topics to be agreed upon by the Plan Administrator and the Post-Confirmation Oversight Committee; and (k) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30-days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### a.      Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Committee in consultation with the Debtors. The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

### b. Retention of Professionals

The Plan Administrator shall have the right, in consultation with the Post-Confirmation Oversight Committee, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### c. Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be determined by the Committee in consultation with the Debtors or Wind-Down Debtors (as applicable) and the Post-Confirmation Oversight Committee as described in the Plan Supplement.

### d. Funding of Reserves, Including the Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund each of the Reserves for the purposes of such Reserves as set forth in the Plan. The Post Effective Date Reserve will be funded with an amount of Cash that the Plan Administrator deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties thereunder that will at least cover the costs of the Wind-Down Budget. The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve. The Plan Administrator may create reserve-specific segregated accounts from the Post Effective Date Reserve in accordance with its business judgment, and may move Distributable Cash into the Post Effective Date Reserve at any time to the extent needed, in the Plan Administrator's business judgment, to cover unanticipated costs of the Wind Down. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

To the extent any amounts in a Reserve are tied to Claims that become Disallowed, the Plan Administrator may, in its business judgment, remove the amount in such Reserve that was allocated to such Claim from the Reserve and move it to Distributable Cash. Any amounts remaining in any Reserve after payment of all Claims contemplated by such Reserve in full shall promptly be transferred to the Post Effective Date Reserve and shall be distributed according to the priority set forth in Article III of the Plan without any further action or order of the Bankruptcy Court.

### e. Establishment of the Post-Confirmation Oversight Committee

Prior to the Effective Date, a committee shall be appointed to serve as the Post-Confirmation Oversight Committee pursuant to the terms of the Post-Confirmation Oversight Committee Agreement. Members of the Post-Confirmation Oversight Committee shall have the duties and oversight responsibilities set forth in the Post-Confirmation Oversight Committee Agreement and in the Plan. For the avoidance of doubt, the Post-Confirmation Oversight Committee may not direct the Plan Administrator or the members

of the Post-Confirmation Oversight Committee to act in a manner inconsistent with the Plan Administrator's fiduciary duties or powers and responsibilities under the Plan.

### 6. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Wind-Down Debtors.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Wind-Down Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to the Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### 7. Plan Administrator and Post-Confirmation Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator, Post-Confirmation Oversight Committee, and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, managers, and any Scheduled Party (as defined in the D&O Liability Insurance Policies) in the ordinary course of business.

### 8. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 9. Dissolution of the Debtors and Wind-Down Debtors

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for Debtor Katerra Inc., and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the

Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor is formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 10. Cancellation of Securities and Agreements

Upon the Effective Date: (a) the obligations of the Debtors under any certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be canceled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

### 11. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including (a) implementation of the Restructuring Transactions and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by Article IV.K of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

13. **Section 1146 Exemption**

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

14. **Settlement of Greensill Claims**

The Debtors may only settle or resolve the Greensill Claims with the consent of the Committee (such consent not to be unreasonably withheld, conditioned, or delayed).

15. **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, and/or in the DIP Orders, or transferred to the Purchaser pursuant to the Purchase Agreement.

The Wind-Down Debtors, through the Plan Administrator, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel

(judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything contained herein to the contrary (including the releases described in Article VIII), to the extent the Debtors are releasing or have previously released certain claims and Causes of Action against a party, including pursuant to the Plan, any Sale Transaction, any Purchase Agreement, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders and the Wolff Settlement Order), nothing in the Plan shall be construed to revive such released claims and Causes of Action against such party or be construed to impair or otherwise limit the releases provided thereunder.

### 16. Closing the Chapter 11 Cases

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the last remaining Chapter 11 Case of the last remaining Debtor Entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### B. Release of Liens

**The Plan contains the following provision regarding releases of liens:**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    **Release by the Debtors**

**The Plan contains the following provision regarding releases by the Debtors:**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Restructuring Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained in the Plan to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a

current or former employee of the Debtors, (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (v) Retained Causes of Action, (vi) the Non-Released D&O Claims, (vii) the Non-Released D&O Parties, or (viii) the parties not released as part of the "Non-Released Claims" described and preserved in paragraph 29 of the order entered at Docket No. 414, which paragraph, for the avoidance of doubt, is not modified in any way by the foregoing Release and such claims described therein are not part of this Debtor Release contemplated by the Plan.

### D.     Third-Party Release

The Plan contains the following provision regarding third-party releases:

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, any of the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Restructuring Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or Entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting

any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained in the Plan to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

E.      Exculpation

The Plan contains the following provision regarding exculpation:

Notwithstanding anything in the Plan to the contrary, to the fullest extent permitted under applicable law, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of any Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      Injunction

The Plan contains the following provision regarding injunction:

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that:  (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released by the Debtors pursuant to the Plan; (3) have been released by third parties pursuant to the Plan; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing

in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to the Plan.  Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

## V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND PREPETITION BUSINESS OVERVIEW

### A.  Katerra's Corporate History

As described more fully in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37] (the "First Day Declaration"), Katerra was co-founded in 2015 by Michael Marks, Jim Davidson, and Fritz Wolff as an innovative and eco-conscious construction company that developed, manufactured, and marketed products and services in the commercial and residential construction spaces.  Katerra historically has evaluated and, where appropriate, executed opportunities to expand through the acquisition of products and companies in areas it believed offered attractive opportunities for growth and fit within its vision of providing end-to-end integration of products and services.  In pursuit of a fully integrated business model, Katerra acquired more than twenty companies that are leaders in their sector of the construction industry, including in the general contractor business specializing in commercial, residential, and multi-family projects.

These acquisitions and partnerships, among others, allowed Katerra to grow the number of products it offered and provided end-to-end services for ground-up new build projects.

### B.  The Debtors' Business Operations

#### 1.  Katerra's United States Manufacturing Facilities

As of the Petition Date, the Debtors operated two factories in the United States.

##### a.  Spokane, Washington "CLT" Facility

Katerra's innovative CLT facility in Spokane, Washington (the "<u>CLT Facility</u>") was used to engineer Cross-Laminated Timber ("<u>CLT</u>"), a solid-wood building material composed of lumber stacked crosswise at 90-degree angles in multiple layers and bonded together under high pressure using structural adhesives. CLT is lightweight, easy to install, and generates almost no waste onsite. The CLT Facility was central to Katerra's drive to reimagine commercial and residential building materials and is the largest single-use CLT facility in North America, producing 30% of the current North American mass timber manufacturing capacity.

Wolff Principal Holdings, L.P. ("<u>Wolff</u>") had a first lien security interest in this facility (the "<u>Wolff Lien</u>"), which was issued by Katerra as security in connection with the December 2020 recapitalization to maintain Katerra's relationship with Wolff and ensure completion of other active construction projects that were necessary to Katerra's ongoing business operations.

The Debtors sold the CLT Facility in the Chapter 11 Cases for approximately $50 million [Docket No. 780]. The Wolff Lien on the CLT Facility was resolved by the Wolff Settlement Agreement, as described in Section VIII.F hereof.

### b. Tracy, CA Factory

In June 2019, Katerra opened a 577,000 square foot technologically advanced manufacturing factory in Tracy, California (the "<u>Tracy Factory</u>") and moved all manufacturing operations out of, and subsequently shut down, its Phoenix, Arizona factory. The Tracy Factory features highly automated production lines for wood-framed walls, floor trusses, roof trusses, as well as cold-formed steel production, automated cabinet and finish areas, and a highly sophisticated window line. On an annual basis, it can produce the equivalent of 12,500 multifamily units. The Tracy Factory uses solar energy to offset the majority of the facility's energy consumption, making it a high-tech operation with a low carbon footprint.

The Debtors sold the Tracy Factory in the Chapter 11 Cases for approximately $21.25 million.

### 2. Katerra's International Operations and Building Platforms

### a. Operations in India (non-Debtor)

Katerra operates three manufacturing facilities in India that produce precast concrete construction materials that can be assembled onsite quicker than through traditional building techniques. Katerra's factory in Krishnagiri, Tamil Nadu produces precast concrete components, furniture, wood products, and building facades. Katerra's factory in Hyderabad, Telangana is an automated factory with the capacity to deliver 8 million square feet of building components every year. The newest facility in Taloja, Maharashtra commenced production in 2021 and serves the Western India region.

The India facilities support Katerra's off-site construction approach, and have enabled Katerra to complete approximately 25 large projects in India.

The Debtors' non-Debtor affiliates are in the process of selling their Indian operations.

### b. Operations in the Kingdom of Saudi Arabia (non-Debtor)

In the Kingdom of Saudi Arabia, Katerra has been awarded contracts to build over 14,000 affordable housing units for the Kingdom of Saudi Arabia's Housing Authority. Pursuant to this agreement, Katerra was able to leverage its unique off-site construction technology and five fully operational on-site

29

factories with a production capacity of 40 to 60 villas per month per factory. The Debtors' non-Debtor affiliates are in the process of selling their Saudi Arabian operations.

### c. Building Platforms

One of Katerra's building platforms (the "Katerra Building Platforms") aimed to take the risk out of construction by applying repeatable manufacturing to the entire building. As a result, Katerra buildings are made from manufactured components ready to be assembled on-site, including wall and floor panels, casework, and bathroom and kitchen kits. The Katerra Building Platform construction projects are predesigned, "componentized," and pre-manufactured before delivery to the site. The building components can be mixed and matched to accommodate the specific goals of the project or the client. The Katerra Building Platforms were designed to function anywhere in the contiguous 48 states and Katerra believes that a sucessful deployment of the Katerra Building Platforms is achievable.

The "K3" platform, also referred to as the "Garden Multifamily Platform," is one example of a Katerra Building Platform. K3 is a fully optimized building platform for market rate multifamily residential housing. This platform is designed to achieve a high-quility, cost-effective product with maximum usability across geographies. The K3 Platform was sold as part of the sale of the Tracy Factory.

### 3. Katerra's Employees

As of the Petition Date, the Debtors directly employed a workforce of approximately 500 individuals. Following the various sales during the Chapter 11 Cases, the Debtors currently employee approximately 100 active U.S. employees.

### C. The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had no funded debt obligations. As set forth below, the Debtors obligations consisted of (1) surety bond obligations, (2) letters of credit, (3) corporate guarantees, and (4) guarantees of the funded debt of certain of the Debtors' foreign non-Debtor subsidiaries. In addition, certain of the Debtors foreign non-Debtor subsidiaries have funded debt. The aggregate outstanding amount of each debt obligation is as follows:

| Funded Debt | Principal Amount (in USD) |
|---|---|
| **Prepetition Foreign Funded Debt (non-Debtor)** | **$72.4 million** |
| Prepetition Samba Credit Facility | $16.7 million |
| Prepetition SIDF Term Loan | $16.3 million |
| Prepetition YES Bank Facility | $39.5 million |
| **Bonding and Letters of Credit** | **$699.1 million** |
| Surety Bond Obligations | $676.7 million |
| Letters of Credit | $22.3 million |
| **Corporate Guarantees** | **$514.8 million–$779.2 million** |
| **Total Debt Obligations** | **$1.29 billion–$1.55 billion** |

In addition to the debt obligations, Katerra Cayman had a total number of 12,195,150 shares on a fully diluted basis as of the Petition Date.

### 1. Bonding and Letters of Credit

### a. Surety Bond Obligations

In the ordinary course of business, the Debtors are required to provide surety bonds or other forms of similar credit support (collectively, the "Surety Bonds") to certain third parties to secure the payment or performance of obligations related to their construction projects (the "Surety Bond Program"). Failure to provide, maintain, or timely renew the Surety Bonds may jeopardize the Debtors' ability to continue operations. As of the Petition Date, the Debtors estimate that they have an aggregate liability of approximately $676.7 million on account of the Surety Bond Program.

The Debtors are also parties to, or may become parties to, certain indemnity agreements that set forth the sureties' (each a "Surety" and, collectively, the "Sureties") rights to recover from the Debtors (collectively, the "Surety Indemnity Agreements") pursuant to which the Debtors agree to indemnify such Surety from any loss, cost, or expense that such Surety may incur on account of the issuance of any bonds on behalf of the Debtors. In addition, certain Surety Indemnity Agreements allow the Sureties to request collateral security, including cash collateral (collectively, the "Surety Collateral"), from the Debtors from time to time. As of the Petition Date, the Sureties have a total of approximately $9.6 million held in certain bank accounts as Surety Collateral pursuant to the Surety Indemnity Agreements.

### b. Letters of Credit

The Debtors have issued certain letters of credit to various other parties (such letters of credit, the "Letters of Credit"). As of the Petition Date, the Debtors estimate that approximately $22.3 million in Letters of Credit remain outstanding.

### 2. Corporate Guarantees

Katerra Cayman and Katerra Inc. (Delaware) ("Katerra Delaware") have guaranteed certain projects of Katerra Saudi Arabia. Under these guarantees, Katerra Cayman and Katerra Delaware are liable for unfunded obligations of Katerra Saudi Arabia under performance bonds, bid bonds, advance payment guarantees, and letters of credit provided in favor of project owners. As of the Petition Date, the Debtors estimate that they have guaranteed approximately $514.8 million to $779.2 million in project obligations of Katerra Saudi Arabia.

### 3. Prepetition Foreign Funded Debt of Non-Debtor Subsidiaries

### a. Samba Credit Facility

On July 19, 2019, Katerra Delaware and Katerra Cayman, as guarantors, entered into that certain credit facility (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Samba Credit Agreement"), with non-Debtor subsidiary Katerra Saudi Arabia, LLC ("Katerra Saudi Arabia"), as borrower, and Samba Financial Group, as lender, to fund certain projects in the Middle East region. The Samba Credit Agreement provides an aggregate availability of approximately $133 million (the "Samba Credit Facility"). As of the Petition Date, the Debtors estimate that approximately $16.7 million is outstanding on account of the Samba Credit Facility.

### b. SIDF Term Loan

On October 23, 2019, Katerra Cayman, as guarantor, entered into that certain term loan agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "SIDF Term Loan Agreement"), with Katerra Saudi Arabia, as borrower, and Saudi Industrial Development Fund, as lender, for an aggregate principal amount of approximately USD $81.5 million (the "SIDF Term Loan") to fund certain projects in the Middle East region. As of the Petition Date, the Debtors estimate that approximately $16.3 million is outstanding on account of the SIDF Term Loan.

c.     **YES Bank Facility**

Katerra Delaware is party to that certain agreement (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "YES Bank Agreement") by and among non-Debtor subsidiary KEF Infrastructure India Pvt. Ltd., as borrower, non-Debtor Katerra Operating Company Inc., as guarantor, and YES Bank Limited, as lender.  The YES Bank Agreement consists of (a) term loans maturing on February 18, 2029 (the "YES Bank Term Loans") in the aggregate principal amount of approximately $34.7 million, and (b) a credit facility (the "YES Bank Credit Facility" and, together with the YES Bank Term Loans, the "YES Bank Facility") with approximately $11 million of availability, approximately $4.8 million of which is drawn.  The YES Bank Term Loans accrue interest at a rate of 11.15% and the YES Bank Credit Facility accrues interest at a rate of 10.2%.  The YES Bank Facility is secured by a standby letter of credit in the amount of $10 million.  As of the Petition Date, the Debtors estimate that approximately $39.5 million is outstanding on account of the YES Bank Facility.

## VI.     KATERRA'S COMMON AND PREFERRED STOCK

### A.     Historical Capital Raises

Historically, Katerra raised the majority of its financing through multiple rounds of equity investments.  As a start-up, in 2015, Katerra raised approximately $14.5 million in capital through two separate rounds of angel investing.  The majority of the capital was provided by Katerra's three co-founders and certain of their companies.

| Investor | Angel (Individual) Feb-2015 Contributed Capital | Angel (Individual) Jun-2015 Contributed Capital |
| --- | --- | --- |
| Foxconn (iCreate & Foxconn Ventures) | $- | $2,000,000 |
| Paxion Capital | $- | $4,000,000 |
| Wolff-related entities | $20,000 | $4,000,000 |
| Michael Marks (Outside Paxion) | $475,900 | $- |
| Jim Davidson (Outside Paxion) | $98,000 | $- |
| Fritz Wolff (Outside Paxion) | $49,752 | $- |
| Others | $276,348 | $3,559,520 |
| Round Total | $920,000 | $13,559,520 |
| Total Invested to Date | $920,000 | $14,479,520 |
| $ / share | $0.005 | $0.50 |

In 2016, Katerra commenced a second round of venture capital funding, which raised approximately $77.35 million in capital.

| Investor | Early Stage VC Mar-2016 Contributed Capital |
| --- | --- |
| Foxconn (iCreate & Foxconn Ventures) | $49,974,400 |
| Paxion Capital | $4,997,440 |
| Wolff-related entities | $2,989,540 |
| Jim Davidson (Outside Paxion) | $490,820 |
| Others | $18,895,824 |
| Round Total | $77,348,024 |
| Total Invested to Date | $91,827,544 |
| Post $ Valuation | $577,321,170 |
| $ / share | $2.231 |

The following year, in 2017, Katerra commenced a Series C financing, which raised another $141 million in capital.

| Investor | Series C Mar-2017 Contributed Capital |
|---|---|
| Foxconn (iCreate & Foxconn Ventures) | $29,970,000 |
| Paxion Capital | $9,990,000 |
| Others | $101,009,112 |
| Round Total | $140,969,112 |
| Total Invested to Date | $232,796,656 |
| Post $ Valuation | $1,168,996,574 |
| $ / share | $3.70 |

In 2018 and 2019, Katerra initiated four different rounds of financing and raised a total of approximately $2.4 billion. During Katerra's Series D-1 and D-2 financing and Series E financing, SVF contributed approximately $1.4 billion of financing and subsequently became Katerra's largest capital investor (though SVF did not hold a controlling stake in Katerra).

| Investor | Series D-1 & D-2 Jan-2018 Contributed Capital | Series E (Incl. Extension) Dec-2018 / Jul-2019 Contributed Capital | Convertible Promissory Note Jul-2019 Contributed Capital | Middle East JV Q4 2018 & Jul-2019 Contributed Capital |
|---|---|---|---|---|
| Softbank | $649,999,950 | $749,999,988 | $ 200,000,000 | $150,000,000 |
| Foxconn (iCreate & Foxconn Ventures) | $29,999,997 | $- | $- | $- |
| Michael Marks (Outside Paxion) | $- | $4,999,992 | $- | $- |
| Katerra | $- | $(52,000,000) | $- | $52,000,000 |
| Others | $390,775,676 | $242,001,091 | $- | $- |
| Round Total | $1,070,775,623 | $945,001,071 | $200,000,000 | $202,000,000 |
| Total Invested to Date | $1,303,572,279 | $2,248,573,350 | $2,448,573,350 | $2,650,573,350 |
| Post $ Valuation | $3,485,000,000 | **$5,999,762,400** | | |
| $ / share | $79.5000 | - | - | - |

On December 9, 2019, Katerra Delaware entered into the Greensill receivables facility, by and among Katerra Delaware, a Delaware limited liability company, as a seller, the other sellers party thereto and Greensill Limited, together with the Transaction Documents (as defined therein) (the "Greensill Receivables Facility"). Pursuant to the terms of the Greensill Receivables Facility, Greensill Limited advanced funds to Katerra to pay suppliers based upon receivables generated or expected by Katerra purportedly in exchange for the underlying receivables, and a security interest therein, and in certain other Katerra assets. Katerra then acted as "servicer" of the receivables subject to the Greensill Receivables Facility on the terms set forth therein. Katerra relied on the Greensill Receivables Facility to fund operations instead of raising capital through rounds of equity financing from December 2019 to May 2020. By December 2020, Katerra owed approximately $440 million under the Greensill Receivables Facility.

In 2020, Katerra initiated additional rounds of equity financing, which were interrupted as further explained herein and in the First Day Declarations.

33

### B. Current Equity Holdings

As of the Petition Date, Katerra Cayman had approximately 12,194,322 shares issued and outstanding consisting of approximately 15,005 in common stock issued and outstanding, and 12,179,065 in preferred stock issued and outstanding. Additionally Katerra Cayman had approximately 252 options and restricted stock units issued and outstanding; and approximately 828 shares available for issuance under Katerra Cayman's equity incentive plan. As a result, the total number of shares of Katerra Cayman on a fully diluted basis is 12,195,150. As of April 30, 2021, the total book value of the equity in Katerra Cayman was approximately $203,187,107.

Before the Petition Date, Katerra Cayman's equity was primarily held by the following entities:

| Stakeholder | Series A Preferred | Ownership Percentage |
|---|---|---|
| SVF Abode (Cayman) Limited | 11,420,798 | 93.65% |
| SVF II Abode (Cayman) Limited | 762,144 | 6.25% |
| SVF Habitat (Cayman) Limited | 7,775 | 0.06% |

Although SVF and its affiliates own nearly 100% of the equity interests of Katerra Cayman, they have never held a majority of the seats of Katerra Cayman's board of directors and currently only have one appointee on Katerra Cayman's three-person board of directors.

## VII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of factors contributed to the Debtors' need to commence these Chapter 11 Cases. These factors include, most significantly, difficulty in controlling project costs and completion delays, which were exacerbated by the COVID-19 pandemic. Over time, these factors have tightened the Debtors' liquidity. As described above and in further detail below, these factors culminated in liquidity challenges beginning in 2020 that continued into 2021.

### A. Katerra's Financial Challenges

Katerra experienced approximately $2.78 billion in financial losses in 2018, 2019, and 2020, which are attributable, in part, to Katerra's difficulty in controlling project costs and completion delays. The COVID-19 pandemic only exacerbated these issues. Katerra's project backlog consisted of 147 unprofitable projects ("Loss Projects") out of 428 active jobs as of April 30, 2021. Loss Projects caused a substantial decrease in profits and additional strains on the Katerra's liquidity.

In May 2020, Katerra commenced another round of financing (Series F) with one of its existing investors, SVF, to raise additional capital to fund operations. As described above, in 2018 and 2019, SVF contributed capital of approximately $1.4 billion in the aggregate as a part of Katerra's Series D-1 & D-2 financings and Series E financing. In 2019, SVF provided Katerra with an additional $200 million in exchange for a promissory note and another $150 million in exchange for an ownership stake in non-Debtor Katerra Middle East. Pursuant to the terms of the Series F financing, SVF provided Katerra with an initial $100 million in funding and agreed to fund another $100 million approximately forty-five (45) days later. In addition, SVF exchanged its 49% ownership stake in non-Debtor Katerra Middle East Inc. for another $150 million in Series F shares.

In late May 2020, however, Katerra identified potential improper revenue recognition practices related to Katerra's Renovations business. Within days, the Independent Committee was formed to oversee an investigation into potential accounting irregularities within Katerra's Renovations business unit and engaged Kirkland & Ellis LLP and Kirkland & Ellis International LLC (collectively, "Kirkland") as special

counsel to conduct an independent investigation. Katerra informed SVF that it was conducting an investigation and had ceased additional equity fundraising while the investigation was ongoing, at which time SVF exercised its contractual right to not fund the $100 million in connection with the Series F financing.

The investigation found that certain employees of the Renovations business intentionally recognized costs prematurely in 2018, 2019, and the first quarter of 2020, thereby rendering the revenue and operating margin line items in higher misstated amounts in Katerra's audited financial statements for the fiscal years ended December 31, 2018 and December 31, 2019 and Katerra's unaudited financial statements for the three-month period ended March 31, 2020. Katerra took appropriate disciplinary and remedial action. In August 2020, Katerra voluntarily contacted the SEC to inform the SEC of the findings of the Independent Committee investigation. In addition, Katerra informed its external auditor, Deloitte Touche Tohmatsu Limited ("Deloitte"), of the findings of the Independent Committee investigation.

Deloitte then requested that an additional investigation be undertaken into another part of the U.S. business to understand whether certain other improper practices or irregularities had occurred. The Independent Committee directed Kirkland to undertake such investigation, and Kirkland reported its findings to the Board of Katerra Cayman and, subsequently, to the SEC and Deloitte in November 2020. Katerra continues to cooperate with the SEC and to provide relevant information upon request, but cannot predict the outcome of this investigation. Together, Deloitte and Katerra determined that restatement of Katerra's audited financial statements for the fiscal year ended December 31, 2019 was not required.

During the investigation, and in part due to the freeze on raising capital, Katerra continued to face worsening liquidity that threatened its operations. Katerra experienced financial and technical setbacks on some of its legacy construction projects due to re-work issues related to earlier-completed work. Katerra's exposure to expensive long-term, third-party commitments in real estate, IT, and software further restrained cash flow. Finally, the Greensill Receivables Facility was already fully drawn, and the debt level thereunder, combined with Katerra's inability to comply with the covenant criteria since early 2020, made it difficult to obtain bonding for new project starts, impeding Katerra's ability to secure new business.

Faced with this significant liquidity crisis, in August 2020, Katerra engaged Kirkland as restructuring counsel to explore strategic alternatives. To prevent an immediate chapter 11 filing in September 2020, SVF again offered financial support to Katerra and provided the additional $100 million in connection with the Series F financing that it had previously elected not to provide. Katerra also contracted to sell its Lifebridge and Amberglen developments in Washington and Oregon, respectively, in September and October 2020.

Notwithstanding these efforts, Katerra continued to experience significant losses. Thus, in late September 2020, Katerra engaged Alvarez & Marsal North America LLP ("A&M") as restructuring advisor and Houlihan Lokey Capital Inc. ("Houlihan Lokey") as investment banker. Katerra engaged these advisors to explore all restructuring options. With the assistance of Kirkland, A&M, and Houlihan Lokey, Katerra engaged its major constituents, as well as third parties, regarding potential restructuring transactions.

### B.    Negotiations with SVF and the New Money Consortium

Faced with the realities of its worsening liquidity situation and its dire need for additional capital, in October 2020, Katerra with the assistance of its advisors, began negotiations with SVF, and a consortium of new investors and existing stakeholders (the "Consortium") who expressed a desire to support Katerra's business. The proposed transaction contemplated a new-money investment by the Consortium and SVF of approximately $380 million in exchange for a 90% equity ownership stake of the Consortium in Katerra, with the remaining 10% of Katerra's equity reserved for management. In addition, the transaction

contemplated the retirement of Katerra's outstanding Greensill Receivables Facility and the sale of Katerra's ownership interests in certain foreign ventures. Katerra, SVF, and the Consortium executed a non-binding letter of intent reflecting this transaction. The transaction, however, did not materialize.

Subsequently, Katerra continued to pursue out-of-court restructuring alternatives and reached out to a number of parties, both existing stakeholders and third parties, to provide additional financing.

### C.     December 2020 Out-of-Court Transaction

In late November 2020, following the breakdown of negotiations with SVF and the Consortium, SVF Abode indicated an interest in investing an additional $200 million to ensure Katerra would be able to meet its ongoing obligations. Katerra issued a promissory note to SVF Abode in exchange for a $25 million bridge loan while Katerra engaged with SVF Abode and other stakeholders to negotiate the terms of an out-of-court restructuring.

Ultimately, Katerra consummated a transaction at the end of December 2020 on the following terms:

- SVF Abode exercised its warrant to purchase ordinary shares of Katerra Cayman and converted $300 million of promissory notes of Katerra held by SVF Abode to equity;

- Katerra Cayman (i) converted all existing preferred shares into ordinary shares of Katerra Cayman, and (ii) issued a new class of preferred shares (the Series A preferred shares) to SVF Abode in exchange for $175 million in cash and extinguishment of a $25 million bridge loan owed to SVF Abode;

- Greensill Limited extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-closing equity in Katerra Cayman, which equity was immediately transferred by Greensill Limited to an affiliate of SVF II in connection with a transaction in which Katerra asserts that SVF II invested $440 million in an indirect parent company of Greensill Limited;

- 5% of the post-closing equity was reserved for certain existing equity holders and 15% of the post-closing equity was reserved in a share pool for an equity incentive plan and related grants; and

- Katerra and Wolff settled and waived certain claims against Katerra, including the amendment of the "Substantial Completion Dates" of a number of active projects with Wolff and certain of its related parties, and in exchange, Katerra granted Wolff a lien on the CLT Facility.

As a part of this transaction, SVF was diluted to the same extent as all other investors (100,000.0:1.0), which resulted in the previous $1.95 billion invested by SVF equaling less than 0.1% of the post-recapitalization equity.

An additional transaction that Katerra was negotiating near the end of 2020, that did not materialize, was a joint venture agreement with the Public Interest Fund ("PIF"), a program established and supported by the Kingdom of Saudi Arabia. Pursuant to the proposed terms of the joint venture, PIF was to invest $147 million in Katerra Saudi Arabia in exchange for a 49% equity ownership stake (the "PIF Sale"). Katerra planned to use approximately $23 million from that investment to restore covenant compliance under the Samba Credit Facility and another approximately $47 million was expected to be paid directly to Katerra Cayman.

Despite Katerra's best efforts, negotiations between Katerra and PIF stalled and the PIF Sale was not executed. Because the sale fell through, Katerra Cayman was forced to use its own capital to pay off the approximately $23 million due under the Samba Credit Facility in March 2021 due to covenant compliance concerns.

### D. Greensill Insolvency Proceedings and the Greensill Receivables Facility

In March 2021, certain Greensill affiliates (other than Greensill Limited) filed insolvency proceedings across the globe including, but not limited to, the following: on March 8, 2021, Greensill Capital (UK) Limited and Greensill Capital Management Company (UK) Limited filed insolvency proceedings in the United Kingdom; on March 9, 2021, Greensill Capital Pty Limited filed insolvency proceedings in Australia, entering liquidation on April 22, 2021; on March 16, 2021, Greensill Bank AG entered into insolvency proceedings in Germany; and on March 25, 2021, Greensill Capital Inc. filed for chapter 11 protection in the United States (collectively, the "Greensill Insolvency Proceedings"). In connection with the Greensill Insolvency Proceedings, it was reported by *The Wall Street Journal* that SVF had injected $400 million into Greensill Capital Pty Limited in exchange for Greensill Limited's 5% equity in Katerra. Immediately after this article was published, Katerra was bombarded with inquiries from customers, employees, and other third parties about the financial viability of the company.

On March 11, 2021, Katerra received a letter from a legal representative of Credit Suisse Asset Management, stating that it was the holder of notes totaling approximately $438 million, under whose terms, Katerra acts as a servicer for the notes program and performs all activities to bill and collect from customers. The firm asked Katerra to provide statements and documentation relating to collection activities starting November 1, 2020 to the date of the letter. In addition, the firm referenced the media reports stating Katerra's approximately $440 million debt owed to Greensill Limited was forgiven by Greensill Limited in exchange for a 5% equity stake in Katerra, and enquired whether such debt forgiveness had any relationship with the receivables sold or owed to Greensill Limited.

Because of the news articles discussing Katerra's relationship with Greensill Limited and SVF, certain of Katerra's contract counterparties stopped doing business with Katerra, expressing concerns that Katerra was still burdened with the Greensill Receivables Facility and that Katerra was going to be implicated into the Greensill Insolvency Proceedings. Katerra was quickly faced with a series of operational issues, including: (1) customers on existing projects looked to replace Katerra mid-project; (2) customers for new projects displayed a new-found reluctance to contract with Katerra; (3) customers and their lenders, in general, demanded Katerra provide bonds or blocked funds in escrow accounts under their control to protect themselves; (4) bonding and surety companies were increasingly difficult about providing bonding capacity for new projects; (5) in verbal conversations, banks were not willing to provide any borrowing facilities to Katerra based on recent history and the publication of recent news articles; and (6) Katerra's current capital raises were negatively impacted.

In mid-May 2021, in response to requests for support, SVF informed Katerra that it would not make any further investments to fund Katerra's operations on a go-forward basis to cover Katerra's unexpected capital shortfall stemming from the failure of the PIF Sale, the Greensill Insolvency Proceedings, and the company's historic losses. After SVF II invested over $2.0 billion in equity and capital in Katerra, and approximately $440 million that Katerra asserts that SVF II had invested in Greensill Capital Pty Limited, SVF explained to Katerra that it could not reasonably invest additional funds into Katerra's business plan.

### E. Katerra's Liquidity Constraints and Actions Taken to Preserve Assets

On May 17, 2021, three senior members of Katerra's management team resigned. Shortly thereafter, Katerra created the Special Committee, re-engaged A&M as financial advisor and appointed

Christopher J. Wells and Marc Liebman of A&M as Chief Restructuring Officer and Chief Transformation Officer, respectively, of Katerra. Katerra also re-engaged Houlihan Lokey, as investment banker, to explore potential financing and sale transactions. Together, Katerra, the Special Committee, Kirkland, A&M, and Houlihan Lokey began exploring a number of restructuring options on an expedited basis. Katerra and its advisors engaged their major constituents, as well as third parties, regarding potential restructuring transactions that could be effectuated either in- or out-of-court.

Despite Katerra's best efforts, it was unable to find an investor willing and able to provide the financing necessary for Katerra to meet its ongoing obligations. As a result, by the end of May 2021, Katerra faced a critical liquidity shortfall such that it projected a negative cash balance, requiring an immediate capital infusion to conduct a marketing process for its assets and effectuate an orderly wind down of its domestic businesses.

To preserve liquidity and retain as many employees as possible while searching for solutions, on June 1, 2021, Katerra decided to cease a majority of its operations in the United States, which resulted in the wind down of approximately 82 projects representing 76.9% of its active project revenue. As part of this wind down, Katerra also implemented a reduction in force and terminated 730 of its 1,300 employees in the United States. Katerra's decision to wind down certain projects was based primarily on a project's expected profitability once completed and/or marketability in an asset sale.

F.      **WARN Notices and Litigation**

Prior to filing the chapter 11 petitions, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act") to employees that are expected to be impacted by a qualified "mass layoff" or "plant closing" and certain governmental entities (collectively, the "WARN Act Notices"). Some of the WARN Act Notices were conditional, providing that, in the event that a sale of certain business lines does not occur, or occurs in a manner different than anticipated, and the Debtors are not able to secure additional financing, employees at those locations may experience an employment loss under the WARN Act.

Unless an exception applies, the WARN Act generally requires 60 days' advance notice to affected employees and governmental entities prior to the implementation of a "mass layoff" or "plant closing." The WARN Notices were not issued 60 days before the anticipated terminations due to the applicability of the "faltering company," "unforeseeable business circumstances," and "natural disaster" exceptions under the WARN Act, which relieve Debtors from any obligation to provide additional pay or benefits in the event that employees do not receive pay and benefits for a full 60 days after receiving the notice.

On June 10, 2021, Clifford Martin, Todd Irving, and Joseph Russomanno, on behalf of themselves and all others similarly situated, filed the *Class Action Adversary Proceeding Complaint for (1) Violation of WARN Act 29 U.S.C. § 2101, ET Seq. and (2) Violation of California Warn Act and (3) Violation of New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act and (4) Payment of Unused Vacation Law Under New Jersey Law* [Docket No. 1] (the "WARN Complaint"), alleging that the Debtors failed to give Plaintiffs, as defined therein, and other similarly situated employees of the Debtors at least 60-days' advance notice of termination, as required by the WARN Act. The WARN Complaint seeks, among other things, statutory remedies pursuant to 29 U.S.C. § 2104 and payment of Plaintiffs' unused accrued vacation time under Cal. Lab. L §§ 201, 227.3, New Jersey and Washington state common-law contracts, and

applicable state laws. On July 15, 2021, the Bankruptcy Court entered a stipulation[8] extending the time for Defendant Katerra Inc. to respond to the WARN Complaint from July 15, 2021 to October 15, 2021.

## VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   DIP Financing

Prior to the Petition Date, Houlihan Lokey embarked on a process to raise liquidity on an exigent basis, approaching several parties, including SB Investment Advisers (UK) Limited—an affiliate of SVF—and other parties familiar with Katerra's businesses. Given the very short time frame (approximately two weeks) along with the complexities of Katerra's businesses and underlying assets, it was impractical to approach a broad range of traditional financing sources. As a result, Houlihan Lokey embarked on a very targeted approach to solicit financing. Given its initial engagement on behalf of the Debtors in September 2020, Houlihan Lokey was able to immediately engage in discussions with parties who had a familiarity with the business and could potentially provide capital in a matter of weeks. Houlihan Lokey solicited both in-court and out-of-court financing proposals from SVF, third party lenders, and parties who had expressed an interest in acquiring certain assets of Katerra. Ultimately, the only party both willing and able to provide the liquidity Katerra required on an expedited basis was SB Investment Advisors (UK) Limited.

Accordingly, on the Petition Date, among other first-day relief sought, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [Docket No. 41] (the "DIP Financing Motion") seeking authorization to obtain a senior secured superpriority debtor in possession promissory note in an aggregate principal amount equal to $35 million. On June 7, 2021, the Bankruptcy Court approved the DIP Financing Motion on an interim basis [Docket No. 111], authorizing the Debtors to borrow up to $25 million under the DIP Promissory Note. The final DIP Hearing was scheduled for July 12, 2021 (the "Final DIP Hearing").

Prior to the Final DIP Hearing, the Committee filed its *Emergency Motion to Continue Final Hearing on Emergency Motion for Entry of Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [Docket No. 385] (the "Extension Motion"), seeking a one-week continuance of the Final DIP Hearing and a one-week extension of the Committee's deadline to object to entry of the Final DIP Order. At a hearing held on July 8, 2021, with the agreement of the Debtors, the DIP Lender, and the Committee, the Court continued the hearing to consider the Extension Motion to July 9, 2021 and extended the Committee's deadline to object to entry of the Final DIP Order to July 10, 2021.

After the hearing on the Extension Motion and following further discussions, the Debtors and the DIP Lender agreed, with the support of the Committee, to amend the DIP Agreement by way of the DIP Amendment [Docket No. 546] to, among other things, accommodate the Committee's request for a one-week continuance of the Final DIP Hearing. The Final DIP Hearing was rescheduled for July 19, 2021.

At the Final DIP Hearing, the Committee objected to approval of the DIP Facility on a final basis. The Debtors, the DIP Lender, and the Committee reached a settlement of the Committee's objection

---

[8]    *See Stipulation and Agreed Order* [Docket No. 12], Adv. Pro. No. 21-03440 (DRJ).

pursuant to which the DIP Lender agreed to cap the professional fees of its legal advisor at $3 million with $1 million of such fees to be waived and/or forgiven by the DIP Lender in the event that on or prior to August 3, 2021 the Debtors obtained approval of a replacement DIP facility that indefeasibly paid the DIP Obligations (as defined therein) in full. Following the Final DIP Hearing, the Bankruptcy Court entered the final DIP order [Docket No. 630] (the "Final DIP Order"), authorizing the DIP Facility on a final basis. The Final DIP Order granted releases to the DIP Lender.

Subsequent to the Final DIP Hearing, the Debtors filed a stipulation and agreed order to provide the Debtors with an early repayment discount by (1) waiving the Debtors' obligation to pay the first $1 million of accrued fees and expenses of the DIP Lender's legal advisor and (2) extending the waiver of interest to all accrued interest under the DIP Facility, estimated to be approximately $200,000, provided that the DIP Obligations were repaid in full on or before August 6, 2021 (the "DIP Stipulation"). The DIP Stipulation was entered by the Bankruptcy Court on August 3, 2021 [Docket No. 769].

The Debtors repaid the DIP Facility in full on August 4, 2021, obtaining the benefit of the $1 million reduction in fees and the interest waiver.

### 1.    Independent Investigation

The Bankruptcy Court approved the Final DIP Order following an evidentiary hearing concerning, among other things, the Committee's objection to the granting of certain releases to the DIP Lender. The Conflicts Committee of Katerra Cayman's Board of Directors conducted an independent investigation as to whether the granting of such releases was a reasonable exercise of the Debtors' business judgment and in the best interest of the Debtors' estates. The Conflicts Committee retained Jackson Walker LLP to lead such investigation, which included an examination and inquiry into certain acts, conduct and omissions of the DIP Lender in the months precipitating these Chapter 11 Cases, including with regard to the Debtor's recapitalization transaction that occurred in late 2020.

### B.    First Day Relief

On the Petition Date, in addition to the DIP Financing Motion, the Debtors filed several motions (the "First Day Motions") intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases and minimize disruption. The First Day Motions sought authority to, among other things, obtain DIP financing on an interim basis, reject burdensome executory contracts and unexpired leases, honor employee related wages and benefits obligations, and ensure the continuation of the Debtors' surety program, insurance, cash management systems, and other business operations without interruption. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Marc Liebman in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37], filed on June 7, 2021.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/Katerra.

### C.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- De Minimis Asset Transactions. On June 22, 2021, the Debtors filed the *Emergency Motion to Approve Procedures for De Minimis Asset Transactions* [Docket No 212]

(the "De Minimis Asset Motion") to seek authorization for the Debtors to implement expedited procedures for the sale, transfer, or abandonment of *de minimis* assets, all as more fully set forth therein. On July 6, 2021, the Bankruptcy Court entered an order granting the De Minimis Asset Motion [Docket No. 364].

- Bar Date Motion. On June 14, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates For Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date And Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 171] (the "Bar Date Motion") to (1) establish deadlines for filing Proofs of Claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code, in these Chapter 11 Cases, (2) establish the Amended Schedules Bar Date and the Rejection Damages Bar Date (both as defined therein), (3) approve the form and manner for filing such claims, including any section 503(b)(9) requests for payment, and (4) approve notice of certain bar dates, all as more fully set forth in the Bar Date Motion. On July 8, 2021, the Bankruptcy Court entered an order granting the Bar Date Motion [Docket No. 427].

- Retention Applications. On June 25, 2021, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland, as restructuring counsel [Docket 244], Houlihan Lokey, as financial advisor and investment banker [Docket 243], A&M, as restructuring advisor, Christopher J. Wells, as Chief Restructuring Officer and Marc Liebman, as Chief Transformation Officer [Docket No. 245], and KPMG LLP ("KPMG"), as tax advisor [Docket No. 240]. On June 29, 2021, the Debtors filed an application seeking to retain Jackson Walker LLP ("Jackson Walker") as co-counsel and conflicts counsel [Docket No. 289]. Between July 20, 2021, and [●], the Bankruptcy Court entered orders granting the applications to retain Kirkland, Houlihan Lokey, A&M, KPMG, and Jackson Walker [Docket Nos. 632, [●], 796, 633, and 795]. The foregoing professionals are, in part, responsible for the administration of these Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

- Interim Compensation Motion. On June 14, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, and (II) Granting Related Relief* [Docket No. 170] (the "Interim Compensation Motion") to authorize the Debtors to establish procedures for interim compensation and reimbursement of expenses for Professionals. On July 13, 2021, the Bankruptcy Court entered an order granting the Interim Compensation Motion [Docket No. 558].

- Ordinary Course Professionals Motion. On June 21, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 202] (the "OCP Motion") to authorize the Debtors to retain and compensate certain law firms, accountants, tax professionals, and other non-attorney professionals utilized in the ordinary course of business. On July 20, 2021, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 634].

- Credit Card Programs Motion. On June 30, 2021, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate and*

*Maintain the Credit Card Programs and (B) Enter Into New Credit Card Programs and (II) Granting Related Relief* [Docket No. 308] (the "Credit Card Programs Motion") to authorize the Debtors to enter into the Commercial Card Program and continue and maintain the P-Cards Program (each as defined in the Credit Card Programs Motion). On July 6, 2021, the Bankruptcy Court entered an order granting the Credit Card Programs Motion [Docket No. 371].

- Lifebridge/Amberglen Settlement Motion. On July 1, 2021, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release Agreement By and Among the Debtors and Certain Project Owners, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts In Connection Therewith, and (III) Granting Related Relief* [Docket No. 328] (the "Lifebridge/Amberglen Settlement Motion") to authorize the Debtors to enter into a settlement and release agreement to provide finality in connection with the Lifebridge Kirkland Apartments, Lifebridge Kirkland Senior Living, Amberglen Apartments, and Amberglen Senior Living projects. On July 12, 2021, the Bankruptcy Court entered an order granting the Lifebridge/Amberglen Settlement Motion [Docket No. 533].

### D.    Sale Process

As part of the wind down of their operations, the Debtors engaged in a robust marketing process to find the highest and best available offers for their assets. Houlihan Lokey was initially engaged by the Debtors in September 2020 and then was re-engaged to run this process in May 2021, at which time the Debtors' marketing efforts with respect to substantially all of the Debtors' assets were launched. Prior to and during these Chapter 11 Cases, Houlihan Lokey engaged in a robust, months-long marketing process. The following table summarizes Houlihan Lokey's outreach and the activity of potentially interested parties related to the CLT Assets and Tracy Assets:

| Asset | Contacted | Signed NDA | Indication of Interest Submission | Qualified Bid Submission |
|---|---|---|---|---|
| CLT | 89 | 70 | 8 | 1 |
| Tracy | 69 | 54 | 3 | 1 |

As described in the *Declaration of Jay Weinberger in Support of the Sales of the (I) Spokane, Washington ("CLT") Assets and (II) Tracy, CA Assets* [Docket No. 685], after a robust marketing process, the Debtors selected Blue Varsity LLC and VBC Tracy LLC as stalking horse bidders in connection with the CLT Facility and the Tracy Factory, respectively. No other party ultimately submitted bids that could top the stalking horse bids. Accordingly, the Debtors selected the stalking horse bidders as the successful bidders. The purchase price for the CLT Facility was $50.0 million and the purchase price for the Tracy Factory was $21.25 million (in each case, subject to applicable adjustments).

On August 3, 2021, the Bankruptcy Court approved both sales to the respective stalking horse bidders [Docket Nos. 793, 794]. The sales were consummated shortly thereafter, providing the liquidity needed to wind down the Debtors' estates in an orderly and expeditious manner.

### E. India and Saudi Arabian Business

Debtor Katerra Cayman indirectly owns operations in India and the Kingdom of Saudi Arabia. Those operations are owned and operated by multiple non-Debtor entities,[9] and are not Debtors in the Chapter 11 Cases. Nonetheless, as part of the wind down of the Debtors' operations, the India and KSA Entities are in the process of selling their operating businesses. Any value, if any, from the sale of these entities that remains after the wind down and satisfaction of applicable liabilities will ultimately be realized by Katerra Cayman and used to fund applicable distributions pursuant to the Plan. The Debtors anticipate that the sales will be complete in Q4 of 2021.

### F. Wolff Claim Settlement

In connection with the Debtors' anticipated sale of the CLT Facility and related assets (the "CLT Assets"), as well as the Tracy Factory and related assets (the "Tracy Assets"), the Debtors examined and investigated transactions with certain Wolff entities. Prior to the Petition Date, certain of the Debtors and certain Wolff entities entered into that certain Global Amendment to Construction Contracts dated as of December 30, 2020 (the "Global Amendment"). In addition, the Debtor Katerra Construction LLC granted to Wolff that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated as of December 30, 2020 (the "CLT Deed"). Also on December 30, 2020, Katerra Inc. and Katerra Construction LLC issued that certain Promissory Note in favor of Wolff and Reynolds Ranch SR Development Company LP in the principal sum of $1,684,221.71 (the "Reynolds Ranch Note"), and that certain Promissory Note in favor of Wolff and River Sequel Senior, LLC in the principal sum of $853,439.71 (the "Riverhouse Note" and, collectively with the Global Amendment, the CLT Deed, the Reynolds Ranch Note, and the mutual release and indemnity agreements executed contemporaneously therewith that are described in the Settlement Term Sheet, the "December 2020 Settlement Documents"). Following the Petition Date, the Debtors began reviewing and analyzing the December 2020 Settlement Documents in the context of these bankruptcy cases and immediately engaged in discussions with counsel for Wolff concerning them. Following its formation, the Committee became involved as well in reviewing the December 2020 Settlement Documents. As the Debtors progressed in their Sale-related efforts, the parties began to negotiate potential participation, including credit bid rights, of Wolff in lockstep with their consideration of the December 2020 Settlement Documents, and any claims related thereto. Following those discussions, which were arm's-length and hard-fought, the Debtors agreed to the terms of a settlement (the "Wolff Settlement Agreement") with Wolff and Paxion, as further set forth and described in the Stipulation of Settlement and Agreement Regarding Outstanding Claims and Disputes Between Debtors and Wolff Principal Holdings, LP and Paxion Capital, LP (the "Wolff Stipulation") [Docket No. 766]. The Bankruptcy Court approved the Debtors' entry into the Wolff Settlement Agreement and the Wolff Stipulation pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure following an evidentiary hearing with respect to the same. *See Order Approving Stipulation and Settlement* [Docket No. 791].

### G. Schedules and Statements

On July 9, 2021, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 438–470]. The Debtors filed amended Schedules of Assets and Liabilities on July 29, 2021 [Docket No. 735] with respect to Skyview Concrete LLC.

---

[9] Such entities include Katerra Saudi Arabia LLC, Katerra Operations Ltd, Co., Katerra Technology Services LLP, Katerra India Private Limited, Khan Global Engineering PL, Katerra Technologies Private Limited (collectively, the "India and KSA Entities").

### H. Appointment of Official Committee

On June 22, 2021, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 210], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in these Chapter 11 Cases. The Committee is currently composed of the following members: (1) Liberty Mutual Insurance Company, (2) Haddad Plumbing & Heating, Inc., (3) Thyssenkrupp Elevator Corporation, (4) Autumn Lake Recreation Association, Inc., (5) American Architectural Window & Door Inc., (6) Ro2 Knipe Village LLC, and (7) Jonathan Sanchez. The Committee has retained Fox Rothschild LLP as legal counsel and FTI as financial advisor.

### I. Greensill Limited Liquidation

Greensill Limited entered liquidation in England by way of a special resolution of its members dated July 30, 2021 passed pursuant to section 84 of the Insolvency Act 1986. Andrew Charters and Sarah O'Toole, each a licensed insolvency practitioner of Grant Thornton UK LLP of 30 Finsbury Square, London, UK EC2A 1AG have been duly appointed joint liquidators of Greensill Limited (the "Liquidators"). The Liquidators have the statutory power to bring any action or other legal proceeding in the name and on behalf of Greensill Limited. Greensill Limited's sole asset was the receivables purchased and financed under the Greensill Receivables Facility, and as such the Liquidators primary focus is the circumstances surrounding the purported extinguishment of the Debtors' obligations under the Greensill Receivables Facility. The Liquidators have made the following preliminary determinations regarding the purported extinguishment of the Greensill Receivables Facility and believe that Greensill Limited holds substantial claims and causes of action against the Debtors and other parties.

- From December 2019 through December 2020, Greensill Limited and certain affiliates of the Debtors were parties to a Receivables Purchase Agreement (the "RPA"), dated December 9, 2019, whereby, among other things, Greensill Limited: (i) purchased accounts receivable from certain Debtors and affiliates, and (ii) financed qualifying anticipated future receivables related to projected sales of goods and services.

- Katerra Inc. (Cayman) issued a guarantee in favor of Greensill Limited to secure the sellers' obligations under the RPA, and each other Debtor-party to the RPA guaranteed the obligations of its affiliates thereunder. Greensill Limited was further granted various liens and security interests in certain assets of the sellers pursuant to the RPA and a Facility Fee Letter, Subsequent Upsize Fee Letter and Facility Guarantee Side Letter, dated December 9, 2019 (the "Fee Letter").

- Greensill Limited entered into a participation agreement, dated December 19, 2019, with Greensill Capital UK Limited ("GCUK"), pursuant to which Greensill Limited granted GCUK a participation in the RPA and the accounts receivable acquired thereunder (the "Participation Agreement").

- GCUK assigned the rights and security interests granted to it under the Participation Agreement to a special purpose vehicle, Hoffman S.à.r.l. ("Hoffman"). Hoffman, in turn, issued notes backed by the interests assigned to it, all of which notes were purchased by certain managed funds (the "Funds," and investors in such Funds, "Fund Investors"). Accordingly, the Funds indirectly funded the financing arrangement reflected in the RPA and were the ultimate beneficiaries in the proceeds of the accounts receivable and all or substantially all of the collateral granted under the RPA and Fee Letter.

- Subsequently, as part of a larger transaction with SoftBank (described below), Greensill Limited, Katerra, Inc. (Cayman), and Katerra Inc. (Delaware) entered into a Contribution and Exchange

Agreement, dated December 30, 2020 (the "Disputed Agreement") whereby: (i) Greensill Limited assigned and contributed all of its claims under the RPA to Katerra, Inc. (Cayman) (the "Contributed Claims"), which the Debtors agree aggregated approximately $440 million; (ii) Katerra, Inc. (Cayman) issued approximately 5% of its equity capital (on a fully diluted basis) to Greensill Limited; (iii) Greensill Limited, with the Debtors' full knowledge, simultaneously assigned such equity interests to SVF II Abode (Cayman) Ltd., a company within the SoftBank/Vision Fund Group ("SVF II Abode"), in exchange for no consideration pursuant to a transfer agreement dated December 30, 2020 by and between SVF II Abode and Greensill Limited.

- The Disputed Agreement was part of a larger transaction in which SoftBank/Vision Fund Group purportedly invested $200 million into Debtors in exchange for 94.9% of the equity of Katerra, Inc. (Cayman) on a fully diluted basis. Accordingly, the Liquidators believe that it appears plain that the value of the Contributed Claims ($440 million) substantially exceeded the value of the 5% equity consideration issued in exchange by Katerra, Inc. (Cayman) to Greensill Limited, which, in any event, was simultaneously transferred to SVF II Abode for no consideration.

- The Liquidators dispute the Debtors' assertion that the 5% equity transferred to SVF II Adobe was "in connection with a transaction in which SVF II Abode invested $440 million in the parent company of Greensill." No such "investment" was made. Instead, an entity named SVF II Wyatt Subco (Singapore) PTE. Ltd. made a $440 million unsecured convertible loan Greensill Capital Pty Limited, the ultimate parent of Greensill Limited. This parent entity is not a counterparty to the RPA or otherwise entitled to the accounts receivable proceeds pursuant to the RPA. Indeed, this loan, made about seven weeks before the date of the Disputed Agreement, does not appear to have any legal connection to the Disputed Agreement. Additionally, this loan did not provide any consideration, direct or indirect, to Greensill Limited, GCUK, Hoffman, or the Funds. The Funds were the ultimate beneficiaries of the proceeds of the accounts receivable under the RPA, and a loan made to Greensill Limited's parent company provided no consideration to Greensill Limited or its creditors, including the Funds.

- The Liquidators believe that the effect of the Disputed Agreement was to render Greensill Limited insolvent, to the extent it was not already insolvent, and to deprive the Fund Investors of the value of the Contributed Claims.

- Accordingly, the Liquidators maintain that, at minimum, Greensill Limited has a claim under English law that the Disputed Transaction constituted a transaction at undervalue under section 238 of the Insolvency Act 1986 on the basis that the Disputed Agreement was (i) a transaction entered into for a consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Greensill Limited; (ii) entered into within a period of two years ending on the onset of insolvency of Greensill Limited (i.e., the date of commencement of the liquidation); and (iii) entered into at the time that Greensill Limited was unable to pay its debts or became unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986.

- The Liquidators intend to seek to lift the automatic stay to commence proceedings in the English High Court in London (or such other court of competent jurisdiction) to assert this and potentially other claims so as to ultimately to seek to rescind, avoid, or otherwise unwind the Disputed Agreement, and in addition to or in the alternative, seek damages.

- If the contemplated relief is granted, then (i) Greensill Limited would be reinstated in the position which it was prior to the consummation of the Disputed Agreement and have a secured claim of not less than $440 million against the Debtors, plus interest, and (ii) all security interests supporting

the claim under the RPA should be restored or, to the extent the collateral has been disposed of, those security interests should be deemed to attach to the proceeds of the collateral or other assets of the debtor.

The Debtors disagree with Greensill Limited's position. The Debtors assert that, in connection with the comprehensive transactions that resulted in the termination of the RPA, not only did Greensill Limited and its affiliates receive the consideration noted above, but they also received $440 million from a SoftBank Group Corporation affiliate (a fact that is confirmed by a wire transfer receipt). Accordingly, the Debtors believe that Greensill Limited's claims in these chapter 11 cases are nothing more than an attempt to recover a second time on account of value that Greensill Limited and its affiliates already received. The Debtors intend to file an objection to Greensill Limited's claims in the Bankruptcy Court and all rights related to the foregoing are reserved.

### J.      Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of these Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of these Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with these Chapter 11 Cases.

### K.      Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into thousands of Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume, assume and assign or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time. Indeed, on the Petition Date, the Debtors filed five omnibus motions [Docket Nos. 25–29] seeking to reject hundreds of Executory Contracts and Unexpired Leases. On June 8, 2021, the Bankruptcy Court entered the *Interim Order Authorizing and Approving Procedures to Reject, Assume or Assume and Assign Executory Contracts and Unexpired Leases* [Docket No. 91], approving procedures for the assumption or rejection of Executory Contracts and Unexpired Leases. Pursuant to the approved procedures, the Debtors have rejected approximately 1,200 Executory Contracts and Unexpired Leases as of the date hereof.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, including the Schedule of Assumed Executory Contracts and Unexpired Leases, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a

46

pending motion to assume such Unexpired Lease or Executory Contract (or a Sale Order contemplating the assumption and assignment of such Unexpired Lease or Executory Contract) as of the Confirmation Date (unless the counterparty to such Unexpired Lease or Executory Contract and the Debtors agree otherwise); (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is an Insurance Contract. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. For the avoidance of doubt, such assumptions, assignments, and rejections will be effective on or prior to the Effective Date of the Plan.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

**L.     The Wind-Down Debtors, and Wind Down**

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtor(s) for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into before, on, or after the Effective Date by and between the Debtors or the Wind-Down Debtors, as applicable, and the Purchaser, (3) resolving any Disputed Claims, (4) making distributions on account of Allowed Claims in accordance with the Plan, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to the Wind Down.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the wind down of any remaining assets or operations from and after the Effective Date, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### M.       Recommendation to Support Plan

As described above, the Plan paves the way for an efficient, cost-effective Confirmation process and Consummation of the Plan and Wind Down.  The Debtors urge all Holders of Claims entitled to vote to vote to accept the Plan.

## IX.       RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.       Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1.       Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.       The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 3.       The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to fulfill their obligations related to the Sale Transaction and what, if anything, Holders of Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 4. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 5. The Debtors' Exclusivity Period May Expire

At the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan as of the date hereof. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 6. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the

debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations, and (d) potential disputes with the Purchaser regarding the Debtors' obligations in respect of the Sale Transaction.

### 8.      The Chapter 11 Cases Could Result in a "Structured Dismissal"

If the Confirmation or Consummation of the Plan does not occur, (a) the Plan shall be null and void in all respects other than as set forth therein and (b) nothing contained in the Plan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holder, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holder, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holder, or any other Entity in any respect.

### 9.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10.     Risk of Nonoccurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12. **The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The Debtors believe that the releases, injunctions, and exculpations set forth in the Plan comply with the requirements for approval of such provisions under applicable law. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

13. **The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors**

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

14. **The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated**

The amount of Cash the Debtors ultimately receive on account of the Sale Transaction and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims or Priority Claims may exceed the total amount of Distributable Cash and/or be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

15. **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Debtors, Wind-Down Debtors, and certain Holders of Claims.

B. **Risks Related to the Debtors' Businesses**

1. **The Debtors Will Be Subject to the Risks and Uncertainties Associated With the Chapter 11 Cases**

For the duration of these Chapter 11 Cases, the Debtors' ability to operate, market and sell their assets, and develop and execute a wind-down plan will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) results of the Debtors' remaining sales may be materially lower than projections; and (b) renewed shelter-in-place orders may cause further project delays, shutdowns, and cancellations.

While the Debtors operations are substantially wound down, they are completing certain projects. The foregoing risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with these Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' ability to complete the ongoing projects. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.

In addition, renewed government lockdowns and employee infections could inhibit the Debtors' ability to wind down their businesses. Because of the risks and uncertainties associated with these Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during these Chapter 11 Cases that may be inconsistent with the Debtors' plans.

## X. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in Class 3 that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 (the "Voting Class"). The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 4, 5, 6, 7, and 8, provided that each such Holder in an impaired or potentially impaired class shall receive a form on which to designate its election not to grant the releases under the Plan. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been Disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B. Voting Record Date

**The Voting Record Date is August 24, 2021**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim in Class 3.

### C. Voting on the Plan

**The Voting Deadline is September 24, 2021 at 4:00 p.m. (prevailing Central Time)**.  To be counted as votes to accept or reject the Plan, all Holders of Allowed Claims entitled to vote on the Plan must complete, execute, and return their Ballots so that they are **actually received** by the Notice, Claims, and Balloting Agent pursuant to the Solicitation and Voting Procedures on or before **September 24, 2021, at 4:00 p.m.** prevailing Central Time (the "Voting Deadline").

To vote, complete, sign, and date your ballot and return it (with an original signature) ***promptly*** in the reply envelope enclosed with your ballot or to one of the below addresses.

> **If sent by hand delivery or overnight mail:**
>
> **Katerra Inc. Ballot Processing**
> **c/o Prime Clerk LLC**
> **One Grand Central Place**
> **60 East 42nd Street, Suite 1440**
> **New York, NY  10165**

### OR

**Via E-Ballot Portal.  Submit your Ballot via the Notice, Claims, and Balloting Agent's online portal, by visiting https://cases.primeclerk.com/katerra.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.**

### PLEASE SELECT JUST ONE OPTION TO VOTE.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE, CLAIMS, AND BALLOTING AGENT TOLL FREE AT (877) 329-1824 (TOLL-FREE) OR (347) 532-7909 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO KaterraInfo@primeclerk.com.**

### D. Ballots Not Counted

**The following Ballots shall not be counted in determining the acceptance or rejection of the Plan**:  (1) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any Ballot cast by any Entity that does not hold a Claim in the Voting Class; (3) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed; *provided* that, if the applicable Claims Bar Date (as defined in the Bar Date Order) has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00; (4) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot cast via the Notice, Claims, and Balloting Agent electronic online balloting portal will be deemed to be an original signature); (5) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (6) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.

## XI. CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors and their non-Debtor affiliates are in the process of selling substantially all of their assets. As of the date hereof, the Debtors have already consummated that certain Sale Transaction with respect to the Debtors' most material assets, and the Debtors intend to appoint a Plan Administrator with knowledge of the company and its business to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable. A chapter 7 proceeding will do nothing more than create additional costs and risk associated with converting to a chapter 7 liquidation. Specifically, the Debtors non-Debtor Affiliates have not yet sold their international operations, and a chapter 7 conversion could materially disrupt those sale processes. The Plan likely provides holders of Claims with a larger, timelier recovery due to, among other things, the expectation of incrementally higher costs and significantly lower realized sale proceeds in chapter 7.

A chapter 7 liquidation would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business to support non-Debtor operations through a sale. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Recoveries could be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and the potential incremental time (thereby reducing the present value of any recovery for Holders) and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' business, assets, and these specific Chapter 11 Cases, to complete the administration of the Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to

three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). While information regarding the additional costs are speculative, the costs are higher and more burdensome for the Debtors' estates than the current proposed Plan, which does not have such incremental costs.

Furthermore, with respect to conversion from chapter 11 to chapter 7 and the related increased costs, delays, and lower recoveries, one bankruptcy judge in the Southern District of New York observed:

- "[L]eaving the case in Chapter 11 would, in fact, avoid the diminution of the estate that would actually occur in a Chapter 7 case." (In re Hostess Brands, Inc., No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012), Hr'g Tr. at 146:21-23).

- "[G]iven the loss in value no new fiduciary could be expected to come up to speed in this case … without a destructive delay … unless he or she were to immediately hire the people that are implementing the wind down, which would be a difficult task without doing any analysis on his or her part, the resulting delay would seriously affect the sale value and greatly diminish the likelihood of there being a recovery here for at least the administrative claimants in full." (Id. at 148:17-149:6).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety (90) days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the number and dollar amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in diminution in value, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

## C.     Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full in cash of all administrative and priority claims unless holders of such claims consent to other treatment. The Plan provides for the payment of priority and administrative obligations from Distributable Cash and/or proceeds of the Sale Transaction.

## D.     Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority

in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E. Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the

Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and certain Holders of Claims (each, for purposes of this Article XIII, a "Holder") entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in, or new interpretations of, Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as, for example, Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, U.S. Holders who prepare "applicable financial statements" (as defined in Section 451 of the Tax Code), and Holders who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss special considerations that may apply to persons who are both Holders of Claims and Holders of Interests, nor any differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, (2) that are deemed to reject the Plan, or (3) that are not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation created or organized

under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code, a "U.S. Person") have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. Person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors**

The Plan provides for a Sale Transaction, which is a taxable transaction for U.S. federal income tax purposes. Gain or loss, if any, will be recognized by the Debtors or Wind-Down Debtors, as applicable, based on the difference between the tax basis in the assets that are disposed of in such Sale Transaction and the amount realized with respect to such assets sold in such Sale Transaction. To the extent any taxable income is generated in connection with such Sale Transaction, the Debtors may have certain tax attributes that may be available to offset any such taxable income. The Debtors currently estimate that, as of December 31, 2020, they had approximately $1.792 billion of federal NOLs and certain other tax attributes (collectively, the "Tax Attributes").[10] To the extent that any gains could not be entirely offset with available Tax Attributes, a cash tax liability could arise as a result of, or in connection with, any such Sale Transaction. It is currently unknown whether a cash tax liability is likely to arise in connection with any Sale Transaction, and whether any such cash tax liability ultimately arises depends on, among other things, the Debtors' determination that their Tax Attributes, and ability to claim losses in connection with sales of specific assets for an amount less than their tax basis, is not subject to limitation pursuant to section 382 of the Tax Code or other limitations.

**C.      Cayman Tax Consequences to the Debtors**

Certain of the Debtors, including Katerra Inc. (Cayman), the Debtors' ultimate parent company, are Cayman Islands-incorporated entities. The Cayman Islands generally does not impose obligations under

---

[10]    The Tax Attributes include certain amounts that are subject to limitations on use as a result of prior ownership changes under section 382 of the Tax Code.

any corporate tax regime and, as a result, the Debtors do not anticipate any Cayman Islands tax consequences pursuant to the Plan.

**D.  Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S. Holders of Allowed Claims Entitled to Vote**

**1.  U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 Claims**

Pursuant to the Plan the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Class 3 General Unsecured Claim, each Holder thereof shall receive cash (if any is available to distribute).

Each such U.S. Holder will be treated as exchanging such Allowed Class 3 Claim in a taxable exchange under Section 1001 of the Tax Code for any such General Unsecured Claims Recovery. Accordingly, subject to the rules regarding accrued but untaxed interest, each U.S. Holder of such a Class 3 Claim should recognize gain or loss equal to the difference between (i) the amount of any General Unsecured Claims Recovery received in exchange for such Claim, and (ii) such Holder's adjusted basis, if any, in such Claim.

With respect to the Unliquidated Collateral received, U.S. Holders should obtain a tax basis in such property equal to the property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

**2.  Character of Gain or Loss**

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Class 3 Claim, the character of such gain or loss as long-term or short-term capital gain (or loss) or as ordinary income (or loss) will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Allowed Class 3 Claim for more than one year at the time of the exchange. Each U.S. Holder of an Allowed Class 3 Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

U.S. Holders of an Allowed Class 3 Claim who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of:  (a) $3,000 ($1,500 for married individuals filing separate returns); or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### 3. Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

If the General Unsecured Claim Recovery received by a U.S. Holder of an Allowed Class 3 Claim is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4. Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 5. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

60

**E. Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

**1. Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Allowed Class 3 Claim generally will not be subject to U.S. federal income taxation unless: (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met, or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2. Accrued Interest**

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax; *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

> (a) the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Katerra's stock entitled to vote;

> (b) the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Katerra (each, within the meaning of the Tax Code);

> (c) the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(d)     such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments). As described above in more detail under the heading "*Accrued Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3.     FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed U.S. Treasury regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's exchange of its Claim.

F.     **Information Reporting and Backup Withholding**

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. The IRS

may make the information returns reporting withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder under the Plan. In addition, backup withholding of taxes (currently at a 24 percent rate) will generally apply to payments in respect of an Allowed Class 3 Claim under the Plan unless the Holder of such Allowed Class 3 Claim: (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (2) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally by, in the case of a U.S. Holder, such U.S. Holder providing a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder providing a properly executed applicable IRS Form W-8 (or otherwise establishing such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.  RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 26, 2021  
       Houston, Texas

KATERRA INC.  
on behalf of itself and Debtor affiliates.


*/s/ Marc Liebman*  
Marc Liebman  
Chief Transformation Officer  
Katerra Inc.


COUNSEL:

**JACKSON WALKER LLP**  
Matthew D. Cavenaugh (TX Bar No. 24062656)  
Jennifer F. Wertz (TX Bar No. 24072822)  
J. Machir Stull (TX Bar No. 24070697)  
1401 McKinney Street, Suite 1900  
Houston, Texas  77010  
Telephone:   (713) 752-4200  
Facsimile:   (713) 752-4221  
Email:        mcavenaugh@jw.com  
          jwertz@jw.com  
          mstull@jw.com

*Co-Counsel to the Debtors*  
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)  
Christine A. Okike, P.C. (admitted *pro hac vice*)  
601 Lexington Avenue  
New York, New York  10022  
Telephone:   (212) 446-4800  
Facsimile:   (212) 446-4900  
Email:        joshua.sussberg@kirkland.com  
          christine.okike@kirkland.com

-and-

Joshua M. Altman (admitted *pro hac vice*)  
300 North LaSalle Street  
Chicago, Illinois  60654  
Telephone:   (312) 862-2000  
Facsimile:   (312) 862-2200  
Email:        josh.altman@kirkland.com


*Co-Counsel to the Debtors*  
*and Debtors in Possession*

**EXHIBIT A**

**Plan**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| KATERRA INC., *et al.*,[1] | ) | Case No. 21-31861 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## AMENDED JOINT CHAPTER 11 PLAN OF
## KATERRA INC. AND ITS DEBTOR SUBSIDIARIES

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                     jwertz@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                     christine.okike@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           josh.altman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  August 26, 2021

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/katerra. The location of Debtor Katerra Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 9305 East Via de Ventura, Scottsdale, Arizona 85258.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................................................................1

    A.     Defined Terms ........................................................................................................................1
    B.     Rules of Interpretation .........................................................................................................10
    C.     Computation of Time ..........................................................................................................10
    D.     Governing Law ....................................................................................................................10
    E.     Reference to Monetary Figures ...........................................................................................11
    F.     Reference to the Debtors or the Wind-Down Debtors .........................................................11
    G.     Nonconsolidated Plan .........................................................................................................11

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS .................................................................................................................................................11

    A.     Administrative Claims and Priority Tax Claims. .................................................................11
    B.     Professional Fee Claims ......................................................................................................12
    C.     DIP Claims ..........................................................................................................................13
    D.     Statutory Fees ......................................................................................................................13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................13

    A.     Classification of Claims and Interests .................................................................................13
    B.     Treatment of Claims and Interests ......................................................................................14
    C.     Special Provision Governing Unimpaired Claims ...............................................................16
    D.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........16
    E.     Subordinated Claims ...........................................................................................................16
    F.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..................16
    G.     Controversy Concerning Impairment ..................................................................................17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................................17

    A.     Restructuring Transactions ..................................................................................................17
    B.     Sale Transaction; Sources of Consideration for Plan Distributions .....................................17
    C.     Wind-Down Debtors ...........................................................................................................17
    D.     Wind-Down Debtors Document Retention Obligations .......................................................18
    E.     Plan Administrator ..............................................................................................................18
    F.     Wind Down .........................................................................................................................20
    G.     Plan Administrator and Post-Confirmation Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation ...........................................................20
    H.     Tax Returns .........................................................................................................................20
    I.     Dissolution of the Debtors and Wind-Down Debtors ..........................................................20
    J.     Cancellation of Securities and Agreements .........................................................................21
    K.     Corporate Action .................................................................................................................21
    L.     Effectuating Documents; Further Transactions ...................................................................21
    M.     Section 1146 Exemption .....................................................................................................21
    N.     Preservation of Causes of Action ........................................................................................22
    O.     Closing the Chapter 11 Cases .............................................................................................22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............23

    A.     Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases .........................................................................................................23
    B.     D&O Liability Insurance Policies ........................................................................................23
    C.     Indemnification Obligations ................................................................................................23

D.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................................24
E.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned)..................................................................................................................................24
F.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases............25
G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements..........................25
H.      Reservation of Rights.....................................................................................................................25
I.      Nonoccurrence of Effective Date ..................................................................................................25

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................25
A.      Timing and Calculation of Amounts to Be Distributed .................................................................25
B.      Disbursing Agent............................................................................................................................26
C.      Rights and Powers of Disbursing Agent ........................................................................................26
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.....................................26
E.      Compliance with Tax Requirements ..............................................................................................27
F.      Allocations......................................................................................................................................27
G.      No Postpetition Interest on Claims.................................................................................................27
H.      Foreign Currency Exchange Rate. .................................................................................................27
I.      Setoffs and Recoupment ................................................................................................................28
J.      Claims Paid or Payable by Third Parties........................................................................................28
K.      Settlement of Greensill Claims ......................................................................................................29

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ..................................................................................................................................29
A.      Allowance of Claims ......................................................................................................................29
B.      Claims Administration Responsibilities.........................................................................................29
C.      Estimation of Claims......................................................................................................................29
D.      Adjustment to Claims without Objection .......................................................................................29
E.      Time to File Objections to Claims ..................................................................................................29
F.      Disallowance of Claims .................................................................................................................30
G.      Amendments to Claims ..................................................................................................................30
H.      No Distributions Pending Allowance..............................................................................................30
I.      Distributions after Allowance ........................................................................................................30
J.      Special Rules for Distributions to Holders of Disputed Claims ......................................................30

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS...............................31
A.      Settlement, Compromise, and Release of Claims and Interests .....................................................31
B.      **Release of Liens** ...........................................................................................................................31
C.      **Release by the Debtors** ................................................................................................................31
D.      **Third-Party Release** ...................................................................................................................32
E.      **Exculpation** ................................................................................................................................33
F.      **Injunction**...................................................................................................................................33
G.      Securities and Exchange Commission Considerations.....................................................................34
H.      Protections against Discriminatory Treatment. ..............................................................................34
I.      Reimbursement or Contribution.....................................................................................................34
J.      Term of Injunctions or Stays.........................................................................................................34

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...........................35
A.      Conditions Precedent .....................................................................................................................35
B.      Waiver of Conditions .....................................................................................................................35
C.      Substantial Consummation ............................................................................................................35
D.      Effect of Nonoccurrence to the Confirmation Date or Effective Date. ...........................................35

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..................................... 35

    A.    Modification and Amendments .................................................................................. 35
    B.    Effect of Confirmation on Modifications .................................................................. 36
    C.    Revocation or Withdrawal of Plan ............................................................................ 36

ARTICLE XI. RETENTION OF JURISDICTION ............................................................................................ 36

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................................... 38

    A.    Immediate Binding Effect ......................................................................................... 38
    B.    Additional Documents .............................................................................................. 38
    C.    Payment of Statutory Fees. ....................................................................................... 38
    D.    Statutory Committee and Cessation of Fee and Expense Payment ........................... 38
    E.    Reservation of Rights ............................................................................................... 38
    F.    Successors and Assigns ............................................................................................. 39
    G.    Notices ...................................................................................................................... 39
    H.    Entire Agreement ...................................................................................................... 40
    I.    Exhibits ..................................................................................................................... 40
    J.    Non-Severability of Plan Provisions ........................................................................ 40
    K.    Votes Solicited in Good Faith .................................................................................. 40
    L.    Waiver or Estoppel ................................................................................................... 40
    M.    Conflicts .................................................................................................................... 40

## INTRODUCTION

Katerra Inc. and its debtor affiliates as debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors" or "Katerra"), in the above-captioned Chapter 11 Cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court [Docket No. 33]. The Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classification and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, as well as a summary and description of the Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms*

As used in the Plan, capitalized terms have the meanings ascribed to them below.

1.      "*A&M Officers*" means Marc Liebman, Christopher J. Wells, and Adam Titus.

2.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors and (b) Allowed Professional Fee Claims in the Chapter 11 Cases.

3.      "*Administrative Claim Bar Dates*" means the deadline for filing requests for payment of Administrative Claims, which shall be (a) 30 days after the Confirmation Date with respect to Claims that arose before the Confirmation Date; (b) 30 days after the Effective Date with respect to Claims that arose on or after the Confirmation Date but prior to the Effective Date; (c) the deadline for filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth in the Bar Date Order; and (d) any other date(s) established by the Bankruptcy Court by which such requests must be Filed pursuant to court order. For the avoidance of doubt, nothing in Article VIII.C–Article VIII.F shall preclude any party from asserting an Administrative Claim and the Debtors reserve all rights related thereto.

4.      "*Administrative and Priority Claims Recovery*" means Cash equal to the amount of such Allowed Administrative Claim as set forth in Article II.A herein.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as

otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Wind-Down Debtor, as applicable. For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

7. "***Avoidance Actions***" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to chapter five of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws. For the avoidance of doubt, Avoidance Actions shall not include any claims transferred to any Purchaser pursuant to any Purchase Agreement.

8. "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

9. "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

10. "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

11. "***Bar Date***" means, collectively, the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed pursuant to the Bar Date Order.

12. "***Bar Date Order***" means that certain *Order (I) Setting Bar Dates for Filing Proofs of Claim Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 427].

13. "***Business Day***" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

14. "***Cash***" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

15. "***Causes of Action***" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, suits, obligations, liabilities, accounts, defenses, affirmative defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise. Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud,

mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

16.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code, and when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.     "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

18.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date (as may be extended by the Bankruptcy Court upon the request of the Debtors or the Wind-Down Debtors) and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtors, as applicable, and by an order of the Bankruptcy Court for objecting to Claims.

19.     "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

20.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

21.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on June 22, 2021 [Docket No. 210].

22.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

23.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

24.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

25.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

26.     "*Consummation*" means the occurrence of the Effective Date.

27.     "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

28.     "*Cure Obligations*" means all (a) Cure Claims and (b) other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

29.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, members, trustees, and any Scheduled Party (as defined in such policies).

30.     "*DIP Amendment Order*" means the *Order (I) Approving the Amendment to the DIP Agreement and (II) Granting Related Relief* [Docket No. 546].

31.     "**DIP Claims**" means all Claims against any of the Debtors arising under the DIP Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

32.     "**DIP Facility**" has the meaning set forth in the Interim DIP Order.

33.     "**DIP Lender**" means SB Investment Advisers (UK) Limited in its capacity as the lender party to the DIP Promissory Note.

34.     "**DIP Orders**" means, collectively, the Interim DIP Order, the DIP Amendment Order, and the Final DIP Order.

35.     "**DIP Promissory Note**" means that certain *Senior Secured Super-Priority Debtor-in-Possession Promissory Note* dated June 10, 2021 (as may be amended, supplemented, or otherwise modified from time to time), between Katerra Inc., as borrower, the Debtor guarantors that are party thereto, and the DIP Lender.

36.     "**Disbursing Agent**" means the Debtors or the Plan Administrator (as applicable), or the Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

37.     "**Disclosure Statement**" means the *Disclosure Statement for the Joint Chapter 11 Plan of Katerra Inc. and Its Debtor Subsidiaries*, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

38.     "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.     "**Disputed Claims Reserve**" means one or more reserves for those Claims that are Disputed Claims as of the Distribution Record Date, which reserves shall be administered by the Plan Administrator.

40.     "**Distributable Cash**" means all Cash, if any, available after giving effect to the Reserves, plus any excess Cash from any Reserves not used for the purposes of such Reserve after satisfaction of all Claims contemplated by such Reserve (including for the avoidance of doubt, payment in full of Allowed Professional Fee Claims), plus any other Cash available in the Estates.

41.     "**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing or such other date as is designated in a Final Order of the Bankruptcy Court.

42.     "**Effective Date**" means the date on or after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

43.     "**Entity**" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

44.     "**Estate**" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

45.     "**Exculpated Party**" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee and each of its members; (d) the Plan Administrator; (e) the DIP Lender; (f) the A&M Officers; (g) Madhav Dhar; and (h) each Related Party of each Entity in clauses (a) through (e); *provided* that each of the Non-Released D&O Parties shall not be an "Exculpated Party."

46. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

47. "*Existing Interests*" means the Interests in Katerra Inc. (Cayman).

48. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

49. "*File*" or "*Filed*" means file or filed with the Bankruptcy Court in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice, Claims, and Balloting Agent.

50. "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 630].

51. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed relating to such order shall not cause such order to not be a Final Order.

52. "*General Unsecured Claim*" means any Claim other than: (a) an Administrative Claim (including a Professional Fee Claim); (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Secured Claim; or (e) an Intercompany Claim.

53. "*General Unsecured Claims Recovery*" means Distributable Cash, if any, after all senior Classes of Claims are paid in full.

54. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

55. "*Greensill*" means Greensill Limited (In Liquidation).

56. "*Greensill Claims*" means the Proofs of Claim numbered by the Notice, Claims, and Balloting Agent as claim numbers 753, 757, 758, 759, 762, 763, 766–69, 774–76, 778, 787–90, 792–805, and 807 filed by Greensill.

57. "*Holder*" means an Entity holding a Claim or Interest, as applicable.

58. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

59. "*Independent Directors*" means Pamela Corrie and Harvey Tepner.

60. "*Insurance Company*" means any company or other Entity that issued an Insurance Contract, any third party administrator of or for any Insurance Contract, and any respective predecessors, successors, and/or Affiliates of any of the foregoing.

61. "*Insurance Contracts*" means all insurance policies that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, letters of indemnity,

documents or instruments relating thereto. For the avoidance of doubt, the term Insurance Contracts shall include, but are not limited to, D&O Liability Insurance Policies, insurance policies providing workers' compensation coverage and claims handling agreements.

62. "***Intercompany Claim***" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

63. "***Intercompany Interest***" means an Interest in one Debtor held by another Debtor.

64. "***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

65. "***Interim DIP Order***" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 111].

66. "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

67. "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

68. "***Non-Released D&O Claims***" means any Retained Causes of Action held by the Debtors and their respective Estates or creditors against the Non-Released D&O Parties.

69. "***Non-Released D&O Parties***" means the Debtors' former directors or officers, solely in their respective capacities as such, against whom the Debtors and their respective Estates or creditors may hold Claims and Causes of Action. For the avoidance of doubt, the Independent Directors, the A&M Officers, and the SoftBank Directors are not Non-Released D&O Parties.

70. "***Notice, Claims, and Balloting Agent***" means Prime Clerk LLC in its capacity as notice, claims, and balloting agent for the Debtors and any successor.

71. "***Other Priority Claim***" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

72. "***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

73. "***Petition Date***" means June 6, 2021, the date on which each of the Debtors commenced the Chapter 11 Cases.

74. "***Plan***" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto).

75. "***Plan Administrator***" means the Person or Entity, or any successor thereto, designated by the Committee in consultation with the Debtors, who will be disclosed no less than seven days prior to the Confirmation Hearing, to have all powers and authorities set forth in Article IV.F of the Plan.

76. "***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), which shall be in form and substance reasonably acceptable to the Committee, to be Filed by the Debtors no later than fourteen (14) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) Schedule of Retained Causes of Action; (c) the identity and terms of compensation of the Plan

Administrator; (d) any transition services agreement between any Purchaser and the Debtors (to the extent not already filed on the Docket in connection with a Sale); (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Budget; (g) the Post-Confirmation Oversight Committee Agreement; and (h) any other necessary documentation related to any Sale Transaction or other Restructuring Transactions.

77.     "*Post-Confirmation Oversight Committee*" means the oversight committee comprised of up to three creditors appointed by the Committee pursuant to the terms of the Plan and identified in the Plan Supplement.

78.     "*Post-Confirmation Oversight Committee Agreement*" means the agreement to be executed as of the Effective Date establishing the Post-Confirmation Oversight Committee pursuant to the Plan, substantially in the form Filed with the Plan Supplement and all ancillary documents and agreements related thereto.

79.     "*Post Effective Date Reserve*" means a reserve established by the Plan Administrator in accordance with Article IV.D hereof in an amount to satisfy the Wind-Down Budget.

80.     "*Priority Claims*" means collectively, Priority Tax Claims and Other Priority Claims.

81.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against any of the Debtors of the kind specified in section 507(a)(8) of the Bankruptcy Code.

82.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

83.     "*Professional*" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

84.     "*Professional Fee Claim*" means any Administrative Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

85.     "*Professional Fee Escrow Account*" means an escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as described in Article II.B.2 hereof as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.

86.     "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated pursuant to Article II.B.3 of the Plan and including any Cash amount that has been escrowed for a similar purpose during the Chapter 11 Cases, which previously escrowed amounts will be transferred to the Professional Fee Escrow Account.

87.     "*Proof of Claim*" means a written proof of claim Filed against any of the Debtors in the Chapter 11 Cases.

88.     "*Proof of Interest*" means a written proof of interest Filed against any of the Debtor in the Chapter 11 Cases.

89.     "*Purchase Agreement*" means any agreement(s) between the Debtors and a third-party Purchaser memorializing any Sale Transaction.

90.     "*Purchaser*" means a purchaser under a Purchase Agreement.

91.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

92.     "**Related Party**" means, collectively, with respect to an Entity, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, representatives, and advisors, each solely in their capacities as such, and the respective heirs, executors, estates, servants and nominees of the foregoing.  For the avoidance of doubt, none of Greensill Capital Pty Limited nor any of its direct or indirect subsidiaries shall be considered a Related Party.

93.     "**Released Party**" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee and each of its members; (d) the Plan Administrator; (e) the DIP Lender; (f) the Releasing Parties; and (g) each Related Party of each Entity in clauses (a) through (f); *provided* that (i) the Non-Released D&O Parties; (ii) the parties not released as part of the "Non-Released Claims" described and preserved in paragraph 29 of the order entered at Docket No. 414; and (iii) any Holder of a Claim or Interest that opts out of, or objects to, the releases contained in the Plan, in each case, shall not be a "Released Party."

94.     "**Releasing Parties**" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee and each of its members; (d) the Plan Administrator; (e) the DIP Lender; (f) all Holders of Claims or Interests that vote to accept the Plan; (g) all Holders of Claims or Interests that are deemed to accept the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (h) all Holders of Claims or Interests that are deemed to reject the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (i) all Holders of Claims or Interests that abstain from voting on the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (j) all Holders of Claims or Interests that vote to reject the Plan and who do not opt out of the releases in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; and (k) each Related Party of each Entity in clauses (a) through (j).

95.     "**Reserves**" means, collectively the Post Effective Date Reserve, the Professional Fee Escrow Account, any Disputed Claims Reserve, and any other reserve established by the Plan Administrator in its reasonable business judgment.

96.     "**Restructuring Transactions**" means the transactions described in Article IV.A of the Plan.

97.     "**Restructuring Transactions Memorandum**" means an exhibit to the Plan Supplement that sets forth the steps to be carried out to effectuate the Restructuring Transactions, as the same may be amended, supplemented, and modified through the Effective Date.

98.     "**Retained Causes of Action**" means the Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan, any Purchase Agreement, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders and the Wolff Settlement Order), as the same may be amended, modified, or supplemented from time to time by the Debtors.

99.     "**Sale Order**" means, collectively, any order(s) of the Bankruptcy Court authorizing a Sale Transaction.

100.     "**Sale Transaction**" means any Bankruptcy Court-approved sale(s) (including but not limited to those at Docket Nos. 412, 414, 715, 793, and 794) and sales of assets by the Wind-Down Debtors, either as a going-concern or otherwise, of some or all of the Debtors' or Wind-Down Debtors' assets to a Purchaser pursuant to a Purchase Agreement.

101. "**_Sale Transaction Cash Proceeds_**" means all Cash proceeds of a Sale Transaction.

102. "**_Schedule of Assumed Executory Contracts and Unexpired Leases_**" means any schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan (as the same may be amended, modified, or supplemented from time to time by the Debtors).

103. "**_Schedule of Retained Causes of Action_**" means the schedule of Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan, any Purchase Agreement, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders and the Wolff Settlement Order), as the same may be amended, modified, or supplemented from time to time by the Debtors.

104. "**_Schedules_**" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may be amended, modified, or supplemented from time to time.

105. "**_SEC_**" means the United States Securities and Exchange Commission.

106. "**_Section 510(b) Claim_**" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

107. "**_Secured_**" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

108. "**_Securities Act_**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

109. "**_Security_**" means a security as defined in section 2(a)(1) of the Securities Act.

110. "**_SoftBank Directors_**" means, collectively, Madhav Dhar, Jeffrey Housenbold, and Justin Wilson as former directors of Katerra Inc. (Cayman).

111. "**_U.S. Trustee_**" means the Office of the United States Trustee for the Southern District of Texas.

112. "**_Unexpired Lease_**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

113. "**_Unimpaired_**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

114. "**_Voting Deadline_**" means 4:00 p.m. (prevailing Central Time) on September 24, 2021.

115. "**_Wind Down_**" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article IV.F.

116. "**_Wind-Down Budget_**" means that certain budget governing the fees, expenses, and disbursements required for the Wind Down.

117.     "***Wind-Down Debtors***" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

118.     "***Wolff Settlement Order***" means the *Order Approving Stipulation and Settlement* [Docket No. 791].

*B.     Rules of Interpretation*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any effectuating provisions may be interpreted by the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

*C.     Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

*D.     Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as

applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the applicable Debtor or the Wind-Down Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Wind-Down Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable and to the extent the context requires.

G.      *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims, have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims and Priority Tax Claims.*

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Debtors or the Wind-Down Debtors no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date.** Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Wind-Down Debtors and the requesting party.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court or as agreed with the Wind-Down Debtors.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or Wind-Down Debtors against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full

11

and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**B.**     *Professional Fee Claims*

      1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Plan Administrator and/or Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

      2.      <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in accordance with Article II.A of the Plan.

When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Post Effective Date Reserve.

      3.      <u>Professional Fee Escrow Amount</u>

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors, or the Wind-Down Debtors (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors. The Debtors and Wind-Down Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Wind-Down Debtors (as applicable), such reasonable Claims for compensation or reimbursement of expenses incurred by the retained professionals of the Debtors and Wind-Down Debtors (as applicable). If the Debtors or Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      DIP Claims

The Debtors operated under a Bankruptcy Court-approved DIP Facility, as memorialized in the DIP Orders. The Debtors paid off their DIP Facility in full on August 4, 2021. Accordingly, DIP Claims are satisfied and entitled to no additional recovery pursuant to the Plan.

D.      Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Plan Administrator and/or Wind-Down Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Wind-Down Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.F hereof.

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment in accordance with Article VI hereof.

1.      <u>Class 1 - Secured Claims</u>

(a)      *Classification:* Class 1 consists of all Secured Claims.

(b)      *Treatment:* Each Holder of an Allowed Secured Claim shall receive:

(i)      payment in full in Cash of such Holder's Allowed Secured Claim;

(ii)      the collateral securing such Holder's Allowed Secured Claim; or

(iii)      such other treatment rendering such Holder's Allowed Secured Claim Unimpaired.

(c)      *Voting:* Class 1 is Unimpaired under the Plan. Holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 - Other Priority Claims</u>

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment:* Each Holder of an Allowed Other Priority Claim shall receive:

(i)      payment in full in Cash of such Holder's Allowed Other Priority Claim; or

(ii)      such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

     (c)    *Voting:* Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - General Unsecured Claims</u>

     (a)    *Classification:* Class 3 consists of all General Unsecured Claims.

     (b)    *Treatment:* On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery until paid in full.

     (c)    *Voting:* Class 3 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 - Intercompany Claims</u>

     (a)    *Classification:* Class 4 consists of all Intercompany Claims.

     (b)    *Treatment*: Each Allowed Other Intercompany Claim shall, at the option of the Debtors or the Wind-Down Debtors, either on or after the Effective Date, be: (a) Reinstated or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed without any distribution on account of such Intercompany Claim.

     (c)    *Voting*: Class 4 is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 - Intercompany Interests</u>

     (a)    *Classification:* Class 5 consists of all Intercompany Interests.

     (b)    *Treatment*: On the Effective Date, Intercompany Interests shall, at the option of the Debtors or the Wind-Down Debtors, either be: (a) Reinstated or (b) discharged, canceled, released, and extinguished and of no further force or effect without any distribution on account of such Intercompany Interests.

     (c)    *Voting*: Class 5 is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - Existing Interests</u>

     (a)    *Classification*: Class 6 consists of all Existing Interests.

     (b)    *Treatment*: Each Allowed Existing Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Interests shall be entitled to any recovery or distribution under the Plan on account of such Existing Interests.

     (c)    *Voting*: Class 6 is Impaired under the Plan. Holders of Existing Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 - Section 510(b) Claims</u>

(a)    *Classification:* Class 7 consists of all Section 510(b) Claims.

(b)    *Allowance:* Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by a Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c)    *Treatment*: Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims, if any, will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)    *Voting:* Class 7 is Impaired under the Plan. Holders (if any) of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Such Holders (if any) are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.    *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.    *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

16

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Restructuring Transactions*

On the Effective Date, to the extent not inconsistent with any Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of any Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; *provided, however*, that no such restructuring transactions may violate the terms of any Executory Contract or Unexpired Lease assumed by the Debtors.

B.    *Sale Transaction; Sources of Consideration for Plan Distributions*

The Plan Administrator and/or Wind-Down Debtors will fund distributions under the Plan with (i) Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, (ii) any remaining Sale Transaction Cash Proceeds after giving effect to the Wind Down process contemplated by the Plan, and (iii) the proceeds of any other non-Cash assets held by the Wind-Down Debtors.  Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan or transferred to a Purchaser pursuant to a Purchase Agreement on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.  The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.  For the avoidance of doubt, the Sale Transaction Cash Proceeds of any Sale Transaction shall be distributed to the creditors of the Debtor that sold the applicable assets in accordance with the priority scheme set forth in the Bankruptcy Code.

C.    *Wind-Down Debtors*

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date, (2) performing the Debtors' obligations under any Purchase Agreement or any transition services agreement entered into in connection therewith (to the extent agreed by the Wind-Down Debtors), (3) resolving any Disputed Claims, (4) making distributions on

account of Allowed Claims in accordance with the Plan, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any non-Cash Estate assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan. Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

D.      *Wind-Down Debtors Document Retention Obligations.*

On and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, as applicable, may maintain or dispose of documents in accordance with their discretion; *provided* that the Wind-Down Debtors and any successors in interest thereto shall retain and preserve all books, records, emails, and other documents relating to (i) the Debtors' Renovations and/or U.S. Construction businesses from and after January 1, 2018 that are in the possession of the Wind-Down Debtors immediately following the Effective Date, and shall provide the SEC with reasonable access to all such documents and (ii) any Retained Causes of Action, including, but not limited to, the Non-Released D&O Claims. The Wind-Down Debtors shall not destroy or otherwise abandon any such documents or records in clause (i) of the preceding sentence without providing the SEC at least sixty (60) days' prior written notice of its intent to abandon or destroy such materials, and a reasonable opportunity to obtain possession thereof. Such notice shall be provided via email to: Amy L. Friedman at friedmana@sec.gov.

E.      *Plan Administrator*

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have been resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into in connection therewith.

The powers and responsibilities of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of any Sale Transaction; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) resolving any Disputed Claims; (4) making distributions on account of Allowed Claims in accordance with the Plan; (5) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (6) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (7) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (8) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (9) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; (10) providing not less than quarterly reports concerning the Wind Down on topics to be agreed upon by the Plan Administrator and the Post-Confirmation Oversight Committee; and (11) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy

18

Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon thirty (30)-days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

       1.       Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Committee in consultation with the Debtors. The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

       2.       Retention of Professionals

The Plan Administrator shall have the right, in consultation with the Post-Confirmation Oversight Committee, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

       3.       Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be determined by the Committee in consultation with the Debtors or Wind-Down Debtors (as applicable) and the Post-Confirmation Oversight Committee as described in the Plan Supplement.

       4.       Funding of Reserves, including the Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund each of the Reserves for the purposes of such Reserves as set forth herein. The Post Effective Date Reserve will be funded with an amount of Cash that the Plan Administrator deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties hereunder that will at least cover the costs of the Wind-Down Budget. The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve. The Plan Administrator may create reserve-specific segregated accounts from the Post Effective Date Reserve in accordance with its business judgment, and may move Distributable Cash into the Post Effective Date Reserve at any time to the extent needed, in the Plan Administrator's business judgement, to cover unanticipated costs of the Wind-Down. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

To the extent any amounts in a Reserve are tied to Claims that become Disallowed, the Plan Administrator may, in its business judgment, remove the amount in such Reserve that was allocated to such Claim from the Reserve and move it to Distributable Cash. Any amounts remaining in any Reserve after payment of all Claims contemplated by such Reserve in full shall promptly be transferred to the Post Effective Date Reserve (or become Distributable Cash, as appropriate) and shall be distributed according to the priority set forth in Article III without any further action or order of the Bankruptcy Court.

5.     Establishment of the Post-Confirmation Oversight Committee

Prior to the Effective Date, a committee shall be appointed to serve as the Post-Confirmation Oversight Committee pursuant to the terms of the Post-Confirmation Oversight Committee Agreement.  Members of the Post-Confirmation Oversight Committee shall have the duties and oversight responsibilities set forth in the Post-Confirmation Oversight Committee Agreement and in the Plan.  For the avoidance of doubt, the Post-Confirmation Oversight Committee may not direct the Plan Administrator or the members of the Post-Confirmation Oversight Committee to act in a manner inconsistent with the Plan Administrator's fiduciary duties or powers and responsibilities under the Plan.

F.     *Wind Down*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Wind-Down Debtors.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Plan and take any actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

G.     *Plan Administrator and Post-Confirmation Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation*

The Plan Administrator, Post-Confirmation Oversight Committee, and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, managers, and any Scheduled Party (as defined in the D&O Liability Insurance Policies) in the ordinary course of business.

H.     *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

I.     *Dissolution of the Debtors and Wind-Down Debtors*

On or after the Effective Date, the Plan Administrator may File one or more certifications with the Bankruptcy Court that it has substantially administered the Plan for one or each of the Debtors and such Debtors shall

be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor is formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

J.    *Cancellation of Securities and Agreements*

Upon the Effective Date: (1) the obligations of the Debtors under any certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be canceled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

K.    *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors or the Wind-Down Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

M.    *Section 1146 Exemption*

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax,

conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.     Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, and/or in the DIP Orders, or transferred to a Purchaser pursuant to a Purchase Agreement.

The Wind-Down Debtors, through the Plan Administrator, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything contained herein to the contrary (including the releases described in Article VIII), to the extent the Debtors are releasing or have previously released certain claims and Causes of Action against a party, including pursuant to the Plan, any Sale Transaction, any Purchase Agreement, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders and the Wolff Settlement Order), nothing in the Plan shall be construed to revive such released claims and Causes of Action against such party or be construed to impair or otherwise limit the releases provided thereunder.

*O.     Closing the Chapter 11 Cases*

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the last remaining Chapter 11 Case of the last remaining Debtor Entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, including the Schedule of Assumed Executory Contracts and Unexpired Leases, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract (or a Sale Order contemplating the assumption and assignment of such Unexpired Lease or Executory Contract) as of the Confirmation Date (unless the counterparty to such Unexpired Lease or Executory Contract and the Debtors agree otherwise); (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is an Insurance Contract. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. For the avoidance of doubt, such assumptions, assignments, and rejections will be effective on or prior to the Effective Date of the Plan.

B.      *D&O Liability Insurance Policies*

Notwithstanding anything in the Plan to the contrary, the D&O Liability Insurance Policies shall be treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies pursuant to sections 105 and 365 of the Bankruptcy Code in their entirety. The Wind-Down Debtors shall maintain all D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, managers, any Scheduled Party (as defined in the D&O Liability Insurance Policies), any other insureds, and all such directors, members, trustees, officers, managers, Scheduled Parties (as defined in the D&O Liability Insurance Policies), and other insureds of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date, subject in all respects to the terms of the D&O Liability Insurance Policies.

C.      *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, any Scheduled Party (as defined in the D&O Liability Insurance Policies), other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the Wind-Down Debtors' obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Wind-Down Debtors, including any D&O Liability Insurance Policies. For the avoidance of doubt, neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses.

D.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or Confirmation Order not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Wind-Down Debtors, the Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims. For the avoidance of doubt, nothing provided herein shall extend or modify any previously established deadline to file a claim arising from the rejection of an Executory Contract or Unexpired Lease previously rejected by the Debtors.

E.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned)*

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by performance or payment of the default amount in Cash on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the Cure Obligation, (2) the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned), or (3) any other matter pertaining to assumption (or assumption and assignment) or the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be determined either (x) by agreement of the parties to such dispute or (y) following the entry of a Final Order or orders resolving the dispute and approving the assumption (or assumption and assignment).

At least fourteen (14) days prior to the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed to the applicable counterparties and their known counsel, notices of proposed assumption (or assumption and assignment), proposed cure, procedures for objecting thereto, and procedures for resolution by the Bankruptcy Court of any related disputes. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption (or assumption and assignment) or related cure amount must be Filed, served, and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption (or assumption and assignment) or cure amount will be deemed to have assented to such assumption (or assumption and assignment) or cure. To the extent that the Debtors seek to assume (or assume and assign) an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will (in the applicable notice and/or Schedule): (a) identify the assignee; and (b) provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed (or assumed and assigned), which adequate assurance information will be provided with the notices of proposed assumption (or assumption and assignment).

Subject to cure or adequate assurance of prompt cure, as set forth in section 365(b) of the Bankruptcy Code, assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Obligations or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time prior to the effective date of assumption (or assumption and assignment). **Subject to full satisfaction of Cure Obligations, any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed (or assumed and assigned) shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

The Debtors, the Wind-Down Debtors, or the Plan Administrator may settle any Cure Claim dispute without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that notice of such settlement will be distributed to known counsel of the applicable counterparty by electronic mail.

F.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed (or assumed and assigned) shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Wind-Down Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as is reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on

account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. For the avoidance of doubt, claims in Class 3 will only be paid following the Plan Administrators determination of the appropriate Pro Rata share to be paid to each Holder following the Wind Down.

B.     *Disbursing Agent*

        Distributions under the Plan shall be made by the Disbursing Agent, which, for the avoidance of doubt, may be the Plan Administrator or the Wind-Down Debtors. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

C.     *Rights and Powers of Disbursing Agent*

        1.     Powers of the Disbursing Agent

        The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        2.     Expenses Incurred on or after the Effective Date

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash in accordance with the Wind-Down Budget.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

        1.     Record Date for Distribution.

        On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

        2.     Delivery of Distributions

        Except as otherwise provided herein, the Plan Administrator shall make distributions to Holders of Allowed Claims on the Effective Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Plan Administrator; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

        3.     Minimum Distributions

        Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be settled and enjoined pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claims against the Debtors, the Wind-Down Debtors, or their property.

4.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms he or she believes are reasonable and appropriate.  The Debtors and Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Property deposited into the various Claim distribution accounts described elsewhere in the Plan (including, to the extent applicable, the Post Effective Date Reserve) will be subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations.  All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

F.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment*

Except as expressly provided in the Plan, each Wind-Down Debtor may, pursuant to sections 553 and 558 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Wind-Down Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Wind-Down Debtors.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind-Down Debtors on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or the Wind-Down Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Debtors' Insurance Companies agrees to pay, in full or in part, a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurance Companies' agreement, the applicable portion of such Claim may be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary herein, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article VIII.F hereof shall remain applicable to all general liability claims arising prior to the Petition Date up to any applicable self-insured retention amount under an applicable Insurance Contract, which are self-insured and shall be treated as general unsecured claims.

3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of any applicable Insurance Contract. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurance Companies under any Insurance Contracts, nor shall anything contained herein constitute

or be deemed a waiver by such Insurance Companies of any defenses, including coverage defenses, held by such Insurance Companies.

K.    *Settlement of Greensill Claims*

The Debtors may only settle or resolve the Greensill Claims with the consent of the Committee (such consent not to be unreasonably withheld, conditioned, or delayed).

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Allowance of Claims*

After the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses such Debtor or its Estate had with respect to any Claim or Interest immediately before the Effective Date, including, but not limited to, defenses under section 558 of the Bankruptcy Code.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the authority:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    *Adjustment to Claims without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, canceled, expunged, or otherwise disallowed (including pursuant to the Plan) in whole or in part, may be adjusted or expunged (including on the Claims Register, to the extent applicable) in whole or in part (as applicable) by the Wind-Down Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

29

F.      *Disallowance of Claims*

All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Pursuant to the terms of the Bar Date Order, if Proofs of Claim are not received by the Notice, Claims, and Balloting Agent on or before the Claims Bar Date or the Governmental Bar Date, as applicable, and except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall be barred from asserting such Claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not received by the Notice, Claims, and Balloting Agent before the Bar Date or the Governmental Bar Date, as applicable, and not subject to an exception as set forth above; *provided* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.

G.      *Amendments to Claims*

On or after the applicable Bar Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtors. Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim (as applicable) in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (and, if applicable, a determination of the appropriate Pro Rata amount to pay on account of such claim), the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

J.      *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors, the Wind-Down Debtors, or the Plan Administrator, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Settlement, Compromise, and Release of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    **Release by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Restructuring Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases,**

31

the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (v) Retained Causes of Action, (vi) the Non-Released D&O Claims, (vii) the Non-Released D&O Parties, or (viii) the parties not released as part of the "Non-Released Claims" described and preserved in paragraph 29 of the order entered at Docket No. 414, which paragraph, for the avoidance of doubt, is not modified in any way by the foregoing Release and such claims described therein are not part of this Debtor Release contemplated by the Plan.

D.     *Third-Party Release*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, any of the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Restructuring Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property

under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or Entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

E.    *Exculpation*

Notwithstanding anything herein to the contrary, to the fullest extent permitted under applicable law, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of any Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction*

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released by the Debtors pursuant to the Plan; (c) have been released by third parties pursuant to the Plan; (d) are subject to exculpation pursuant to the Plan; or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as

applicable, the Debtors, Wind-Down Debtors, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to the Plan. Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

G.      *Securities and Exchange Commission Considerations*

Notwithstanding any provision contained herein to the contrary, no provision of the Plan, or any order confirming the Plan, shall (i) release any non-Debtor person or Entity (including any Released Party) from any Claim or Causes of Action of the SEC or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any Claims, Causes of Action, proceedings, or investigations against any non-Debtor person or Entity (including any Released Party) in any forum.

H.      *Protections against Discriminatory Treatment.*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a release), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.       *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

J.       *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order),

shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.   the Bankruptcy Court shall have entered the Confirmation Order;

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the Post-Confirmation Oversight Committee shall have been constituted;

4.   the Reserves shall have been established and funded as set forth herein; and

5.   the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors in their discretion.

B.      *Waiver of Conditions*

The conditions to Consummation set forth in Article IX.A may be waived by the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. §§ 1101 and 1127, shall be deemed to occur on the Effective Date.

D.      *Effect of Nonoccurrence to the Confirmation Date or Effective Date.*

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein and (2) nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or

35

omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption (or assumption and assignment) or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including accrued Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Obligations pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Wind-Down Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

36

7.　　enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.　　enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.　　resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.　　resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.　　resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

13.　　enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.　　determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.　　enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.　　adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.　　consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.　　determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.　　hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.　　hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.　　hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.　　hear and determine all disputes involving the existence, nature, scope, or enforcement of any settlements, exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

23.　　hear and determine all disputes related to any Sale Transaction;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are presumed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Wind-Down Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees and applicable interest payable pursuant to section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred by the Committee and its Professionals. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date except as provided in the prior sentence.

E.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.      *Successors and Assigns*

      The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices*

      To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, all notices, requests and demands shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

            Katerra Inc.
            9305 East Via de Ventura
            Scottsdale, Arizona 85258
            Attention:   Christopher Wells, Chief Restructuring Officer
            E-mail address:  CWells@alvarezandmarsal.com

            with copies (which shall not constitute notice) to:

            Kirkland & Ellis LLP
            601 Lexington Avenue
            New York, New York 10022
            Attention:  Joshua A. Sussberg, P.C. and
            Christine A. Okike, P.C.
            E-mail address:  joshua.sussberg@kirkland.com;
                         christine.okike@kirkland.com

            - and -

            Kirkland & Ellis LLP
            300 North LaSalle Street
            Chicago, Illinois 60654
            Attention: Joshua M. Altman and
            Dan Latona
            E-mail address:  josh.altman@kirkland.com
                         dan.latona@kirkland.com

            - and -

            Jackson Walker L.L.P.
            1401 McKinney Street, Suite 1900
            Houston, Texas 77010
            Attn.:  Matthew D. Cavenaugh, Jennifer F. Wertz, and
            J. Machir Stull
            E-mail address:  mcavenaugh@jw.com
                         jwertz@jw.com
                         mstull@jw.com

      After the Effective Date, the Wind-Down Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at https://cases.primeclerk.com/Katerra or the Bankruptcy Court's website at www.txsb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.    *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.    *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Katerra Inc.
on behalf of itself and Debtor affiliates.

August 26, 2021

By:     */s/ Marc Liebman*
Name:    Marc Liebman
Title:     Chief Transformation Officer

COUNSEL:

Houston, Texas

August 26, 2021

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:     mcavenaugh@jw.com
          jwertz@jw.com
          mstull@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:     joshua.sussberg@kirkland.com
          christine.okike@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:     josh.altman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>EXHIBIT B</u>**

**Recovery Analysis**

**Katerra Inc.**
Disclosure Statement Exhibit
$ in Millions

| Debtor Entity [1] | Distributable Plan Value [2] | | Class 3 (General Unsecured Claims) | | | |
|---|---|---|---|---|---|---|
| | | | Claim Value ($) | | Recovery (%) | |
| | Low Recovery Scenario | High Recovery Scenario | Low Recovery Scenario | High Recovery Scenario | Low Recovery Scenario | High Recovery Scenario |
| Katerra Inc. | 4.76 | 5.37 | 104.40 | 104.40 | 2.3% | 3.2% |
| Katerra Inc. (Cayman) | 8.76 | 25.05 | 481.57 | 111.02 | 1.8% | 22.6% |
| Katerra Construction LLC | 20.10 | 38.37 | 914.04 | 547.06 | 0.5% | 5.1% |
| Katerra Affordable Housing, LLC | 0.00 | 0.02 | 0.31 | 0.31 | 0.4% | 5.0% |
| Bristlecone 28th Ave, LLC | 0.01 | 0.01 | 0.00 | 0.00 | 100.0% | 100.0% |
| Bristlecone Residential, LLC | 0.01 | 0.01 | - | - | -- | -- |
| Edge @ LoHi, LLC | 0.00 | 0.00 | 0.04 | 0.04 | 0.4% | 5.0% |
| Katerra Architecture LLC | 0.01 | 0.10 | 2.06 | 2.06 | 0.4% | 5.0% |
| CAPGro Construction Management, LLC | 0.73 | 0.73 | 1.58 | 1.58 | 32.4% | 32.4% |
| Lord, Aeck & Sargent, Inc. | 1.10 | 1.00 | 0.30 | 0.30 | 0.4% | 5.0% |
| Katerra Engineering LLC | 0.00 | 0.01 | 0.10 | 0.10 | 0.4% | 5.0% |
| Kirkland 2 Project LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.4% | 5.0% |
| Hillsboro 2 Project LLC [3] | - | - | - | - | -- | -- |
| Kirkland 1 Project LLC | 0.00 | 0.00 | 0.03 | 0.03 | 0.4% | 5.0% |
| Hillsboro 1 Project LLC [3] | - | - | - | - | -- | -- |
| Skyview Concrete LLC | 0.24 | 0.24 | 0.36 | 0.36 | 33.9% | 40.8% |
| UEB Builders, Inc. | 2.34 | 3.23 | 32.68 | 32.68 | 0.4% | 5.0% |
| Dangoo Electronics (USA) Co. Ltd. | 0.85 | 0.85 | - | - | -- | -- |
| Valpico Glenbriar Apartments LLC | 0.00 | 0.00 | 0.01 | 0.01 | 0.4% | 5.0% |
| Katerra RO2 Knipe Village Investment LLC | 0.00 | 0.00 | 0.01 | 0.01 | 0.4% | 5.0% |
| All Other Debtors | - | - | - | - | -- | -- |
| **Total** | **$38.91** | **$75.00** | **$1,537.50** | **$799.98** | **1.1%** | **7.4%** |

**Notes:**

(1) Excludes inactive Debtors with no associated distributable plan value or claims.

(2) Excludes secured assets, including cash collateralized by surety bonds held in third-party escrow.

(3) Hillsboro 1 Project LLC and Hillsboro 2 Project LLC have intercompany claims that will receive no recoveries.

**<u>EXHIBIT C</u>**

**Non-Released D&O Parties**

*Non-Released D&O Parties*

| Officer / Director | Position and Nature of Interest | Debtor(s) |
|---|---|---|
| Khan, Nejeeb | | |
| Bhat, Ravi | | |
| Marsh, Matt | | |
| ALVAREZ, TIM | Vice President | Katerra Architecture LLC; Katerra Engineering LLC |
| BURKE, SEAN | PRESIDENT | Dangoo Electronics (USA) Co. Ltd. |
| CAULFIELD, JIM | VP and Authorized Officer | Katerra Construction LLC |
| CAULFIELD, ROB | VP and Authorized Officer | Katerra Construction LLC |
| CURTIS, CRAIG | President/Chief Executive Officer | Lord, Aeck & Sargent, Inc. |
| FELICE, RICK | VP and Authorized Officer | Katerra Construction LLC |
| FIFER, KATHERINE | Treasurer | AlgoSquare Inc.; CAPGro Construction Management, LLC; Dangoo Electronics (USA) Co. Ltd.; Hillsboro 1 Project LLC; Hillsboro 2 Project LLC; Katerra Construction LLC; Katerra Inc.; Katerra Pearson Ranch Investement LLC; Katerra Pegasus RiNo Investment LLC; Katerra RO2 Knipe Village Investment LLC; Katerra XSC Houston Investment LLC; Kirkland 1 Project LLC; Kirkland 2 Project LLC; Lord, Aek & Sargent, Inc.; Roots Software, LLC; UEB Builders, Inc. |
| FRANICH, BRENDAN | Secretary and Director | AlgoSquare Inc.; CAPGro Construction Management, LLC; Dangoo Electronics (USA) Co.; Hillsboro 1 Project LLC; Hillsboro 2 Project LLC; Katerra Affordable Housing, LLC; Katerra Inc.; Katerra Pearson Ranch Investment LLC; Katerra Pegasus RiNo Investment LLC; Katerra RO2 Knipe Village Investment LLC; Katerra XSC Houston Investment LLC; Kirkland 1 Project LLC; Kirkland 2 Project LLC; Lord, Aeck & Sargent, Inc.; Roots Software, LLC |
| FRANICH, BRENDAN | President, Chief Executive Officer, Secretary, and Director | Apollo Technologies, Inc. |
| FRANICH, BRENDAN | Vice President and Director | Katerra Architecture LLC |
| FRANICH, BRENDAN | Director | Katerra Engineering LLC; Valpico Glenbriar Apartments LLC; WM Aviation, LLC |
| FRANICH, BRENDAN | Secretary | UEB Builders, Inc. |
| FRANICH, BRENDAN | Manager | Kirkland 1 Project MM LLC |
| HARVEY, KYLE | President | Lord, Aeck & Sargent, Inc. |
| JAEGERS, ERIC | VP and Authorized Officer | Katerra Construction LLC |
| KEILTY, TOM | VP and Authorized Officer | Katerra Construction LLC |
| KIBSGAARD, PAAL | Director | AlgoSquare Inc.; CAPGro Construction Management, LLC; Hillsboro 1 Project LLC; Hillsboro 2 Project LLC; Katerra Affordable Housing, LLC; Katerra Construction LLC; Katerra Inc. (Cayman); Katerra Pearson Ranch Investment LLC; Katerra Pegasus RiNo Investment LLC; Katerra RO2 Knipe Village Investment LLC; Katerra XSC Houston Investment LLC; Kirkland 1 Project LLC; Kirkland 2 Project LLC; Roots Software, LLC; UEB Builders, Inc.; Valpico Glenbriar Apartments LLC |
| KIBSGAARD, PAAL | President and Director | Dangoo Electronics (USA) Co. Ltd. |
| KIBSGAARD, PAAL | Chief Executive Officer and Director | Katerra Inc. |
| KIBSGAARD, PAAL | Manager and Director | WM Aviation, LLC |
| LANGE, MARK | Vice President | Lord, Aeck & Sargent, Inc. |
| LESCHINSKI, MATTHEW | Director | Skyview Concrete LLC |
| MARKS, MICHAEL | Director | Katerra Inc.; Katerra Inc. (Cayman) |
| MARSH, MATTHEW | Chief Financial Officer | Apollo Technologies, Inc.; CAPGro Construction Management, LLC; Dangoo Electronics (USA) Co. Ltd.; Katerra Construction LLC; Lord, Aeck & Sargent, Inc.; Roots Software, LLC |
| MARSH, MATTHEW | Director | Katerra Inc.; Katerra RO2 Knipe Village Investment LLC; Katerra XSC Houston Investment LLC; Kirkland 1 Project LLC; UEB Builders, Inc. |
| MARSH, MATTHEW | Manager and Director | Katerra Pearson Ranch Investment LLC |
| MARSH, MATTHEW | Manager | Kirkland 1 Project MM LLC; Kirkland 2 Project LLC; WM Aviation, LLC |
| OBRIEN, JAMES SCOTT | Vice President | Lord, Aeck & Sargent, Inc. |
| PICARD, LISA | Director | Katerra Inc. (Cayman) |
| REED, KATRINA | Vice President | Katerra Architecture LLC; Katerra Engineering LLC |
| SMITH, GREG | VP and Authorized Officer | Katerra Construction LLC |
| SMITH, ZACH | Director and Officer | Bristlecone 28th Ave, LLC; Bristlecone Residential, LLC; Edge @ LoHi, LLC |
| WATSON, WILLIAM | Vice President | Katerra Engineering LLC |
| WEAVER, KYLE | VP and Authorized Officer | Katerra Affordable Housing, LLC |
| YEUNG, ALAN | Director | Katerra Inc. (Cayman) |